**ORAL ARGUMENT NOT YET SCHEDULED**

Docket Nos. 24-1028 and 24-1029 (Consolidated)

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

TOWN OF EAST HAVEN, CT and SAVE THE SOUND, INC., *Petitioners*,

---v.---

FEDERAL AVIATION ADMINISTRATION, et al., *Respondents*, and

TWEED NEW HAVEN AIRPORT AUTHORITY and AVPORTS, LLC,
*Intervenors*.

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL AVIATION ADMINISTRATION

_____

**JOINT BRIEF FOR PETITIONERS**
_____

| | |
|---|---|
| JAMES T. SHEARIN, Esq. | ROGER REYNOLDS, Esq. |
| DANA M. HRELIC, Esq. | JESSICA ROBERTS, Esq. |
| Pullman & Comley LLC | DARA ILLOWSKY, Esq. |
| 90 State House Square | Save the Sound |
| Hartford, CT 06103 | 127 Church Street, 2d Floor |
| Tel: 860-424-4382 | New Haven, CT 06510 |
| jtshearin@pullcom.com | Tel: 203-787-0646 |
| dhrelic@pullcom.com | rreynolds@savethesound.org |
| | jroberts@savethesound.org |
| *Counsel For Petitioner Town of East Haven* | dillowsky@savethesound.org |
| | *Counsel For Petitioner Save the Sound, Inc.* |

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

Petitioner Save the Sound is a nonprofit organization whose mission is to protect and improve the land, air, and water of Connecticut and the entire Long Island Sound region. Save the Sound brings this action on behalf of its members who live and recreate in the vicinity of Tweed-New Haven Airport.

Petitioner Town of East Haven is home to over 27,000 residents that together comprise a tightly knit shoreline community. The vast majority of the Tweed Airport expansion consists of planned expansion within The Town. The Town is considered a "Distressed Municipality" by the State of Connecticut (the "State") and, as such, is automatically considered an "Environmental Justice Community" by the State and entitled to special protections. Connecticut General Statutes § 32-9p.

Federal Respondent the Federal Aviation Association ("FAA") is the lead federal agency responsible for the accuracy, scope, and content of environmental documents prepared in preparation for the project, and Michael G. Whitaker serves as the administrator of the FAA (together, the "Respondents").

Intervenor for Respondent, Tweed-New Haven Airport Authority ("the Airport Authority"), is the sponsor of the Tweed-New Haven Airport ("HVN") and the proponent of the original expansion program. The Airport Authority has entered into agreements that have the effect of largely delegating to Intervenor for

Respondent Avports LLC ("Avports") the authority to manage, supervise, and operate HVN Airport (together, the "Intervenors").

## B. Rulings Under Review

On December 11, 2023, the responsible FAA Official signed the Final Environmental Assessment ("FEA") prepared by the Airport Authority. On December 21, 2023, it issued a Finding of No Significant Impact ("FONSI") and Record of Decision ("ROD") for the proposed Runway 02-20 Extension and Terminal Expansion project at Tweed New Haven Airport ("the Proposed Action"). The FEA begins on page 1444 of the Administrative Record. The FONSI and ROD begins on page 8912 of the Administrative Record.

## C. Related Cases

The present consolidated petitions on review have not previously been heard by this Court or any other Court. Counsel is unaware of any related cases currently pending in this Court or any other Court.

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Proc. 26.1(a) and D.C. Cir. R. 26.1(a) and 28(a)(1), Petitioner Save the Sound respectfully submits the following corporate disclosure statement: Save the Sound has no parent corporation, nor does any person or corporate entity own ten percent or more of Save the Sound.

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**..................................................................................................i

    **A.   Parties and Amici** ...............................................................i

    **B.   Rulings Under Review** .................................................... ii

    **C.   Related Cases** ................................................................... ii

**DISCLOSURE STATEMENT** ........................................................... iii

**TABLE OF CONTENTS** ...................................................................iv

**TABLE OF AUTHORITIES**[*] ...........................................................vi

**GLOSSARY OF ABBREVIATIONS** ............................................. viii

**JURISDICTIONAL STATEMENT**....................................................1

    **A.   The Basis for Federal Aviation Administration Jurisdiction.** ........1

    **B.   The Basis for the Court of Appeals' Jurisdiction.**............................1

**STATEMENT OF ISSUES** .................................................................1

**STATUTES AND REGULATIONS** ..................................................2

**STATEMENT OF THE CASE** ...........................................................2

    **A.   Facts Relevant to the Issues**..............................................2

        *1.   Project History*................................................2

        *2.   The Ruling Presented for Review*................3

    **B.   Relevant Procedural History**.............................................3

**SUMMARY OF ARGUMENT**...........................................................4

**STANDING**..........................................................................................6

    **A.   Petitioner the Town of East Haven has Standing.**............................6

    **B.   Petitioner Save the Sound has Standing.** ..........................8

**ARGUMENT** .....................................................................................10

    **I.   Standard of Review** .......................................................10

    **II.   NEPA Statutory and Regulatory Scheme** .....................12

**III.   FAA Violated NEPA by Improperly Segmenting Connected and Interdependent Pieces of the Project and by Failing to Take a Hard Look at Cumulative Impacts.**........................14

    **A.   Standard of Review** ......................................................14

    **B.   Additional Facts**............................................................14

C.      **FAA Improperly Segmented NEPA Review of the Proposed Action by Omitting Review and Consideration of the Taxiway Reconfiguration.** ....................................................19

D.      **FAA Unlawfully Failed to Take the Requisite Hard Look at Cumulative Impacts.** ....................................................27

     i.      FAA Unlawfully Failed to Consider Impacts from Reasonably Foreseeable Future Action. ..................................29

     ii.      FAA Unlawfully Failed to Consider Impacts From a Past Action. ....................................................35

IV.      **The FEA and FONSI/ROD Improperly Rested on Unsupported and Internally Inconsistent Reasoning About Current and Projected Enplanements and Thus Failed to Take the Requisite "Hard Look" at the Proposed Impacts in Violation of NEPA.** ...............37

     A.      **Standard of Review** ....................................................37

     B.      **Additional Facts** ....................................................37

     C.      **Argument** ....................................................41

V.      **The FONSI is Not Supported in the Record Because the FEA Fails to Take the Requisite Hard Look at Localized Flooding, Stormwater Pollution, and Wetlands Impacts.** ....................................................51

     A.      **Standard of Review** ....................................................51

     B.      **Additional Facts** ....................................................51

     i.      The Project Site & Conditions ....................................................51

     ii.      Proposed Action ....................................................53

     iii.      Legal Standards ....................................................54

     C.      **Argument** ....................................................56

     i.      FAA Failed to Adequately Analyze and Mitigate Localized Flooding. ....................................................57

     ii.      FAA Failed to Adequately Analyze and Mitigate Stormwater Pollution Impacts ....................................................60

     iii.      FAA Failed to Adequately Analyze and Mitigate Impacts on Wetlands ....................................................63

**CONCLUSION** ....................................................66

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS** ..................68

**CERTIFICATE OF SERVICE** ....................................................69

**ADDENDUM** ....................................................AD1

**Cases**

*Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209 (D.C.Cir. 1983) ................13

*Air Transport Ass'n of America v. Dep't of Transp.*, 119 F.3d 38 (D.C.Cir. 1997)37

*Am. Rivers v. FERC*, 895 F.3d 32 (D.C.Cir. 2018) ................................... 55, 56, 62

*ANR Storage Company v. FERC*, 904 F.3d 1020 (D.C.Cir. 2018).................. 37, 50

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934 (9th Cir. 2005) ....................9

*\*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87 (1983)................ 10, 29, 34, 37

*Barnes v. U.S. DOT*, 655 F.3d 1124 (9th Cir. 2011). ................................ 46, 47, 48

*Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109
(D.C.Cir. 1971) ..........................................................................................56

*City of Olmsted Falls, OH v. FAA.*, 292 F.3d 261 (D.C.Cir. 2002) ..........................6

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C.Cir. 2014)10, 11, 14, 19,
20, 27, 32, 37, 41, 51

*EarthReports, Inc. v. FERC*, 828 F.3d 949 (D.C.Cir. 2016) ..................................13

*\*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C.Cir. 2002) ................... 13, 28, 32

*Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45 (D.C.Cir. 1988)...........................9

*Hunt v. Wash. State Apple Advertising Com'n.*, 432 U.S. 333 (1977) ...................10

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ....................42

*Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F.Supp.2d 1249 (D. Wyo. 2004). ....43

*Izaak Walton League of America v. Marsh*, 655 F.2d 346 (D.C.Cir. 1981)..... 29, 36

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)........................................................19

*Marin Audubon Soc. v. FAA*, No. 23-1067, 2024 WL 4745044 (D.C.Cir. Nov. 12,
2024) ............................................................................................... 20, 36

*Mayo v. Reynolds*, 875 F.3d 11 (D.C.Cir. 2017) .....................................................10

*Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C.Cir. 2008)..... 11, 12

*Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998)..............47

*Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7 (2d Cir. 1997). ......................... 55, 60

*Nat'l Parks & Conservation Ass'n v. U.S. Dept. of Transp.*, 222 F.3d 677 (9th Cir.
2000) ........................................................................................................47

*Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th
Cir. 2011) ..................................................................................................33

*NRDC v. Hodel*, 865 F.2d 288 (D.C.Cir. 1988).....................................................20

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C.Cir. 2007) ..................................9

*Scientists' Inst. For Pub. Info, Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079
(D.C.Cir. 1973) ........................................................................................13

*Seattle Cmty. Council Fed'n v. FAA*, 961 F.2d 829 (9th Cir. 1992) ......................47

*\*Sierra Club v. FERC*, 867 F.3d 1357 (D.C.Cir. 2017). 8, 11, 12, 55, 56, 62, 63, 64

*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C.Cir. 2015) .. 13, 32
*Sierra Club v. US Dep't of Energy*, 867 F.3d 189 (D.C.Cir. 2017) ........................13
*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973). ......................................................14
*Siskiyou Regional Educ. Project v. Rose*, 87 F.Supp.2d 1074 (D. Or. 1999).........41
*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C.Cir. 2006) ................................................................................ 12, 28, 32, 35, 36
*Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65 (2d Cir. 2019)............45
*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)................................................................................................7
*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519 (1978) ........... 13, 59
*\*WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41 (D.D.C. 2019) ....... 8, 11, 12, 42
*Wyoming Outdoor Council v. U.S. Army Corps of Engineer*s, 351 F.Supp.2d 1232 (D. Wyo. 2005).................................................................................................55

**Statutes**
42 U.S.C. § 4332 ................................................................. 28, 31, 32, 63
42 U.S.C. § 4332(2)(C).............................................................................12
42 U.S.C. §§ 4332(D)-(E)................................................................. 11, 41
42 U.S.C. §§ 4336(2)(B)-(C) ....................................................................43
5 U.S.C. § 706................................................................................ 29, 34, 37

**Regulations**
40 C.F.R. § 1500.1(a) (2023)...................................................................13
40 C.F.R. § 1501.3(b) ..............................................................................25
40 C.F.R. § 1501.3(b) (2023)...................................................................20
40 C.F.R. § 1501.9(e)(1).................................................................... 20, 25
40 C.F.R. § 1508.1(aa) (2023) .................................................................32
40 C.F.R. § 1508.1(g) (2023)............................................................ 28, 32, 63
40 C.F.R. § 1508.1(i) ........................................................................ 12, 46

\* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ACIP | Airport Capital Improvement Plan |
| ALP | Airport Layout Plan |
| AR_1 | Administrative Record at page 1 |
| HVN | Tweed New Haven Airport |
| DEA | Draft Environmental Assessment |
| EIS | Environmental Impact Statement |
| FAA | Federal Aviation Administration |
| FEA | Final Environmental Assessment |
| FEMA | Federal Emergency Management Agency |
| FONSI | Finding of No Significant Impact |
| MPU | Master Plan Update |
| NEPA | National Environmental Protection Act |
| ROD | Record of Decision |
| TNHAA | Tweed New Haven Airport Authority |

# JURISDICTIONAL STATEMENT

## A. The Basis for Federal Aviation Administration Jurisdiction.

FAA's jurisdiction arises out of 49 U.S.C. §§ 47101(a)(7), 40103(b), and 44502(a). FAA issued the "Finding of No Significant Impact and Record of Decision for Runway 02-20 Extension and Terminal Expansion Project of Tweed New Haven Airport, New Haven, Connecticut" ("FONSI/ROD"), the Final FAA Order reviewed here, pursuant to FAA Orders 1050.1F and 5050.4B.

## B. The Basis for the Court of Appeals' Jurisdiction.

Any final action or order issued by the Administrator of FAA with respect to aviation safety duties and powers designated to be carried out by the Administrator under Title 49, Part A is reviewable by this Court under 49 U.S.C. § 46110(a).

# STATEMENT OF ISSUES

1. Whether FAA violated NEPA by (a) improperly segmenting necessarily connected pieces of the project, and (b) failing to take a hard look at cumulative impacts.

2. Whether the FEA and FONSI/ROD improperly rested on unsupported and internally inconsistent reasoning about current and projected enplanements, distorting their analysis of noise, air quality, and climate change, in violation of NEPA's "hard look" requirement.

1

3. Whether FAA failed to meaningfully analyze and mitigate localized flooding, stormwater pollution, and wetlands impacts, in violation of NEPA's "hard look" requirement.

## STATUTES AND REGULATIONS

Applicable statutes and regulations are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Facts Relevant to the Issues

#### 1. *Project History*

In October 2021, the Tweed-New Haven Airport ("HVN") issued its Master Plan Update Final Report detailing a proposed approximately $165 million expansion of the many aspects of the Airport's facilities. AR_12293. The 2021 Master Plan Update ("MPU") included upgrades to the Airport and related facilities over a period of four phases. AR_12292. Phase One, projected for 2022-2026, included extensions to Runway 2-20, taxiway reconfiguration, construction of a new terminal building and apron, and all related land acquisition and mitigation measures. AR_12292.

In March 2023, TNHAA released a draft Environmental Assessment ("DEA") for the Proposed Action. AR_7. The DEA stemmed from the MPU but included only two of its recommendations: the Runway 02-20 extension and the construction of a new terminal. AR_26, 30. Thereafter, Petitioners, along with agencies and experts,

2

submitted extensive public comments, emphasizing that the DEA does not provide a sufficient basis for a FONSI and that an Environmental Impact Statement ("EIS") is required under NEPA instead. AR_5529.

2. *The Ruling Presented for Review*

Despite the receipt of these comments, FAA signed the FEA on December 11, 2023. AR_1444. The FEA mirrored the DEA. On December 21, 2023, the FAA issued FONSI/ROD for the Proposed Action. AR_8936. The impact of FAA's decision means that the Airport "may begin to implement the Proposed Project." AR_8913. FAA's conclusions, as represented in the FEA and the FONSI/ROD, are the subject of this appeal. Additional facts will be set forth as necessary below.

## B. Relevant Procedural History

Following publication of the FEA on December 11, 2023, and the FONSI/ROD on December 21, 2023, the Petitioners timely filed separate Petitions for Review on February 14, 2024. The Petitions were consolidated by the Court on February 20, 2024. After that consolidation, both the Airport Authority and Avports separately moved to intervene for Respondents, which motions were granted by the Court on June 5, 2024.

<u>**SUMMARY OF ARGUMENT**</u>

This case involves FAA's complete failure to meaningfully analyze and mitigate the significant impacts of the runway and terminal expansion of an airport that is located almost entirely in a floodplain in a residential, Environmental Justice neighborhood. Though the inadequacies of the DEA were pointed out in great detail by Petitioners and multiple federal and state agencies, some of whom had jurisdiction over the activities at issue, FAA effectively ignored these comments and re-issued their original defective document as an FEA.

While a new parallel full-length taxiway is necessary as a matter of safety and compliance with FAA Standards (and, as such, was included in, and recommended by, the MPU), it was not included in the FEA either as part of the plan or as a foreseeable cumulative impact. By segmenting NEPA review of this connected element and failing to describe its cumulative impacts in its analysis of the Proposed Action, FAA avoided addressing the filling of tidal wetlands, which is undisputedly a high environmental impact activity.

Moreover, while an extended runway will allow for larger and more frequent flights, and while the New Haven region has been described as one of the most underserved air travel markets in the country, FAA conducted its impacts analysis on the premise that there would not only be **no increase** in flights as compared to the No Action scenario, but, in fact, there would be a decrease in flights. In reaching

4

this remarkable conclusion, FAA failed to explain its reasons for ignoring the demand-inducing impact of the runway extension despite numerous comments requesting that it do so. This flawed assumption distorts any conclusion reached with respect to how increased flights will impact noise, air quality, and climate change. Two federal agencies, EPA—which has experience and expertise on air quality impacts—and DHHS, were among those that called on FAA to change this critical flawed assumption. Their calls went unanswered.

The FEA also manifestly failed to meaningfully analyze localized flooding, stormwater pollution, and wetlands impacts, again despite extensive expert commentary demonstrating the necessity to do so. The "analysis" of flooding basically came down to a statement that 61,000 CY of fill would be offset by 90,000 CY of proposed cut. Yet there was no further analysis of the grading and localized conditions necessary to understand whether localized flooding events would occur. Given that the surrounding neighborhoods are part of the same 100-year flood zone as HVN, and that residents of these neighborhoods will be put in harm's way, a meaningful analysis is necessary in this era of rising sea levels.

The FEA was similarly vague and inadequate in its discussion of potential stormwater and wetland impacts and mitigation. There was no detail proposed as to potential stormwater detention systems, and there was no response to comments by government agencies and experts pointing out that stormwater would impact

flooding, wetlands, and water quality, and that siting stormwater management systems would be difficult given the high ground water levels. Finally, with respect to wetlands, the FEA basically acknowledged that harm cannot be mitigated on-site. FAA proposed a series of off-site mitigation measures but even there, provided no detail as to what those may be.

### STANDING

**A. Petitioner the Town of East Haven has Standing.**

The vast majority of the Proposed Action consists of a planned expansion and relocation of facilities currently located in the City of New Haven to the Petitioner, the Town of East Haven ("the Town"). This includes one end of an extended runway and ancillary access to the runway; a new terminal facility with four gates and two additional boarding positions; new parking facilities (including a multi-story garage) with at least 4,000 additional parking spaces; and a new access road and primary access route through the Town. The Town, including the federally recognized Environmental Justice areas, will be directly harmed by the Proposed Action.

In *City of Olmsted Falls, OH v. FAA*, 292 F.3d 261, 268 (D.C.Cir. 2002), this Circuit found standing "for a city suing an arm of the federal government when a harm to the city itself has been alleged." The Town has alleged, supported by the Reports generated by three independent consulting firms, with an affidavit from the Town Mayor, that, as a direct result of the Proposed Action, the Town will suffer

direct environmental and other harms. The environmental impacts that will occur as a direct result of the Proposed Action include that the tidal and inland wetlands located within the Town will suffer detrimental harms, the likelihood of improperly treated stormwater will increase, there will be material and adverse impacts on the Town's floodplain causing increased flooding, and the Town's air quality will be degraded. The Town's ability to perform its essential functions will be negatively affected. The proposed changes to the roadways, coupled with an anticipated overall increase in traffic, will require an increased police presence and inhibit the Town's emergency and service responses, which will be further adversely affected by the increase in severe flooding. The Town expects that the far-reaching impacts of the expansion may result in loss of residents and business from the Town, ultimately leading to decreased revenues for the Town. Ultimately, the requisite injury in fact to the Town itself is undeniable and imminent, and, therefore, the Town has established the requisite standing to sue.

Alternatively, the Town asserts that its co-Petitioner, Save the Sound, has alleged a sufficient personal stake in the outcome of this controversy to establish standing, and "[b]ecause of the presence of this [petitioner], [the court] need not consider whether the other...[petitioners] have standing to maintain the suit." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 n.9 (1977).

**B. Petitioner Save the Sound has Standing.**

Save the Sound has standing to bring this appeal on behalf of its members because (1) at least one of its members "would have standing to sue in her own right" (including constitutional and prudential standing), (2) Save the Sound "is suing to vindicate interests 'germane to its purpose,'" and (3) neither "the claim asserted or the relief requested requires that an individual member to be a party." *See Sierra Club v. FERC*, 867 F.3d 1357, 1365 (D.C.Cir. 2017).

First, its members would have constitutional standing, which requires demonstration of an injury in fact that is fairly traceable to the FAA's actions and would likely be redressed by a favorable decision. *Id.* (citations omitted); *see also WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 63 (D.D.C. 2019). As demonstrated in the four attached affidavits, members of Save the Sound live within 1.5 miles of HVN, and they have suffered concrete and particularized injuries from the noise and air quality impacts caused by HVN's operation. The record reflects that the Proposed Action would increase noise, flight traffic, air pollution, wetlands and water pollution, and flooding, which would impact the health, safety, and welfare of these members. Because an adequate EA or EIS has not been prepared, these impacts have not been fully studied or mitigated. This failure injured Save the Sound's members, and their injuries would be redressed by this Court remanding the FONSI/ROD to ensure that it is fully informed by a proper NEPA analysis.

Its members also have prudential standing, which is established when a party's grievance falls within the zone of interest protected or regulated by the statutory provision invoked in the suit. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 600 (D.C.Cir. 2007). The zone of interest that NEPA protects is environmental. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939-40 (9th Cir. 2005). Save the Sound's members have demonstrated a substantial interest in the FONSI/ROD because of the impact that it would have on the environment—specifically, on air quality, noise, water quality, and flooding. Their interest in these environmental issues is rooted in the noise, pollution, and flooding impacts that they have, and will continue to experience because of HVN's operation. They will suffer further environmental injuries from FAA's failure to analyze and mitigate these environmental impacts.

Second, the interests that Save the Sound seeks to protect are germane to its purpose and mission, which is to protect and improve the land, air, and water in the Long Island Sound region. Save the Sound seeks here to maintain the air and water quality in and around the Project Site and to protect surrounding communities from adverse environmental impacts of airport development that remain inadequately analyzed and mitigated. *See Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58-59 (D.C.Cir. 1988).

Finally, neither the claims asserted, nor the relief requested requires an individual member to participate in this litigation. Save the Sound's claims do not require any individualized proof and can be resolved in a group context. *See Hunt v. Wash. State Apple Advertising Com'n.*, 432 U.S. 333, 344 (1977). This satisfies the third and final prong for associational standing, demonstrating that Save the Sound has standing to bring its petition for review.

## ARGUMENT

### I. Standard of Review

Judicial review of agency actions under NEPA is available "to ensure that the agency has adequately considered and disclosed the environmental impact of its action and that its decision is not arbitrary or capricious." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1312-13 (D.C.Cir. 2014) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983)). "The APA requires that [courts] 'hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C.Cir. 2017). An agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Del. Riverkeeper Network*, 753 F.3d at 1313 (internal quotations omitted).

An "agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.'" *Id*. This Court has employed such "rule of reason" in determining whether an agency's NEPA analysis is sufficient. *See Sierra Club*, 867 F.3d at 1368; *WildEarth Guardians*, 368 F.Supp.3d at 58 (applying a "rule of reason" in reviewing an agency's decision not to issue an EIS). This "rule of reason" requires courts to consider whether an analysis under NEPA contains deficiencies that are "significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club*, 867 F.3d at 1368. NEPA further requires that federal agencies "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," and "make use of reliable data and resources…." 42 U.S.C. §§ 4332(D)-(E).

In order to issue a FONSI/ROD on the basis of only an EA and not an EIS, FAA must either conclude that "there would be no significant impact or have planned measures to mitigate such impacts." *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C.Cir. 2008). In determining whether the agency properly declined to prepare an EIS, the Court must determine "whether the agency '(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an

impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Id.* (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C.Cir. 2006)); *see also WildEarth Guardians*, 368 F.Supp.3d at 64 (holding that BLM violated NEPA by failing to take a "hard look" at drilling-related and downstream greenhouse gas emissions from leased parcels of land).

## II. NEPA Statutory and Regulatory Scheme

NEPA requires agencies to identify and discuss the significance of direct, indirect, and cumulative environmental impacts caused by an agency action. 42 U.S.C. § 4332(2)(C); AR_9417; *Sierra Club*, 867 F.3d at 1371. FAA guidance adopts the CEQ definition of impacts, including "direct impacts" (those that "occur at the same time and place"); indirect impacts (those that are "later in time or farther removed in distance, but are still reasonably foreseeable"); and cumulative impacts (those that "result from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions, whether Federal or non-Federal"). AR_9417 (citing 40 C.F.R. § 1508.1(i)).

Impacts are "reasonably foreseeable" if they are "'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club*, 867 F.3d at 1371 (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C.Cir. 2016)). "In determining what effects are 'reasonably

foreseeable,' an agency must engage in 'reasonable forecasting and speculation.'" *Sierra Club v. US Dep't of Energy*, 867 F.3d 189, 198 (D.C.Cir. 2017) (quoting *Scientists' Inst. For Pub. Info, Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C.Cir. 1973)). Agencies cannot "avoid drafting an impact statement simply because describing the environmental effects...involves some degree of forecasting." *Scientists' Inst. For Pub. Info, Inc.*, 481 F.2d at 1092.

In analyzing impacts, the agency must allow for meaningful engagement of the public by considering and responding to public comments on the Draft EA. *See* AR_9408; *see also Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C.Cir. 2015); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C.Cir. 2002); *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C.Cir. 1983). A core goal of NEPA is to educate the public and decisionmakers on the potential environmental impacts of a proposed action and to ensure "fully informed and well-considered decision[making]" through the public comment process. *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 558 (1978); *see also* 40 C.F.R. § 1500.1(a) (2023). Where commenters, and particularly "responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973).

**III. FAA Violated NEPA by Improperly Segmenting Connected and Interdependent Pieces of the Project and by Failing to Take a Hard Look at Cumulative Impacts.**

**A. Standard of Review**

Judicial review of agency actions under NEPA must ensure that the agency's decision "is not arbitrary or capricious." *Del. Riverkeeper Network*, 753 F.3d at 1312-13; *see also supra* pp. 11-13 (agency must take "hard look" at environmental impacts in deciding not to prepare EIS).

**B. Additional Facts**

For decades, HVN has operated as a small, non-hub airport, with aircraft departing from it roughly several times per day. *See* AR_12287, 12301-02, 12360. In October 2021, however, the TNHAA proposed significant expansion of the airport in its MPU,[1] including an extension of Runway 02-20 and a reconfiguration of the taxiways at HVN. *See* AR_12271, 12507. The runway extension would accommodate greater demand and larger planes—the taxiway reconfiguration is, and would continue to be, necessary to align the runway extension with FAA Standards ("Standards"). *See* AR_12346, 12436, 12451, 12489. These Standards "establish[] an acceptable level of safety, efficiency, and capacity when designing and implementing airport development projects." AR_10749. Use of Standards

---

[1] The Master Plan is "the official FAA airport planning document," updated to "evaluate the changing needs of HVN" and "identif[y] necessary improvements" to it. AR_12287-88.

14

"ensure[s] that facilities can safely accommodate aircraft." AR_12434. For projects funded under the Airport Improvement Program (AIP), these Standards are mandatory. AR_10749.

To meet Standards applicable to HVN,[2] its runway centerline and parallel taxiway must be separated by 400 feet.[3] AR_11077, 12446. Additionally, the parallel taxiway must extend the full length of the runway. AR_10896. Critically, HVN currently does not meet these Standards. AR_12451. While Runway 02-20 (HVN's sole active runway) contains two parallel partial taxiways, neither extends the full length of the runway, and both taxiways are less than 400 feet to the runway centerline. AR_12446-47.

To meet the Standards, HVN's MPU established "Facility Requirements" for the Airport that call for "standard taxiway geometries," including standard runway-taxiway centerline separation. AR_12289-90, 12446-51. For this reconfiguration, the MPU evaluated the construction of a full-length parallel taxiway on the east side of Runway 02-20 and a partial parallel taxiway on this runway's west side

---

[2] "The selection of appropriate [Standards] is based on the characteristics of the most demanding aircraft expected to use an airport...on a regular basis (500 operations per year)." AR_12434. The "most demanding group of aircraft to utilize [HVN] at least 500 times...is AAC-ADG C/D-III." AR_12379. The "design aircraft will continue to be a C/D-III for the Airport throughout the planning period." AR_12380.

[3] This standard is based on the Aircraft Design Group (ADG III for HVN) and is set forth in the FAA Advisory Circular 150/5300-13B, FAA Standards & Recommendations for Airport Design. AR_10749, 10875.

(collectively, the "Taxiway Reconfiguration"). AR_12489-90. The MPU shows a map of the Taxiway Reconfiguration's layout. AR_12491, 12509. The MPU did not identify any other alternatives.[4] AR_12489-90.

Importantly, the MPU noted that the environmental impact of this reconfiguration would be "high" (on a scale ranging from high, moderate, minor, and none). AR_12474, 12489. For one, it would necessitate either paving or bridging over part of Morris Creek—a tidally-influenced watercourse that provides habitat for protected species and drains to a nearby Ecologically Sensitive Area. *See* AR_12400-12401, 12405, 12509. Second, it would involve paving over a portion of the tidal/estuarine and riverine wetlands along this creek, which also provide habitat and other critical functions. AR_7859, 12398-12401, 12404, 12509. Finally, it would involve adding over 300,000 sq. ft. of impervious surface,[5] which contributes to water quality degradation and flooding. *See* AR_5633, 5648, 12509.

Notwithstanding these impacts, the MPU recommended its construction "accompany the recommended runway extensions" because it would meet Standards and Facility Requirements (and is the only option provided for doing so). AR_12489-90. This recommendation was included in the Airport Layout Plan

---

[4] The only potential alternative is a "no build" option, which would not meet Standards or Facility Requirements, and was thus not recommended. AR_12475-76.

[5] This was calculated by multiplying the necessary width for the taxiway (50') by the length of additional proposed taxiway (6,635') as a conservative estimate of the amount of additional impervious surface. AR_12446, 12509.

("ALP")[6] along with the runway extension. AR_12515. A proposed schedule and budget for implementing projects on the ALP is set forth in a "Phasing Plan." AR_12520-22. In this plan, projects are phased "to prioritize addressing immediate needs in Phase I (1-5 years)," medium term projects in Phase II (6-10 years), and long-term projects in Phase III (11-20 years) and Phase IV (beyond 20-year planning period). AR_12292-93. Notably, each phase of this plan calls for and includes the design and/or construction of a component of the Taxiway Reconfiguration. *Id.* Additionally, each component of the Taxiway Reconfiguration is expected to receive federal funding through FAA's AIP, which would, as mentioned above, make meeting the Standards mandatory. *See* AR_10749, 12520-22.

In November 2021, shortly after the MPU was released, a new carrier, Avelo Airlines, began serving HVN. AR_1459, 1463. By Summer 2022, the number of aircraft departures from HVN had increased dramatically. *Compare* AR_12360 & 1459. Specifically, Avelo's aircraft departed from HVN at an average rate of twelve times per day, constituting a marked increase from the rate in years prior. *See id.* Consistent with the MPU, a DEA was prepared in 2023 for the extension of Runway 02-20 and construction of a new terminal building ("Proposed Action"). AR_25-26.

---

[6] The ALP is "the approved planning document" for HVN, which FAA uses to allocate federal grant funding. AR_12515.

However, no part of the Taxiway Reconfiguration was included in this Proposed Action. *See id.*

The DEA's cumulative impacts analysis, which is used to analyze the impacts of other past, present, and proposed, and reasonably foreseeable actions, listed the Taxiway Reconfiguration as a "future project[] at HVN." AR_195-202. However, it mentioned no impacts from it (contrary to the MPU's categorization of its environmental impact as "high"). AR_195-202, 12489. Additionally, it failed to mention the entry of Avelo Airlines as a past action. AR_195-202. Notwithstanding this, the DEA found the Proposed Action, when combined with future projects, would not result in a significant impact. AR_195-202.

In comments on the DEA, the EPA noted that the "recent past impacts from rapid growth at the airport (associated with the entry of Avelo) are an important part of the cumulative impact equation primarily because they are the catalyst for the proposed runway extension/terminal expansion work." AR_1751. Petitioners also emphasized that FAA must assess the impact of Taxiway Reconfiguration in conjunction with the runway expansion, stating that the Taxiway Reconfiguration is foreseeable, if not inevitable. AR_5068-70, 5613-18, 5888-89.

FAA responded that the taxiway reconfiguration is a "separate action" with "independent utility." AR_2046. In the FEA, the cumulative impacts analysis of the Taxiway Reconfiguration remained unchanged, failing again to mention any impacts

from it. *See* AR_1640-48. While the FEA added the "entry of Avelo Airlines" as a past action, it also failed to mention consideration of any of its past impacts. *See id.*

**C. FAA Improperly Segmented NEPA Review of the Proposed Action by Omitting Review and Consideration of the Taxiway Reconfiguration.**

It is well settled that "[a]n agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network*, 753 F.3d at 1313. Under NEPA, "proposals for...actions that will have cumulative or synergistic environmental impact upon a region...pending concurrently before an agency...must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

FAA defines "connected actions" as closely related actions that:

(a) Automatically trigger other actions;

(b) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(c) Are interdependent parts of a larger action and depend on the larger action for their justification.

AR_9404; *see also* 40 C.F.R. § 1501.9(e)(1).[7]

When considering whether two or more components of a larger project are interdependent for the purposes of a NEPA review, this Court considers whether there is a "physical, functional, or temporal nexus between the projects." *Del. Riverkeeper Network*, 753 F.3d at 1308. The rule against segmentation is a long-standing one that "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C.Cir. 1988); *Del. Riverkeeper Network*, 753 F.3d at 1313.

The record in the present matter demonstrates that FAA improperly segmented NEPA review of the interdependent and connected elements of the Proposed Action. As described by FAA, the Proposed Action includes only the extension of Runway 02-20 and the construction of a new East Terminal building.

---

[7] The CEQ Regulations define "connected actions" nearly identically. They also provide that an agency, "[i]n considering whether the effects of the proposed action are significant…shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions…." 40 C.F.R. § 1501.3(b) (2023).

Three days before the filing of this brief, a panel of this Court issued a split opinion in *Marin Audubon Soc. v. FAA*, No. 23-1067, 2024 WL 4745044, at *3 (D.C.Cir. Nov. 12, 2024), holding that the CEQ Regulations are *ultra vires*. While Petitioners cite primarily to the applicable FAA Orders, they also rely upon the CEQ Regulations, which similarly support their argument. That being said, *Marin Audubon Soc.* does not affect Petitioners' arguments in this case, as the FAA has internally adopted essentially identical guidelines and the binding common law of this Circuit supports its position.

AR_1463-64. It does *not* include the actions necessary to make that runway extension fully safe, functional, and compliant with FAA Standards, as expressly discussed in the MPU and depicted in the ALP. *See* AR_12489-90, 12515. Specifically, it does not include the Taxiway Reconfiguration as an interdependent element of completing the improvements to HVN. But without the full-length parallel taxiway, Runway 02-20 lacks a basic safety component. This is a critical omission in the Proposed Action.

As discussed above, the runway and taxiways as they are currently situated are *not* in compliance with FAA Standards. The MPU acknowledges this deficiency in the current design and placement of the runway and taxiways; AR_12446; and it specifically recommends that a new full-length parallel taxiway be designed and constructed *with* the recommended runway extension in order to bring them into FAA compliance. AR_12489. It explained that "[a] full-length parallel taxiway provides improved flexibility from an operational standpoint by allowing aircraft to maintain clear of the runway environment and exit at optimal points to minimize runway occupancy time." *Id.*

Without reconstruction of a new full-length parallel taxiway, there will be no correction to the nonstandard runway-taxiway separation of less than 400 feet that exists now. In fact, the situation will be worse because the extended runway will now be at least 639 feet longer than the existing taxiway at Runway 02 end and at

least 336 feet longer at Runway 20 end; AR_1463; exacerbating the dangerous conditions faced by planes taxiing both on and off the runway. This is depicted in the Proposed Action map in the FEA. AR_1467:



In other words, the FEA approved a Proposed Action that is not compliant with current FAA Standards and contains no FAA modification to standards approval, which is not only a key component for federal funding but is also in the Airport Improvement Program (AIP) Handbook ("The sponsor must obtain an FAA modification to standards approval for any change that is not specifically allowed, no matter how minor it may seem to the sponsor. This is necessary to ensure an acceptable level of safety, capacity, efficiency, utility or access...in the event of a pre-existing nonstandard airfield configuration, AIP funds may only be used to rehabilitate or reconstruct the affected airfield element if FAA has formally approved a modification to standards or the airfield element is brought up to standards"). AR_10186. It is thus not surprising that the ALP not only contemplates the planned design and construction of a new full-length parallel taxiway that runs the entire length of the extended runway and is fully compliant with FAA requirements, but also depicts the planned removal of the existing non-compliant taxiways. AR_12537. The ALP clearly demonstrates that the Taxiway Reconfiguration is connected to, and a necessary part of, the Runway 02-20 extension. Yet despite these recommendations, the Taxiway Reconfiguration is expressly **excluded** from both the FEA and FONSI/ROD.

The reason is obvious. An FAA-compliant full-length parallel taxiway to Runway 02-20 will necessarily encroach on the protected wetlands, including tidal

wetlands, that are located on and around Airport property. *See* AR_12295. Specifically, the construction of an FAA-compliant full-length parallel taxiway at the Runway 02 end will necessitate either paving or bridging over part of Morris Creek. *See id.* It will also involve filling and paving over a portion of the tidal/estuarine and riverine wetlands along this creek. *See id.* This will have an unavoidably significant impact on the environment. AR_12489-90. Petitioners noted in their Comments the significance of this environmental impact. *See, e.g.*, AR_5070. FAA avoided the need to address them by omitting the Taxiway Reconfiguration from the Proposed Action. *See* AR_1628. This was improper.

The failure of the FEA to study and include the connected Taxiway Reconfiguration constitutes clear improper segmentation of the project. A parallel taxiway is a basic safety component of the runway extension. The Airport conducted its last Taxiway B expansion in 2002 at the same time that it expanded Runway 02-20 safety areas. In the 2002 Record of Decision for that project, FAA was very explicit regarding the public safety need for a taxiway that serves the full length of the runway:

> The potential for runway incursions (more than one aircraft or ground vehicle operating on the runway at the same time) *is...a safety concern where taxiways do not extend to the runway end*, such as Runway 2....*Full-length parallel taxiways are basic components for even the smallest of general aviation airports*.

AR_5069 (emphasis added). FAA has thus described one as a basic component of the other.

The Taxiway Reconfiguration recommendation in the MPU underscores that point. *See* AR_12489. A taxiway has no independent utility, or reason to exist, apart from the runway that it is built to serve. And a runway without a full-length parallel taxiway is missing a basic safety component according to FAA's own previous analyses. The taxiway and runway therefore share a common purpose that neither can accomplish on its own: to safely accommodate the extended runway. They are interdependent projects lacking independent utility.

Moreover, the Taxiway Reconfiguration is clearly a "connected" action in that it: (1) is triggered by the runway expansion, which required a NEPA analysis; (2) it will not proceed unless the action of extending the runway is performed; and (3) it is an interdependent part of the larger runway expansion and depends upon the runway expansion for its justification. *See* AR_9404; *see also* 40 C.F.R. §§ 1501.3(b) & 1501.9(e)(1). Although it need only satisfy one of the definitions of a "connected action" under the applicable regulations, it satisfies all three.

Notwithstanding the clear connection, the FEA does not discuss taxiway construction or design in connection with the runway extension; instead, it goes so far as to suggest it is "not expected to be considered for implementation within the next five (5) years," and that it "would be subject to a separate NEPA action."

25

AR_1642. But that myopic view of the planned expansion meets the very definition of impermissible segmentation. Indeed, the temporal nexus between the runway extension and the taxiway construction actions cannot be debated; the recommendation for *both* was made in the same MPU and ALP, and it included simultaneous design and construction work. Allowing FAA to proceed with a separate NEPA review of the Taxiway Reconfiguration at some unknown future time, as FAA suggests; AR_1642; allows FAA to do nothing more than kick the can down the road on this necessarily connected issue. Unless and until the Taxiway Reconfiguration occurs, Runway 02-20—whether extended or not—will not be compliant with FAA Standards. This will compromise not only funding eligibility for the Proposed Action but also the safety of those using the runway, potentially hampering the increased enplanements and flight activity that FAA elsewhere projects.

Moreover, it creates a new potentially insurmountable hurdle: if the extension of Runway 02-20 occurs but the Taxiway Reconfiguration fails to pass muster under NEPA review, an incredible amount of time and resources will have been expended on a project that will never be safe or complete and on a runway that could be rendered unusable. This is precisely the type of result that the rule against segmentation aims to avoid. Rather, it requires interdependent, connected actions to

be considered together in the same NEPA analysis. The FEA does not meet this requirement.

In *Del. Riverkeeper Network*, this Court considered claims of improper segmentation by an agency, questioning whether the agency (FERC) was justified in rejecting commenters' requests that it analyze the entire upgrade project after the parties had noted "the interrelatedness of the sequential pieces" of the project. *Id.* at 1318. The Court ultimately concluded that: "When FERC was reviewing the Northeast Project application, it was undeniably aware that the previous and following projects were also under construction or review, and that each phase of the development fit with the others like puzzle pieces to complete an entirely new pipeline." *Id.* at 1318-19.

That conclusion is equally warranted here. FAA was not justified in rejecting commenters' requests that it analyze both the runway extension *and* the Taxiway Reconfiguration in the same EA. Both actions fit "like puzzle pieces to complete an entirely new" airport design. FAA's piecemeal approach constitutes improper segmentation. By taking that approach, FAA violated NEPA, rendering the FEA and FONSI/ROD arbitrary and capricious.

**D. FAA Unlawfully Failed to Take the Requisite Hard Look at Cumulative Impacts.**

Even if FAA's failure to include the Taxiway Reconfiguration in the Proposed Action does not constitute improper segmentation, it demonstrates that FAA failed

to take the requisite hard look at the cumulative impacts from the Taxiway Reconfiguration, thereby violating NEPA.

As already discussed, in an EA, agencies must analyze the cumulative "effects or impacts...to the human environment from the proposed action...that are reasonably foreseeable." 42 U.S.C. § 4332; AR_9417, 11422-23; 40 C.F.R. § 1508.1(g) (2023). "If the proposed action would cause significant incremental additions to cumulative impacts, an EIS is required." AR_9417. Per FAA's guidance, potential cumulative impacts should be considered "as early as possible in the project development process," as early identification "may help in the design of alternatives or mitigation measures that minimize a project's impacts on the environment." AR_11422. This analysis must identify, among other things:

> …
> (3) *other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area*;
> (4) *the impacts or expected impacts from these other actions; and*
> (5) *the overall impact that can be expected if the individual impacts are allowed to accumulate.*

*TOMAC*, 433 F.3d at 864 (quoting *Grand Canyon Trust*, 290 F.3d at 345) (emphasis added). In conducting this analysis, agencies must allow for meaningful engagement of the public by considering and responding to public comment. *See* AR_9408; *see also supra* p.13. A court reviewing such analysis should ensure that it "contains sufficient discussion of the relevant issues and opposing viewpoints to enable the

decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C.Cir. 1981).

As demonstrated below, FAA failed to take the requisite hard look at cumulative impacts from the Taxiway Reconfiguration—a reasonably foreseeable future action expected to have impacts in the same area as the Proposed Action. Additionally, it failed to take a hard look at impacts from a key past action—the entry of Avelo in 2021. As a result, FAA's cumulative impact analysis violates NEPA, rendering the FONSI/ROD arbitrary and capricious under the APA. *See Baltimore Gas & Elec. Co.*, 462 U.S. at 90, 98; 5 U.S.C. § 706.

### i. FAA Unlawfully Failed to Consider Impacts from Reasonably Foreseeable Future Action.

FAA defines a "reasonably foreseeable action" as one that "a proponent would likely complete and that has been developed with enough specificity to provide meaningful information to a decisionmaker and the interested public." AR_9179; *see also supra* pp.12-13. As described above, an agency must engage in "reasonable forecasting and speculation" in "determining what effects are reasonably foreseeable."

As noted above, HVN's Facility Requirements specifically call for Taxiway Reconfiguration to meet Standards. AR_12446-48. The fact that this

Reconfiguration has been characterized by FAA as "a safety concern…[and a] basic component[] for even the smallest of general aviation airports"; AR_5069; plainly establishes that it is foreseeable. Certainly, it is sufficiently likely to occur that the MPU and ALP detailed a need and a plan for it, with the MPU mapping its precise layout, and the ALP specifying the costs and timetable for its completion. AR_12489-90, 12509, 12515, 12520-22. Perhaps most tellingly, however, neither the DEA nor FEA deny that it is reasonably foreseeable; both clearly list the Taxiway Reconfiguration as a "future activity." AR_197, 1642.

Notwithstanding this, both the DEA and FEA failed to mention any expected impacts from the Taxiway Reconfiguration as well as the cumulative impact that it will have with the Proposed Action. AR_197-02, 1640-48. However, this analysis does not state that there are *no* anticipated impacts from the Taxiway Reconfiguration either. *Id.* Indeed, a hard look at these impacts would indicate that they are significant. As discussed herein, they would include paving or bridging over a part of Morris Creek, paving a portion of the wetlands along it, and adding over 300,000 sq. ft. of impervious surface to HVN. *See* AR_12509.

While Petitioners and other public commenters highlighted these impacts, FAA did not amend its analysis to consider them. Rather, the FEA changed nothing from the DEA; *Compare* AR_200-201 *with* AR_1646-47; maintaining vaguely that "these projects *would be* designed to minimize environmental impacts to avoid

exceeding Significant Thresholds." AR_1642 (emphasis added). The basis for that conclusion, insofar as it applies to the Taxiway Reconfiguration, is missing. *Id.* And, because there is no information about the impacts from the Taxiway Reconfiguration, it is unclear if FAA even considered them at all, or how the projects would be designed to minimize environmental impacts.

FAA failed to meaningfully address and respond to the concerns raised with the impact of the planned Taxiway Reconfiguration. *See e.g.* AR_1801. Instead, it stated in its responses to comments on the DEA that the "taxiway extension is not required for aircraft to utilize the full length of the runway" because "aircraft can back taxi and turn around, as is done under existing conditions." AR_1782. This response fully fails to acknowledge that the "existing conditions" are neither safe nor compliant with FAA Standards. FAA also stated in the FEA that "on-airport future projects" including the Taxiway Reconfiguration are "independent, not related or triggered by the Proposed Action," and that the Taxiway Reconfiguration is both subject to separate NEPA review and will not be "considered for implementation within the next five (5) years." AR_1641-42. However, even if FAA intended these terse statements to justify its lack of analysis, they do not suffice. **The sole threshold for considering a future project in a cumulative impact analysis is whether it is "reasonably foreseeable"**; *see* 42 U.S.C. § 4332 & AR_9417; and FAA's response entirely fails to address that point.

As for FAA's claim that the reconfiguration is "independent, not related or triggered by the Proposed Action," the evidence strongly indicates otherwise, as explained in Part C above. However, even if this claim is true, it does not render a project unforeseeable for the purpose of a cumulative impacts analysis. Indeed, the very purpose of a cumulative impact analysis is to consider projects that are reasonably foreseeable *even though* they may be independent, not related or triggered by the Proposed Action.[8] *See TOMAC*, 433 F.3d at 864 ("The 'cumulative' impacts to which the regulation refers are those *outside* of the project in question."); *Sierra Club*, 803 F.3d at 51 ("The cumulative actions doctrine is not concerned with geographic segmentation; if it were, it would be wholly redundant of the connected actions doctrine. Instead, it prevents agencies from ignoring the environmental effects of other actions."); *see also Grand Canyon Trust*, 290 F.3d at 346. Thus, these claims do not affect the foreseeability of the Taxiway Reconfiguration.

Nor does the FEA's claim that the Reconfiguration will not be considered for implementation within the next five years (though this claim contradicts the Phasing Plan's schedule) and subject to NEPA review at that time. AR_12292, 12520-22. NEPA does not limit "reasonably foreseeable" actions to those that occur within a specific time frame. 42 U.S.C. § 4332.[9] The Ninth Circuit has held that when the

---

[8] The same facts that support a segmentation claim can also sustain a claim of inadequate cumulative impacts analysis. *Del. Riverkeeper Network*, 753 F.3d 1304.

[9] *See also* 40 C.F.R. §§ 1508.1(aa), 1508.1(g) (2023).

agency selects a particular time frame (such as five years) to analyze cumulative impacts, and that time frame excludes reasonably foreseeable projects, the agency's reliance on that time frame is arbitrary and capricious. *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011) (agency's "default" five-year time frame for its cumulative impact analysis improperly excluded reasonably foreseeable development over the next 20 years). Moreover, as FAA guidance provides, projects need not be specifically proposed to be reasonably foreseeable. AR_11423; *see also Northern Plains Resource Council, Inc.,* 668 F.3d at 1078 (development projects were reasonably foreseeable even though they were not already approved and had no specific construction timelines yet).

Here, the Taxiway Reconfiguration is planned and necessary to comply with the Facility Requirements and Standards; this indicates that it is sufficiently likely to occur. Additionally, its impacts can be meaningfully estimated now, as the taxiways must be reconfigured in a very particular manner to comply with these Standards and Facility Requirements. *See* AR_10896, 11077, 12446. For instance, the taxiway must extend both parallel to and the full length of Runway 02-20, and it must be a certain distance from that runway's centerline. *Id.* These parameters define its precise location and eliminate many of the uncertainties regarding the taxiway's impact. The specifications for this project, alongside a map the proposed Taxiway Reconfiguration, are included in the MPU and ALP. AR_012489-90, 12509. There

33

are no alternatives proposed in these documents. AR_12489-90. Thus, the impact from the planned Taxiway Reconfiguration can be, and must be, analyzed now.

There is a reason the FAA did not analyze these impacts. They are profoundly detrimental to the environment, as discussed in Subsection C. The Taxiway Reconfiguration would involve bridging or paving over a portion of Morris Creek, paving a portion of the tidal/estuarine and riverine wetlands along it, and adding over 300,000 sq. ft. of impervious surface. *See* AR_12523, 12404, 12407-08. As the MPU found, the environmental impact of this Reconfiguration would be "high." AR_12474, 12489. It would cause adverse impacts to the coastal environment— impacts that FAA may not be able to satisfactorily mitigate. If it cannot, then this alone would meet its significant impact threshold for coastal resources. AR_1588. Additionally, it would likely meet the significant impact threshold for wetlands. AR_1631.

In sum, the Taxiway Reconfiguration would significantly impact the environment, and FAA must take a hard look at these impacts in its cumulative impacts analysis. By failing to do so, FAA violated NEPA, rendering the FONSI/ROD arbitrary and capricious under the APA. *See Baltimore Gas & Elec. Co.*, 462 U.S. at 90; 5 U.S.C. § 706.

As part of a cumulative impact analysis, NEPA also requires FAA to take a "hard look" at past actions that have had impacts in the same area, and to identify the cumulative impact that can be expected from them in combination with the Proposed Action. *See TOMAC,* 433 F.3d at 864; *supra* pp.11-12.

Here, the introduction of Avelo Airlines in 2021 is a pivotal past action that must be included in the cumulative impacts analysis. As EPA noted in its comments on the DEA, "recent past impacts from rapid growth at the airport (associated with the entry of Avelo) are an important part of the cumulative impact equation primarily because they are the catalyst for the proposed runway extension/terminal expansion work." AR_1751. In response, FAA did add the "[i]ntroduction of Avelo Airlines" as a past action in the FEA's cumulative impacts analysis and noted that "[s]ince starting service at HVN, Avelo has added flights and destinations." AR_1641.

However, that was all it did, as it still did not identify any impacts associated with this action. AR_1640-48. In the table analyzing cumulative environment impacts, the FEA changed only two sentences from the DEA, and only to add: "HVN will offer sound insulation for structures identified as being significantly impacted by aviation noise," and "impacts of the proposed action are neither disproportionately high nor adverse on EJ communities." AR_1647-48. These changes do not identify impacts from the entry of Avelo, they do not analyze whether

35

they are significant, and they do not dismiss FAA's obligation to analyze them. Despite FAA's lack of analysis, it concludes that previous actions "did not result in significant impacts." AR_1641. This is not the hard look that NEPA requires. *See Izaak Walton League of America*, 655 F.2d 346. In *Marin Audubon Soc.*, 2024 WL 4745044, at *10, the majority opinion stated that "[i]t was unreasonable for the Agencies to avoid fully treating the environmental effects of the [increased flights in the] Bay Area Parks Plan on the ground that those effects would minimally alter a status quo that itself has never been adequately assessed…. ('The agencies acknowledge that no previous NEPA analysis of [interim operating authority] occurred.)" (Citation omitted.) Here, as *Marin*, as pointed out by EPA, the impacts of the increased flights by Avelo since 2021 were omitted from previous analyses.

Had the FAA taken the requisite hard look at these impacts, it would have found them significant. When Avelo began serving HVN in 2021 after the release of the MPU, the number of aircraft departures from HVN increased dramatically. *Compare* AR_12360, 1459. While there were only a few daily aircraft departures from HVN in 2020, there was an average of 12 daily aircraft departures by 2022. *Id.* As described herein, an increase in flight activity has significant impacts on air quality, noise, and environmental justice. A sufficient cumulative impacts analysis must identify and evaluate these impacts. *See TOMAC,* 433 F.3d at 864. Because FAA failed to do so, it violated NEPA, rendering the FONSI/ROD arbitrary and

36

capricious under the APA. *See Baltimore Gas and Elec. Co.*, 462 U.S. at 90; 5 U.S.C. § 706.

**IV. The FEA and FONSI/ROD Improperly Rested on Unsupported and Internally Inconsistent Reasoning About Current and Projected Enplanements and Thus Failed to Take the Requisite "Hard Look" at the Proposed Impacts in Violation of NEPA.**

### A. Standard of Review

Judicial review of agency actions under NEPA must ensure that the agency's decision "is not arbitrary or capricious." *Del. Riverkeeper Network*, 753 F.3d at 1312-13; *see also supra* pp. 11-13 (agency must take "hard look" at environmental impacts in deciding not to prepare EIS). An agency's action is "arbitrary, capricious, an abuse of power, or otherwise not in accordance with law" if it is not supported by a reasoned analysis or it is internally inconsistent. *See ANR Storage Company v. FERC*, 904 F.3d 1020, 1024 (D.C.Cir. 2018); *Air Transport Ass'n of America v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C.Cir. 1997).

### B. Additional Facts

The Noise and Air Quality Technical Report, which was Appendix I to the FEA, reflects that aircraft flight operations were used to evaluate air and noise quality impacts for the Proposed Action and No Action. *See* AR_8061. Operations were derived from two sources: (a) non-air carrier operations, and (b) air carrier operations. AR_8023-24. Air carrier operations are the operations necessary for

Avelo's expected levels of service under existing conditions and under both the No Action and Proposed Action for 2026 and 2031. AR_8024.

The FEA and the appended Noise and Air Quality Technical Report consistently state that HVN will experience the same number of enplanements under both the Proposed Action and No Action scenarios. *See* AR_1470, 8024. FEA Table 2-1 shows, without explanation or support, that forecasted enplanements for both the Proposed Action and the No Action are 665,334 in 2026 and 1,222,551 in 2031. AR_1470. The FEA also concluded that "[a]ir cargo facilities are *not currently available…*, nor are there *active* plans for air cargo under consideration," so they were "not considered." AR_1722 (emphasis added).

The FEA reasoned that the Proposed Action would allow HVN to utilize larger aircraft (189 seats) than the aircraft HVN currently utilizes and would use under the No Action scenario (147 seats). AR_1470. Because the number of forecasted enplanements was kept constant across both scenarios and larger aircraft can accommodate more passengers, the FEA concluded that the Proposed Action would result in less operations than the No Action. *See* AR_1574. Appendix I contains the analysis supporting this conclusion. *Id.*

The FEA thus concluded that "$CO_2e$ emissions and fuel usage are expected to be higher under the No Action when compared to the Proposed Action." AR_1587. $NO_x$ is expected to increase because larger aircraft have higher emission factors, but

the FEA notes that the increase in $NO_x$ would be "offset by the forecasted decrease in flight operations under the Proposed Action." AR_1578. In addition to the reduction in air emissions, the FEA also determined that fewer people would be exposed to harsher noise emissions under the Proposed Action. AR_1603. These conclusions are foundational to the FAA's ultimate conclusion that the Proposed Action would not significantly impact the environment or upon environmental justice communities. *See* AR_8924-27.

It is standard practice to analyze whether an increase in capacity, such as a longer runway that will accommodate larger planes, will increase enplanements. Indeed, the MPU performed the analysis and concluded that the expanded runway would, in fact, induce demand. *See* AR_12362. The MPU states that "utilizing traditional methodologies such as econometric trending from present-day volumes do[es] not adequately capture legitimate future opportunities and growth potential." AR_12358. Due to HVN's limited existing service, "the entry of a new airline can result in a step-function growth event which can alter traditionally calculated long-term growth trends." *Id.* The MPU's enplanement forecasting "utilized a strategic, airline-driven approach in deriving enplanement forecast(s)" as well as "a 'bottom-up' methodology, assuming tactical capacity increases across various airline/service types based on underlying conditions with varying levels of macroeconomic/industry growth and volatility built in." AR_12360.

The MPU included enplanement forecasting for 2020 to 2040 under six scenarios, consisting of unconstrained and constrained cases with high, medium, and low levels of growth. AR_12361-62. The constrained cases assumed that no major changes would be made to the Airport. AR_12361. Across all growth levels, the unconstrained case (i.e., the Proposed Action) forecasted greater enplanements than the constrained case (i.e., the No Action), a difference that increases as time passes. AR_12362. Yet FAA both failed to follow this analysis and failed to elaborate on its reasons for doing so, either in the DEA or FEA. *See* AR_32 , AR_1470 ("As shown in Table 2-1..., in 2022 actual Air Carrier/Air Taxi Operations and enplanements exceeded the FAA approved forecasts for HVN and are expected to continue to grow through 2031."). Instead of performing any actual forecasting, the FEA assumed that enplanements would be constant. AR_1470. Furthermore, the FEA and its supporting documents fail to provide any explanation for this departure from standard practice and common sense.

There is no support in the FEA for the forecasted enplanements. *See* AR_1470-71. Table 2-1 contains these forecasted enplanements and cites to the following sources: "FAA," "2021 Master Plan," "Avelo Airlines Preliminary Schedule," "Avports Analysis," and "McFarland Johnson Analysis." AR_1470. Of these citations, the only one containing any actual enplanement forecasting is the "2021 Master Plan," or MPU, which, in its forecasting, did consider the demand

40

inducing impact of the expanded runway. *See* AR_12362. Finally, the FEA's only relevant appendix, Appendix I, contains no further analysis and simply makes the same assumption. AR_8024 ("The No Action scenarios assume the same level of passenger demand.").

## C. Argument

The FEA's conclusion that enplanements would not increase with the Proposed Action was neither adequately explained nor analyzed by FAA and is inconsistent with other parts of the FEA concluding that passenger growth was both a goal *and* consequence of the Proposed Action. *See* AR_1468, 1470.

First, it fails to conform with NEPA's mandate of professional integrity and use of reliable data and resources, *see* 42 U.S.C. §§ 4332(D)-(E), as well as principles of reasoned decisionmaking. *Del. Riverkeeper Network*, 753 F.3d at 1313. Specifically, FAA improperly failed to disclose the methodology used both to make this assumption and to derive the actual numbers for 2026 and 2031, despite demands from agencies and other commenters to do so. *See e.g.,* AR_1747, 1751, 1757-58, 5071-74, 12852-55. Reliance on the forecasted enplanements and constant enplanement assumption "without any study or supporting documentation" is insufficient to satisfy NEPA obligations. *See Siskiyou Regional Educ. Project v. Rose*, 87 F.Supp.2d 1074, 1098-99 (D. Or. 1999) (NEPA obligations were not

satisfied because Forest Service failed to disclose analyses, methodologies, and data relied upon by its experts to reach conclusions in EA).

Reliance on inconsistent and unsupported assumptions can result in the public's impaired ability to challenge the FONSI and courts second guessing FAA's conclusions. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) ("NEPA requires the public receive the underlying environmental data from which a Forest Service expert derived her opinion"), *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008). By relying on an unsupported assertion about a major aspect of this project, FAA did not provide a sufficiently reasoned basis for its conclusions in the FEA and did not provide the public with information necessary to provide informed comments as required by *WildEarth Guardians*, 368 F.Supp.3d at 58. In relying on this unsupported assumption, FAA violated NEPA's clear "hard look" requirement.

Critically, FAA ignored EPA's comments on this issue that the DEA "largely overlook[ed] recent past impacts and would benefit from greater transparency regarding future impacts from airport operations," AR_1751, and "[t]he EA would benefit from additional information to support the overall conclusion that the average number of flights will decrease over time...[, which] is especially important given the recent growth at the airport occurred without the benefit of the airport improvements currently under consideration." *Id.* But the FEA did not explain

FAA's enplanements analysis. *See id.* This response is deficient because the EPA, as an agency with jurisdiction over air emissions, should have been treated like a cooperating agency and its input given greater consideration. *See* 42 U.S.C. §§4336(2)(B)-(C) ("A lead agency shall, with respect to a proposed agency action...request the participation of each cooperating agency at the earliest practicable time...[and] give consideration to any analysis or proposal created by a cooperating agency."), *see also Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F.Supp.2d 1249, 1262 (D. Wyo. 2004).

The arbitrariness of the constant enplanements assumption is made clear by the fact that it is inconsistent with statements made in the MPU, in the FEA, and elsewhere during this process. The administrative record reflects that the Proposed Action creates the potential for greater increases in passengers and operations, as well as increases in freight. The MPU's market analysis found that HVN is "*one of the most underserved airports in the country.*" AR_12357 (emphasis added). "However, due to the current runway limitations, HVN has been unable to adequately serve the needs of the flying population. Travelers are forced to make the long and tedious drive to one of the New York/New Jersey airports...." AR_12346. To state the obvious, if passengers that currently use other airports switch to using HVN, enplanements will increase.

The FEA itself notes that "airlines have expressed interest in serving HVN; however, *the existing 5,600-foot runway length has prevented them from doing so. For example,…*Allegiant indicated interest in serving HVN but indicated a runway 'of approximately 6,000 feet' would be required." AR_1459 (emphasis added). The FEA continues, stating that while "Avelo is the only airline currently offering commercial services at HVN...[,] as a public airport, HVN is available to other carriers that may be interested in serving HVN in the future." *Id.* "Avelo's growth at HVN demonstrates the strength of the existing market and previously unmet need for convenient air service in southern Connecticut." AR_1463. Again, if additional airlines are attracted to HVN, enplanements will necessarily increase.

In an application to the Small Community Air Service Development Program, HVN stated that "due to the runway limitations (current runway length is at 5,600 feet), HVN has been unable to adequately serve the needs of the flying population. *Travelers are forced to make the long and tedious drive to one of the New York/New Jersey airports....*" AR_5113 (emphasis added). This uses the same language as the MPU. *See* AR_12346. The application then stated that "Tweed New Haven's proposed 2021 Master Plan has been well received by the community and has received serious interest from private investors, *paving the way to considerable airport expansion.*" AR_5123 (emphasis added). In previous litigation regarding whether the HVN runway extension could go forward, the Second Circuit found that

> [l]engthening the runway would allow for the safe use of larger aircraft, allow flights with no seating restrictions, allow more passengers on each airplane, and allow service to more destinations. It would also allow Tweed to attract more carriers and expand the availability of safe air service for its customers.

*Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65, 69 (2d Cir. 2019). The extension of the runway would pave the way for yet a further increase in the number of enplanements.

Officials have spoken at length about the potential for the Proposed Action to induce an increase in enplanements. In 2019, the Airport's then-Interim Executive Director was quoted as saying that "[t]he Greater New Haven market area is *the largest underserved market in the country*" and noted that "[e]xtending the runway and adding a new carrier and new destinations would work towards filling that current void." AR_5148. In 2023, Avelo CEO Andrew Levy stated that: "The runway being lengthened certainly opens up to more aircraft and economic capability, and it's possible we would look something further out west—certainly Denver and Las Vegas are markets where people would be quite interested, and then L.A. as well." AR_5145. Again, increased flights to further destinations will increase enplanements.

Put simply, FAA's failure to support its conclusion that the Proposed Action would not lead to expanded enplanements ignored the demand-inducing aspects of an extended runway, which are abundant on this record. It thus violated NEPA's

45

requirement that agencies consider the impacts of their actions. FAA guidance notes that an EA must address "[i]ndirect (*including induced*) impacts," AR_9417, and adopts the CEQ's definition of "indirect impact," which says that indirect effects "may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.1(i)(2).

In a strikingly similar case, the court in *Barnes v. U.S. DOT* rejected an EA and remanded because the EA failed to consider the demand-inducing impacts of a new runway. 655 F.3d 1124, 1136 (9th Cir. 2011). Petitioners argued that FAA, when evaluating the significance of the project's environmental impacts, failed to consider the indirect effect that the new runway would have on passenger demand. *Id.* at 1136. In response, FAA simply stated that, according to its forecasts, "aviation activity at [Hillsboro] is expected to increase at the same rate regardless of whether a new runway is built or not," adding that courts have generally accorded significant deference to FAA's expertise in forecasting air transportation. *Id.* The court was not persuaded: "The [FAA] cannot point to any documents in the record *that actually discuss the impact of a third runway on aviation demand* at [Hillsboro]." *Id.* (emphasis added). According to the court, FAA

> would like [the] court to take their word for it and not question their conclusory assertions in the EA that a new runway would not increase

demand. Their word, however, is not entitled to the significant deference that courts give aviation forecasts actually performed by the FAA.

*Id.* at 1137. The court added that, while the FAA correctly pointed out the "court has recognized that, '[w]hen it comes to airport runways, it is not necessarily true that "if you build it, they will come,"' the court cannot determine whether that adage is true or not here because the FAA "failed to take the required 'hard look,' and failed to conduct a demand forecast based on three, rather than two runways at [Hillsboro]." *Id.* at 1137-38 (quoting *Nat'l Parks & Conservation Ass'n v. U.S. Dept. of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000)).

The court distinguished *Seattle Cmty. Council Fed'n v. FAA*, 961 F.2d 829 (9th Cir. 1992), and *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569 (9th Cir. 1998), from the proposed addition of a new runway: "Unlike the flight patterns and the flight arrival path at issue in *Morongo Band of Mission Indians* and *Seattle Cmty. Council Fed'n*, this case involves a *major ground capacity expansion project*." *Id.* at 1138 (emphasis added). The court added that the FAA has recognized that "a new runway is 'the most effective capacity-enhancing feature an airfield can provide.'" *Id.* "[A] new runway has a unique potential to spur demand, which sets it apart from other airport improvements, like changing flight patterns, improving a terminal, or adding a taxiway...." *Id.*

As was the case in *Barnes*, FAA here assumes that demand will rise at the same rate under both the Proposed Action and No Action, without any further explanation. Regardless of whether deference to FAA's forecasting might generally be warranted, where no actual forecasting has been adequately documented and explained, such deference cannot be warranted here. In addition, extending a runway, like the addition of a runway, is a "ground capacity expansion project," rather than simply an airport improvement project. *Barnes*, 655 F.3d at 1138. FAA was clearly deficient in failing to analyze the impacts of the increased demand attributable to the extension of the runway as growth-inducing effects. *See id.* at 1139.

Many commenters, including both the EPA and DHHS, commented that the impacts analysis was severely flawed because of the FEA's failure to consider the potential for the Proposed Action to induce greater enplanements. The EPA recommended the EA "specifically describe whether the recent increases in flights combined with existing and future scenarios creates impacts that warrant mitigation beyond what is already identified in the EA," and requested that the environmental justice analysis be modified to consider the impacts of past and future growth in operations to provide a "better understanding of the Proposed Action on communities with EJ concerns." AR_1752; *see also* discussion of cumulative impacts at *supra* pp. 27-37.

The DHHS raised similar concerns about the environmental justice analysis. It stated that given the asthma and ozone concentrations, the action would "allow[] for more frequent flights by larger aircraft with more powerful engines, all expansion scenarios would increase health risks in these neighborhoods, several of which rank among the most cumulatively impacted communities in the United States." AR_12852. Municipalities and local agencies submitted comments echoing and expounding upon the concerns raised by the federal agencies. *See* AR_1747, AR_1757-58, AR_1760-61. These comments were substantively ignored.

Pursuant to 42 U.S.C. § 4332(C)(i), NEPA documents must detail "reasonably foreseeable environmental effects of the proposed agency action." In addition to its faulty assumption concerning increased enplanements, FAA failed to address whether the market conditions made it reasonably foreseeable that freight would enter, resting instead on the conclusion that there are no "active" plans for cargo operations.

In 2014, a Freight Cargo Study for HVN was prepared, which examined "options for increasing freight services for niche markets, removing trucks from the I-95 and I-91 corridors, reducing congestion and providing timely delivery of goods and food products for the region's consumer." AR_7387. Seven years later, the Board Agenda for the May 2021 SCRCOG Board Meeting stated that the Proposed Action would allow for "improved freight utilization at the Airport. SCRCOG staff

49

will work with the Airport Authority, Town of East Haven and City of New Haven to evaluate potential increased freight operations to reduce congestion on the region's interstates and provide timely delivery of goods and food products to the region." AR_5202. FAA simply ignored the record in failing to consider the induced demand for freight in its impacts analysis. It failed to take the requisite "hard look" under NEPA.

The APA and NEPA require internal consistency and a reasoned analysis in agency decisions. *See ANR Storage Co.*, 904 F.3d at 1020, 1024 (FERC's market-power analysis showed that intrastate storage facilities were "good alternatives" within the relevant market but nevertheless concluded that these facilities would not check ANR Storage's exercise of market power. This analysis was internally inconsistent and thus arbitrary and capricious). Similarly, here, the FEA consistently stated that the main goal of the Proposed Action is to capture an underserved market constrained by the airport's capacity. *E.g.*, AR_1459. However, the FEA states simultaneously that enplanements would not increase due to the expansion. Both cannot be true. This fundamental disconnect allows FAA to reach the startling—and utterly implausible—conclusion that there will be greater environmental impacts from the No Action scenario than if the Proposed Action were to proceed. Ignoring the possibility of freight operations makes the disconnect even more startling. It is a

fatal inconsistency within FAA's decision. The FEA, and the FONSI/ROD, cannot stand.

**V.  The FONSI is Not Supported in the Record Because the FEA Fails to Take the Requisite Hard Look at Localized Flooding, Stormwater Pollution, and Wetlands Impacts.**

The FEA fails to meaningfully analyze or mitigate localized flooding, stormwater, and wetlands impacts. As such, there is no basis upon which this Court can conclude that FAA "adequately considered and disclosed the environmental impact of its actions" under NEPA.

**A. Standard of Review**

Judicial review of agency actions under NEPA must ensure that the agency's decision is not arbitrary and capricious. *See, e.g.*, *Del. Riverkeeper Network*, 753 F.3d at 1312-13; *see also supra* pp. 11-13 (agency must take "hard look" at environmental impacts in deciding not to prepare EIS).

**B. Additional Facts**

**i.  The Project Site & Conditions**

HVN is sited in a low-lying floodplain along the coast of Long Island Sound. AR_1632-33, 2906-07. Due to this location, it is prone to flooding from storms, tides, and sea level rise. AR_1570, 3956-57, 5552-64. FEMA classifies all but a very small portion of the airport property as Flood Zone AE, meaning it has "at least a 1% annual chance of being flooded, but where wave heights are less than three (3) feet." AR_1632. According to East Haven's public safety personnel, certain roads

near HVN (through which the Proposed Action would route traffic)[10] experience severe flooding "10 to 15 times per year," due in part to being "well below the flood elevations – in some places by about 8 feet." AR_5562-63. This flooding is expected to increase in both frequency and severity with climate change, particularly since sea levels are expected to rise 20 inches by 2050. AR_1570, 3956-57.

Such flooding is a public health and safety issue. *See* AR_5553. It is often severe enough to close the nearby intersection down, block entire roads, and turn back traffic. *Id.* Additionally, when stormwater flows over impervious surfaces or exposed soil, it picks up pollutants. AR_2888, 3958, 5584, 5647-49. Because stormwater cannot generally infiltrate impervious surfaces, this polluted stormwater is then transported into surrounding wetlands and waterbodies. AR_3958. Stormwater discharges from roads trafficked by motor vehicles contain particularly high levels of toxic pollutants such as heavy metals, petroleum products, and hydrocarbons. AR_5647-49.

Wetlands, in contrast, can function to attenuate flooding and pollution by storing excess flood waters and retaining pollutants. AR_13003-06. There are seven wetlands in and around the Project Site—six inland wetlands totaling 22.7 acres and one tidal wetland, totaling 8.4 acres. AR_7875-81. Due to their flood storage

---

[10] The intersection of Hemingway Avenue at Coe Avenue and Short Beach Road. AR_5552-62.

capacity and ability to retain pollution from stormwater, these wetlands have been crucially important for the surrounding community. *See* AR_5562, 5632-35, 5648, 13023. Loss of flood and pollutant storage capacity at HVN would increase already severe levels of flooding in the surrounding community and degrade the quality of nearby waters, including Long Island Sound. *See* AR_2906-07, 5647-48.

### ii.    Proposed Action

The Proposed Action, as described in the EA, would add 61,300 CY of fill to the Project Site—an undertaking that would require over 4,000 truckloads of fill material and impact 9.28 acres of wetlands. AR_1626, 5650. The Proposed Action would also add at least 941,922 sq. ft. (21.6 acres) of impervious surface to this Site—3.2 times the amount currently there. AR_5598. This loss of wetlands and dramatic increase in impervious surfaces would sharply decrease HVN's flood storage capacity, rendering much of it "useless for water retention." AR_3461, 5651, 5889-91. Additionally, it would increase pollution while simultaneously diminishing the wetland's capacity to retain and remove these pollutants. AR_5584-5601.

Despite these impacts, FAA concluded in its DEA that "no adverse impacts on natural and beneficial floodplain values are anticipated" and that any impacts to wetlands would be "less than significant." AR_191, 194. It reasoned that the fill "would be mitigated by a corresponding cut" of up to 90,000 CY and the increase in impervious surface would "be mitigated by providing additional stormwater

controls." AR_194. Finally, it stated that "compensatory mitigation would be implemented for all wetland impacts to achieve the overall policy goal of 'no net loss' according to their ecological functions and values." AR_190. It did not identify the mitigation actions or sites that HVN would use. *Id.* Rather, it stated that "[d]uring the engineering design phase, exact wetland impacts would be defined...mitigation actions would continue to be developed...[and] HVN would submit permit applications" prior to construction. AR_186.

Numerous commenters pointed out the defects in FAA's reasoning, particularly as to its analysis and proposed mitigation of localized flooding, stormwater pollution, and wetlands impacts. AR_2910-11, 3955-59, 5584-603, 5889-92, 7826-30. In each instance, FAA failed to meet its legal obligation, choosing instead either to ignore the very real environmental concerns posed by the Proposed Action or to brush them aside as an issue to be dealt with in some uncertain way at some uncertain time in the future.

### iii.   Legal Standards

As described above, agencies must analyze that direct and indirect impacts must be identified and discussed in an EA. Indirect impacts can include those "related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems." AR_11222. Accordingly, this Court has held that off-site, downstream pollution can be an

indirect impact, provided such pollution is a reasonably foreseeable consequence of the Proposed Action. *See Sierra Club*, 867 F.3d at 1371.

If an EA proposes mitigation measures to reduce project impacts below significance, it must support the likely efficacy of those measures with substantial evidence and analysis, not mere speculative or conclusory statements. *See Am. Rivers v. FERC*, 895 F.3d 32, 54-55 (D.C.Cir. 2018). In doing so, it should provide for "monitoring to determine how effective the proposed mitigation would be" and "alternatives in the event that [they] fail[]." *See id.*; *see also Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997).

In *Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, the court remanded a FONSI that asserted, without any evidence, that its plans to replace filled wetlands at a 1:1 ratio "preferably near the project area" would result in no significant impact. 351 F.Supp.2d 1232, 1252 (D. Wyo. 2005). While the court did "not expect the Corps to conduct extensive research on the efficacy of wetland replacement," "[n]either can the Court defer to the Corps' bald assertions that mitigation will be successful" absent "any, let alone substantial, evidence in the record." *Id.*

The agency also cannot simply leave mitigation measures as "TBD," relying on "anticipated-but-unidentified" measures without further analysis. *Am. Rivers*, 895 F.3d at 54. In *American Rivers,* FERC released a FONSI that relied in part on a

license requirement to install aeration systems. *Id.* at 53-54. As this Court wrote, "[t]hat sounds like a promising approach," but unfortunately "the aspiration" was not "matched with substance," and the administrative record was "devoid of information about what aeration system [would] be implemented, or when, or how it will perform." *Id.* at 53. Rather, FERC allowed an additional six months after the license was issued to disclose its anticipated aeration measures, and a year after that to implement them. *Id.* This Court concluded that "it was irrational for [FERC] to cast…significant environmental impacts aside in reliance on some sort of mitigation measures, which [FERC] was content to leave as 'TBD.'" *Id.* at 54. "[T]he existence of permit requirements overseen by another federal agency or state permitting authority" and conclusory statements that a project will eventually comply with such permitting processes "cannot substitute for a proper NEPA analysis." *See Sierra Club*, 867 F.3d at 1375 (citing *Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1122-23 (D.C.Cir. 1971)).

## C. Argument

The FONSI/ROD is arbitrary and capricious because FAA failed to adequately analyze and ensure effective mitigation of impacts on (i) localized flooding, (ii) stormwater pollution, and (iii) wetlands, despite extensive comments detailing these concerns. These arguments are related insofar as wetlands impact

flooding and stormwater pollution (and vice versa). However, for the sake of clarity, they are described separately below.

### i. FAA Failed to Adequately Analyze and Mitigate Localized Flooding.

Filling wetlands and adding 21.62 acres of impervious surface in a FEMA-designated floodplain most certainly impacts flooding at and around the Project Site. However, the FEA fails to meaningfully analyze this impact and ensure effective mitigation of it, despite numerous comments raising these concerns. Petitioners, experts, and agencies emphasized that FAA's assumption that the availability of 90,000 CY of cut would necessarily mitigate 61,300 CY of fill is a radical oversimplification of floodplain impact mitigation. It fails to account both for the impact of grading and filling wetlands on specific, localized areas; and for the influence that the Site's high groundwater table will have on subsurface hydrology. *See, e.g.*, AR_5584-603, 5633, 5889-92, 7826-30. It also dramatically underestimates the amount of fill required.

As Matthew Davison, professional wetlands and soil scientist commented on behalf of East Haven, any cuts meant to compensate for the anticipated fill would need to be made "in the same general location and elevation as the fill." AR_5632-33. He noted that it was not clear from the DEA where exactly such cuts *could* occur given the Project site is "low-lying and surrounded by wetlands," but that "[c]uts in areas remote from the Terminal Expansion fill and at elevations higher than the fill

will not mitigate for the anticipated loss of flood storage capacity." *Id.* Similarly, DEEP observed that "given the high groundwater table and low-lying airport property, a corresponding cut may not provide sufficient water holding capacity." AR_7828. DEEP explained that "[e]ffective flood storage compensation should be done incrementally, by elevation, by providing an equal or greater volume of flood storage than the amount being displaced for the entire elevation range of the floodplain." *Id.* DEEP therefore requested an "analysis of floodplain compensation volume versus floodplain displacement volume…on an incremental elevation range of the site's floodplain and located outside any wetland or watercourse." *Id.* Finally, Steven Trinkaus, licensed Professional Engineer retained by Petitioner East Haven, pointed out that the amount of fill required for the Proposed Action may be much greater than FAA's estimates.[11] As he explained, 61,300 CY of fill would raise the 31-acre Project site only 1.2'. AR_5650. But to bring structures used by staff and the public above the base flood elevation, the grade would have to be raised by at least 7'. *Id.*

FAA's response to these credible comments lacked any specifics as to the extent of local flooding, and the FEA's analysis remained largely unchanged. *See* AR_1635-39. While it added a map of the Project site in which it highlighted areas

---

[11] The record also contains inconsistent estimates of impervious surface that would be added by the Proposed Action. *Compare* AR_66, 1504 (impervious footprint area will be 30.99 acres versus impervious surface increased by 21.6 acres).

alongside Runway 02-20 and a small area just south of the runway "that would be *considered* for floodplain mitigation," AR_1636 (emphasis added), this general gesture toward possible sources of cut within the airport property does not explain how floodplain mitigation strategies will account for location-specific effects of grading, elevation, fill, groundwater levels, or disruption of subsurface hydrology.

Nor does it suggest FAA even considered these issues. In response to DEEP's request for an analysis that accounts for the elevation range of the floodplain, FAA "note[d] the request" but stated that a more detailed analysis would not be performed until the design and permitting phases. AR_1785. It maintained, without any support, that any impacts "would be mitigated by a corresponding cut" of 90,000 CY and that "no adverse impacts on natural and beneficial floodplain values are anticipated." AR_1636. This response effectively brushes aside commenters' concerns, implying that they should simply trust that their flooding concerns would be dealt with eventually. *See* AR_1785. But NEPA requires FAA to earn that trust by demonstrating that its FONSI is the result of "fully informed and well-considered decision[making]." *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 558.

Like *Wyoming Outdoor Council*, where the court remanded FONSIs for failing to support the efficacy of proposed mitigation measures, the FEA here fails to provide *any* evidence or other assurances that 90,000 CY could be used to adequately mitigate flooding on the entire property, or how it would do this. The

inadequacy of the FAA's flood mitigation measures is compounded by the complete lack of plans to monitor the success of those measures and adjust accordingly. *See Nat'l Audubon Soc'y*, 132 F.3d at 17. Thus, FAA fails to ensure that the Project's impacts will actually be mitigated below significance and fails to create a legitimate basis for declining to prepare an EIS.

**ii.  FAA Failed to Adequately Analyze and Mitigate Stormwater Pollution Impacts.**

As Trinkaus noted, the FEA has a "fatal flaw" in that it fails to meaningfully analyze and mitigate the impacts of stormwater pollution on wetlands and surface waters as a result of the ground being replaced with buildings and roads. AR_2897-99, 5585. Commenters noted that detention, infiltration, and treatment measures may not be feasible on site, given the location and hydrological features; AR_2897-900, 5632-35; and DEEP called for "further analysis" of "the use of infiltration and stormwater detention…in consideration of localized flooding and site conditions." AR_7828. It opined that "[d]etaining stormwater in this location of a watershed may have potential adverse impacts to downstream properties," and so "a detailed routing analysis" should be pursued before implementing detention strategies "to ensure that discharging stormwater runoff from the airport does not coincide with peak flows from the watershed." *Id.* In fact, because "no site evaluation has been conducted to determine the underlying soil conditions," the extent to which these soils can infiltrate stormwater is unclear. AR_5649. However, as Davison explained, high

groundwater would limit the volume of detention basis in a manner that was not considered in the conceptual design plans. AR_5632.

Again, despite these detailed and credible comments from experts and agencies, FAA's response lacked any specifics as to the extent of the problem and whether/how mitigation will work. AR_1769-71. FAA's analysis does not account for whether/the extent to which stormwater can infiltrate on site. *See* AR_1625-31. Nor does it account for where stormwater will discharge if it cannot infiltrate and the pollutant load of this discharge, despite legitimate concerns raised in comments about the likely presence of toxins in such discharges. *Id.*; *see also* AR_7833. While FAA's response suggested unidentified "remediation actions in advance or concurrent with construction activities" and compliance with regulations, it did not propose any specific remediation measures. AR_1789.

Nor does the DEA provide any evidence or other assurances that the stormwater impacts from the addition of at least 21.6 acres of impervious surface can be effectively mitigated. *See* AR_1769-71. Expert and agency comments pointed out that it lacked any detail to demonstrate that proposed detention and treatment solutions are likely to be effective or feasible, especially given the particularly challenging localized flooding and site conditions, the inconsistent and unsupported estimates of impervious surface the Proposed Action would add, and the high groundwater table at the Project Site. *See* pp.57-58. However, the FEA unlawfully

waved these concerns away by insisting that other agencies and Connecticut's various permitting processes would handle them. *Id.*; *see also* AR_1636.

This Court held the FONSI in *American Rivers* was arbitrary and capricious because it dismissed significant environmental impacts based on unknown mitigation measures the project applicant would identify at some later date. 895 F.3d at 53; *see also Sierra Club*, 867 F.3d at 1375. The FEA here runs into the same problem. Rather than provide specific mitigation measures and evidence that they will be effective, the FEA cites, in the most general way, to Connecticut's stormwater permitting requirements. *Id.* But FAA cannot shirk its responsibility to take a hard look by asking this Court to simply trust that impacts will be mitigated at a later date through an entirely separate process under a different regulatory scheme—particularly where the very state agency responsible for that process has already requested, and been denied, a more thorough analysis in the present NEPA process, as DEEP did. *See* AR_1785.

Because the FEA is entirely devoid of any data, analysis, or other evidence demonstrating strategies that will reduce these impacts below significance, it must be rejected. FAA acted arbitrarily and capriciously when it vaguely and speculatively asserted that state permitting processes and unsupported stormwater management strategies would reduce the impacts of at least 21.6 additional acres of impervious surfaces below significance.

### iii. FAA Failed to Adequately Analyze and Mitigate Impacts on Wetlands.

FAA's analysis of wetlands is also deficient in that it fails to analyze indirect impacts to wetlands and consider the full range of functions that these wetlands provide. *See* AR_1626, 7875-81. As for indirect impacts to tidal wetlands, Davison commented that the Proposed Action may "prevent additional tidal wetlands from forming naturally in and around the project area" and stormwater discharges would pollute those that are present. AR_5584-85. Trinkaus commented that such pollution can "kill tidal grasses in the wetland areas, thus exposing tidal wetland soils to wave action which results in erosion and loss of tidal wetland areas." AR_5648. These are reasonably foreseeable, albeit indirect, impacts that the Project would cause.

Under NEPA, FAA has an obligation to respond to this concern and analyze these impacts. 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.1(g); *Sierra Club*, 867 F.3d at 1371. It failed to do so, instead reiterating, without support, that tidal wetlands would not be impacted, and the project "would be designed to meet water quality standards." AR_1754. However, this conclusion is based on an analysis that only considers direct impacts. The FEA did not mention any *indirect* impacts to wetlands, nor does it state that there will be none. *See* AR_1625-31. This lack of information indicates that FAA failed to analyze indirect impacts altogether, despite extensive comments that the Proposed Action will indirectly impact a tidal wetland through stormwater pollution and degradation of the surrounding wetlands. *See*

AR_5584-85, 5648. To the extent that FAA has concluded, contrary to expert comments, that there are no indirect impacts, the basis for this conclusion must still be documented. *See Sierra Club*, 867 F.3d 1357.

As for FAA's analysis of wetland functions, Petitioners noted that the DEA "completely fail[ed] to acknowledge the flood flow alteration and nutrient removal and retention function of these wetlands." AR_5076. As Davison highlighted, these wetlands "provide nutrient removal/retention and floodflow alteration functions at a principal level due to the fact that [they] are low-gradient, densely vegetated, and located within a 100-year floodplain." AR_5632. The Wetland Report, attached as Appendix F to the EA, found impacted wetlands suitable for both these functions, noting that they have "[v]egetation diversity/abundance sufficient to utilize nutrients" and the ability "to absorb and retain water," among other features. *See* AR_7878-79, 13021-28. Rather than evaluate these, FAA reiterated its conclusion that the impacted wetlands "do not provide a substantial enough number of qualifiers...to meet the principal level of [these functions]." AR_1771.

In limiting its analysis to principal functions identified in the Wetland Report, it failed to consider the wetlands' flood-flow alteration and nutrient removal functions, which are critical for the surrounding communities. AR_5562, 5632-35, 5648, 13023. Even if these functions do not rise to a "principal level," the Wetland Report found that all directly impacted wetlands are suitable for nutrient removal,

64

and some are also suitable for flood-flow alteration. AR_7875-81. The FEA does not contain any mention of these features/functions, and it is not clear if FAA considered them in finding no significant impact. *See* AR_1626. This is not the hard look that NEPA requires.

Finally, FAA's proposed mitigation of wetlands impacts is also deficient. While FAA proposed to "replace" these wetlands using "off-site permittee responsible mitigation" and pay into Connecticut's In-Lieu Fee Program, it does not identify replacement parcels or indicate that there are replacement parcels at HVN. *See* AR_1630-31, 12939. Therefore, as commenters noted, "there is no way to assess...whether such mitigation would be adequate or not." AR_5075. Additionally, it states that the "stormwater detention system" proposed to mitigate flooding impacts from the addition of impervious surface, described above, would also be used to mitigate wetland impacts. AR_1630. But for the same reasons described above, FAA's vague reference to a future, undefined stormwater detention system is an inadequate basis to claim that wetlands impacts will be mitigated.

As commenters stressed, payment into or in lieu of a fee program and mitigation some distance away from the Project does little to nothing to mitigate flooding on the lands *adjacent to* the Project site which were at one time afforded protection by the wetlands the EA proposes to destroy. Flooding is a hyper-local issue and replacing lost flood storage and flood flow alteration functions with

compensatory mitigation up to two miles away, as the FEA proposes to do, will not help control increased flooding coming from the Project site into surrounding neighborhoods. *See supra* at pp. 59-62.

The FEA does little to argue otherwise and does not even propose any plan for monitoring this mitigation measure. *See* AR_1625-31. In response to comments, FAA merely repeated a simple refrain which it has leaned on since the DEA: that compensatory mitigation would achieve "no net loss" of wetland ecological functions and values. AR_1630, 1771. This response does not engage with East Haven and others' valid criticism, but rather repeats the same conclusory statement. It provides no elaboration or scientific support for how this sort of mitigation will actually compensate for the loss of localized flood storage capacity. This approach is entirely ignorant of the flooding problems in East Haven, despite the Town repeatedly flagging the problems. In failing to outline mitigation measures that will actually preserve the flood storage functions of the wetlands in and around the Project site, the EA provides no reason to believe the Project will do anything other than worsen "already unacceptable circumstances." *See* AR_1773.

## CONCLUSION

The FEA and FONSI/ROD should be vacated, and the matter remanded to FAA with direction to perform a full and adequate EIS.

Dated: November 15, 2024

Respectfully submitted,

*/s/ James T. Shearin*
JAMES T. SHEARIN, Esq.
DANA M. HRELIC, Esq.
Pullman & Comley LLC
90 State House Square
Hartford, CT 06103-3702
Tel: 860-424-4382
jtshearin@pullcom.com
dhrelic@pullcom.com

*Counsel for Petitioner Town of East Haven*

*/s/ Roger Reynolds*
ROGER REYNOLDS, Esq.
JESSICA ROBERTS, Esq.
DARA ILLOWSKY, Esq.
Save the Sound
127 Church Street, 2d Floor
New Haven, CT 06510
Tel 203-787-0646
rreynolds@savethesound.org
jroberts@savethesound.org
dillowsky@savethesound.org

*Counsel for Petitioner Save the Sound, Inc.*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

This brief complies with the word limit of Fed. R. App. P. 35(a)(7)(B) and this Court's Order dated August 1, 2024, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains **14,980** words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman font, size 14.

Dated: November 15, 2024                    */s/ Dana M. Hrelic*

## CERTIFICATE OF SERVICE

I, Dana M. Hrelic, hereby certify that on this 15th day of November, 2024, I electronically filed the Petitioners' Joint Brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system and that a true and correct copy of the foregoing Joint Brief was served by the appellate CM/ECF system on all participants in this matter pursuant to Circuit Rule 25.

Dated: November 15, 2024                    */s/ Dana M. Hrelic*

_____

# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TOWN OF EAST HAVEN, CT and SAVE THE SOUND, INC., *Petitioners*,

---v.---

FEDERAL AVIATION ADMINISTRATION, et al., *Respondents*, and

TWEED NEW HAVEN AIRPORT AUTHORITY and AVPORTS, LLC,
*Intervenors.*

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL AVIATION ADMINISTRATION

_____

## ADDENDUM

## TO JOINT BRIEF FOR PETITIONERS

_____

JAMES T. SHEARIN, Esq.
DANA M. HRELIC, Esq.
Pullman & Comley LLC
90 State House Square
Hartford, CT 06103
Tel: 860-424-4382
jtshearin@pullcom.com
dhrelic@pullcom.com

*Counsel For Petitioner Town of
East Haven*

ROGER REYNOLDS, Esq.
JESSICA ROBERTS, Esq.
DARA ILLIOWSKY, Esq.
Save the Sound
127 Church Street, 2d Floor
New Haven, CT 06510
Tel: 203-787-0646
rreynolds@savethesound.org
jroberts@savethesound.org
dillowsky@savethesound.org

*Counsel For Petitioner Save the Sound, Inc.*

# **ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

**STATUTES**..................................................................................................**AD1**

5 U.S.C. § 706..............................................................................................AD1

42 U.S.C. § 4331..........................................................................................AD2

42 U.S.C. § 4332..........................................................................................AD3


**REGULATIONS**.........................................................................................**AD6**

40 C.F.R. § 1500.1 (2023)............................................................................AD6

40 C.F.R. 1501.3 (2023)..............................................................................AD6

40 C.F.R. 1501.9(e) (2023)..........................................................................AD7

40 C.F.R. 1508.1 (g) (i) & (aa).....................................................................AD8


**STANDING EVIDENCE FOR SAVE THE SOUND**.....................................**AD9**

Affidavit of Mary Cannata............................................................................AD9

Affidavit of Joseph Janiga..........................................................................AD12

Affidavit of Anne Urkawich........................................................................AD15

Affidavit of Lorena Venegas.......................................................................AD17

Affidavit of Lynne Bonnett.........................................................................AD20


**STANDING EVIDENCE FOR TOWN OF EAST HAVEN**.........................**AD23**

Affidavit of Mayor Joseph Carfora..............................................................AD23

Davison Engineering Report on Environmental Assessment..........................AD25

Trinkaus Engineering, LLC Report on Environmental Assessment.................AD41

VN Engineers, Inc. Report on Environmental Assessment............................AD77

**STATUTES**

**Administrative Procedure Act**
**5. U.S.C. § 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**AD1**

# National Environmental Policy Act

## 42 U.S.C. § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may--
   (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
   (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
   (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
   (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
   (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
   (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

**42 U.S.C. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

(A) utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

(i) reasonably foreseeable environmental effects of the proposed agency action;

(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce

environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;

(E) make use of reliable data and resources in carrying out this chapter;

(F) consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

(G) any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(H) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(I) consistent with the provisions of this chapter, recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(J) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(K) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(L) assist the Council on Environmental Quality established by subchapter II of this chapter.

<u>**CODE OF FEDERAL REGULATIONS**</u>

**Council on Environmental Quality Regulations**

**40 C.F.R. § 1500.1 (2023). Purpose and policy.**

(a) The National Environmental Policy Act (NEPA) is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. Section 101 of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 102(2) of NEPA establishes the procedural requirements to carry out the policy stated in section 101 of NEPA. In particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decisionmaking process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

(b) The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

**40 C.F.R. § 1501.3 (2023). Determine the appropriate level of NEPA review.**

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:
(1) Normally does not have significant effects and is categorically excluded (§1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with §1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

## 40 C.F.R. § 1501.9 (e) (2023). Scoping.

. . .

(e) Determination of scope. As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions that may require environmental impact statements;

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

**40 C.F.R. 1508.1 (g), (i) & (aa) (2023). Definitions.**

. . .

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

. . .

(i) Environmental document means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

. . .

(aa) Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

## AFFIDAVIT OF MARY CANNATA

I, Mary Cannata, being duly sworn, do hereby depose and state under oath,

1. I am over the age of 18, and I have knowledge of and am competent to testify to all facts contained in this Declaration.

2. I reside at 75 Frank Street, East Haven, Connecticut. I own a home at this address and have lived here for approximately 32 years.

3. I am making this Declaration with the understanding that it will be used in support of a Petition to the United States Court of Appeals for the D.C. Circuit for review of the Finding of No Significant Impact / Record of Decision with regard to the Runway 02-20 Extension and East Side Terminal Development ("Proposed Action") at HVN.

4. I have been a member of Save the Sound since January 2024. I support Save the Sound's mission and work to protect and improve the land, air, and water of Connecticut and Long Island Sound. I joined Save the Sound because of my concern for the quality of the natural environment, particularly in East Haven. It is my understanding that Save the Sound is active throughout Connecticut and frequently works on improving environmental quality and ensuring compliance with existing environmental laws such as the National Environmental Policy Act.

5. I have been, and will continue to be, adversely affected and injured by the noise, traffic, and air pollution caused by HVN's operation.

6. From where I live—less than one mile away from the Airport—I can hear, see, and smell planes flying into and out of HVN at all times of the day and night. Sometimes, when these planes land, they fly directly over my neighborhood.

7. When my kitchen windows are open, I can smell the exhaust from the planes inside my house—it smells like motorcycles driving down the street. When the wind blows in from the

**AD9**

Long Island Sound, this smell is particularly strong. At times, when I walk out to the front of my house at night, I can smell what smells like gasoline.

8. In my bathroom upstairs, there is a layer of white dust that accumulates very quickly—I have to clean every other day to get rid of this dust, and I am worried that it is from plane exhaust. I am considering hiring an expert to do an evaluation to see what this dust is and how toxic it may be.

9. I enjoy riding my bicycle and walking in my neighborhood. The route that I ride my bicycle involves biking on Dodge Avenue and Burr Avenue near the Airport. I worry about the air pollution that I am exposed to and inhaling on this route from the planes flying overhead and how this air pollution might be impacting my health.

10. I am worried about traffic associated with the Airport. On one of my bicycle rides, I very nearly got into an accident with a truck delivering things to the Airport when this truck blew through a stop sign. While I slammed on my brakes and was able to avoid getting hit, I fell off and damaged my bike. I am concerned that the Proposed Action will increase traffic on my bicycle route, which would further jeopardize my safety. I filed a complaint verbally at the Airport.

11. I also worry about how the Proposed Action will increase flooding and water pollution in my neighborhood, considering the Proposed Action will fill wetlands and add impervious surface to an area that is already flood prone.

12. The Proposed Action will increase traffic (both flight and car/truck traffic), thereby increasing the amount of noise and air pollution that I experience, as well as increasing the risk of traffic accidents.

13. These impacts diminish my quality of life and threaten my health and safety. Though I have lived at 75 Frank Street for over thirty years and do not want to move, I am facing the decision of whether to do so because of HVN's impact on my health, safety, and quality of life, and the risk that this impact will increase as HVN expands.

14. Considering how HVN personally and adversely affects me, it is imperative to fully investigate how the Proposed Action will increase these impacts before committing to the Proposed Action.

15. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

THE AFFIANT

*Mary Cannata*

Mary Cannata

Subscribed and sworn to me on this _14th_ day of November, 2024

*Jessica Roberts*

Jessica Roberts
Commissioner of the Superior Court
Juris # 444274

**AD11**

# AFFIDAVIT OF JOSEPH JANIGA

I, Joseph Janiga, being duly sworn, do hereby depose and state under oath,

1. I am over the age of 18, and I have knowledge of and am competent to testify to all facts contained in this Declaration.

2. I reside at 75 Frank Street, East Haven, Connecticut, where I have lived here for approximately 32 years.

3. I am making this Declaration with the understanding that it will be used in support of a Petition to the United States Court of Appeals for the D.C. Circuit for review of the Finding of No Significant Impact / Record of Decision with regard to the Runway 02-20 Extension and East Side Terminal Development ("Proposed Action") at HVN.

4. I first became a member of Save the Sound in May 2022. While my membership lapsed in 2023, I renewed my membership in January 2024, and I have been a member of Save the Sound since this time. I support Save the Sound's mission and work to protect and improve the land, air, and water of Connecticut and Long Island Sound. I joined Save the Sound because of my concern for the quality of the natural environment, particularly in East Haven. It is my understanding that Save the Sound is active throughout Connecticut and frequently works on improving environmental quality and ensuring compliance with existing environmental laws such as the National Environmental Policy Act.

5. I have been, and will continue to be, adversely affected and injured by the noise, traffic, and air pollution caused by HVN's operation.

6. From where I live—less than one mile away from the Airport—I can hear, see, and smell planes flying into and out of HVN at all times of the day and night. Sometimes, when these planes land, they fly directly over my house.

**AD12**

7.  Planes typically start flying out of HVN at 6:30 in the morning, and the noise from these planes often wakes me up.

8.  In the family room of my house, I can feel the vibration from the planes flying into and out of HVN.

9.  In the above-ground pool in my yard, there are balls that float in the water and keep the ducks from landing in the pool. While these balls were clean when I put them in the pool, they are now coated in what looks like thick, black oil, which I suspect is from the atmospheric deposition of air pollution from these planes.

10. I can smell the exhaust from these planes and worry about the pollution in this exhaust.

11. I suffer from chronic sinusitis, and air pollution exacerbates my symptoms. I worry about the impact that air pollution caused by HVN has on my health.

12. The Proposed Action will increase flight traffic, thereby increasing the amount of noise and air pollution that I experience.

13. I also worry about how the Proposed Action will increase flooding and water pollution in my neighborhood, considering the Proposed Action will fill wetlands and add impervious surface to an area that is already flood prone.

14. These impacts diminish my quality of life and threaten my health and safety. Though I have lived at 75 Frank Street for over thirty years and do not want to move, I am facing the decision of whether to do so because of HVN's impact on my health and quality of life and the risk that this impact will increase as HVN expands.

15. Considering how HVN's air traffic personally and adversely affects me, it is imperative to fully investigate how the Proposed Action will increase these impacts before committing to the Proposed Action.

16. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

THE AFFIANT

Joseph Janiga

Subscribed and sworn to me on this 14th day of November, 2024

Jessica Roberts
Commissioner of the Superior Court
Juris # 444274

**AD14**

# AFFIDAVIT OF ANNE URKAWICH

I, Anne Urkawich, being duly sworn, do hereby depose and state under oath,

1. I am over the age of 18, and I have knowledge of and am competent to testify to all facts contained in this Declaration.

2. I am the Member Engagement Manager of Save the Sound, which is a nonprofit organization representing 4,400 member households throughout the Long Island Sound region. Our mission is to protect and improve the region's land, air, and water. We use legal and scientific expertise and bring communities together to achieve results that benefit our environment for current and future generations.

3. I am making this Declaration with the understanding that it will be used in support of a Petition to the United States Court of Appeals for the D.C. Circuit for review of the Finding of No Significant Impact / Record of Decision with regard to the Runway 02-20 Extension and East Side Terminal Development ("Proposed Action") at HVN.

4. Save the Sound has members who live and recreate within 1.5 miles of the Airport. These members have been, and will continue to be, harmed by the environmental impacts of HVN's operation, including noise, air pollution, water pollution, and flooding.

5. Because the Proposed Action involves filling wetlands, adding impervious surfaces, and will result in increased air traffic, it will increase the amount of noise, air pollution, water and wetlands pollution, and flooding that these members experience. As a result, it poses severe threats to these members' health, safety, and welfare, and to the environmental resources that Save the Sound protects.

6. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

**AD15**

THE AFFIANT


_Anne Urkawich_ (signature)
Anne Urkawich


Subscribed and sworn to me on this 14 day of November, 2024


_Jessica Roberts_ (signature)
Jessica Roberts
Commissioner of the Superior Court
Juris # 444274


**AD16**

# AFFIDAVIT OF LORENA VENEGAS

I, Lorena Venegas, being duly sworn, do hereby depose and state under oath,

1. I am over the age of 18, and I have knowledge of and am competent to testify to all facts contained in this Declaration.

2. I reside at 73 George Street, East Haven, Connecticut, where I have lived and owned my home for approximately 15 years. The neighborhood where I live is designated as an Environmental Justice Community by the Connecticut Department of Energy & Environmental Protection.

3. I am making this Declaration with the understanding that it will be used in support of a Petition to the United States Court of Appeals for the D.C. Circuit for review of the Finding of No Significant Impact / Record of Decision with regard to the Runway 02-20 Extension and East Side Terminal Development ("Proposed Action") at Tweed New Haven Airport ("HVN" or "the Airport").

4. I am a member of Save the Sound, Inc., and I have been a member of Save the Sound since January of 2024. I support Save the Sound's mission and work to protect and improve the land, air, and water of Connecticut and Long Island Sound. I joined Save the Sound because of my concern for the quality of the natural environment, particularly in the East Haven area. It is my understanding that Save the Sound is active throughout Connecticut and frequently works on improving environmental quality and ensuring compliance with existing environmental laws such as the National Environmental Policy Act.

5. I have been, and will continue to be, adversely affected and injured by the noise and air quality impacts of HVN's operation.

6. I live about 1.5 miles from the Airport. From my home, I can hear and feel planes taking off from and landing at HVN at all hours. These planes are so loud that the windows in my house shake when they pass over. Every night, there are at least several planes flying near my home, and I struggle with sleep because the noise from these planes keeps me awake. They sound like roaring thunder.

7. From my home, I can also smell the jet fuel from these planes taking off. This smell surrounds my neighborhood and diminishes my quality of life.

8. I have struggled with respiratory issues and worry about my exposure to air pollutants from these planes. When they take off, I can see a plume of grey exhaust trailing them, and I know this exhaust is impacting my air quality, which can exacerbate respiratory issues.

9. Since the entry of Avelo in 2021, the number of planes taking off from and landing in HVN has significantly increased. While there used to be only about six flights per day, now there are dozens, and the number of flights keeps increasing.

10. As the number of planes has increased, so too have the noise and air quality impacts.

11. Due to these increasing impacts, I avoid spending time outdoors in my neighborhood and the nearby beaches and parks. While I used to enjoy walking and watching birds and other wildlife in these areas, I now experience too much noise, smell, and pollution to enjoy these activities there.

12. Additionally, I experience frequent flooding near my home and along the route I take from my home to work. This flooding has been so severe that it has closed roads near my home, and it poses a risk to my home and safety.

13. The Proposed Action will increase flight traffic, thereby increasing the amount noise, smell, and air pollution that I experience daily. The Proposed Action will also fill wetlands and

increase the amount of impervious surface, which will result in more frequent and severe floods, as well as wetland/water pollution in my neighborhood.

14. These impacts diminish my quality of life and threaten my health and safety.

15. Considering how the air traffic and flooding personally and adversely affects me, it is imperative to fully investigate how the Proposed Action will increase these impacts before committing to the Proposed Action.

16. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

THE AFFIANT

_____
Lorena Venegas

Subscribed and sworn to me on this _9th_ day of November, 2024

_____
Jessica Roberts
Commissioner of the Superior Court
Juris # 444274

**AD19**

## AFFIDAVIT OF LYNNE BONNETT

I, Lynne Bonnett, being duly sworn, do hereby depose and state under oath,

1. I am over the age of 18, and I have knowledge of and am competent to testify to all facts contained in this Declaration.

2. I reside at 675 Townsend Ave., New Haven, Connecticut, where I have lived for approximately 34 years.

3. I am making this Declaration with the understanding that it will be used in support of a Petition to the United States Court of Appeals for the D.C. Circuit for review of the Finding of No Significant Impact / Record of Decision with regard to the Runway 02-20 Extension and East Side Terminal Development ("Proposed Action") at Tweed New Haven Airport ("HVN" or "the Airport").

4. I have been a member of Save the Sound since January 2024. I support Save the Sound's mission and work to protect and improve the land, air, and water of Connecticut and Long Island Sound. I joined Save the Sound because of my concern for the quality of the natural environment, particularly in the East Haven area. It is my understanding that Save the Sound is active throughout Connecticut and frequently works on improving environmental quality and ensuring compliance with existing environmental laws such as the National Environmental Policy Act.

5. I have been, and will continue to be, adversely affected and injured by the noise, traffic, and air pollution caused by HVN's operation.

6. From where I live—less than one mile away from the Airport—I can hear planes flying overhead and feel the vibrations from them in my floor.

**AD20**

7.  When I am gardening outside in my yard and hear a plane taking off northward from HVN, the noise is so loud that I have to drop what I am doing and cover my ears.

8.  I enjoy sitting on my deck and having people over, but the noise from planes passing over is significantly disruptive for me and my guests. When I have people over, we avoid staying outside on my deck if planes are flying overhead because nobody wants to sit through the noise.

9.  If this noise gets more frequent from the influx of flights, I doubt that I will be able to sit out there and enjoy being on my deck.

10. I also worry about air pollution from these planes and the adverse health impacts it may have on me when I go outside.

11. While I enjoy walking outside at nearby parks and beaches, such as Fort Wooster Park, East Shore, and Lighthouse Point Park, I avoid doing so when the wind is blowing air pollution there from the Airport; I only go to these places when the wind is blowing from the southwest to avoid air pollution.

12. While I bicycle a fair amount near and across the airport property to get to Short Beach, I am constantly worrying that a plane will pass over on my bike ride and I will have to breathe exhaust.

13. The Proposed Action will increase flight traffic, thereby increasing the amount of noise and air pollution that I experience. The Proposed Action will also increase water pollution from stormwater runoff, which can impact water quality at the beaches I like going to.

14. These impacts diminish my quality of life and threaten my health and safety. Though I have lived at 675 Townsend Ave. for over thirty years, I am facing the decision of whether to move because of these quality-of-life issues and the risk that they will get worse from the Proposed Action.

15. Considering how HVN's air traffic personally and adversely affects me, it is imperative to fully investigate how the Proposed Action will increase these impacts before committing to the Proposed Action.

16. I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

THE AFFIANT

Lynne Bonnett

Subscribed and sworn to me on this 9th day of November, 2024

Notary

DANNA LOJA-ROJAS
Notary Public, State of Connecticut
My Commission Expires Jun 30, 2028

**AD22**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| TOWN OF EAST HAVEN, CT and<br>SAVE THE SOUND, INC.,<br>Petitioners, | )<br>)<br>)<br>) | |
| v. | )<br>) | Case No. 24-1029<br>(consolidated with 24-1028) |
| FEDERAL AVIATION<br>ADMINISTRATION, *et al.,*<br>Respondents, | )<br>)<br>)<br>) | |
| TWEED NEW HAVEN<br>AIRPORT AUTHORITY and<br>AVPORTS, LLC,<br>Intervenors. | )<br>)<br>)<br>) | |

### AFFIDAVIT IN SUPPORT OF PETITIONER
### TOWN OF EAST HAVEN'S JURISDICTIONAL STATEMENT

I, Joseph Carfora, being duly sworn, hereby deposes and say:

1. I am over the age of eighteen (18), and I understand the obligations of an oath.

2. I am the Mayor of the Town of East Haven, Connecticut ("the Town") and have served in that capacity since November 2019. I have firsthand personal knowledge of all matters set forth herein and could and would competently testify to them if called upon to do so at trial.

3. As Mayor, as I have been involved with the proposed expansion of the Tweed New Haven Airport ("Airport") from the earliest discussions in 2019 and continuing to the present.

4. Roughly half of the Tweed New Haven Airport is located within the municipal boundary of the Town, on property owned by the City of New Haven, leased to the Tweed-New Haven Airport Authority, and recently sub-leased to a private airport management company called AvPorts. Much of the planned Airport expansion consists of moving facilities from the City of New Haven to the Town of East Haven, including the commercial passenger terminal and associated parking lots and access roadways. This, in turn, will result in entirely new traffic patterns on Town roads and impacts on Town resources. The Town, including its federally recognized Environmental Justice areas, will suffer direct harms because of the planned expansion.

**AD23**

5. The Town and its residents are directly affected by the severe flooding that occurs within the Town, which notably occurs at the new main access route used for the Airport and at the critical juncture of Hemingway Avenue and Short Beach Road where virtually all traffic to and from the Airport will have to travel by virtue of the planned expansion. Flooding affects the Town directly by, for example, requiring emergency response for stranded motorists and managing redirected traffic circumventing flooded roadways.

6. Even when the roads are dry, the Town and its residents will experience significant increases in traffic, as the new route to the Airport physically relocates said Airport traffic from New Haven residential neighborhoods to East Haven neighborhoods. This too will result in a substantial impact to the Town's first responders engaged in traffic control and accident response.

7. The impact of the frequent flooding combined with the significant increase in traffic on an already over-burdened route will not only inhibit access to the Airport, but also impede and strain the Town's ability to provide emergency response services within the Town.

8. Due to the proximity of community gathering places within the Town to the Airport, most notably the Town Green located along Hemingway Avenue, the Town and its residents will be directly impacted by the increased traffic to and from the Airport making it more difficult to access and host community events.

9. The Town will be directly affected by the environmental impacts of the planned expansion. These impacts include but are not limited to a large increase in the volume of polluted stormwater runoff and subsequent management, which is the Town's responsibility, the direct loss of the Town's tidal and inland wetlands, a negative impact on the Town's air quality, and alterations to the floodplain, which will exacerbate the already unmanageable flooding problems.

10. The myriad impacts associated with the planned Airport expansion also may result in the loss of residents and businesses from the Town, which would decrease the tax base and various revenues to the Town.

The foregoing is true and correct to the best of my personal knowledge and belief.

_____
Hon. Joseph Carfora

Subscribed and sworn to before me this 7th day of November, 2024.

_____

Print Name:
Notary Public
My Commission Expires_____

LISA A. BALTER
NOTARY PUBLIC
My Commission Expires July 31, 2026

**AD24**

AD25

COMMENTS OF THE TOWN OF EAST HAVEN ON THE
TWEED NEW HAVEN AIRPORT NEPA DRAFT
ENVIRONMENTAL ASSESSMENT RUNWAY 02-20
EXTENSION AND TERMINAL EXPANSION PROGRAM

Attachment B

Davison Engineering Report on Environmental
Assessment dated April 21, 2023



Wetland Delineation • Wetland Assessment & Permitting • Wildlife Surveys • Fisheries & Aquatics • GIS Mapping • Forestry

April 21, 2023

Ms. Jean Perry Phillips, Esq.

Pullman & Comley, LLC

90 State House Square

Hartford, Connecticut    06103-3702

**RE:    Environmental Assessment Review, Tweed New Haven Airport, Runway 02-20 Extension and Terminal Expansion Program**

Dear Ms. Phillips,

At the request of the Town of East Haven, I have reviewed the following McFarland Johnson materials submitted by Tweed New Haven Airport for the proposed runway and terminal expansion project.

1. NEPA Draft Environmental Assessment (EA), Runway 02-20 Extension and Terminal Expansion Program, March 2023, including the following Appendices:
    a. Appendix A:  Runway 02-20 Length Eligibility Analysis.
    b. Appendix B:  FAA Section 163 Determination
    c. Appendix C:  Agencies Correspondence
    d. Appendix D:  Public Involvement/Public Comments
    e. Appendix E:  PGAL Tweed Airport New Haven East Terminal Expansion
    f. Appendix F:  Wetland Report
    g. Appendix G:  Environmental Background Information
    h. Appendix H:  SHPO Project Review Package
    i. Appendix I:  Noise and Air Quality Technical Report
    j. Appendix J:  Environmental Justice Screening Report
    k. Appendix K:  Traffic Study for New Terminal, Traffic Study for Existing Terminal.

Davison Environmental, LLC • 10 Maple Street, Chester, CT 06412 • 860-803-0938 • www.davisonenvironmental.com

2. Trinkaus Engineering: Tweed New Haven Airport, Runway 02-20 Extension and Terminal Expansion Program, letter dated April 18, 2023

We offer the following comments relative to our review:

General

1. Coastal wetlands (tidal and freshwater) are critically important for the benefits they provide to coastal resiliency, floodwater management including storm surge attenuation, water quality, and wildlife.

2. The Long Island Sound Study ("LISS") is a cooperative effort formed in 1985 by the U.S. EPA, and the states of Connecticut, and New York. It consists of federal and state agencies, user groups, concerned organizations, and individuals dedicated to restoring and protecting the Sound. In 1994, the LISS developed a Comprehensive Conservation and Management Plan ("CCMP") to protect and restore Long Island Sound. This plan was updated in 2015 with targets to drive further progress through 2035.

3. The first theme of the 2015 CCMP is "Clean Waters and Healthy Watersheds" with a goal of improving water quality by reducing contaminant and nutrient loads from the land and waters impacting Long Island Sound.

4. The airport property and many of the surrounding neighborhoods lie within FEMA Flood Zones with mandatory flood insurance purchase requirements and floodplain management standards (VE and AE). Neighborhoods surrounding the airport are currently affected by flooding, absent further adverse impacts from anticipated sea level rise, storm intensity and frequency increases from climate change. The Sea Level Affecting Marshes Model ("SLAMM") is a widely adopted and effective model to predict wetland response to long-term sea-level rise and has been applied in every coastal state. Figures 1 & 2 depict SLAMM generated projected sea level rise on marshes proximate to the project area in 2025 and 2085. These figures demonstrate that 1. Areas within and immediately surrounding the project area would be affected by sea level rise; and 2. While the project as proposed would not directly impact tidal wetlands, it would prevent additional tidal wetlands from forming naturally in and around the project area and tidal wetlands may be impacted by stormwater runoff and other aspects of the project.

Wetland Impacts

1. The project as described will require the filling of at least 9.3 acres of freshwater wetlands. Remaining developed areas will directly abut freshwater and tidal wetlands.

2.  The Wetland Report assigned only Sediment/Toxicant Retention and Production Export functions to the affected wetlands (Wetlands 04. 05, 06A, 06B). These wetlands also provide Nutrient Removal/Retention and Floodflow Alteration functions at a principal level due to the fact that these wetlands are low-gradient, densely vegetated, and located within a 100-year floodplain. Nutrient/Removal/Retention functions are closely related to Sediment/Toxicant Retention functions which are almost always provided together. The loss of 9.3 acres of wetlands providing these functions will result in a loss of these functions and subsequent adverse impact to remaining freshwater and tidal wetland areas.

3.  The proposed expansion will increase the impervious area by at least 941,922 square feet (21.62 acres) for a total of 1,232,415 square feet when one includes the preexisting 240,493 square feet of impervious surfaces

4.  There are significant design challenges associated with proper stormwater management on the site considering almost 22 acres of additional impervious cover are proposed. Section 5.14.1.2 of the EA indicates that "infiltration opportunities are somewhat limited due to the high groundwater levels at the proposed terminal location. Detention and treatment would be provided for stormwater that cannot be infiltrated". Detention must occur below the elevation of the proposed parking garage, surface parking, airfield, terminal, runway and other stormwater generating surfaces (stormwater is gravity fed) and above groundwater which is acknowledged in the EA as "high", or closer to ground, which will limit the depths and volumes of detention basins. Basins will therefore likely need to be large and shallow, occupying large areas. These areas are not depicted on conceptual design plans. Without infiltration, these systems are likely to pond water, potentially attracting waterfowl, which present a safety hazard to aircraft.

5.  Trinkaus Engineering's review of proposed stormwater treatment indicates that "The increase of impervious area will result in significant increases of non-point source pollutants, such as Total Suspended Solids (TSS), Total Nitrogen (TN), Total Phosphorous (TP), Metals, Petroleum Hydrocarbons, and chloride based deicing agents"

6.  Improperly treated stormwater is the single largest source of water quality degradation in Long Island Sound and surrounding coastal wetlands. Nitrogen is particularly harmful to tidal wetlands.

Floodplain Impacts

1.  The EA states that construction of the runway profile and safety area improvements, the east terminal and site grading, and the parking garage will require approximately 61,300 cubic yards (or over 4,000 truckloads) of fill within a 100-year flood zone. As discussed by

Mr. Trinkaus, it is likely that more fill will be required to achieve required FEMA elevations in these areas and in the area of the proposed roadway and bridge, and the surface parking area

2. To compensate for floodplain loss, an equal volume of cut is required in the same general location and elevation as the fill. It is unclear where those cuts can occur at the Terminal Expansion location which is low-lying and surrounded by wetlands. Cuts in areas remote from the Terminal Expansion fill and at elevations higher than the fill will not mitigate for the anticipated loss of flood storage capacity. The project plans do not reference locations of cuts and fills.

3. Any loss of flood storage capacity that is not adequately compensated for will result in increased flooding in the areas surrounding the project which are reportedly already experiencing flooding at unacceptable levels.

Biological Impacts

1. Due to intensive use of the existing project area and ongoing mowing, the habitat value of the Project Area would be considered low overall, as described in the EA. The EA does acknowledge that the State-listed field bentgrass (*Paspalum laeve*) and potentially the state-listed two-flower Cynthia (*Krigia biflora*) will be directly impacted by the Project. These species are dependent upon anthropogenic habitat maintenance, making their presence less notable than a natural occurrence. But complete surveys and mitigation plans would be required to receive a Final Determination from the CTDEEPs Natural Diversity Database program which is required for a Stormwater General Permit.

2. No discussion was provided regarding the potential for secondary impacts of the project on wildlife, including both inland wetland and tidal species. Secondary impacts are those that occur to habitats adjacent to a project. They include noise and light pollution (which can disrupt audial communications and nocturnal behaviors), the discharge of stormwater pollutants such as nitrogen, phosphorus, hydrocarbons, heavy metals, sediment or de-icing agents that can impair water quality, and the impact of increased stormwater volume that can alter wetland hydroperiod (i.e., change the depth and duration of standing water within a wetland) and increase water temperatures (i.e., thermal impacts) which can impact tidal marsh vegetation (i.e., marsh dieback), and aquatic habitat in downstream Morris Creek.

3. The potential for secondary impacts from stormwater on fish and shellfish is not discussed. The only mention of shellfish includes Section 4.15.2, "Morris Creek has a Surface Water Quality Classification "SA" designated for: habitat for marine fish, other aquatic life and

wildlife; shellfish harvesting for human consumption..″ They go on to mention in section 5.4 Coastal Resources, "The Proposed Action is not anticipated to result in adverse impacts to tidal wetlands…wildlife/finfish/shellfish habitat." However no data or analysis is provided to support this supposition or address the reasonably foreseeable impacts from stormwater. Morris Creek is an active oyster restoration site being led by UCONN Marine Science Researcher Zofia Baumann (an article highlighting the oyster restoration efforts was posted as recently as November 7, 2022; link: https://marinesciences.uconn.edu/tag/morris-creek/). The EA mentions nothing of any ongoing research in the adjacent areas to the project.

4. The list of potential fish species in Section 4.3.3 does not include species that may utilize tidal creeks at various life stages, including: Mummichog, Atlantic Silversides or Alewife. Juvenile fish may utilize Morris Creek as a refuge site, especially given the increased habitat present due to the shellfish restoration projects that are ongoing. There is also potential for other fish species not listed in Section 4.3.3 to swim in and out of these tidal waters for feeding purposes. While the impacts to migratory fish species may be minimal, there is no discussion whatsoever of any potential impacts. Existing and proposed runways drain to Morris Creek and Tuttle Brook. There are several published scientific papers[1] detailing the potential adverse impacts of certain deicing chemicals used at

---

[1] Koryak, Michael, et al. "The impact of airport deicing runoff on water quality and aquatic life in a Pennsylvania stream." *Journal of Freshwater Ecology* 13.3 (1998): 287-298.

Pillard, David A. "Assessment of benthic macroinvertebrate and fish communities in a stream receiving storm water runoff from a large airport." *Journal of Freshwater Ecology* 11.1 (1996): 51-59.

Swietlik, William. *The Environmental Impacts of Airport Deicing--Water Quality*. Environmental Protection Agency, Washington DC Office of Water, 2010.

Sulej-Suchomska, Anna Maria, Piotr Przybyłowski, and Żaneta Polkowska. "Potential toxic effects of airport runoff water samples on the environment." *Sustainability* 13.13 (2021): 7490.

Chung, Kyong-Hwan, Sang-Chul Jung, and Byung-Geon Park. "Eco-friendly deicer prepared from waste oyster shells and its deicing properties with metal corrosion." *Environmental Technology* 42.21 (2021): 3360-3368.

Frank, M. D. *Chemical deicers and the environment*. CRC Press, 1992.

Hartmann, Jason T., et al. "Establishing mussel behavior as a biomarker in ecotoxicology." *Aquatic Toxicology* 170 (2016): 279-288.

airports that impact shellfish and fisheries populations without proper stormwater treatment.

EA Section 5.14.1.4, Significant Impact Threshold - Wetlands and Surface Water Features

The EA in Section 5.14.1.4 contains statements that are not supported by the information presented in the EA, including the following:

1.  The project <u>does not</u> have the potential to "Adversely affect a wetland's function to protect the quality or quantity of municipal water supplies, including surface waters and sole source and other aquifers."

    <u>Response:</u> Site wetlands provide principal functions associated with water quality protection (Sediment/Toxicant Retention and Nutrient Removal/Retention). Filling wetlands that provide these functions represents an adverse effect to these functions.

2.  The project <u>does not</u> have the potential to "Substantially reduce the affected wetland's ability to retain floodwaters or storm runoff, thereby threatening public health, safety, or welfare (the term welfare includes cultural, recreational, and scientific resources or property important to the public)".

    <u>Response:</u> The project is projected to require approximately 61,300 cubic yards (or over 4,000 truckloads) of fill within a 100-year flood zone. There is a reasonable chance that more fill will actually be required given actual and required elevations and project components. The project plans do not demonstrate the ability to compensate for this volume of fill with cuts at a similar location and elevation.

3.  The project <u>does not</u> have the potential to "Adversely affect the maintenance of natural systems supporting wildlife and fish habitat or economically important timber, food, or fiber resources of the affected or surrounding wetlands".

    <u>Response:</u> Properly treating stormwater generated from over 20 acres of additional cover on a site lacking infiltration capacity, with high groundwater and surrounded by wetlands presents significant engineering challenges. Acceptable stormwater treatment measures have not been demonstrated to be feasible on the site. Absent a demonstrable design, the information presented indicates a high likelihood of wetland degradation due to improperly treated stormwater discharges from the site. The cumulative impact of foreseeably degraded inland and tidal wetlands with the planned loss of a minimum of 9.3 acres of wetlands should be, but is not, considered.

4.  The project <u>does not</u> have the potential to "Be inconsistent with applicable state wetland strategies."

    <u>Response:</u> There are no state wetland strategies that support over 9-acres of wetland filling.

Respectfully submitted,

Matthew Davison
*Registered Soil Scientist*
*Professional Wetland Scientist*
*Certified Professional in Erosion and Sediment Control*
*CT Certified Forester*
matt@davisonenvironmental.com

Eric Davison
*Wildlife Biologist*
*Registered Soil Scientist*
eric@davisonenvironmental.com

*Attachments: Figures 1 and 2*

*FIGURES 1 and 2*



005638

3391

AD34

East Haven
New Haven

SCALE

1 inch = 1,250 feet

0    625    1,250 Feet

DAVISON ENVIRONMENTAL, LLC
10 MAPLE STREET
CHESTER, CT 06412
860-803-0938

DAVISON ENVIRONMENTAL

*Map Notes:*
*Sea Level Affecting Marshes Model (SLAMM)*
*data derived from www.longislandsoundstudy.net/slamm*
*Base Map: CTECO 2019 Aerial Imagery*
*Map Date: March, 2023*

se Effects on Marshes

Likelihood of Coastal Marsh

1-20%
20-40%
40-60%
60-80%
80-100%



## Projected 2085 Sea Level Rise Effects on Marshes

Tweed Airport
New Haven & East Haven, CT

### Legend

- ⬚ Approximate Project Site
- ⬛ Approximate Airport Property
- — Municipal Boundary

**2085 Likelihood of Coastal Marsh**

- 1-20%
- 20-40%
- 40-60%
- 60-80%
- 80-100%

*Map Notes:*
*Sea Level Affecting Marshes Model (SLAMM)*
*data derived from www.longislandsoundstudy.net/slamm*
*Base Map: CTECO 2019 Aerial Imagery*
*Map Date: March, 2023*

005640

**3393**

**MATTHEW DAVISON**  **Davison Environmental, LLC**
**Professional Wetland Scientist**  **10 Maple Street**
**Professional Soil Scientist**  **Chester, CT 06412**
**Certified Professional in E&S Control**  **860-836-6576**
**Connecticut Certified Forester**  matt@davisonenvironmental.com

### General Background

Mr. Davison has been providing environmental consulting services in Connecticut since 1998. He is a Professional Wetland Scientist (PWS), Professional Soil Scientist (PSS), Certified Professional in Erosion and Sediment Control (CPESC), and Connecticut Certified Forester. His experience includes local, state, and federal permitting, wetland delineation, soil mapping and classification, wetland evaluation, wetland impact assessments, habitat surveys, erosion and sedimentation control design, review and monitoring.

Mr. Davison has managed environmental efforts and mapping for a variety of Eversource projects over the past ten years, including new transmission lines, transmission line rebuilds, reconductoring, optical ground wire installation, maintenance, substation expansions, gas pipelines, and distribution lines. He has served as Eversource's Environmental Compliance Monitor on several projects, including providing contractor training, development and maintenance of project regulatory compliance matrices, and stormwater compliance monitoring.

Matthew is the co-owner of Davison Environmental LLC along with Eric Davison. Davison Environmental, LLC provides consulting services in the areas of biological, wetland, and soil sciences. In addition to the identification, description, and classification of natural resources, the firm also provides functional evaluation of wetlands and other biological systems, guidelines for mitigation of potential adverse impacts, and permit support through expert testimony and public representation. Services provided revolve around the impact of human activities on terrestrial, wetland, aquatic, and marine resources.

### Representative Projects

**Eversource, Various Transmission Line Rebuild Projects (2016 – Present)**
Matthew managed environmental efforts for the 1508 Line (Guilford to Madison), 1342 Line (Madison to Old Saybrook), 1555 Line (New Milford), and 1655 Line (Wallingford to Branford) Rebuild Projects. Responsibilities included natural resource identification and delineation, mapping, rare species surveys and authorizations, environmental permitting, contractor training, and regulatory compliance matrix development and maintenance. Matthew also assisted with the development of SWPCPs as required for the CTDEEP Stormwater GP (NPDES). For projects that have been constructed or are currently under construction, Matthew was/is responsible for the oversight of erosion and sedimentation controls, coordination with site contractors regarding environmental compliance, stormwater monitoring, and Stormwater GP/NPDES compliance.

**Eversource, Frost Bridge to Campville 115-kV Line Project (2016 – 2018)**
Managed environmental surveys, permits, provided expert testimony at the CSC and mapping for a new 10.4-mile 115-kV transmission line in Watertown, Thomaston, Litchfield, and Harwinton, Connecticut. As part of his project responsibilities Matthew drafted portions of the CSC Application, SWPCP, D&M Plan, and assisted with the layout of roads and work pads, and erosion and sedimentation controls. Matthew managed permit compliance on behalf of Eversource, including compliance with the CTDEEP Stormwater GP, and D&M Plan. His responsibilities included oversight of installation and maintenance of erosion and sedimentation controls, coordination with site contractors, rain event monitoring, attending weekly site meetings, and submission of weekly monitoring reports.



**AD36**

MATTHEW DAVISON          *PWS, PSS, CPESC, CT Certified Forester*

**Eversource, Branford to Guilford Distribution Line Removal Project (2016 – Present)**
Managed environmental permitting for the removal of a distribution line between Branford and Guilford, Connecticut. Project responsibilities included managing natural resource surveys including rare plants, rare plant protection measures, required agency consultations, mapping, and preparation of a CTDEEP LWRD (formerly OLISP) Certificate of Permission (COP) which was approved in fall 2018.

**Eversource, Norwalk Bridge Transmission Line Relocation Project (2017 – Present)**
Managing environmental tasks for the proposed relocation of a 115-kV transmission line, which requires an HDD crossing beneath the Norwalk River. Project responsibilities include managing natural resource surveys, preparing required agency consultations, attending pre-application meetings with CTDEEP and ACOE, and preparation of applicable CTDEEP LWRD and ACOE Section 10 permits.

**Eversource, Various Gas Pipeline Projects (2017 – Present)**
Managed or is currently managing environmental efforts for portions of the Wallingford to Durham Resiliency Project and Southeast Resiliency Project. Responsibilities include natural resource identification and delineation, mapping, rare species surveys and authorizations, environmental permitting, and attending meetings with local officials regarding natural resource concerns. The SE Resiliency Project includes a proposed gas pipeline HDD crossing beneath the Connecticut River between Middletown and East Hampton, Connecticut. Project responsibilities include preparing required agency consultations, attending pre-application meetings with CTDEEP and ACOE, and preparation of applicable CTDEEP LWRD and ACOE Section 10 permits.

**Eversource, Millstone Line Separation Project (2012 – 2014)**
Conducted full-time compliance monitoring for the separation of existing 345-kV double circuit transmission lines over 4.1 miles in Waterford, Connecticut. Responsibilities included oversight of installation and maintenance of E&S controls, coordination with site contractors, rain event monitoring, attending weekly site meetings, and submission of weekly monitoring reports.

**Eversource, NERC Alert Project (2012 – 2014)**
Managed environmental surveys, permits, and mapping for compliance with the North American Electric Reliability Corporation (NERC) rating recommendations.

**BNE Energy, Wind Energy Projects, Colebrook and Prospect, Connecticut (2010 – 2012)**
Managed environmental permitting efforts for siting of commercial wind farms at three locations in Connecticut. Conducted natural resource inventories including wetlands, existing flora and fauna, and habitat evaluations. Compiled technical documents and assisted in permitting with federal and state agencies. Provided expert testimony at the Connecticut Siting Council.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| **Education** | B.S. University of Massachusetts, Forestry, 1997<br>New England Regional Soil Science Certificate Program,<br>University of Massachusetts, 1998-2000 |
|---|---|
| **Registration** | Professional Soil Scientist, Society of Soil Scientists of Southern<br>New England, since 2000. |
| **Certifications** | Professional Wetland Scientist #2302<br><br>Certified Professional in Erosion and Sediment Control #6828<br>Connecticut Certified Forester #193 |



**AD37**

**ERIC DAVISON**
**Wildlife Biologist**
**Professional Soil Scientist**
**Senior Wetland Scientist**

**Davison Environmental, LLC**
**10 Maple Street**
**Chester, CT 06412**
**860-803-0938**
eric@davisonenvironmental.com

---

**General Background**

Eric Davison is a wildlife biologist who holds professional certifications as a Wetland Scientist through the *Society of Wetland Scientists* (SWS) and Soil Scientist through the *Society of Soil Scientists of Southern New England* (SSSNE). Eric has been a practicing wildlife biologist in Connecticut for 20 years. Skills and experience include the ability to identify resident and migrant avian species by sight and sound, and the ability to locate and identify all of Connecticut's native amphibians and reptiles.

Eric has significant experience identifying and mapping vernal pools, including cryptic and range restricted vernal pool indicator species. Eric holds a Scientific Collectors Permit from the Connecticut Department of Energy and Environmental Protection authorizing the study (including handling and trapping) of state-listed wildlife. Eric also has extensive experience in local, state, and federal wetland permitting, and has worked on numerous Connecticut Siting Council dockets along with providing expert testimony at Council hearings over the past 8 years.

Eric Davison is the co-owner of Davison Environmental LLC, which provides consulting services in the areas of biological, wetland, and soil sciences. In addition to the identification, description, and classification of natural resources, the firm also provides functional evaluation of wetlands and other biological systems, guidelines for mitigation of potential adverse impacts, and permit support through expert testimony and public representation. Services provided revolve around the impact of human activities on terrestrial, wetland, aquatic, and marine resources.

**Representative Projects**

**Eversource Transmission Line Reconductoring and Structure Replacement Project**
**667 Line, Salisbury and Canaan, CT**
Conducted wetland and biological surveys along a ten-mile utility right-of-way. Work included the delineation and mapping of State and Federal jurisdictional wetlands and watercourses; identification and mapping of vernal pools via minnow trapping, dip-netting, call-surveys and larval sampling; and surveys for the state and federally endangered Bog Turtle (*Glyptemys muhlenbergii*).

**NDDB Compliance Surveys, Eversource 1505/1607 Lines Hazard Tree Removal**
**Brooklyn and Canterbury, CT**
Conducted surveys for two State-listed birds, the American Kestrel (*Falco sparverius*) and Brown Thrasher (*Toxostoma rufum*). Work included the field identification of all breeding birds within the work area by sight and sound and led to the confirmation of a nesting pair of Kestrel. Protection strategies were developed to prevent disturbance to these birds during vegetation management work in compliance with NDDB protocols.

**NDDB Compliance Surveys, Eversource 1732 Line Vegetation Management**
**Canton and New Hartford, CT**
Conducted surveys for State-listed plants and host plants for the State-listed Frosted Elfin (*Callophrys irus*) including Wild Indigo (*Baptisia tinctoria*), Wild Blue Lupine (*Lupinus perennis*), Slender Mountain Ricegrass (*Piptatherum pungens*), Low Frostweed (*Crocanthemum propinquum*) and Needlegrass (*Aristida longespica* var. *geniculata*) as required under the CT DEEP's Natural Diversity Database Program review. Protection strategies were developed to mitigate impacts to these plants during vegetation management work in compliance with NDDB protocols.



**AD38**

ERIC DAVISON        *Wildlife Biologist, Professional Soil Scientist, Senior Wetland Scientist*

---

**NDDB Compliance Surveys, Eversource 348-364 Structure Replacement Project**
**East Haddam, Lyme and East Lyme, CT**
Conducted vernal pools surveys as well as surveys for State-listed plants and host plants for the State-listed Frosted Elfin (*Callophrys irus*). Plants identified and mapped including Dillenius' Ticktrefoil (*Desmodium glabellum*), Wild Indigo (*Baptisia tinctoria*) and Needlegrass (*Aristida longespica var. geniculata*). Vernal pools surveys identified the presence of two State-listed reptiles, the Spotted Turtle (*Clemmys guttata*) and Common Ribbonsnake (*Thamnophis s. saurita*). Protection strategies were developed to mitigate impacts to vernal pools, plants and animals during the proposed maintenance work in order to comply with NDDB protocols.

**CPV Towantic Energy Center, Oxford, CT**
Lead biologist responsible for herpetological and avian surveys for a proposed 785 MW dual-fueled combined cycle electric generating facility. Work included expert testimony at numerous Connecticut Siting Council hearings.

**Employment History**

Davison Environmental, 10 Maple Street, Chester, CT
- Owner, 2015 to present

Environmental Planning Services, 89 Belknap Road, West Hartford, CT
- Biologist/Senior Wetland Scientist, 2000-2015

Cary Institute of Ecosystems Studies, 2801 Sharon Turnpike, Millbrook, NY
- Biodiversity Specialist, 2009-2011 (part time, grant funded term position)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **Education** | B.S. University of Massachusetts, Wildlife Conservation and Management, 1998 |
| | New England Regional Soil Science Certificate Program, 2000 |
| **Affiliations** | Member, Chester Inland Wetlands and Watercourses Commission, since 2013. |
| **Registrations/ Certifications** | Professional Soil Scientist, Society of Soil Scientists of Southern New England, since 2000. |
| | Certified Professional Wetland Scientist, Society of Wetland Scientists, since 2007 |



**AD39**



Biodiversity Studies  •  Wetland Delineation & Assessment  •  Habitat Management  •  GIS Mapping  •  Permitting  •  Forestry

## QUALIFICATION STATEMENT

Davison Environmental, LLC provides consulting services in the areas of biological, wetland, and soil sciences, environmental impact assessment and mitigation planning to public agencies and private clients; including design professionals, attorneys, site developers, municipalities, and public interest groups.

In addition to identification, description, and classification of natural resources, the firm also provides functional evaluation of wetlands and other biological systems, guidelines for mitigation of potential adverse impacts, and permit support through expert testimony and public representation. Services provided revolve around the impact of human activities on terrestrial, wetland, aquatic, and marine resources. The firm specializes in biological and wetland surveys, impact assessment, and mitigation planning.

**SERVICES**
- Wetland delineation and assessment (CT and federal)
- Environmental impact assessments
- Site plan review
- Local, state and federal permitting
- Wetland mitigation
- Sediment and erosion control review
- Coastal site plan (CAM) applications
- Biodiversity studies (herpetiles, birds, vernal pools)
- Threatened and endangered species surveys
- Natural resource mapping and interpretation
- GIS mapping

For more information please visit our website at www.davisonenvironmental.com or contact Eric Davison by phone at 860-803-0938 or by email at eric@davisonenvironmental.com.

COMMENTS OF THE TOWN OF EAST HAVEN ON THE TWEED NEW HAVEN AIRPORT NEPA DRAFT ENVIRONMENTAL ASSESSMENT RUNWAY 02-20 EXTENSION AND TERMINAL EXPANSION PROGRAM

Attachment C

Trinkaus Engineering. LLC Report on Environmental Assessment dated April 18, 2023

005646



**Trinkaus Engineering, LLC**
114 Hunters Ridge Road
Southbury, Connecticut  06488
203-264-4558 (office)
+1-203-525-5153 (mobile)
E-mail: strinkaus@earthlink.net
http://www.trinkausengineering.com

April 18, 2023

Ms. Jean Perry Phillips, Esq.
Pullman & Comley, LLC
90 State House Square
Hartford, Connecticut    06103-3702

>                             RE:    Impacts on Stormwater and
>                                    Surrounding Environment
>                                    Tweed New Haven Airport
>                                    Runway 02-20 Extension and
>                                    Terminal Expansion Program
>                                    Draft Environmental Assessment

Dear Attorney Phillips,

At the request of the Town of East Haven, I have reviewed the following documents published by Tweed New Haven Airport Authority for a proposed runway and terminal expansion project.   All the following documents were provided  by McFarland Johnson.

a.  NEPA Draft Environmental Assessment (EA), Runway 02-20 Extension and Terminal Expansion Program, March 2023
b.  Appendix A:  Runway 02-20 Length Eligibility Analysis prepared by McFarland Johnson
c.  Appendix B:  FAA Section 163 Determination  prepared by the FAA.
d.  Appendix C:  Agencies Correspondence prepared by select state and federal agencies.
e.  Appendix D:  Public Involvement/Public Comments prepared by McFarland Johnson/compiled by McFarland Johnson
f.  Appendix E:  PGAL Tweed Airport New Haven East Terminal Expansion prepared by PGAL.
g.  Appendix F:  Wetland Delineation Report prepared by FHI Studio
h.  Appendix G:  Environmental Background Information Authorship Unknown
i.  Appendix H:  SHPO Project Review Package prepared by CT DECD
j.  Appendix I:  Noise and Air Quality Technical Report prepared by HMMH.
k.  Appendix J:  Environmental Justice Screening Report data available from federal agencies
l.  Appendix K:  Traffic Study for New Terminal, Traffic Study for Existing Terminal .prepared by FHI Studio

The focus of my review is on how the proposed improvements will impact stormwater management and the environment surrounding Tweed New Haven Airport.

**Summary of Proposed Improvements:**

A. The construction of a new terminal building, a parking garage, surface parking and gate area to be in the East Haven portion of the airport property.
B. A new access driveway with a bridge to provide access from Proto Drive in East Haven to the new facilities.
C. A lengthening of Runway 02-20 to 6,535 feet at the current southern terminus of this runway.

I have the following comments for your consideration.

1. Table 3-10 in the EA states that the impervious footprint area associated with the terminal building, the terminal apron, the taxiway, vehicle parking and the bridge totals 1,289,717 square feet or 30.99 acres. A pervious area of 23,760 square feet or 0.55 acres is proposed for a stormwater management area. Section 3.3.1.2 states there is a proposed 699 foot extension with a 235 foot displaced threshold for the southern end of the runway and a 336 foot extension with a 336 foot displaced runway end threshold proposed for the northern end of the runway. A 355 foot by 200 foot EMAS is also proposed. The runway extensions and EMAS will contribute significant quantities of impervious surfaces which are not quantified at any point in the EA or appendices. In Section 5.14.1.2 the EA states the proposed expansion will increase the impervious area by 941,922 square feet (21.62 acres). These numbers are inconsistent, and it is unclear what the true increase in impervious areas will be. However, even if we use the lower 941,922 square feet calculation, it results in 3.2 times the existing impervious area on the site. This increase of impervious areas will result in significant increases in stormwater runoff volume for all rainfall events. Obviously, the problem will be further exacerbated if the higher 1,289,717 square feet calculation (or something in between the two figures) is accurate.

   Section 5.14.1.2 states in part " *The proposed terminal site would include stormwater detention systems to allow for a controlled release of stormwater from the site, on-site improvement of water quality, and elements of infiltration where possible. The site design would allow for some infiltration and filtering of stormwater to recharge groundwater and minimize the amount of stormwater that enters surface waters and adjacent wetlands; however, infiltration opportunities are somewhat limited due to the high groundwater levels at the proposed terminal location. Detention and treatment would be provided for stormwater that cannot be infiltrated.*" The above quote from the EA clearly states that infiltration of post-development runoff is unlikely to occur. If you are unable to infiltrate runoff, then the runoff will be discharged as surface flow which will worsen flooding in the surrounding areas. Even if some type of Low Impact Development (LID) practice such as permeable pavement was to be considered for

**AD43**

surface parking areas, it would not result in reductions of runoff volume due to a lack of natural infiltrative capacity in the soils around the expansion.

2.  The increase of impervious area will also result in significant increases of non-point source pollutants, such as Total Suspended Solids (TSS), Total Nitrogen (TN), Total Phosphorous (TP), Metals, Petroleum Hydrocarbons, and chloride based deicing agents. The primary source of TSS and deicing agents is maintenance of roadways and exterior parking areas during the winter to provide safe surfaces for vehicles and pedestrians. This of course is different than the deicing agents associated with aircraft maintenance which are expected to be managed via a collection system installed in the proposed new apron.

3.  The primary source of metals and hydrocarbons in stormwater runoff is motor vehicles. Construction of approximately 4,000 additional parking spaces consisting of a combination of surface parking and a parking garage is  proposed. The existing 1,128 parking spaces will continue to be utilized with a shuttle service proposed to provide transit between the existing spaces on the west side and the new terminal on the east side. In short there is a planned significant increase of motor vehicles using the site that will also generate higher pollutant loads impacting coastal and tidal wetlands.

4.  Based upon professional literature, approximately 40% of nitrogen and phosphorous loads are the result of atmospheric deposition onto impervious surfaces during all-weather events.   When there are large impervious areas, this material will accumulate on these surfaces and then be washed off with a rainfall event.  Nitrogen loads are a significant concern as runoff will be directed toward tidal wetlands where nitrogen in the runoff can kill tidal grasses in the wetland areas, thus exposing tidal wetland soils to wave action which results in erosion and loss of tidal wetland areas.  Links to Professional Journal Articles are provided at the end of this report which discuss atmospheric deposition of nutrients.

5.   The EA vaguely discusses generic possible approaches as to how stormwater management will be handled for the terminal expansion, but no detailed site specific stormwater management information is provided in the EA.  The EA does not address the increase of runoff volumes and pollutant loads which will result from this expansion. This is a major deficiency of the EA.  It is standard civil engineering practice to provide, at a minimum, conceptual plans for how stormwater will be handled on a site.  No such plan has been provided by the EA.

6.  As stated above, the EA in Section 5.14.1.2 discusses the possibility of using infiltration to handle some or all the expected runoff, however, it is further acknowledged in the EA that the soils may not be suitable for infiltration.  No site evaluation has been conducted to determine the underlying soil conditions in the proposed expansion.  This is a major deficiency in the EA.

7.  The EA includes a proposal to extend Runway 02-20 by approximately an additional 639 feet at Runway 02 and 336 feet at Runway 20 and install a 355 foot by 200 foot EMAS system.  This will result in a further increase in impervious areas that need to be

addressed. There is no discussion as to how stormwater associated with the runway expansion, including EMAS, will be managed in the EA. This is a major deficiency in the EA.

8. As this site is located within 500 feet of a tidal resource, the CT DEEP 2004 Storm Water Quality Manual requires that the Runoff Capture Volume (RCV) be calculated and observed. Per the DEEP Manual, the objective of the RCV is to capture stormwater runoff to prevent the discharge of pollutants, including "unpolluted" fresh water, to sensitive coastal receiving waters and wetlands. The RCV is defined as the runoff generated by the first inch of rainfall which must be retained on site. For the proposed expansion as described in the EA, the RCV would be a minimum of 1.71 acre-feet of runoff which is 74,556 cubic feet. There is no discussion in the EA of how compliance with the RCV requirement will be accomplished.

9. The EA states that approval of any stormwater management system will be done through the CT DEEP Construction Stormwater General Permit. This is incorrect. The CT DEEP General Permit is a certification process only for a stormwater management/erosion control plan which has been previously reviewed and approved by local land use agencies. In this case, the agency with review and approval of the stormwater management system is the Town of East Haven Inland Wetlands and Watercourses Commission and Flood & Erosion Commission.

10. The EA in Section 5.14.3 states that the proposed alternative for Runway 02-20 will require that the existing runway will need to be raised vertically by 0-4 feet and that the runway extension and safety area will be raised by 3-6 feet to achieve FAA Runway design standards and accommodate the EMAS above the State-projected sea level rise for year 2050. In this section it is also noted that paved sections in the terminal area including roadways, parking, aircraft apron, taxiways and lanes would be constructed at or close to existing grade. The terminal however would be constructed with a finished floor elevation at or above 13 feet above MSL elevation, or 8 feet above existing grade. The terminal would be constructed on columns with a crawlspace underneath the terminal to allow passage of floodwaters. The proposed parking garage would include construction of a ground level pad and other items to achieve the 13 feet base flood elevation. Given the close proximity and interdependence of the various components of this project, proposing that the runway expansion, the new terminal and parking facilities, the access road and the bridge will be at varying stated elevations (some of these will be substantially elevated above grade, while others will be maintained at grade), does not appear to produce a cohesive final grading of the site.

11. Tweed New Haven Airport is in an AE Flood Zone as defined by FEMA. According to the submitted EA, the 100-year flood elevation is 12.0 MSL (Mean Sea Level). According to the EA, the elevation of the first floor of the terminal building and the base elevation of the parking garage will be at 13.0 MSL. This is only 1' above the FEMA 100-year flood elevation of 12.0 MSL. The FEMA document entitled "Floodplain Management Requirements – A Study Guide and Desk Reference for Local Officials – FEMA 480", dated February 2005 states on page 5-31 that an extra margin of protection

requires the lowest floor to be one or more feet above the Base Flood Elevation (BFE). The EA does not discuss if 1' above BFE is adequate to protect the new terminal building and vehicles in the parking garage from flooding.

12. No geotechnical data has been provided in the EA regarding the proposed runway improvements, new terminal, parking garage and surface parking area which would provide information on the subsurface soil conditions around the expansion and allow an evaluation of the type of construction proposed.

13. No grading plan has been provided in the EA which would allow for the evaluation of the stated amount of fill to be brought in. This is a critical component given the proximity of terminal and runway improvements and the disparity in planned elevations of various critical components. On its face the information given suggests that the estimated amounts of fill required for construction site wide are grossly underestimated. If additional fill is required, then the extent of fill beyond the area of actual construction will also increase. This would result in greater adverse physical impacts to the delineated inland wetlands.

14. According to topographic maps of Tweed New Haven Airport provided by the town, the average elevation around the proposed terminal is 6.0 MSL; thus to raise the terminal building and parking garage above the base flood elevation will require raising the grade by a minimum of 7' for structures which will be used by staff and the public. No detailed information has been provided as to how this will be accomplished.

15. As stated in the EA, the proposed expansion will encompass approximately 31 acres. While it is stated that the runway expansion, terminal building, and parking garage will be located above the 100-year flood elevation, why isn't the large surface parking area being raised above the base flood elevation? It is stated that 61,300 cubic yards of material will be placed for the runoff expansion, parking garage and terminal building to elevate above base flood elevation. Over an area of 31 acres, 61,300 cubic yards will only raise the elevation by 1.2' which is insufficient to raise the features above the base flood elevation. Looking at 61,300 cubic yards of fill another way would mean that only approximately 4.7 acres of the 31 acres could be raised 7' to be above the base flood elevation. Frankly, it does not appear that the stated volume of 61,300 cubic yards will be adequate for this project and the estimate is not supported in the EA.

16. If the 61,300 cubic yards of material is correct, this will require over 4,000 dump trucks to bring the structural fill material. There is no discussion in the EA about the importation of this fill volume and the impact on the East Haven road system and neighborhoods surrounding the site. These impacts will be exacerbated if more fill is needed.

17. The filling required for the new terminal and runway expansion will result in a significant loss of flood storage below the limit of the 100-year base flood elevation. It is stated that there is an available area along the existing runway where compensating flood storage

5

can be provided for the proposed filling within the 100-year flood plain, but the EA does not contain adequate information to support this assertion.

18. There is minimal discussion in the EA about the proposed access road from Proto Drive, the required bridge, and impacts to freshwater and tidal wetlands. This is a serious deficiency in the EA as these potential impacts must be discussed in detail so a full evaluation can be made by the regulatory agencies. The construction of the access road will require the placement of fill within the 100-year flood plain. No information is provided on how the construction of the proposed road will be accomplished.

19. The proposal will require the filling of approximately 9.3 acres of freshwater wetlands. This will require review and approval by the East Haven Inland Wetlands and Watercourses Commission. The filling of such a large area is deemed a "significant activity" under the Inland Wetland Regulations and thus "feasible and prudent" alternatives to the proposed filling must be provided. No "feasible and prudent" alternatives have been provided in the EA. As no preliminary grading plan has been provided for the expansion in the EA, the extent of filling of freshwater and potentially tidal wetlands could be greater than the 9.3 acres cited in the EA. If fill is brought to the site, there must be a slope from the top of the fill back down to original grade which does not appear to have been considered in the EA.

20. AE flood zones can also experience wave heights of three (3) feet or less. This is not considered in the EA, and given the stated intent to construct much of the site at ground level -- including apparently the surface parking area -- this is a major problem and deficiency.

21. The Town of East Haven has presented testimony from various town officials including the Police and Fire Departments regarding frequent road and property flooding outside the limits of Tweed New Haven Airport during all levels of rainfall events and high tides that coincide with full moons and high winds. The flooding events documented include those on the proposed new access route, a state roadway, to the airport. There is no discussion in the EA as to how the proposed raising of the grade for the terminal and runway expansion and the increase of impervious area will affect the current flooding situation of roads and private properties outside the limit of the airport. It is clear however that the project as proposed will increase the frequency and duration of flooding in this area. Photographs, videos, and other documentation of this problem are available here. (https://easthavenct-my.sharepoint.com/personal/thedley_easthaven-ct_gov/_layouts/15/onedrive.aspx?id=%2Fpersonal%2Fthedley%5Feasthaven%2Dct%5Fgov%2FDocuments%2FFlooding%20Photos&ga=1 )

22. According to Section 33.14 Flood Plain Districts of the East Haven Zoning Regulations, any Site Plan or Special Exception application shall contain assurances that the flood-carrying capacity is maintained with any altered or relocated portion of any watercourse. What this means is if filling is to occur within a designated flood plain which would reduce the storage capacity of the flood plain, then compensating flood storage must be

provided.   There is no discussion in the EA of how or where compensating flood storage will be provided though the requirement is noted in Section 5.14.3.

23. It is understood that the existing storage area for aviation fuel will increase as part of the proposal.  A containment system must be provided around all types of above ground liquid fuel storage tanks.   No such system has been discussed in the EA.

Conclusion:

It is my professional opinion that there are significant deficiencies in the EA as stated above including the lack of information regarding site grading and stormwater management that prevent an accurate assessment of the impacts to the site and the adjacent areas in East Haven that would be caused by the proposed project.  However, considering the information provided, such as it is, and taking it at face value, there are clearly grave consequences to the physical environment in the project area and immediately and further adjacent, including to inland and coastal wetlands, watercourses, and water resources.Please feel free to contact my office with any questions about the information provided in this report.

Respectfully Submitted,
Trinkaus Engineering, LLC

Steven D. Trinkaus, PE

Link:  https://d1wqtxts1xzle7.cloudfront.net/73492852/j.scitotenv.2008.04.04420211023-13380-1kzb7sj-libre.pdf?1635028946=&response-content-disposition=inline%3B+filename%3DAtmospheric_deposition_of_carbon_and_nut.pdf&Expires=1681907364&Signature=RUL0KbIamrLpL9WwGIg1kV-7I1oEpNGgoiKlTsofWBVzp4DPZJtjmLYKBpInE7w3nE1Kyy6ZYG5WP02CtStyZqb~e~06mc-bSGEIb~99AiMOnm4cG6b3pBFXGiRNj5JbU8w5g5uV5ok~y7BMEpAZC6vGBwAzURvMcj63XXjH27m-dsETU3FvQNWv~4zptwKmJTItN2P4LFQjZxwPDEH~VFMazjEX96RSFd56fgUPx293ZjgmZgBs4SjUKvctcInT6z0nb342iWhEB8pvhP~kcmq8Obk5QX2~9pAFBCuX1GaJA~nYf5yARj5P0zbKEzJc~w5kzesG94g1TsksqjJ2WQ__&Key-Pair-Id=APKAJLOHF5GGSLRBV4ZA

Link:  https://www.mdpi.com/2306-5338/5/3/45

Link:  https://pubs.usgs.gov/wri/wri034241/pdf/wrir034241.pdf

7

**Steven D. Trinkaus, PE**
**Trinkaus Engineering, LLC**
**114 Hunters Ridge Road   Southbury, Connecticut     06488**
Phone:  +1-203-264-4558 (office), +1-203-525-5153 (mobile)
Website:  http://www.trinkausengineering.com
Email:  strinkaus@earthlink.net
Alternative Email:  Trinkaus.korea.lid@gmail.com

| | |
|---|---|
| **Qualifications** | B.S. / Forest Management/1980<br>University of New Hampshire |
| **Licenses/Certifications** | Licensed Professional Engineer- Connecticut (1988) |
| **Professional Societies** | American Society of Civil Engineers<br>Connecticut Society of Professional Engineers<br>International Erosion Control Association |
| **Professional Awards** | Steve was named an Industry Icon by Storm Water Solutions<br>in July 2015 http://editiondigital.net/publication/?i=263831&p=16<br>for his work in the Low Impact Development field. |

**International Experience**

**South Korea – July 2017, June 2016, April 2015, October 2014, April 2014, October 2013 and June 2013**

- Steve was invited by Dr. Leeyoung Kim of Kongju University to make a presentation at the Seoul International Symposium for water cycle held on July 27, 2017 at Seoul City Hall.   Steve's presentation was entitled "Sustainable Urban Water Cycle Management, Low Impact Development Strategies for Urban Retrofits".   Steve also made a presentation to Master and PhD Engineering students at Kongju University on designing LID treatment systems.   He also visited the research office of Land & Housing Institute in Daejeon to inspect recent LID retrofits consisting of Bioretention systems, Bioswales and Permeable Paver systems.
- Steve was invited by Dr. Shin to visit the Korean GI/LID research center in July of 2017.   The purpose of the visit was to inspect the LID research systems which had been in place for a year to observe how well they were functioning and also to observe the current research on infiltration of LID systems and evaportranspiration of green roof systems.
- Steve was an invited attendee to the official opening of the Korean GI & LID Research Center recently constructed at the Yangsam Campus of Pusan National University.   Steve was a consultant on the design of the research center for Dr. Hyunsuk Shin of Pusan National University.
- Steve was an invited presenter at the World Water Forum by Dr. Hyunsuk Shin of Pusan National University.  He presented case studies of GI/LID applications in the United States.
- Steve was invited by Dr. Yong Deok Cho of Kwater to participate in the Water Business Forum at the World Water Forum.   Steve presented an overview of his business and expertise in Low Impact Development.

1

- Steve was invited by Dr. Hong-Ro Lee of Kunsan National University and made a presentation entitled "Understanding Low Impact Development in the Urban-Rural Interface" for the **Ariul Brainstorming Working Group** on April 16, 2015 in Gunsan, South Korea. He also toured portions of the proposed land reclamation area to assess how Low Impact Development strategies could be incorporated to address water quality issues from the proposed agricultural, residential, commercial and industrial land uses for this area.
- Steve was a Contributing Author as well as an Advisory Reviewer for a report prepared by Land & Housing Institute (LHI) entitled " Pyeongtaek Godeok New City Low Impact Development techniques (LID), A study on the introduction of measures (I) " dated: January 2015. This report by LHI also cited the Town of Tolland LID Design Manual as a foreign LID Manual to be used as a reference document.
- Steve was an invited presenter at the International Water Forum 2014 held in conjunction with the Nakong River International Water Week in Gyeongju, South Korea sponsored by DaeGyeong Water Foundation & the International Hydrologic Environmental Society. His presentation focused on urban stormwater and the benefits of LID in these areas.
- Steve was an invited presenter at the IWA Water Reuse & Energy Conference 2014 held in Daegu, South Korea. His presentation was on the regulatory barriers to implementation of LID and how to overcome these barriers. He also participated in a panel discussion with other presenters.
- He also made a presentation at The 1st GI & LID Technical Education Workshop held at Pusan National University on October 22nd on an overview of LID and the application of LID concepts. He was invited by Dr. Kyung Hak Hyun of Land & Housing Institute (LHI) to make two presentations of LID case studies at Sangyung University and at a seminar hosted at LHI along with Kwater.
- Steve met with Jong-Pyo Park, Director and Kyoung-Do Lee, CEO of HECOREA, a water resource consulting firm to discuss LID in dense urban areas. Steve signed a MOU with HECOREA to provide consulting services on LID monitoring approaches and maintenance protocols for the Go-Deok International Planning District near Pyeongtaek, South Korea.
- Steve was invited by Dr. Kyung Hak Hyun of Land & Housing Institute to present at the 2nd Low Impact Development Forum in Daejeon, South Korea on October 31, 2013. He also inspected the site of Asan-tangjeong which is an expansion of residential housing for the city of Asan. This expansion will incorporate LID stormwater strategies.
- Steve was invited to make a presentation of the implementation of LID on commercial sites by Dr. Reeho Kim of the Korea Institute of Construction Technology in Seoul.
- Steve met with Dr. Sangjin Lee of Korean Water and Dr. Woo Young Heo, CEO of LID Solution Co, Ltd to review the initial concept plans for the Eco-Delta City project. Eco-Delta City is a new city located near the Gimhae International Airport of 13 square kilometers and will incorporate LID concepts throughout the new city.
- Steve signed a MOU with Dr. Shin of Pusan National University to provide consulting services for the Smart GI/LID Research Facility at Pusan National University. Steve was asked by Dr. Shin to review the design plans for the GI/LID research facility to be constructed at Pusan National University with a focus on the exterior LID research facilities. He provided a written comprehensive review for consideration by PNU.
- Steve was invited by Dr. Hyunsuk Shin of Pusan National University in South Korea to present a workshop on Low Impact Development on June 24, 2013. The presentation was made to research professors, graduate engineering students and practicing engineers at K-water headquarters in Daejeon, South Korea. He also met with representatives of other agencies tasked with the development of a new city, called Eco-Delta City which will implement LID practices from the ground up and comprises approximately 3,500 acres.

2

**AD50**

**Nanjing, China, September 2018**

Steve was invited by the organizing committee for the third China Sponge City International Exchange Conference to make three presentations on LID. The presentations were entitled: "LID: The Good, the Bad and the Ugly", "Permeable Pavement Case Studies" and "The regulatory framework to adopt LID". The conference was held September 27th and 28th in Nanjing, China.

**Beijing/Zhenjiang, China – August 2017**

Steve was invited to make a presentation entitled "Urban LID in China and South Korea" at the 2017 Second China Sponge City International Exchange Conference held in Beijing on August 16-1, 2017. He also made a presentation for Dr. Nian She, Director of Smart Sponge City Planning and Construction Research Institute in Zhenjiang, China on modeling approaches for LID treatment systems as well as inspecting some recent LID retrofits currently under construction in Zhenjiang.
Steve also made a presentation at Reschand entitled "LID Case Studies from US" at the request of Yuming Su of Reschand.

**Nanjing, China – September 2016**

Steve was invited to present at the 2016 First China Sponge City International Exchange Conference held in Nanjing, China. The presentation focused on several case studies of LID systems in the US.

**Zhenjiang, China – June 2015**

Was retained by Dr. Nian She to design Urban LID retrofits for a 2.5 hectare (6.5 acres) dense residential area in the city of Zhenjiang. The LID retrofits had to fully treat runoff from the existing impervious areas (building roofs, driveways and parking areas) for 65 mm (2.6") of rainfall in 24 hours. The LID systems also had to attenuate the peak rate of runoff for a rainfall event of 150 mm (5.9") rainfall event. A combination of Bioretention systems, and permeable pavers with a filter course and reservoir layer were used to meet these stormwater requirements.

**Zhenjiang, China – May 2015**

Steve was invited by Professor Nian She of Shenzhen University to make a presentation entitled "Using LID to Attenuate Large Rainfall Events and Reduce Flood Potential" at the 2015 First Sino US Sponge City LID Technology Practice Conference held on May 4-5, 2015 in Zhenjiang, China organized by Zhenjiang Water Supply and Drainage Management Office. (http://www.c-water.com.cn/2015lid/en/index_e.html). In addition to the presentation, field inspections were made of several new LID installations in the city consisting of Bioswales, permeable pavement systems and rainwater harvesting.

**Guangzhou, China – December 2012**

- Steve was an invited attendee at the 15th Annual Guangzhou Convention of Chinese Scholars in Science and Technology in Guangzhou, China on December 17 – 21, 2012 to present a project narrative on how Low Impact Development and sustainable development can be applied to address water quality issues in urban and rural areas of China to implement sustainability concepts and conservation of resources. He attended with Dr. Jim Su, PE of Golder Associates of Mt. Laurel, New Jersey. While at the convention he met with representatives from Sichuan University, Chang'an University, Guangdong University of Technology, Shenzhen University and the South China Institute of Environmental Sciences, MEP to discuss LID being incorporated into their engineering programs.
- Steve also met Dr. Hongbin Cheng of New China Times Technology which is located in Stellenbosch, South Africa. Steve has signed a three year partnership agreement with New China Times Technology to introduce LID concepts to the west cape area of South Africa.

3

**Taiwan – December 2011**

- Steve was invited by Hung Kwai Chen, Director of the Water Resources Planning Institute, Water Resource Agency, Ministry of Economic Affairs of Taiwan and Dr. Yong Lai of the US Bureau of Reclamation to present a 12-hour presentation on Low Impact Development on December 8th and 9th, 2011 in Taichung, Taiwan. The presentation focused on applying LID strategies in both urban and rural environments to address runoff volumes and water quality issues.

- Steve is an invited consultant to a project team headed up by Xiaoyan Zhou, PhD of the Institute for Taiwan Water Environment Research (TIIWE) along with The National Taiwan Ocean University, Hohai Engineering Professor Liao Chaoxuan, Ting Engineering Consultants Co., Ltd and University of Colorado professor Guo Chunyuan to develop a LID demonstration project in New Taipei City along with LID policy strategies to further the use of LID in New Taipei City, Taiwan.

## Low Impact Development

- Review of existing municipal land use regulations to identify barriers to the implementation of Low Impact Development

- Preparation of regulatory language changes to facilitate the adoption of Low Impact Development

- Preparation of design manuals for the implementation of Low Impact Development strategies and processes with an approach that simplifies the design process

- Application of environmental site design strategies to focus development concepts on land most suitable for development while enhancing the protection of environmentally sensitive areas

- Design of Low Impact Development treatment systems, such as Bioretention areas, wet/dry swales, vegetated level spreaders, vegetated filter strips, subsurface gravel wetlands, constructed wetlands and/or pond systems, infiltration basins & trenches

- Hydrologic analyses of current and post-development conditions to assess impacts of proposed development on storm water flows

- Design of storm water control systems including detention and water quality basins and appropriate planting plans

- Perform hydrologic modeling of stormwater management systems to demonstrate compliance with regulatory benchmarks

- Prepare Pollutant loadings analyses to evaluate the effectiveness of stormwater treatment designs in reducing pollutant loads

## Wastewater Management:

- Soil testing to determine suitability of land to support on-site sewage disposal systems for residential and commercial projects and assistance with identifying optimal location for both small and large scale systems.

- Perform necessary calculations to model and design large scale subsurface sewage disposal systems under CT DEEP criteria and State Department of Public Health

- Design of on-site sewage disposal systems in accordance with state and local health codes

- Perform construction oversight of both small and large scale subsurface sewage disposal systems and provide certifications of compliance.

## Site Engineering:

- Development feasibility studies

- Layout concepts to maximize development, while preserving environmentally sensitive areas

- Design of horizontal and vertical road geometry

- Preparation of grading, drainage and erosion and sedimentation control plans

- Use AutoCAD Land Development, Civil3D, HydroCAD and Pondpack software packages

- Layout and design of sanitary sewers

- Bid estimates

- Construction oversight

- Third party technical reviews

- Expert testimony

## Professional Committees

- Chairman and primary author of EWRI/ASCE LID Model Ordinance Task Committee (goal is to create a National LID Guidance document to further the adoption of LID)
- Chairman of EWRI/ASCE LID Task Committee on Filter Strips and Bioswales (goal is to review & evaluate literature and design specifications for filter strips and Bioswales and create uniform design standards for different geographical regions)
- Member of EWRI/ASCE LID National Guidelines Task Committee

## Published Articles

- **"Easier Said Than Done – Overcoming common errors when installing bioretention systems"** – October 2018 edition of Storm Water Solutions by Scranton Gillette Communications.
- **"Large-scale LID Design for urban expansion in South Korea"** with co-author, Dr. Kyung Hak Hyun of South Korean Land and Housing Institute – Volume 3/Issue 4, August/September 2015 – Worldwater Stormwater Management by the Water Environmental Federation.
- "**Research team leads LID deployment in South Korea**" – Volume 2/Issue 1, Spring 2014 – Worldwater Stormwater Management by the Water Environmental Federation.

5

- "**Low Impact Development, Sustainable Stormwater Management**" – English article converted to Chinese and published in the Chinese Edition of Global Water Magazine, July 2013.
- "**A Case Study: Southbury Medical Facility and Low Impact Development**" - January/February 2014 issue of Land and Water.
- "**A True Pioneer of Low Impact Development – Member Spotlight**" – January/February 2014 Issue of Erosion Control – Official Journal of the International Erosion Control Association.
- "**Low Impact Development: Changing the Paradigm**" published in the March 2012 edition of PE, The Magazine for Professional Engineers by the National Society of Professional Engineers. Article was also republished in the Spring 2012 addition of EWRI Currents (with permission of NSPE).
- "**Stormwater Retrofit of Existing Detention Basins**" published in the March/April 2012 Land and Water, The Magazine of Natural Resource Management and Restoration with co-author Sean Hayden of the Northwest Conservation District.
- "**Out in the Open; Creating a Stormwater Park in the Heart of a Community**" published in the April 2013 issue of WaterWorld by Pennwell Corporation.
- "**Creating a Stormwater Park in the City Meadow of Norfolk, Connecticut**" published in the July/August 2013 edition of Land and Water

## Volunteer Organizations

- President (elected 11/2013) and Connecticut Representative to the Board of Directors for the Northeast Chapter of IECA,
- Alternate member of Inland Wetlands Commission Town of Southbury (served three years),
- Northwest Conservation District Board of Directors (served 18 months)

## Software Development

Developed a proprietary software application called **A**ssessment of **P**ollutant **L**oads and **E**valuation of **T**reatment **S**ystems (**A.P.L.E.T.S.**). This application calculates the pollutant loads for current and future land use conditions for the seven most common pollutants in non-point source runoff (TSS, TP, TN, Zn, Cu, TPH, & DIN) for a total of twenty-two different types of land uses. The application then allows the evaluation of the effectiveness of thirty-four Conventional and Low Impact Development treatment systems in removing these pollutants. Up to four treatment systems can be used in a row as a treatment train to achieve water quality goals.

## Future Presentations

- Steve will be making two presentations entitled "Stormwater Management for Ground Mounted Solar Arrays in New England" and "LID in Connecticut – Are Designs Improving" at the **2023 World Environmental & Water Resources Congress** to be held in Henderson, Nevada on May 21 – 24, 2013. https://www.ewricongress.org/

- Steve will be presenting a 6.5-hour webinar over two days entitled "Low Impact Development" on June 6th and 7th, 2023 for design professsionals sponsored by Halfmoon Seminars.

- Steve will be making two presentations entitled "Designing LID Systems: What do you need to know and why?" and LID in Connecticut – Are Designing Improving?" at the 2023

6

International LID conference to be held in Oklahoma City, Oklahoma on August 6 – 9, 2023. https://www.lidconference.org/

**Invited Speaker Presentations:**

- Steve made a presentation entitled "Making Rainfall Disappear using Bioretention and Permeable Pavement" for a webinar entitled " Groundwater:  Making the Invisible Visible" sponsored by the **Philippine-American Academy of Science and Engineering** (PAASE) on March 11, 2002 at 8 am (Philippine Time) https://paase.org/?fbclid=IwAR1KNhxJ69qpo1COxxCT4omfefLysKCfLDN9cw-Ygizs2DtLiJMfO-Nk8Pg

- Steve made a two-hour presentation via zoom on November 22, 2021, for the Green Infrastructure & Low Impact Development Specialized Graduate School at **Pusan National University** at the request of Dr. Hyun Suk Shin.  The topics presented were "Why we need LID" and "Bioretention systems and the design".

- Steve made two presentations at the **IWA Dipcon 2019**; The 19th IWA International Conference on Diffuse Pollution and Eutrophication being held in Jeju, South Korea in October 2019.   The presentations were entitled  "How Low Impact Development strategies can mitigate high intensity rainfall events" and "If LID is so easy to implement, how come we keep getting it wrong". (http://iwadipcon2019.org/dipcon/about.asp )

- Steve made the following presentations at **St. Andrews University in Scotland** on October 19th , 2017 for the Sustainable Development program.   The first presentation is entitled "Improving the environment with Low Impact Sustainable Development Strategies".  The second presentation is entitled "Addressing Water Quality and Runoff Issues in a changing weather world".

- Steve was invited by Dr. Jae Ryu of the University of Idaho Water Center to make a presentation entitled "Designing Low Impact Development treatment systems for **Urban & Agricultural Environments" at the Annual US-Korea Conference on Science, Technology, and Entrepreneurship** being held in Atlanta, Georgia on July 29 to August 1, 2015. ( http://www.ukc.ksea.org/UKC2015/ )

- Steve was invited by the Lake George Waterkeeper to make a presentation entitled "Applying LID Concepts in the Real World" at the 5th Annual Low Impact Development Conference being held in Lake George, NY on May 7, 2015. ( http://fundforlakegeorge.org/2015LID )

- Steve was invited by Dr. Hyunsuk Shin and made a presentation entitled "Real Adaptation and Implementation of GI and LID Technology in USA" at the **World Water Forum** (http://eng.worldwaterforum7.org/main/) being held in Daegu, South Korea on April 14, 2015.

- Steve prepared a presentation for a workshop to civil and environmental engineering students at **Pusan National University** (http://www.pusan.ac.kr/uPNU_homepage/kr/default.asp)  in Busan, South Korea on April 17, 2015, entitled "Designing LID System - What do you need to know and why".

- Steve was invited by Dr. Hong-Ro Lee of Kunsan National University and made a presentation entitled "Understanding Low Impact Development in the Urban-Rural Interface" for the **Ariul Brainstorming Working Group** on April 16, 2015, in Gunsan, South Korea.   It will focus on how

7

Low Impact Development concepts can be applied to made land areas filled in off the west coast of South Korea to address water quality issues.

- Steve was an invited speaker at the **2014 Low Impact Development Conference** sponsored by the Lake George Waterkeeper and the Fund for Lake George in Lake George, NY on May 1, 2014, for land use professionals and regulatory agencies. He will be presenting case studies focusing on the application of LID concepts for commercial and residential projects.

- Steve was invited by Justin Kenney, Green Infrastructure Coordinator of the Vermont Department of Environmental Conservation Watershed Management Division to present an eight-hour workshop entitled "From Bioretention to Permeable Pavement: An In-depth Introduction to Low Impact Development and Green Stormwater Infrastructure" in Montpelier, Vermont on December 5, 2013. The presentation was hosted by the **Vermont Green Infrastructure Initiative** with support from the following Vermont Agencies and Divisions, **Building and General Services, Ecosystem Restoration Program and Agency of Transportation.**

- Steve was invited to attend and present on the Application of LID Concepts for the Urban Environment and LID Case Studies at the 2nd Low Impact Development, Stormwater Management Forum hosted by the **Land & Housing Institute, Korean Land & Housing Corporation** to be held in South Korea in on October 31, 2013. He also made presentations at the **Korean Institute of Construction Technology** and **Pusan National University** on various aspects of LID during this time.

- Steve was an invited speaker at the **2013 Low Impact Development Conference** sponsored by the Lake George Waterkeeper and the The Fund for Lake George in Lake George, NY on May 2, 2013 for land use professionals and regulatory agencies. Over 80 design professionals and regulatory people were in attendance. He made a presentation entitled "Barriers to the implementation of LID".

- Steve was an invited presenter at a closed-meeting of the **National Association of Home Builders (NAHB) and the Water Environment Federation (WEF)** on October 10, 2012 focusing on progressive stormwater management. The presentation focused on the application of LID strategies on actual development projects and discussed the hydrologic performance and cost effectiveness of LID design.

- Steve was the invited presenter for a 1-hour long webinar presented by **Stormwater Solutions and Stormwater USA** on Low Impact Development and the Basics of Bioretention held on September 18, 2012. Over 760 individuals watched the webinar.

- Steve was an invited speaker at and **EPA/WEF Stormwater Technical Meeting** on July 18, 2012 in Baltimore, MD to discuss the application of Low Impact Development strategies for actual projects with a focus on cost effectiveness when compared to conventional stormwater management as well as field performance of the LID designs. The purpose of this meeting was to assist EPA in the development of a National Stormwater Rule.

- Site Design using Low Impact Development Strategies and What are the impacts of Impervious Cover on Water Quality and Quantity were presented at a workshop entitled "Challenges and Solutions using Low Impact Development", sponsored by the **Lake George Waterkeeper** in Lake George, NY on May 5, 2011, for land use professionals and regulatory agencies. 90 design professionals and regulators in attendance.

- Steve was an invited speaker at the **2012 Low Impact Development Seminar** sponsored by the Lake George Waterkeeper in Lake George, NY on April 25, 2012, for land use professionals and regulatory agencies. 100 design professionals and regulatory people were in attendance. He made a presentation entitled "The Hydrologic Benefits of Vegetation in Site Design".

## Conference Presentations:

- Steve made a presentation entitled "Stormwater Management for Ground Mounted Solar Arrays in the Real World". The presentation was made on Tuesday, February 7, 2023, at 10:30 to 11:00 am CST in Room 2203 at the **2023 IECA Annual Conference**. https://www.eventscribe.net/2023/IECA/

- Steve made two presentations at the International Erosion Control Association (IECA) Annual Conference being held at the Minneapolis Convention Center in Minneapolis, MN from February 15th to February 18th, 2022. (http://www.eventscribe.net/2022/IECA2022). The first presentation is entitled "Low Impact Sustainable Development Design Manual for Morris, Connecticut". The second presentation is entitled "LID in Connecticut – Are Designs Improving?".

- Steve made two presentations at the UKC 2021 which is sponsored by the Korean-American Scientists and Engineers Association being held at the Hyatt Regency Orange County, CA from December 15th to December 18th, 2021. (https://ukc.ksea.org/ukc2021/wp-content/uploads/2021/12/UKC-2021_PB_v1.pdf ). The first presentation is entitled "Implementing LID Retrofits to address Nutrient Loads in Lake Pocotopaug in East Hampton, CT". The second presentation is entitled "How to Design Stormwater Management for Ground Mounted Solar Arrays".

- Steve made the following presentations: "Implementing LID Retrofits to Address Nutrient Loads in Lake Pocotopaug in East Hampton, Connecticut" and "How to Design Stormwater Management for Ground Mounted Solar Array" at the Virtual IECA Annual Conference and Expo on February 22 – 25, 2021https://ieca.org/IECA/2021%20Annual%20Conference%20Home/IECA/IECA_Events/2021_Events/2021_Virtual_Annual_Conference.aspx?hkey=2dc821ad-cb72-4b2e-80ed-69ad51367611 .

- Steve made one presentation at UKC 2019 by The Korean-American Scientists and Engineers Association in Chicago, IL in August 2019. The presentation is entitled "Designing Low Impact Development Treatment Systems for Agricultural Environments". (https://ukc.ksea.org/ukc2019/about/about-ukc-2019/)

- Steve made two presentations at the 2019 Annual Conference of IECA being held in Denver, CO in February 2019. The presentations were entitled "A Study on Introduction Plan of Low Impact Development Techniques for Widespread Application in South Korea" and "If LID is so easy to implement, how come we keep getting it wrong".

- Steve made a presentation entitled "LID in China and South Korea" at the 2018 Annual Conference of the Northeast Chapter of IECA in Concord, NH on October 1, 2018.

- Steve made a presentation entitled "If LID is so easy to implement, how come we keep getting in wrong" at the **2018 International Low Impact Development** conference being held in Nashville, TN on August 12 – 15, 2018. The conference is sponsored by ASCE and EWRI. ( https://www.lidconference.org/ )

**AD57**

- Steve made two presentations at the **2018 TRIECA Conference** being held on March 21 & 22, 2018 at the Pearson Convention Center in Brampton, Ontario.   The presentations are entitled "Addressing Stormwater in China with Low Impact Development" and "Implement Low Impact Development in South Korea."  This conference is sponsored by the Toronto and Region Conservation Authority and the Canadian Chapter of the International Erosion Control Association.

- Steve made the following presentations at the **2018 IECA Annual Conference** being held in Long Beach, CA in February of 2018.  The presentations are entitled "How Low Impact Development strategies can mitigate high intensity rainfall events" and Designing Low Impact Sustainable Development treatment systems for Agricultural Environments".

- Steve was invited by the Dylan Drudul, President of the Mid-Atlantic Chapter of IECA to present the keynote address at a one-day event called "Sediment Control Innovations Roadshow on July 14th in Columbia, Maryland.  The keynote is entitled **"A Worldwide Perspective on Municipal Stormwater Issues".**

- Steve made a presentation entitled **"Designing LID Systems:   What do you need to know and why"** at the 27th Annual Nonpoint Source Pollution Conference being held in Hartford, CT on April 20-21, 2016, as sponsored by the New England Interstate Water Pollution Control Commission.

- Steve will be presenting four one-hour long webinars through Halfmoon Seminars on Low Impact Development.   The first entitled **"Introduction to Low Impact Development"** will be on May 10, 2016 at 12 pm.   The second entitled **"Bioretention System Design"** will be offered on May 10, 2016 at 1:30 pm.   The third entitled **"Applying LID Concepts to Residential Development"** will be offered on May 12, 2016 at 12 pm.   The fourth entitled **"LID Case Studies"** will be offered on May 12, 2016 at 1:30 pm.

- Steve will be making a presentation entitled **"Designing LID Systems:   What do you need to know and why"** at the UKC2016 conference, sponsored by KSEA (Korean-American Scientists and Engineers Association) at the Hyatt Regency DFW in Dallas, Texas, August 10 – 13, 2016.

- Steve made five presentations at the **2016 Environmental Connection** conference by IECA (www.ieca.org) being held in San Antonio, Texas on February 16 – 19, 2016.   The presentations were entitled "Designing LID Systems:   What do you need to know and why", "Construction Site Stormwater:   The Ignored Problem", "Solving Construction Stormwater Problems in the Field", "Developing Effective LID Municipal Regulations", and "LID Demonstration Projects in Connecticut, a study of Contrasts".

- Steve made two presentations at the **EPA Region Stormwater Conference 2015** (http://epa.gov/region6/water/npdes/sw/ms4/2015conference/index.html) being held in Hot Springs, AR on October 18-23, 2015.   The presentations are entitled "Designing LID systems:   What do you need to know and why" and "Designing LID treatment systems for Urban and Agricultural Environments."

- Steve made a presentation entitled "Applying LID strategies to residential and commercial developments to address water quality and runoff volumes"  at the KSEA Northwest Regional Conference 2015 held at the Idaho Water Center in Boise, Idaho on October 11, 2015.

- Steve made a presentation entitled "Solving Construction Stormwater Problems in the Field" at **WEFTEC 2015** (http://www.weftec.org ) in Chicago, IL on September 29, 2015.

- Steve made three presentations entitled: "Korean GI/LID Research Facility", Applying LID concepts to High Density Residential Developments, and Municipal LID Regulations" at the 2015 Environmental Connection IECA Annual Conference being held in Portland, Oregon on February 16 – 18, 2015. He also presented a half day workshop entitled: "Designing LID Projects". He moderated an Expert Panel on Low Impact Development with Seth Brown, (Water Environment Federation), Bob Adair (Construction Ecoservices, Inc.) and Roger Sutherland (AMEC)

- Steve made two presentations at International Low Impact Development Conference 2015 in Houston, Texas which is sponsored by ASCE-EWRI. The presentations are entitled "Korean GI/LID Research Facility", and "LID Demonstration Projects in Connecticut: The Good and the Bad".

- Steve made presentations entitled "Overview of Low Impact Development" and "The Application of Low Impact Development Strategies for Land Development Projects" along with Dr. Jae Ryu of the University of Idaho and Dr. Hyun-Suk Shin of Pusan National University at the annual meeting of the **American Water Works Association** in Tyson Corners, VA on November 6, 2014.

- Steve made two presentations entitled "Construction Site Stormwater: The Ignored Problem" and "Applying LID Concepts to High Density Residential Development" at the **2014 Annual Conference and Trade Show of the Northeast Chapter of IECA** held at Lake Morey, Vermont on November 4 – 5, 2014.

- Steve made the following presentations entitled: "A Case Study – Southbury Medical Facility and Applying LID concepts on undeveloped land and in the urban environment" at Municipal Wet Weather Stormwater Conference, hosted by the **Southeast Chapter of IECA** in Charlotte, NC on August 18th and 19th, 2014.

- Steve made the following presentations: "The Incorporation of LID on Affordable Housing Projects, A Case Study – Southbury Medical Facility and LID' and Municipal LID Regulations" at the **16th Annual EPA Region 6 Stormwater Conference** sponsored by the South Central Chapter of IECA in Fort Worth, TX on July 27th through August 1st, 2014.

- Steve made oral presentations at the **2014 Environmental Connection** sponsored by the International Erosion Control Association in Nashville, Tennessee on February 25 – 18, 2014. The presentations were entitled "A Case Study – Southbury Medical Facility and LID", "The Implementation of the Highland Estates Detention Basin Retrofit water quality impairment in Northfield Lake", and "Creating Effective Municipal LID Regulations".

- Steve co-presented an all day workshop on Low Impact Development with Jamie Houle of the University of New Hampshire Stormwater Center at the **2013 International Erosion Control Association Northeast Chapter Conference and Trade Exposition** on November 19 – 21, 2013 in Warwick, RI.

- Steve made three oral presentations at the **2013 International Low Impact Development Symposium** held at the Saint Paul RiverCentre in Saint Paul, Minnesota on August 18 – 21, 2013. The presentations were entitled "A Case Study – Southbury Medical Facility and LID", "LID regulations in Connecticut: The Long and Tortured Road", and "Creating a Stormwater Park in the City Meadow of Norfolk, Connecticut."

- Steve presented two papers at the **2013 EWRI World Environmental and Water Resources Congress** held in Cincinnati, Ohio on May 19- 23, 2013. The papers are entitled: "Municipal LID

11

**AD59**

Regulations - What is important to include to be successful?" and "Creating a Stormwater Park in the City Meadow of Norfolk, Connecticut". http://content.asce.org/conferences/ewri2013/index.html

- Steve made a presentation at the **Soil and Water Conservation Society Winter Conference** held in Berlin, Connecticut on February 15, 2013. The presentation focused on erosion and sedimentation control issues with Low Impact Development treatment systems.

- Steve presented two papers at the **2013 Environmental Connection** held in San Diego, CA on February 10 – 13, 2013. The papers are entitled "LID Demonstration Project for Seaside Village in Bridgeport, Connecticut" and "Creating a Stormwater Park in the City Meadow of Norfolk, Connecticut". He also presented a full day LID workshop entitled "Next Generation Low Impact Development and Meet Today's Needs" and a half day workshop on Low Impact Development covering Environmental Site Design, Water Quality Issues, Pollutant Loading Analyses, Designing different types of LID treatment systems and actual case studies.

- Steve made three presentations at the **2012 Annual Conference of the Northeast Chapter of IECA** in Fishkill, NY on November 7, 8, & 9, 2012. The presentations are entitled: "LID Demonstration Projects in Connecticut, A Study of Contrasts, Environmental Site Design and LID Hydrologic Issues, and Siting and Designing LID Treatment Systems with Case Studies"

- Steve made two oral presentations entitled "Applying Environmental Site Design Strategies to Design a Residential Subdivision" and "The incorporation of LID on Affordable Housing Projects" at the **2012 Ohio Stormwater Conference** in Toledo, Ohio sponsored by the Ohio Stormwater Association on June 7th and 8th, 2012.

- Presented two papers at the **ASABE Watershed Technology Conference** in Bari, Italy, May 28 – 30, 2012. The papers were entitled "LID Demonstration Project for Seaside Village in Bridgeport, Connecticut" and "The creation of a Stormwater Park in the City Meadow of Norfolk, Connecticut".

- Steve made one oral presentation entitled "LID Demonstration Project for Seaside Village in Bridgeport, Connecticut" and presented one poster entitled "The Incorporation of LID on Affordable Housing Projects" at the **2012 World Environmental & Water Resources Congress** in Albuquerque, New Mexico sponsored by EWRI/ASCE on May 20 - 24, 2012.

- "Stormwater Retrofit of Highwood Estates Detention basins to address Water Quality Issues and How the application of Environmental Site Design Strategies can provide a resource for carbon sequestering" were presented at the **2011 International Erosion Control Associated Northeast Chapter Annual Conference** on December 1 – 3, 2011 at the Crowne Plaza Hotel in Natick, Massachusetts.

- Stormwater Retrofit of Highwood Estates Detention Basins to enhance Water Quality Benefits; A Low Impact Development (LID) Model Ordinance and Guidance Document and The Farmington River Enhancement Grants: A tale of three towns and the path to Low Impact Development were presented at the **Philadelphia Low Impact Development Symposium "Greening the Urban Environment"** in Philadelphia, PA (September 2011) sponsored by EWRI, Villanova University, North Carolina University and the University of Maryland.

- Stormwater Retrofit of Highwood Estates Detention Basins to enhance Water Quality Benefits; The Farmington River Enhancement Grants: A tale of two towns and the path to Low Impact Development and A Low Impact Development (LID) Model Ordinance and Guidance Document was

12

**AD60**

005665

**3418**

presented at the **EWRI/ASCE 2011 World Environmental & Water Resources Congress** in Palm Springs, CA (May 2011).

- Stormwater Retrofit of Highwood Estates Detention Basins to enhance Water Quality Benefits was presented at the "Annual Nonpoint Source Pollution Conference", sponsored by the **New England Interstate Pollution Control Commission** in Saratoga Springs, NY, on May 17-18, 2011.

- Stormwater Pollutant Load Modeling presented at the **Northeast Chapter of IECA Annual Conference** at the University of New Hampshire Stormwater Center in Durham, NH (December 2010).

- How the application of Environmental Site Design Strategies and Low Impact Development Storm Water Treatment Systems can mimic the Natural Hydrologic Conditions in a watershed and provide a resource for carbon sequestering and The Importance of Assessing Pollutant Loads from Land Development Project and the Design of Effective Storm Water Treatment Systems at the **EWRI/ASCE Watershed Management Conference** in Madison, WI (August 2010).

- The Tolland Low Impact Development Design Manual: The Changing Paradigm for Land Development, The application of Environmental Site Design Processes to design a residential subdivision and A Low Impact Development (LID) Model Ordinance and Guidance Document at the **ERWI/ASCE 2010 World Environmental and Water Resources Congress** in Providence, RI (May 2010).

- The application of Form-Based Zoning and Low Impact Development for the Revitalization of the Town Center of Simsbury, Connecticut and The Integration of Low Impact Development to enhance the application of Smart Code Zoning to create a Gateway District to the Historic Town Center of Tolland, Connecticut at the **EWRI/ASCE 2010 International Low Impact Development Conference** in San Francisco, CA (April 2010).

- The application of Environmental Site Design Processes to design a residential subdivision and Assessing Pollutant Loads and Evaluation of Treatment Systems to achieve Water Quality Goals for Land Development Projects at the **EWRI/ASCE 2009 World Environmental & Water Resources Congress** in Kansas City, Missouri (May 2009).

- Ahead of the Curve – Tolland, CT adopts Low Impact Development Regulations and Preparing a Pollutant Loading Analysis for Land Development Projects at the **Urban Water Management Conference** in Overland Park, KS sponsored by National Association of Clean Water Agencies (NACWA) and the City of Independence Water Pollution Control Department (March 2009).

- Ahead of the Curve – Tolland, Connecticut adopts Low Impact Development Regulations and Trade Winds Farm – Winchester, Connecticut – How to create a LID subdivision along with the preparation of a poster on Preparing a Pollutant Loading Analysis for Land Development Projects at **EWRI/ASCE 2008 International Low Impact Development Conference** in Seattle, WA (November, 2008).

- Trade Winds Farm – Winchester, Connecticut – How to create a LID subdivision and Preparing a Pollutant Loading Analysis for Land Development Projects at the **IECA Northeast Chapter's Annual Conference & Trade Exposition** in Portland, ME (October, 2008).

13

**AD61**

- The Preparation of a Valid Pollutant Loading Analysis at the **National StormCon 2008 Conference** in Orlando, FL (August, 2008).

- Panelist with Linda Farmer, AICP for Profiles of Partnerships for Addressing NPS Pollution at **NEIWPCC Annual Non-point Source Pollution Conference** in Groton, CT (May, 2008).

**Workshop Presentations:**

- Steve presented a two-hour webinar entitled "Bioretention System Design" on Wednesday, November 2, 2022 at 1:00 pm CST, sponsored by Halfmoon Seminars. Link: https://halfmoonseminars.org/product/webinars/biorentention-system-design-2/?variation=142422

- Steve presented a 6.5-hour webinar entitled "Low Impact Development" on Wednesday, April 20, 2022 from 10:00 am to 2:00 pm and then on Thursday, April 21, 2022 from 10:00 am to 12:45 pm sponsored by Halfmoon Seminars.

- Steve presented a two-hour webinar entitled "Bioretention System Design" on March 28, 2022. ( https://halfmoonseminars.org/product/webinars/biorentention-system-design/ ).

- Steve made a two-hour webinar entitled "How to Design for Stormwater Management for Ground Mounted Solar Arrays" on Wednesday, December 29, 2021 sponsored by Halfmoon Seminars ( https://halfmoonseminars.org/product/webinars/how-to-design-for-stormwater-management-for-ground-mounted-solar-arrays-3/ )

- Steve made a 6.5-hour presentation on Erosion and Sediment Control on Tuesday, January 25, 2022 for Halfmoon Seminars.

- Steve made an all-day (6.5 hour) webinar entitled "New York Erosion and Sediment Control" on February 3, 2022. ( https://halfmoonseminars.org/product/webinars/new-york-erosion-and-sediment-control/ ).

- Steve presented a 2-hour webinar entitled "How to Design Stormwater Management for Ground Mounted Solar Arrays" on July 14, 2020. This webinar is hosted by Halfmoon Seminars.

- Steve presented a two-day webinar encompassing 6.5 hours entitled "Low Impact Development" on July 15, 2020 and July 16, 2020. The webinars are hosted by Halfmoon Seminars.

- Steve presented an all-day workshop on Low Impact Development for continuing education for design professionals in Little Rock, Arkansas on February 28, 2020 which is sponsored by Halfmoon Seminars.

- Steve presented an all-day workshop on Low Impact Development for continuing education for design professionals in Nanuet, NY on December 19, 2019 which is sponsored by Halfmoon Seminars.

- Steve presented a webinar entitled "Construction Stormwater Regulation Strategies: Best Practices to Assure NPDES Compliance" on Thursday, November 12, 2015 at 2:00 pm to 3:00 pm eastern time. The webinar is sponsored by Business and Legal Resources.

- Steven presented a full day workshop entitled "Stormwater Management 2015" in Columbia, Maryland on August 13, 2015 which focused on applying the State of Maryland Stormwater Manual. The workshop was sponsored by Halfmoon Seminars, LLC and 113 people attended the workshop.

- Steve presented a full day workshop on "Stormwater Regulations in Connecticut", sponsored by Halfmoon Seminars, LLC in North Haven, Connecticut on June 25, 2014. More than 30 engineers and landscape architects attended the workshop.

- Steve was the facilitator in a live chat as part of the Stormwater Solutions Virtual Trade Show on April 2, 2014. The topic of the live chat will be LID with a focusing on Bioretention systems.

- Steve made a presentation entitled "What is Low Impact Development and how do you apply it to residential projects" for the Connecticut Chapter of the American Institute of Architects in New Haven, Connecticut on April 22, 2014.

- Steve made a presentation entitled "Wastewater to Stormwater; Designing a subsurface flow gravel wetlands" at the annual meeting of the Connecticut Association of Wetland Scientists on March 20, 2014 in Southbury, Connecticut.

- Steve made a presentation entitled " Low Impact Development and the Connecticut General Stormwater Permit" at the annual meeting of the Southern New England Chapter of the Soil and Water Conservation Society on March 14, 2014 at Eastern Connecticut State University.

- He co-taught an ASCE Short Course entitled, "Introduction to Low Impact Development" with Mike Clar at the 2013 Low Impact Development Symposium held in St. Paul, Minnesota on August 18, 2013.

- Steve presented a workshop on Low Impact Development to the Town of Naugatuck Inland Wetlands Commission on June 5, 2013 to demonstrate how the implementation of LID can reduce stormwater impacts in the urban area of the community.

- Steve presented a webinar entitled "The Basics of Low Impact Development on Wednesday, April 17, 2013.

- Steve presented a webinar entitled "Changing the Regulatory Framework to Adopt LID Strategies" on Thursday, March 7, 2013 and on Thursday, August 8, 2013 from 11:30 am to 1:00 pm through **ASCE and EWRI.** Link for more information.

- Steve presented a three-hour workshop on Low Impact Development on June 5, 2012 at the Oxford town hall for municipal land use staff and officials at the request of the **Oxford Inland Wetlands and Watercourses Commission**. Approximately 20 individuals attended the workshop.

- Steve presented an eight-hour short courses on Low Impact Development at the **EWRI/ASCE 2011 World Environmental & Water Resources Congress** in Palm Springs, CA (May 2011). The following topics will be covered: Understanding and Implementing Principles of Low Impact Development, Applying LID Strategies to a Site, Low Impact Development Hydrologic Considerations, The Regulatory Framework and LID, LID Integrated Management Practices, Erosion and Sedimentation Controls for the Implementation of LID Practices and Case Studies (Applying LID and Regulations). 12 attendees took the course, including professors from Mississippi State

15

**AD63**

005668

University, Oklahoma State University, Adelaide University (Australia) and Pusan National University (South Korea).

- Understanding and Implementing Principles of Low Impact Development, Applying Low Impact Development to a Site, Low Impact Development Hydrologic Considerations, Low Impact Development Integrated Management Practices, Erosion and Sediment Control for the Implementation of Low Impact Development Practices, and Case Studies of LID (Residential and Commercial) at workshops on Low Impact Development sponsored by **HalfMoon, LLC** (https://www.halfmoonseminars.com ) in Albany, NY, Ronkonkoma, NY, North Haven, CT, Manchester, NH, Nanuet, NY, Cleveland, OH, Natick, MA, Portland, ME Fort Washington, PA, Springfield, MA, Wilmington, DE, White River Junction, VT, Somerset, NJ, and White Plains, NY for continuing education credit for design professionals. A total of 322 land use professionals have attended these workshops.

- Pollutant Loads and the Design of Effective Stormwater Treatment Systems was presented at the Virtual H2O conference on February 22, 2011 as presented by **PennWell Publishing**. 25 professionals in attendance.

- LID Stormwater Treatment Systems: Siting, Design and Installation for Maximum Environmental Benefit. What are the aesthetic, financial and maintenance implications? presented at a seminar for the **AIA Connecticut, Committee on the Environment** in New Haven, CT (December 2010). 70 architects in attendance.

- Low Impact Development and the Environmental Site Design process to create sustainable sites at a seminar for the **AIA Connecticut, Committee on the Environment** in New Haven, CT (September 2010). 40 architects in attendance.

- Workshop entitled Using Environmental Site Design Strategies and LID stormwater systems for commercial development at the **Connecticut Conference on Natural Resources** at the University of Connecticut (March 2010). 10 design professionals and regulatory staff in attendance.

- Implementing Low Impact Development in Your Community for the **Connecticut Technology Transfer Center** in Glastonbury, CT (November, 2009). 40+ professionals in attendance.

- What towns can do to encourage LID at the "Low Impact Development Forum" presented by the **Housatonic Valley Association** in Shelton, CT. (October 2009). 12 professionals in attendance.

- Town of Tolland, CT; Low Impact Development Regulations and Design Manual at the **Community Builders Institute** for the workshop entitled: "Swift, Certain & Smart: Best Practices in Land Use" (May 2009). 30+ professionals in attendance.

- Low Impact Development, Environmental Site Design and Water Quality issues and strategies to local municipalities (**Greenwich, and Old Lyme**) to provide an educational opportunity about the many benefits of Low Impact Development in 2009. 30+ design professionals, regulatory commissioners and staff in attendance for each presentation.

- Low Impact Development, Environmental Site Design and Water Quality issues and strategies to local municipalities (**Bolton, Farmington, and Guilford** to date) on a pro bono basis to provide an educational opportunity about the many benefits of Low Impact Development in 2009. 25+ design professionals, regulatory staff and commission members in attendance for each presentation.

16

- Workshop entitled <u>Using Environmental Site Design Strategies to create a residential subdivision</u> at the **Connecticut Conference on Natural Resources** at the University of Connecticut (March 2009). 20 design professionals and regulatory staff in attendance.

- <u>The Need for Pollutant Loading Analyses for Land Development Projects</u> to storm water engineers at **CT DEP** (March 2009). 6 DEP staff in attendance.

- <u>A review of existing land use regulations and storm water management issues for the Middle Quarter Districts in Woodbury, CT and how the implementation of Environmental Site Design and Low Impact Development strategies can improve water quality of storm water runoff</u> for the Woodbury land use agencies (August 2008). 15 regulatory commission members in attendance.

- <u>Low Impact Development</u> at meeting of the **Connecticut Association of Zoning Enforcement Officers** (October 2007). 30+ professionals in attendance.

- <u>Low Impact Development and adoption of LID regulations by municipalities</u> at workshops of the **Land Use Leadership Alliance (LULA)** (2007, 2010 and 2011). 20+ professionals in attendance at each presentation.

- <u>Stormwater management and Low Impact Development</u> at workshop sponsored by the **Northwest Conservation District** held for land use officials (March 2006). 20+ professionals in attendance.

## Conferences Attended

- Bioretention Summit: Ask the Researcher – Annapolis, MD by the University of Maryland (Dr. Alan Davis), North Carolina State University (Dr. Bill Hunt) and Villanova University Stormwater Partnership (Dr. Rob Traver) – (July 2010).

- Workshop at the University of New Hampshire Stormwater Center on permeable pavements. This full-day training included field visits to a variety of on-the ground porous pavement installations throughout the region. Participants learned key design principles necessary to successfully design, evaluate, specify, and install porous pavement for stormwater management. (December 2009).

- Two workshops at the University of New Hampshire Stormwater Center in Durham, NH to observe conventional and Low Impact Development storm water treatment systems in operation. The Stormwater Center is independently verifying the effectiveness of the various treatment systems to remove pollutants from runoff and reduce impacts associated with storm flows. (March 2006 and May 2007).

- 2ND National Low Impact Development Conference – North Carolina State University held in Wilmington, NC, (March 2007).

- Designing Bio/Infiltration Best Management Practices for Stormwater Quality Improvement – University of Wisconsin (Madison, WI) (November 2005).

- Stormwater Design Institute – Center for Watershed Protection (White Plains, NY), (December 2004).

17

- Engineering and Planning Approaches/Tools for Conservation Design – University of Wisconsin (Madison, WI) (December 2003).

- Law for Design Professionals in Connecticut – Lorman Education Services in Trumbull, CT (September 2002).

- On-site Wastewater Facility Design – University of Massachusetts in Amherst, MA (May 2002).

- The Northeast Onsite Wastewater Short Course & Equipment Exhibition – New England Interstate Water Pollution Control Commission in Newport, RI (March 2002).

- Designing On-site Wetland Treatment Systems, University of Wisconsin, (Madison, WI) (October 1999).

- Cost Effective Drainage System Design – University of Wisconsin (Atlanta, GA) (November 1997).

- Treatment Wetlands, University of Wisconsin, (Madison, WI). "Creating and Using Wetlands for Wastewater Disposal and Water Quality Improvement" (April 1996).

- Alternative On-site Wastewater Treatment Systems, New England Intrastate Pollution Control Commission's On-Site Wastewater Task Force in Westford, MA (November 1994).

- Stormwater Quality, University of Wisconsin, (Portland, ME). "Designing Stormwater Quality Management Practices" (June 1994).



## LOW IMPACT SUSTAINABLE DEVELOPMENT PROJECTS

### LID and LISD Regulations and Design Manuals

- **Town of Tolland. CT –** Prepared amendments to Town of Tolland Zoning, Subdivision, Inland Wetland regulations and Road Design Manual to incorporate Low Impact Development standards. Wrote "Design Manual – Low Impact Development – Storm Water Treatment Systems – Performance Requirements – Road Design & Storm Water Management" prepared for the Town of Tolland; October 2007. The Town of Tolland was awarded the Implementation Award by the CT-APA for the LID regulations and design manual in December 2008.

- **Town of Plainville, CT –** Planimetrics was the lead consultant on this project. This office performed the technical regulatory audit to identify barriers to the implementation of LID. These barriers were removed from the regulations to provide for the implementation of LID. A LID design manual was written by Steve Trinkaus to address specific development/stormwater issues for the Town of

18

Plainville.   The regulatory changes and LID manual were adopted by the Planning and Zoning Commission in September 2010.   This work was funded by the Farmington River Enhancement Grants from CT DEP.

- **Town of Harwinton, CT** – In conjunction with Planimetrics of Avon, CT, the existing land use regulations were evaluated for barriers to the implementation of Low Impact Development (LID). The project team suggested changes to the land use regulations to encourage the application of LID in the community.   Steve Trinkaus defined design processes and strategies to encourage the implementation of LID in the town.  This work was funded by the Farmington River Enhancement Grants from CT DEP.

- **Town of East Granby, CT** – Planimetrics was the lead consultant on this project.  This office performed the technical regulatory audit to identify barriers to the implementation of LID.  These barriers were removed from the regulations to provide for the implementation of LID.   Steve Trinkaus prepared a LID Design Manual and LID Educational document for the town working with Gary Haynes, the town planner.   This work was funded by the Farmington River Enhancement Grants from CT DEP.

- **Town of Morris, CT** - This office performed the technical regulatory audit to identify barriers to the implementation of LISD.  These barriers were removed from the regulations to provide for the implementation of LISD.  A LISD design manual was written by Steve Trinkaus to address specific development/stormwater issues for the Town of Morris.   The regulatory changes and LISD manual were adopted by the Planning and Zoning Commission in January 2020.

## LID Projects

- **Town of Stonington** – Stonington, Connecticut – Perform site investigation consisting of deep test holes and then double ring infiltration tests to determine feasibility of LISD stormwater retrofits to reduce directly connected impervious cover under Town MS4 permit.  Design LISD retrofits consisting of Bioretention systems at four locations.  Retrofits will result in the disconnection of approximately five acres of impervious area.

- **Victorian Heron, LLC** – Bethel, Connecticut (Affordable Housing) – An existing Victorian house with 6 apartments will be expanded by the addition of a new building containing five more apartment developed under 8-30g.   Access and parking areas improved for fire access to site.   Stormwater will be handled by the creation of a Bioretention system to address water quality, groundwater recharge volume and peak rate attenuation.

- **Garden Homes Management** – Westport, Connecticut (Affordable Housing) – 19-unit residential apartment building being developed under 8-30g (affordable housing) on 1 acre site directly tributary to West Branch of the Saugatuck River.   All construction activities are located outside regulatory setbacks to tidal wetland and 100-year flood boundary.   Stormwater management system was designed to fully infiltrate the runoff for all storm events up to and including the 100-year event and reduce pollutant loads to existing levels as wooded parcel.

- **Jelliff Mill, LLC** – New Canaan, Connecticut:  Redesigned the site layout to create ten single family residential units on a site overlooking the restored historic Jelliff Mill dam on the Noroton River.  The site design uses two sections of permeable pavement and a Bioretention system to infiltrate the runoff from the proposed impervious areas on the site.  Due to the presence of sand and gravel soils, all

19

runoff from the impervious areas will be infiltrated up to and including the 25-yr storm event (5.7" of rain/24 hrs). Fully constructed and occupied.

- **SRG Family, LLC** – Southbury, Connecticut: Design final site grading for 38,000+ sq.ft. Medical services building and approximately 225 parking spaces in order to maintain overland flow patterns. Designed multiple LID treatment systems consisting of bioswales with weirs, Bioretention systems and Permeable Pavement (asphalt) to handle runoff from all impervious area on the project site. The LID treatment systems are capable of fully infiltrating the runoff from a 50-yr storm event will virtually eliminating the discharge of any pollutants to the adjacent wetland area. Currently pending before Inland Wetlands Commission for modification of original approval.

- **Farmington River Watershed Association** – Winchester, Connecticut: Designed stormwater retrofit for existing 1-acre paved parking area at the science building of the Northwest Community College to treat runoff prior to discharge into the Still River. Retrofit consists of forebay and Bioswale to treat runoff from parking area and building roof. Currently at Bid stage.

- **Garden Homes Management** – Southport, Connecticut (Affordable Housing) - Designed site to support 96-unit apartment building and 115 parking spaces. Site contains both freshwater and tidal wetlands. Stormwater management design required to provide Groundwater Recharge Volume & Water Quality Volume in addition to reducing the post-development peak rate of runoff from the 10-yr rainfall event to the pre-development peak rate of runoff from the 2-yr rainfall event. The stormwater management design includes grassed swales, Bioretention systems and underground concrete galleries to meet all of these stormwater requirements. Due to favorable soils on the site, the site will likely be a zero discharge site. Court Approved.

- **Garden Homes Management** – Milford, Connecticut (Affordable Housing) - Designed site to support 257-unit apartment building with 295 parking spaces. Stormwater management design required to provide Groundwater Recharge Volume & Water Quality Volume in addition to reducing the post-development peak rate of runoff from the 25-yr rainfall event to the pre-development peak rate of runoff from the 25-yr rainfall event. The design utilizes a Bioretention system, two underground galleries systems as well as a small detention basin to meet all of the stormwater requirements. Court Approved.

- **Garden Homes Management** – Milford, Connecticut (Affordable Housing) - Designed site to support 21,888 sq.ft. building (three stories) containing 36 studio apartments and 45 parking spaces. Permeable pavement and Bioretention will be used on the site to treat runoff for water quality improvements along with reducing runoff volume from the 1-yr to 100-yr storm event. Construction complete and project occupied.

- **Quickcomm, Inc.** – Newtown, CT: Design a parking facility for approximately 140 vehicles to serve an existing corporate use. Runoff from the entire parking facility will be directed to one of seven Bioretention systems. Water quality of the runoff will be improved by the filtration through a specialized soil media and will then infiltrate into the underlying soils. Due the presence of sand and gravel soils, the Bioretention systems will fully infiltrate all runoff up to and including a fifty-year design storm (6.5" of rain/24 hours). Land use approvals obtained in the fall of 2012 and work completed in the fall of 2013.

- **Garden Homes Management** – Fairfield, Connecticut (Affordable Housing) - Designed site to support 32,592 sq.ft. building (three stories) containing 54 studio apartments and 68 parking spaces. Permeable pavement will be used for majority of parking facility. Roof drains will also be directed

20

to permeable pavement system for water quality improvement.  Reservoir layer was sized to fully contain 1.7" of runoff from contributing impervious area.  By using a raised underdrain an anaerobic condition will be maintained in the bottom of the reservoir, thus providing denitrification of Total Nitrogen prior to discharge to tidal section of Rooster River.  Construction complete and occupied.

- **Garden Homes Management** – Oxford, Connecticut (Affordable Housing) - Design site plan for 126 units of manufactured housing on 41+ acres.  Stormwater management is achieved by the use of linear Bioretention systems (Bioswales) along both sides of all interior roads.  After treatment in Bioswales, all runoff is directed to standard detention basins to provide peak rate attenuation from the 2-year to 100-year rainfall event. Approved by Inland Wetlands Agency, Denied by Planning and Zoning Commission.   Court Approved and under construction.

- **Compton Family Trust** – New Hartford, Connecticut:   Design two wet swales systems to convey and filter runoff from road which is currently discharged into West Hill Lake via a paved swale.  West Hill Lake has very good water quality and the owner desires this work on this property to become a template for other homeowners on West Hill Lake to prevent adverse impacts of stormwater on the water quality of the lake.   Received all necessary land use approvals.  Construction to commence in the summer of 2012.

- **Highwood Estates** – Thomaston, Connecticut:   Design retrofits for two existing failing detention basins serving existing 50 lot residential subdivision.  Retrofits were designed using LID techniques to improve water quality reaching Northfield Brook, an impaired waterway.  The larger basin was converted to an Extended Detention Shallow Wetlands to significantly reduce pollutant loads.   Due to a limited area, only a forebay and deep pool could be designed for the smaller basin, thus providing measurable improvements in water quality.

- **Farmington River Watershed Association** – Winchester, Connecticut: Design stormwater retrofits consisting of a Bioretention system at the Town of Winchester Wastewater Treatment Plant and a Bioswale at the Town of Winchester Public Drinking Supply facility.  These projects are being funded as LID demonstration projects to increase public awareness of LID.  The systems were installed in June 2012 and were featured in articles in the Republican American and Register Citizen newspapers.

- **Harwinton Sports Complex** – Harwinton, Connecticut:  Redesign stormwater management system for indoor sports facility to use vegetated swales and Bioretention systems.  Redesign site grading to eliminate all structural drainage in parking facility.   Client saved over $ 40,000 on infrastructure costs by the use of LID treatment systems.

- **Holland Joint Venture, LLC –** Bridgewater, Connecticut:  Prepared site plan for 28,000 sq.ft. industrial/light assembly use and 140 parking spaces on 10.94 acres.  Utilize Environmental Site Design strategies to preserve large portions of site in natural condition, minimize impacts due to site disturbance, and minimize impacts to wetland/watercourse system by access driveway.   Designed five Bioretention systems for storm water management and pollutant removal from all impervious areas.

- **Goodhouse Flooring, LLC** – Newtown, Connecticut:  Design site to accommodate 8,800 commercial building and associated driveway and parking areas on 1-acre site.   Designed eight Bioretention systems to handle runoff from all impervious surfaces. Analyze and demonstrate that State of Connecticut water quality goals will be achieved for the site design.

21

- **Trade Winds Farm** – Winchester, Connecticut:  24 lot Open space subdivision on 104+ acres of land.  Performed all civil engineering design work for project.  Notable feature of project is the preservation of 64+ acres of the site as dedicated Open Space.  Many LID strategies such as Environmental Site Design, site fingerprinting, volumetric reduction and water quality improvements were incorporated into site design.  Storm water treatment systems utilized vegetated basins, vegetated swales with gravel filter berms, emergent marsh, Bioretention systems, linear vegetated level spreader, and meadow filter strips.

- **Northern View Estates** – Sherman, Connecticut:  Five lot subdivision with private road.  Design has no direct wetland impacts and only minor intrusions into defined 100' upland review area.  Low Impact Development systems, such as vegetated swales and Bioretention were used to treat post-development runoff while maintaining existing drainage patterns to the maximum extent possible.

- **Mill River** – New Milford, Connecticut:  Designed 14 lot open space subdivision on 68-acre site.  Performed all civil engineering services for project.  .LID treatment systems such as a permanent pond/emergent marsh system, linear biofiltration swale, and rain gardens were designed for the site.

- **Byron Avenue Cluster Development** – Ridgefield, Connecticut:  Seven lot cluster subdivision on 4 acres.  The Stormwater management system consisted of a road with no curbs, grassed swales, and constructed wetland with detention to reduce pollutant loads and increases in the peak rate of runoff.

- **The Estates on the Ridge** – Ridgefield, Connecticut:  32 lot open space subdivision on 152+ acres.  Over 80 acres of the site will be preserved as Open Space as part of this project.  Stormwater will be treated by the use of rain gardens for roof drains, infiltration trenches for footing drains, emergent marsh systems and vegetated swales for conveyance and treatment of road runoff.  Designed over 1 mile of proposed road for project.  Designed bottomless culverts over several wetlands crossing to minimize direct impact on wetland areas.

- **G & F Rentals, LLC** – Oxford, Connecticut:  By utilizing LID stormwater concepts such as grass filter strips, Bioretention in parking islands, Bioretention for roof drains, and infiltration trenches, a total of 54,000 sq.ft. of commercial office space along with 140+ parking spaces was placed on 10-acre site.  The project also restored previously degraded inland wetlands on the site.

- **Dauti Construction – Edona Commons** – Newtown, Connecticut:  Designed 23-unit affordable housing plan to minimize impacts on delineated wetland areas.  Designed three construction wetland systems for the treatment of storm water runoff for water quality renovation.

- **American Dimensions, LLC** – New Milford, Connecticut:  Redesigned the storm water treatment systems for a 7-lot residential subdivision.   Rain gardens were designed to handle the runoff from all roof areas and proposed driveways.   Each rain garden provided the required Water Quality Volume and Groundwater Recharge Volume as specified in the 2004 Storm Water Quality Manual.  A Subsurface Gravel Wetland was designed to treat the full Water Quality Volume for runoff from adjacent roads network which drained through the subject property.

- **Mo00litero Residence** – New Fairfield, CT:  Designed five Bioretention systems to mitigate both volumetric increases of runoff and address water quality issues for large building addition to single family residence on Candlewood Lake.  Also designed landscape filter strip above lake edge to filter runoff from up gradient lawn area.  Bioretention systems fully infiltrated 5" of rain in 24 hours from Hurricane Irene in August of 2011.  Project was featured in newsletter of Candlewood Lake Authority to demonstrate the effectiveness of LID treatment systems in a lake environment.

22

- **Multiple single-family residences** – Design Bioretention systems to mitigate volumetric increases of runoff due to increases of impervious cover on the lot for large building additions and new construction including the reduction of volumetric increases up to the 25-yr event (5.7" of rain in 24 hours).

## Residential Subdivisions

- **Stone Ridge Estates**, 59 lot residential open space subdivision, Ridgefield, Connecticut (Town of Ridgefield)
- **Oak Knoll**, 14 lot open space subdivision, Ridgefield, Connecticut (Mike Forbes)
- **Ward Acres Farm**, 12 lot open space subdivision, Ridgefield, Connecticut (Sturges Brothers, Inc.)
- **Horblitz Subdivision**, 13 lot open space subdivision, Ridgefield, Connecticut (John Sturges)
- **McKeon Subdivision**, 14 lot conventional subdivision, Ridgefield, Connecticut (McKeon Family Trust)
- **High Ridge Estates**, 5 lot subdivision in historic district, Ridgefield, Connecticut (Scandia Construction)
- **Millstone Court**, 7 lot conventional subdivision, Ridgefield, Connecticut (Sturges Brothers, Inc.)
- **Cricklewood Subdivision** – 12 lot conventional subdivision, Redding, Connecticut (Jay Aaron)
- **Spruce Meadows Subdivision** – 12 lot conventional subdivision, Wilton, Connecticut (Piburo Builders)
- **Noroneke Estates** – 12 lot open space subdivision, Ridgefield, Connecticut (John Sturges)
- **Lynch Brook Lane** – 7 lot open space subdivision, Ridgefield, Connecticut (Sturges Brothers, Inc.)
- **Ledgebrook Subdivision** – 27 lot conventional subdivision, Southbury, Connecticut (Conte Family Trust, LLC**)**
- **Seven Oaks** – 19 lot open space subdivision, Ridgefield, Connecticut (Basha Szymanska)
- **Applewoods** – 29 lot conventional subdivision, Bethel, Connecticut (Gene & Joe Nazzaro)

## Third Party Engineering Reviews

- **Groton Open Space Association** – Wal-Mart Super center, Mystic Woods Age Restricted Development, and changes to stormwater standards in the Town of Groton regulations – Groton, Connecticut. Focus of review was on stormwater management plans to address water quality and runoff volumes per the CT DEP 2004 Storm Water Quality Manual as well as the adequacy of the erosion and sedimentation control plan for the proposed development. Project approved with modifications to stormwater management system to address water quality.
- **Town of Tolland Planning & Zoning Commission** – Star Hill Athletic Complex with focus on water quality impacts on existing impaired waterway. Focus was on suggesting changes to stormwater management system to comply with recently adopted Low Impact Development requirements in the Town of Tolland. Project approved and built with modifications to stormwater management system to address water quality of post-development runoff.
- **Town of Newtown Inland Wetlands Commission** – Sherman Woods – 38 lot residential Subdivision with focus on stormwater management and water quality. Review stormwater management plan for compliance with CT DEP 2004 Storm Water Quality Manual to address water quality issues being directed to high quality wetland systems. Also review erosion & sedimentation control plan for adequacy and compliance with CT DEP 2002 Guidelines for Soil Erosion & Sediment Control. Project withdrawn and not resubmitted.
- **Town of Winchester Inland Wetlands Commission** – 30,000 sq.ft. Commercial building with grading and stormwater management within 100-yr flood plain. Plan reviewed focused on impacts to

23

**AD71**

floodway and 100-year flood plain as a result of the placement of significant fill within the flood plain.   Project approved with modifications to stormwater management system.

- **Town of Southbury Inland Wetlands Commission** – 35,000 sq.ft. Medical office building proposed in close proximity to inland wetlands & watercourses.   Review focus on the adequacy of the stormwater management plan to address water quality and runoff volumes prior to discharge into on-site wetland areas.

- **Friends of Litchfield** – Stop & Shop proposal on existing retail site proposing an increase of impervious area of 1 acre directly draining into an aquifer protection area.  Focus of review was on adequacy of stormwater management system to address water quality of runoff and prevent further off-site adverse impacts.  Project approved with minor modifications to stormwater management system.

- **The Regency at Ridgefield** – Proposal for contractor's yard on steep slope immediately uphill of existing pond and wetlands.   Project proposed removal of over 45,000 cubic yards of earth and rock to facilitate construction of building.   Focus of review was on adequacy of erosion control and stormwater management plan to prevent discharges of pollutants to receiving pond.  Project denied citing impacts of stormwater on existing pond.

- **Friends of Oswegatchie Hills Nature Preserve, Inc. and Save the River, Save the Hills, Inc**. – Review of preliminary site plan for 840 unit of affordable housing on a 230+ acre site directly adjacent to the Niantic River submitted for a zone change to the Planning and Zoning Commission.  Focus of review was on stormwater management and impacts to down gradient wetlands, including the Niantic River.  Preliminary site plan approval granted with conditions of approval requiring final plans to address stormwater issues raised by Trinkaus Engineering, LLC.

- **Save the River, Save the Hills, Inc**. – Review of the erosion control plans and stormwater management plans for 90-acre solar array proposed on core forest in Waterford, Connecticut which drained directly to first order cold water fishery streams.  Provide written comments to Connecticut Siting Council on behalf of Save the River, Save the Hills (Intervenor).   Siting Council denied project citing erosion and stormwater management issues with the plan.

- **Town of Brookfield Inland Wetlands Commission** – The Enclave at Brookfield, an affordable housing project with 187 units on 9.8 acres proposing filling of wetland, locating stormwater basin within inland wetland area and a significant increase of impervious.  Review focused on adequacy of stormwater management system to address water quality, runoff volume and peak rate changes due to development in accordance with CT DEP 2004 Storm Water Quality Manual and local land use requirements, review of erosion & sedimentation control plan for compliance with CT DEP 2002 Guidelines for Soil Erosion & Sediment Control and local land use requirements.  Offer modifications to plans to address water quality and runoff volume which applicant accepted resulting in approval of project.

- **Town of Brookfield Inland Wetlands Commission and Zoning Commission** – The Renaissance, an affordable housing project with 156 units of 5+ acres adjacent to the Still River replacing existing development on the site.   Review focused on adequacy of stormwater management system to address water quality, runoff volume and peak rate changes due to development in accordance with CT DEP 2004 Storm Water Quality Manual and local land use requirements, review of erosion & sedimentation control plan for compliance with CT DEP 2002 Guidelines for Soil Erosion & Sediment Control and local land use requirements.   Additionally, reviewed issues of development in the floodway and 100-year flood plain of the Still River.  Provided modifications to plans to address water quality and runoff volume which applicant accepted resulting in approval of project.

- **Town of Brookfield Inland Wetlands Commission** – Brookfield Village – Phase II – 12/23 Station Road proposing commercial space and residential apartments in the "Four Corners of Brookfield"; 70 Stony Hill Road proposing 26 units of affordable housing served by private water and on-site sewage disposal systems; 468 Federal Road – 280-unit affordable housing project.   In all applications, the review focused on the probable adverse impacts to inland wetlands and watercourse as well as the

**AD72**

adequacy of the erosion control plan and stormwater management plan to treat non-point source pollutants and runoff volumes to minimize adverse impacts to the receiving inland wetlands and watercourses. Original application withdrawn after initial review. Provide sketch of modifications to improve water quality of post-development runoff and minimize direct impacts on inland wetlands. Application not resubmitted at this time.

- **Town of Salisbury Inland Wetlands Commission** – Review of multiple applications for residential development and/or improvements on existing lakes. Issues reviewed were stormwater management to ensure that water quality of post-development runoff was improved prior to entering lake and that erosion control plans were appropriate and adequate to prevent eroded material from reaching the lake or shoreline wetlands.

- **Branford Citizens for Responsible Development** – Review of development plans for Costco Store and other commercial development on 45 acres in Branford, CT. Review focuses on stormwater management issues particularly increased runoff volumes and pollutant loads to be generated by development and whether the proposed stormwater management proposal would adequately address the impacts of these two issues. Both the 2004 CT DEP Storm Water Quality Manual and the Branford Inland Wetland Regulations were used to determine if the plans were compliant with the applicable standards. The erosion control plan was evaluated for compliance with the CT DEP 2002 Guidelines for Soil Erosion & Sediment Control. Project withdrawn and not resubmitted.

- **Save our Shelton** – Review of development plans for large-scale mixed-use development on 120+ acre site on Bridgeport Avenue. Site contained core forest and high-quality wetland/watercourse systems. Review focused on stormwater management issues, particularly increased runoff volumes and pollutant loads to be generated by development and whether the proposed stormwater management proposal would adequately address the impacts of these two issues. Both the 2004 CT DEP Storm Water Quality Manual and the Shelton Inland Wetland and Stormwater Regulations were used to determine if the plans were compliant with the applicable standards. The erosion control plan was evaluated for compliance with the CT DEP 2002 Guidelines for Soil Erosion & Sediment Control. Project still in land use process.

- **Concerned Citizen Group - Roxbury, CT** – Review of proposed residential 12-lot subdivision on steeply sloping site with high quality wetlands and watercourses. Review of all aspects of civil engineering (site layout, grading, erosion/sediment control, stormwater management, stream crossing methodology) using the CT DEP 2004 Storm Water Quality Manual and CT DEP 2002 Guidelines for Soil Erosion and Sediment Control as well as the Town of Roxbury land use regulations and ordinances and evaluate impacts to wetlands and watercourses. Stormwater management system and erosion control plans were found to be inadequate to protect the high-quality wetlands and watercourses from adverse impacts by the Inland Wetlands Commission. Project denied by Inland Wetlands Commission citing findings from the Trinkaus Engineering, LLC review and other consultants.

- **Par Arbors, LLC – Bloomfield, CT –** Review of truck storage and dispatch center on agricultural land with numerous delineated inland wetland/watercourses on the site. Focus of review was on stormwater management and the adverse effects of increased pollutant loads and runoff volumes on wetland. Also review adequacy of erosion control plans. Provided testimony at two public hearings in front of Inland Wetlands Commission. Application to conduct regulated activities was denied by the commission in July 2019.

- **Town of Brooklyn –** Perform review of stormwater management design with regard to addressing water quality, runoff volume and downstream impacts of a 51-unit condominium project. Provide suggestions to design engineer to implement comments in review letter.

- **Friends of the Lake – Enfield, CT –** Perform third-party civil engineering review of proposed 819,000 square truck warehouse/distribution center with a focus on impacts of increased runoff volumes and water quality from a high-pollutant load site. Prepare written report and provide testimony in front of Planning and Zoning Commission.

25

- **Newtown Neighbors – Newtown, CT -** Perform third-party civil engineering review of proposed 340,000 square truck warehouse/distribution center with a focus on impacts of increased runoff volumes and water quality from a high-pollutant load site. Prepare written report and provide testimony in front of Planning and Zoning Commission.
- **Town of Mansfield – Mansfield, CT -** Perform third-party civil engineering review of alterations to existing car dealership to allow for the construction three new restaurants and retail space. Review encompassed all civil engineering aspects of plan. Prepare written report for submission to Inland Wetlands Agency.

## Ground Mounted Solar Arrays

- **Lodestar Energy – Winchester, CT:** Performed all civil engineering for an eight-acre solar array on 100-acre parcel. This work included the access driveway, two wetland crossings and the design of a stormwater management system for the project. Notable aspects include: All solar panels are considered impervious area, Soil Class for hydrologic model was dropped down by 1 to account for compaction by the movement of vehicles, grass swales with check dams were proposed on the two sides of the array to collect runoff and convey to a constructed wetland basin which met the requirements of the channel protection volume (DEP Manual). All designed comprehensive erosion and sedimentation control plan with multiple phases. The design of the erosion control plans and stormwater management plans exceed the requirements found in the CT DEP 2004 Storm Water Quality Manual and the CT DEP 2002 Guidelines for Soil Erosion and Sediment Control.

- **GRE – Waterford, CT:** Retained by Save-the-River, Save-the-Hills to review the erosion control plan and stormwater management plan on an environmentally sensitive site with runoff being directed to cold-water fishery streams which support native trout populations and drain to Niantic River. Provide civil engineering technical review in pre-filed testimony to Connecticut Siting Council and testify at Siting Council public hearing on application.

- **GRE – East Lyme, CT**: Retained by adjacent property owner to evaluate stormwater impacts from 30 acres ground mounted solar array in legal case for adverse impacts to wetlands and watercourses. Finding showed that runoff from the site was significantly under-estimated by the design professional as the panels were not considered impervious and the changes to soil conditions due to regrading were not considered in the design which resulted in the failure of the stormwater basins during construction as well as after the construction was complete.

- **Other Ground Mounted Solar Projects:** I have also reviewed the erosion and stormwater management plans for ground mounted arrays in Old Lyme, Brooklyn/Canterbury, New Milford, North Stonington, and East Hampton for compliance with the standards found in the CT DEP 2004 Storm Water Quality Manual. In all cases, the stormwater management designs were not in compliance with the DEP Manual.

## Commercial Site Plans

- **Cannondale Corporation Headquarters** - Bethel, Connecticut
- **Village Bank Headquarters** – Danbury, Connecticut
- **Newtown Hardware -** Newtown, Connecticut
- **Amicus Healthcare Living Centers –** Rocky Hill, Connecticut
- **Nathan Hale Office Building** – Fairfield, Connecticut
- **Ridgefield Recreation Center** – Ridgefield, Connecticut
- **Silver Spring Country Clubhouse & Pool house renovations -** Ridgefield, Connecticut

**AD74**

005679

## Multi-family Projects

- **64 Wooster Street –** 12-unit affordable housing project - Bethel, Connecticut
- **91 Wooster Street –** 13-unit affordable housing project – Bethel, Connecticut
- **49 Taylor Avenue –** 18-unit affordable housing project – Bethel, Connecticut
- **47 Shelly Road –** 9-unit affordable housing project served by private company and on-site sewage disposal systems – Bethel, Connecticut
- **1315 Washington Boulevard –** 180-unit affordable housing project – Stamford, Connecticut

## On-site sewage disposal systems

- **Candle Hill Mobile Home Park** – Design Subsurface Sewage Disposal Systems for individual mobile home units.  New Milford, Connecticut.
- **Hemlock Hills Camp Resort** – Expansion of campground, design of gravity sanitary sewer and design of subsurface sewage disposal system to handle 4,800 gpd.  Litchfield, Connecticut.
- **Old Field Condominiums** – long term inspection & reporting on the condition of multiple subsurface sewage disposal systems serving 40 unit condominium complex with design flows in excess of 15,000 gpd. Southbury, Connecticut.
- **Thorncrest Farm** – Design of on-site sewage disposal system to handle wastewater from milking operation.   Goshen, Connecticut.
- **Silver Spring Country Club** – Design of multiple subsurface sewage disposal systems for private country club with average daily flow of 7,000 gpd during peak usage season.
- **Richter Park Golf Course** – Design subsurface sewage disposal system to replace existing failed system for golf club house and year round restaurant with average daily flow of just under 5,000 gpd.
- **Redding Country Club** - Performed soil testing to design a repair to an existing wastewater management system that was experiencing periodic effluent discharges during high use on very marginal soil conditions.   Utilized oversized grease tanks for kitchen waste and septic tanks to increase the clarity of the effluent which was discharged by force main to the subsurface sewage disposal system increase the long term functionality of the system.  Discharge rate 4,900 gpd.

## General Civil Engineering Projects

- **Montgomery Residence**, 10,000 sq.ft. residence with 2.5 acre pond, Redding, Connecticut.
- **Neils Different,** Design 1 acre pond, Ridgefield, Connecticut.
- **Anthony DeLuca**, Design 2 acre pond**,** Redding, Connecticut.
- **Barrett Cram**, Design 0.5 acre pond, Redding, Connecticut.
- **Jay & Eileen Walker Residence**, 27,000 sq.ft. residence, Ridgefield, Connecticut.

## Athletic Facilities

- **Kingdome – East Fishkill, NY,** Prepare comprehensive site plan for the construction of an air-supported structure covering 7.96 acres of land area.   Project also includes the design of 303 parking spaces, two full size artificial turf baseball fields and three 54-80 artificial turf baseball fields.  Designed all site grading and stormwater management facilities to address water quality volume, channel protection volume as well as peak rate attenuation for the 1-yr, 2-yr, 10-yr, 25-yr, 50-yr and 100-yr rainfall events.
- **Tiger Hollow – Ridgefield High School – Phase I**, Design and site artificial turf competition field and track complex.   Design access road to provide access to new building containing locker rooms,

27

concessions, media room, and equipment storage areas.  Design all utility connections and obtain local permits.

- **Tiger Hollow – Ridgefield High School – Phase II**, Prepare Conceptual Development plan for reconfiguration of existing athletic fields adjacent to the Tiger Hollow stadium.
- **Joel Barlow High School – Redding, CT**, Provide preliminary Master Plan on pro bono basis for reconfiguration and improvement of existing athletic fields at Joel Barlow in response to Falcon Pride stadium proposal.   Plan was provided to Region 9 Board of Education for general discussion purposes.

COMMENTS OF THE TOWN OF EAST HAVEN ON THE TWEED NEW HAVEN
AIRPORT NEPA DRAFT ENVIRONMENTAL ASSESSMENT RUNWAY 02-20
EXTENSION AND TERMINAL EXPANSION PROGRAM

Attachment D

VN Engineers, Inc. Report on Environmental Assessment dated April 27,
2023 with attached independent Tweed New Haven Airport Expansion Traffic
Impact Study



**VN ENGINEERS, INC**.
116 Washington Avenue
North Haven, CT 06473
www.VNEngineers.com

**TRAFFIC INFRASTRUCTURE PLANNING**
Tel: (203) 234-7862
Fax: (203) 234-9154

April 27, 2023

Johnathan Bodwell
Town Engineer
250 Main Street
East Haven, CT 06512

**Re:   Review of NEPA Draft Environmental Assessment**
**Proposed "Tweed New Haven Airport"**

Dear Mr. Bodwell,

VN Engineers, Inc. (VNE) is pleased to provide this independent review of the NEPA Draft
Environmental Assessment for the proposed "Tweed New Haven Airport" expansion in New Haven
and East Haven, Connecticut. The project includes the extension of Runway 02-20 and construction of
a new airport terminal, East Terminal, along with other associated facilities.

The following information was provided to VNE for review:

- NEPA Draft Environmental Assessment – Tweed New Haven Airport, prepared by McFarland
  Johnson, dated March 2023.

Overall, the traffic study has been performed in a professional manner in accordance with standard
traffic engineering procedures, however, additional information and analysis should be considered to
further demonstrate the impact of the project. Based on our review of the information provided, we
offer the following comments:

**Appendix K: Traffic Study for New Terminal**

1. Traffic analysis was done for two separate time periods: the morning peak period between
   9:15 am and 10:15 am and the midday peak period between 2:15 pm and 3:15 pm. The report
   specifies that the midday peak period was selected to provide the traffic impacts during the
   peak hour of highest trip generation to and from the airport and the morning peak hour was
   selected to provide traffic impacts during a commuter hour. Traditionally, when the goal is to
   evaluate the effects of a proposed development, capacity analysis is done for the most
   conservative scenario to gauge the impact on the existing traffic peak periods. The most
   conservative scenario demonstrates the worst traffic conditions that would result from the
   existing peak hour traffic along the roadway network plus the generated traffic from a
   proposed development. The evening peak hour often shows higher existing traffic volumes
   than the morning peak hour and that is substantiated from the traffic counts provided in
   Appendix A – Traffic Count Data collection. At all intersections in the study area, the existing
   evening peak hour volumes are higher than those of the morning peak hour. Figure 3-9 within
   the report shows almost 500 site generated trips during the evening peak hour. Even though
   the airport generated peak traffic does not occur during the evening, it is important to analyze
   how that airport generated traffic would affect the overall capacity and flow throughout the
   roadways during the existing heavy evening commute peak.

005683

**3436**

*Traffic Peer Review*
*NEPA Draft EA*

*April 2023*
*Page 2 of 4*

In April 2023, VN Engineers conducted a separate traffic study to determine how the proposed expansion of the Tweed New Haven Airport will impact the local traffic and quality of life for East Haven residents. Turning movement and vehicle classification counts were conducted for this study between Wednesday, February 22, 2023, and Tuesday, March 7, 2023, during the morning and evening peak periods. This data also shows that evening peak hour experienced more traffic compared to morning peak hour. Appendix A includes the traffic impact study report prepared by VN Engineers. Generally, at locations that experience poor operations, the operations are worse with higher delays and longer 95th percentile queues during the evening peak analysis than those of the morning peak analysis. Despite the site generated volumes from the airport, the evening peak analysis should be included within the EA to show the ultimate effect the airport traffic will have on the current peak commuter hour within the study area.

2. It should also be noted that the Town of East Haven is partially a seasonal town with the route to the town beach running through the study area. Traffic counts used within the EA document were collected during December 2021. It should be recognized that traffic patterns during the summer may differ from those of other seasons.

3. The study area for the traffic analysis includes intersections primarily along state routes. Traffic generated to and from airport may be routed on local roads by GPS software to avoid delays. This report does not evaluate the traffic impact on local roads. Additionally, the following intersections would be important to evaluate as part of this study:

   a. Hemingway Ave (Route 142) at Coe Ave and Short Beach Road (Route 142): Based on the trip distribution, all of the site generated traffic will travel through this intersection. Furthermore, this intersection is very prone to significant flooding and the Town of East Haven often works with the Connecticut DOT to close this intersection due to flooding from the nearby marsh land even without a major storm event. If this intersection is impassable, all site generated traffic will need to be rerouted around it. Appendix B includes some recent flooding at this intersection documented by the East Haven Fire Department and the Department of Public Works. A study done by South Central Regional Council of Governments (SCRCOG) in 2012 also identifies the environmental and flooding issues at this intersection. Please refer to Appendix C for this study. Further documentation of the flooding issues at this intersection are available here: (https://easthavenct-my.sharepoint.com/:f:/g/personal/thedley_easthaven-ct_gov/Ekn-x4lN6RNMuemyGY8tWQsBQ85UQWVXLVAq3kAjyHCfvg?e=2MorBw)

   b. Frontage Road (Route 1) at Forbes Place: All traffic heading towards I-95 southbound or from I-95 northbound towards the site will travel through this intersection. From the trip distribution, it appears that 75% of the generated traffic will flow through this intersection. This intersection was part of the study area covered by the traffic study conducted by VN Engineers. Analysis for this intersection shows that currently the northbound approach operates at LOS F during the morning peak period. Additionally, during both peak hours, the 95th percentile exceeds the available storage length. As a high percentage of trip generated traffic will travel through this intersection, which already experiences high volumes and poor operation, analysis of this intersection should be included within the EA to properly demonstrate the effect the airport generated traffic will have throughout the Town of East Haven.

   c. Forbes Place at Kimberly Ave: This local unsignalized intersection is highly trafficked by vehicles traveling through downtown East Haven towards Route 1 and I-95 southbound. GPS software may route generated traffic through this intersection to avoid traffic further East on Route 1. This intersection also experiences a high number

**AD79**

005684

**3437**

*Traffic Peer Review*
*NEPA Draft EA*

April 2023
Page 3 of 4

of crashes and could benefit from additional analysis. Analysis by VN Engineers show that the southbound approach operates at a LOS F during the existing evening peak-hour with the overall intersection operating at a LOS F. From the analysis results within the VN Engineers' Traffic Impact Study, along with field visit observations, this is an intersection that experiences high delays and queues throughout multiple times of the day. It also is one of the top three intersections within VN Engineers' study that experiences the most crashes throughout the study area. Proper evaluation of this intersection is vital before allowing additional traffic to further impact the operations and safety here.

4. Table 5-2 in the report summarizes the study area crashes by crash type. The fatal injury column identifies three fatal crashes within the study period (2016-2020). The report does not discuss the nature of these fatal crashes or what factors contributed to these crashes. Local road fatalities are rare in nature and deserve proper investigation so that the contributing factors can be mitigated as best as possible.

5. Table 5-2 does not include any pedestrian or bicycle related crashes. The report does not identify the data source, however, from our experience, the UConn Crash Data Repository identifies pedestrian and bicycle related crashes as "Not Applicable" under the "Manner of Collision" column. Without further explanation, it is not possible to make any assumption of whether that is the case here. Pedestrian and bicycle crashes are often under reported and pedestrian/bicycle injuries have more serious consequences compared to motor vehicle injury. Proper investigation into any pedestrian and bicycle related crashes would be important for evaluating the safety within the study area especially since the expansion is predicted to increase the traffic throughout the area. Within the traffic impact study, VN Engineers identified eleven pedestrian and bicyclist injury within the study area between January 1, 2019, and December 31, 2022 (data from the year 2020 was excluded from analysis due to the pandemic disrupting typical traffic patterns).

6. Table 5-3 summarizes the Level of Service for the existing, no action and proposed conditions. Table 6-1 summarizes the Level of Service for the no action, proposed action no improvements, and proposed action with improvements. These summary tables only include the overall level of service. While there are more detailed tables provided in Appendix H, it is typically more valuable to include discussion of the delay time and 95th percentile queues within the report. This information is helpful in assessing the extent of the impacts to the various movements analyzed. Below are a few examples of impacts that warrant additional discussion.

   a. At Intersection 7 (Route 1 at Hemingway Avenue (Route 142)), the delay for the northbound left-turning lane group increases by 30.8 seconds between the no action and proposed action midday scenarios. That is a significant increase in delay for that lane group. However, that impact is not thoroughly covered within the report since the overall intersection has a LOS C.

   b. At Intersection 8 (Hemingway Avenue (Route 142) at Main Street), the delay for the northbound left-turning lane group increases by 62.8 seconds between the no action and proposed action midday scenarios. That is a significant increase in delay for that lane group and results in almost a 200' increase in the 95th percentile queue that exceeds that available storage. However, that impact is not thoroughly covered within the report since the overall intersection has a LOS D.

**AD80**

005685

**3438**

*Traffic Peer Review*
*NEPA Draft EA*

*April 2023*
*Page 4 of 4*

Discussion of these impacts within the report provides a more transparent summary of the impact that the project will have on the study area. Additionally, it provides more detail into areas that would require further mitigation even if the overall intersection LOS is acceptable.

7. Under the impact summary, it is recommended that a signal be installed at the intersection of Coe Avenue with Proto Drive to improve the level of service. This will need to be a non-negotiable inclusion of the project. Without this signalization, the approach of Proto Drive will experience a delay of approximately 18 minutes according to the Synchro model, which would be unacceptable. This signalization improvement must be included as part of the project. Based on the full details of the delays and the LOS, additional detailed mitigations or improvements at other locations would also be highly valuable under this project beyond the potential strategies identified in Section 6.

8. In addition to providing signalization at the intersection of Coe Avenue at Proto Drive, the roadway of Proto Drive will need to be improved from its existing condition to handle the increased traffic demand from the airport expansion. The existing pavement is 30' wide and in poor condition. There are not any pavement markings along Proto Drive, except for the stop bar at the intersection. Furthermore, large trucks have been observed to frequently park on the roadway and pedestrians have been observed walking in the road since there are no sidewalks along the roadway. Since Proto Drive leads to an industrial area, the traffic turning from Coe Avenue on to Proto has a high percentage of heavy vehicles. It has been observed that these large vehicles have difficulty maintaining their lane while maneuvering the turn. If there is to be increased traffic on Proto Drive, the turning radius at the intersection will need to be investigated. Any intersection geometry improvements will need to accommodate these large truck turning movements as well as the added airport traffic. These additional improvements to Proto Drive should have been included in the Study as they will be essential under this project.

We hope that this letter is useful in your review for the proposed project. If you have any questions, please do not hesitate to contact us.

Sincerely,

Nancy Dutta, Ph.D., P.E., PTOE
Traffic Engineer

Sydney Brooks LaLuna, P.E.
Project Engineer

List of Appendix

Appendix A : Tweed New Haven Airport Expansion Traffic Impact Study, April 2023.

Appendix B : Flooding at Hemingway Avenue, Coe Avenue and Short Beach Road Intersection, March 2023.

Appendix C : Hemingway Coe Avenue Corridor Study, June 2012.

# Appendix A

# Tweed New Haven Airport Expansion

# Traffic Impact Study

005687

3440

# Tweed New Haven Airport Expansion Traffic Impact Study



AD83

005688

**3441**

# TRAFFIC IMPACT STUDY

# TWEED NEW HAVEN
# AIRPORT EXPANSION

# EAST HAVEN, CONNECTICUT

## APRIL 2023

**Prepared By:**
**VN Engineers, Inc.**
116 Washington Avenue
North Haven, CT 06473
(203) 234-7862

**Prepared for:**
**Town of East Haven**
250 Main Street
East Haven, CT 06512
(203) 468-3212

**AD84**

# TABLE OF CONTENTS

1.0   SCOPE ...................................................................................................4

2.0   INTRODUCTION .....................................................................................4

    2.1 STUDY AREA ...................................................................................4

    2.2 ENVIRONMENTAL JUSTICE ...............................................................6

    2.3 FLOODING AND HURRICANE SURGE ..................................................7

3.0   PEAK-HOUR VOLUMES .........................................................................8

4.0   LEVELS OF SERVICE AND QUEUE ANALYSES .........................................8

5.0   EXISTING CONDITIONS .........................................................................9

6.0   NO-BUILD 2029 ANALYSIS ................................................................15

7.0   FULL-SITE BUILD 2029 ANALYSIS ......................................................19

8.0   HALF-SITE BUILD 2029 ANALYSIS .....................................................28

9.0   SAFETY ANALYSIS .............................................................................32

10.0  CONCLUSIONS ..................................................................................35

# APPENDICES

APPENDIX A: TRAFFIC COUNT DATA

APPENDIX B: EXISTING 2023 TRAFFIC VOLUMES

APPENDIX C: NO-BUILD 2029 TRAFFIC VOLUMES

APPENDIX D: SITE GENERATED TRIPS AND TRIP DISTRIBUTION

APPENDIX E: FULL-SITE BUILD 2029 TRAFFIC VOLUMES

APPENDIX F: EXISTING 2023 CAPACITY ANALYSIS

APPENDIX G: NO-BUILD 2029 CAPACITY ANALYSIS

APPENDIX H: FULL-SITE BUILD 2029 CAPACITY ANALYSIS

APPENDIX I: HALF-SITE BUILD 2029 CAPACITY ANALYSIS

APPENDIX J: INTERSECTION CRASH SUMMARY TABLES

APPENDIX K: LEVEL OF SERVICE INFORMATION

005690

**3443**

# LIST OF FIGURES

Figure 1: Study Area ........................................................................................................ 5

Figure 2: CT 2022 Environmental Justice Communities (Source: CT DEEP)............................. 6

Figure 3: Hurricane Surge Inundation Mapping (Source: CT Division of Emergency Management) ............................................................................................................... 7

# LIST OF TABLES

Table 1: Study Intersections.............................................................................................. 4

Table 2: Study Area Existing Conditions ........................................................................... 11

Table 3: Existing 2023 Capacity Analysis Results ............................................................. 12

Table 4: 2029 No-Build Capacity Analysis Results ............................................................ 16

Table 5: Full-Site Build 2029 Capacity Analysis Results .................................................... 22

Table 6: 2029 No-Build and Full-Site Build Comparison Table............................................. 25

Table 7: Half-Site Build 2029 Capacity Analysis Results.................................................... 29

Table 8: Study Area Safety Analysis Results ..................................................................... 34

**AD86**

## 1.0 SCOPE

The Town of East Haven is a community of approximately 27,800 residents located in New Haven County. The Tweed New Haven Airport is set in both the City of New Haven and the Town of East Haven. According to the Tweed-New Haven Airport Master Plan published in October 2021, an expansion to the airport has been proposed that includes extending its runway by more than 1,000 feet and construction of a new four-to-six gate terminal on the East Haven side. This report was prepared to identify the impact the Tweed New Haven Airport will have on vehicular traffic and safety in Town of East Haven. Safety and capacity analyses were performed for existing and future conditions at each of the eighteen study area intersections to determine how the proposed expansion of the Tweed New Haven Airport will impact the local traffic and quality of life for East Haven residents. This study focuses on the 2023 existing conditions and the 2029 proposed action year.

## 2.0 INTRODUCTION

### 2.1 STUDY AREA

The study area includes the eighteen intersections listed in **Table 1**. The traffic signal plans used in the analysis for the existing, no-build, and build scenarios were provided by the Connecticut Department of Transportation and the Town of East Haven. **Figure 1** shows the study intersections analyzed in this report.

**Table 1: Study Intersections**

| Site No. | Location | Signal No. |
|---|---|---|
| 1 | High Street (Route 100) and the I-95 Southbound Off-Ramp (Exit 52) | #043-237 |
| 2 | High Street (Route 100), Laurel Street, and the I-95 NB On-Ramp | #043-222 |
| 3 | High Street (Route 100) and Kimberly Avenue (Route 735) | #043-222 |
| 4 | High Street (Route 100) and Messina Drive | #043-211 |
| 5 | Main Street, Messina Drive and Kirkham Avenue | #043-XXX |
| 6 | High Street and Main Street (Route 100) and Thompson Avenue | #043-221 |
| 7 | Saltonstall Parkway (Route 1), Hemingway Avenue (Route 142), and Estelle Road | #043-209 |
| 8 | Hemingway Avenue (Route 142) and Main Street (Route 100) | #043-212 |
| 9 | Hemingway Avenue (Route 142) and Dodge Avenue | #043-205 |
| 10 | Coe Avenue (Route 337) and Proto Drive | Unsignalized |
| 11 | Thompson Avenue and Dodge Avenue | Unsignalized |
| 12 | Hemingway Avenue and Short Beach Road (Route 142) and Coe Avenue (Route 337) | #043-225 |
| 13 | Hemingway Avenue (Route 142) and Messina Drive | Unsignalized |
| 14 | Coe Avenue (Route 337) and Silver Sands Road (Route 337) | #043-229 |
| 15 | Silver Sands Road (Route 337), South End Road (Route 337), and Minor Road | Unsignalized |
| 16 | Forbes Place and Kimberly Avenue (Route 735) | Unsignalized |
| 17 | Main Street, Forbes Place, and Bradley Avenue | #043-103 |
| 18 | Frontage Road (Route 1) at Forbes Place | #043-203 |



**Figure 1: Study Area**

5

## 2.2 ENVIRONMENTAL JUSTICE

Each year, the Connecticut Department of Economy and Community Development (DECD) publishes a list of 25 municipalities that are identified as "Distressed Municipalities", This ranking is based on 1) Level of Per Capita Income, 2) percent of population with high school degree or higher, and 3) Per Capita Adjusted Equalized Net Grand List (AENGL). The top 25 towns with the highest total scores are designated distressed municipalities. According to the list published by DECD in 2022, the Town of East Haven ranks 17 in the list of distressed communities as shown in **Figure 2.**



4/6/2023, 11:03:34 AM          1:144,448

☐ CT Towns

🟥 Distressed Municipalities

🟧 Environmental Justice Block Groups

Esri, NASA, NGA, USGS, Esri, HERE, Garmin, SafeGraph,
GeoTechnologies, Inc, METI/NASA, USGS, EPA, NPS, USDA

**Figure 2: CT 2022 Environmental Justice Communities (Source: CT DEEP)**

6

**AD89**

## 2.3 FLOODING AND HURRICANE SURGE

The Connecticut coastline is susceptible to flooding from both river floods and coastal storm effects, with many permanent residents and additional seasonal residents. As a coastal community, East Haven is subject to these forces. Much of the southern and eastern sections of the Town are within Flood Hazard Areas as shown in **Figure 3**.

The whole study area and the airport falls under the areas expected to be affected by tidal flood, coastal storm or hurricane related flooding in some capacity. There are also multiple medical facilities and storm shelters within the study area that can be accessed via Hemingway Ave, Main Street and High Street. These streets are also expected to carry the additional traffic generated by the airport expansion.



**Figure 3: Hurricane Surge Inundation Mapping (Source: CT Division of Emergency Management)**

7

**AD90**

## 3.0 Peak-Hour Volumes

Turning movement and vehicle classification counts were conducted by VN Engineers, Inc. for all eighteen intersections between Wednesday, February 22, 2023, and Tuesday, March 7, 2023, during the following periods:

- 7:00 a.m. to 9:00 a.m.
- 4:00 p.m. to 6:00 p.m.

The peak-hours varied between the eighteen study intersections. The majority of intersections have the morning peak-hour from 7:30 a.m. to 8:30 a.m. and the evening peak-hour from 4:15 p.m. to 5:15 p.m. The traffic count data collected as part of this project is included in **Appendix A**.

As part of the analysis, the volumes between directly adjacent intersections were balanced proportionately. The volume projections for the 2029 traffic volumes were calculated by applying a growth rate of one percent per year to the existing 2023 traffic volumes. No other major traffic generator projects have been identified in the area. The 2023 existing traffic volumes are presented in **Appendix B**. The projected no-build 2029 peak-hour volumes are presented in **Appendix C.** The trip distribution patterns, and the site generated trips are presented in **Appendix D**. The projected full-site build 2029 peak-hour volumes are presented in **Appendix E.** The existing signal plans and timing patterns used for this study were obtained from the Connecticut Department of Transportation and the Town of East Haven.

## 4.0 Levels of Service and Queue Analyses

This study uses established procedures for estimating traffic capacity and queue lengths at each of the study intersections. The capacity analysis determined a Level of Service (LOS) for each intersection's lane groups using an alphanumeric rating system that is similar to the common academic grading methodology (A, B, C, D, E, and F). It should be noted that LOS C or better is commonly considered to be a "desirable" traffic operation, while LOS D is commonly considered to be "acceptable" in urban areas. More information about the level of service for signalized and unsignalized intersections is provided in **Appendix K**.

A queuing evaluation was also performed for each lane group at the study intersections to evaluate the available storage to accommodate the anticipated traffic demand. The 95th percentile queue length, which represents the queue length that only has a five percent probability of being exceeded during the peak-hour, was compared to the available lane storage to identify areas where queues may potentially block traffic operation in other lanes. The capacity analysis and queuing evaluation was performed using Synchro 11 Traffic Signal Coordination Software (Build 909, Rev. 20).

## 5.0 EXISTING CONDITIONS

The study area includes 18 intersections in southern East Haven, where the airport site-generated traffic is expected to travel through. These intersections were selected from area observations and coordination with the Town of East Haven. The study area includes multiple intersections along Route 100, Route 142, Route 337 and Route 1. Route 100 (Main Street and High Street) is a minor arterial that connects downtown East Haven with entrance and exit ramps for I-95 NB. Route 142 is a minor arterial which runs through downtown East Haven from Route 1 to the bordering Branford town line. Route 337 is a major arterial running from the turn of Route 142 onto Short Beach Road to the bordering New Haven town line. Route 1 is a U.S. Route and principal arterial running parallel to I-95 through East Haven before continuing into New Haven and Branford.

**Table 2** presents the existing lane configuration, roadway classification, approach grades, and speed limits, and pedestrian infrastructure of each intersection. An observational field visit was conducted for all intersections on March 31st, 2023, to confirm and observe the existing conditions.

The results of the existing conditions capacity analysis, which includes the levels of service (LOS), volume to capacity (v/c) ratios, and 95th percentile queue lengths, are provided in **Table 3**. The available storage represents either the length of a turn-lane, the distance to an adjacent major intersection, or the distance to the gore for a freeway off-ramp, as appropriate. The queue lengths were calculated assuming an average vehicle length of 25 feet. The full details of the existing conditions analysis are included in **Appendix F**.

The existing conditions analysis presented in **Table 3** shows that a majority of approaches and overall intersections operate at acceptable levels of service with adequate storage for queuing with the exception of the following approaches and intersections:

- Intersection 2: High Street (Route 100) & I-95 NB On-Ramp (Exit 52)

  o The northbound approach operates at a LOS E with the through movement operating at a LOS F for both morning and evening peak-hours. The 95th percentile queues for the through movement exceed the available storage for both periods.

  o The southbound approach operates at a LOS E with both movement groups operating at a LOS E for the morning peak-hour and the through movement operating at a LOS F for the evening peak-hour.

  o Overall, this intersection operates at a LOS E for both morning and evening peak-hours.

- Intersection 3: High Street (Route 100) & Kimberly Avenue

  o The northbound approach operates at a LOS F for both peak-hours.

  o The southbound through movement operates at a LOS E during the evening peak-hour with the queue exceeding the available storage.

- o Overall, the intersection operates at a LOS E for the morning peak-hour and a LOS F for the evening peak.
- Intersection 7: Hemingway Avenue (Route 142) & Saltonstall Parkway (Route 1)
  - o The eastbound left-turn operates at a LOS E for both peak periods with the 95th percentile queue exceeding the available storage length in the evening.
  - o The westbound left-turn also operates at a LOS E for both peak periods.
- Intersection 12: Hemingway Avenue and Short Beach Road (Route 142) at Coe Avenue (Route 337)
  - o The 95th percentile queue for the southbound left-turn during evening peak hours exceeds the available storage length.
- Intersection 13: Hemingway Avenue & Messina Drive
  - o The eastbound left-turn operates at a LOS F during the evening peak-hour.
- Intersection 16: Kimberly Avenue & Forbes Place
  - o The southbound approach operates at a LOS F during the evening peak-hour with the overall intersection operating at a LOS F.
  - o The southbound approach of this intersection was required to be modeled as a yield approach because the Highway Capacity Manual does not support analysis of a three-way stop, one-way free intersection.
- Intersection 18: Frontage Road (Route 1) & Forbes Place
  - o The northbound approach operates at a LOS F during the morning peak-hour. During both peak hours the 95th percentile exceeds the available storage length.

| Approach | Street | Speed | Classification | Grade | Pedestrian Accommodations | ADA |
|---|---|---|---|---|---|---|
| NB | High Street (Route 100) | 30 | Minor Arterial | -2% | right-hand side of EB approach. Crosswalks span across NB and WB approaches with with accompanying ramps at each end. In service pedestrian signal push buttons located at each end of crosswalks. Tactile warning strip located at right-hand corner of NB approach. | Y |
| SB | High Street (Route 100) | 30 | Minor Arterial | -5% | | |
| EB | Kimberly Avenue | 25 | Minor Arterial | 3% | | |
| NB | High Street (Route 100) | 30 | Minor Arterial | -1% | Sidewalks along both sides of all 4 approaches. Crosswalks span across all 4 approaches with with accompanying ramps at each end. In service pedestrian sign push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | High Street (Route 100) | 30 | Minor Arterial | -1% | | |
| EB | Messina Drive | 25 | Minor Arterial | 1% | | |
| WB | Messina Drive | 25 | Minor Arterial | -1% | | |
| NB | Kirkham Drive | - | Local | At Grade | Sidewalks along both sides of all 4 approaches. Crosswalks span across all 4 approaches with with accompanying ramps at each end. In service pedestrian sign push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | Messina Drive | 25 | Minor Arterial | -1% | | |
| EB | Main Street | 25 | Minor Arterial | 1% | | |
| WB | Main Street | 25 | Minor Arterial | -1% | | |
| NB | Thompson Avenue | - | Minor Arterial | -1% | Sidewalks along both sides of all 4 approaches. Crosswalks span across all 4 approaches with with accompanying ramps at each end. In service pedestrian sign push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | High Street (Route 100) | 30 | Minor Arterial | 1% | | |
| EB | Main Street | 25 | Minor Arterial | 1% | | |
| WB | Main Street (Route 100) | 25 | Minor Arterial | -1% | | |
| NB | Hemingway Avenue (Route 142) | 30 | Minor Arterial | 1% | Sidewalks along both sides of SB, Eb, and WB approaches, and right-hand side of NB approach. Crosswalks span across EB and WB approaches with accompanying ramps at each end. In service pedestrian signal push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | Estelle Road | - | Local | -2% | | |
| EB | Saltonstall Parkway (Route 1) | 40 | Principal Arterial | -1% | | |
| WB | Saltonstall Parkway (Route 1) | 40 | Principal Arterial | 1% | | |
| NB | Hemingway Avenue (Route 142) | 35 | Minor Arterial | -1% | Sidewalks along both sides of all 4 approaches. Crosswalks span across all 4 approaches with with accompanying ramps at each end. In service pedestrian sign push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | Hemingway Avenue (Route 142) | 30 | Minor Arterial | 3% | | |
| EB | Main Street (Route 100) | 25 | Minor Arterial | 1% | | |
| WB | Main Street (Route 100) | 25 | Minor Arterial | -2% | | |
| NB | Hemingway Avenue (Route 142) | 35 | Minor Arterial | At Grade | Sidewalks along both sides NB, SB, and EB approaches. Crosswalks span across SB and EB approaches with accompanying ramps at each end. In service pedestrian signal push buttons and tactile warning strips located at each end of crosswalks. | Y |
| SB | Hemingway Avenue (Route 142) | 35 | Minor Arterial | 1% | | |
| EB | Dodge Avenue | 25 | Minor Arterial | -1% | | |
| WB | Sunfield Apartments Parking Lot | - | - | - | | |
| NB | Coe Avenue (Route 337) | 35 | Minor Arterial | At Grade | Sidewalk along left-hand side of NB approach which continues onto right-hand side of SB approach. Ramps located at each corner of WB approach. | N |
| SB | Coe Avenue (Route 337) | 35 | Minor Arterial | -1% | | |
| WB | Proto Drive | - | - | -1% | | |
| NB | Thompson Avenue | 25 | Local | 1% | Sidewalks along both sides of all 4 approaches. Crosswalks span across all 4 approaches, with accompanying ramps at each end. Tactile warning strips located right-hand corners of EB and WB approaches. | N |
| SB | Thompson Avenue | 25 | Minor Arterial | -1% | | |
| EB | Dodge Avenue | 25 | Minor Arterial | At Grade | | |
| WB | Dodge Avenue | 25 | Minor Arterial | At Grade | | |
| NB | Coe Avenue (Route 337) | 35 | Minor Arterial | -1% | Sidewalks along both ends of NB, SB, and WB approaches. Crosswalks span across all 4 approaches with accompanying ramps at each corner. In service pedestrian signal push buttons located at each end of crosswalks. | Y |
| SB | Hemingway Avenue (Route 142) | 35 | Minor Arterial | -1% | | |
| EB | South Shore Plaza Outlet | - | - | -1% | | |
| WB | Short Beach Road (Route 142) | 35 | Minor Arterial | -1% | | |
| NB | Hemingway Avenue (Route 142) | 30 | Minor Arterial | 1% | Sidewalks along both sides of SB and WB approaches, and along the right-hand side of NB approach which contiues onto left-hand side of SB approach. Ramps and tactile warning strips located at right-hand sides of NB and WB approaches. | Y |
| SB | Hemingway Avenue (Route 142) | 30 | Minor Arterial | -1% | | |
| WB | Messina Drive | 25 | Minor Arterial | -1% | | |
| NB | Coe Avenue | - | Major Collector | 1% | Out of service pedestrian signal push buttons at both corners of WB approach and on the right-hand side of EB approach. Ramps and tatile warning strips are located at both corners of EB approach. | Y |
| SB | Coe Avenue (Route 337) | 35 | Minor Arterial | 3% | | |
| EB | Silver Sands Road (Route 337) | 25 | Major Collector | -2% | | |
| WB | Silver Sands Road | 25 | Minor Collector | 1% | | |
| NB | Minor Road | - | Local | 3% | - | N |
| SB | South End Road (Route 337) | 25 | Minor Arterial | -1% | | |
| EB | South End Road | 25 | Major Collector | 1% | | |
| WB | Silver Sands Road (Route 337) | 25 | Major Collector | 1% | | |
| NB | Forbes Place | 25 | Major Collector | 1% | Ramps at both ends of NB approach | N |
| SB | Forbes Place | 25 | Minor Arterial | -3% | | |
| EB | Kimberly Avenue | 25 | Minor Collector | 1% | | |
| WB | Kimberly Avenue | 25 | Minor Arterial | -1% | | |

005698 3451 A-094

**Table 3: Existing 2023 Capacity Analysis Results**

| Int. Name | Int. # | Lane Group | AM | | | | PM | | | | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | |
| High Street (Rt 100) & I-95 SB Off-Ramp (Exit 52) | 1 | WB | 47.9 | D | 0.77 | 210 | 41.0 | D | 0.86 | 348 | 1000 |
| | | NB | 16.7 | B | 0.38 | m184 | 31.1 | C | 0.49 | m209 | 425 |
| | | SB | 10.1 | B | 0.56 | 327 | 20.8 | C | 0.63 | 353 | 400 |
| | | Overall | 19.0 | B | - | - | 30.5 | C | - | - | - |
| High Street (Rt 100) & I-95 NB On-Ramp (Exit 52) | 2 | EB | 24.7 | C | 0.64 | 203 | 13.3 | B | 0.33 | 114 | 400 |
| | | NB | 77.2 | E | - | - | 63.3 | E | - | - | - |
| | | NBL | 12.1 | B | 0.27 | m30 | 15.6 | B | 0.57 | m72 | 200 |
| | | NBT | 88.3 | F | 1.04 | m#282 | 81.0 | F | 1.03 | m295 | 200 |
| | | SB | 69.9 | E | - | - | 77.0 | E | - | - | - |
| | | SBL | 59.1 | E | 0.71 | #170 | 51.0 | D | 0.49 | m95 | 310 |
| | | SBT | 71.9 | E | 0.94 | #356 | 80.1 | F | 1.01 | #388 | 400 |
| | | Overall | 62.4 | E | - | - | 63.4 | E | - | - | - |
| High Street (Rt 100) & Kimberly Avenue | 3 | EB | 23.9 | C | 0.41 | 183 | 28.6 | C | 0.60 | 310 | 850 |
| | | NB | 126.2 | F | 1.16 | #531 | 239.8 | F | 1.44 | #566 | 1000 |
| | | SB | 31.8 | C | - | - | 52.1 | D | - | - | - |
| | | SBT | 50.5 | D | 0.86 | m128 | 71.6 | E | 0.97 | m#444 | 185 |
| | | SBR | 2.5 | A | 0.45 | m0 | 1.6 | A | 0.35 | m0 | 185 |
| | | Overall | 59.3 | E | - | - | 104.7 | F | - | | - |
| High Street (Rt 100) & Messina Drive | 4 | EB | 17.0 | B | 0.13 | 28 | 17.6 | B | 0.13 | 30 | 250 |
| | | WB | 7.8 | A | - | - | 10.2 | B | - | - | - |
| | | WBT | 17.1 | B | 0.10 | 34 | 18.8 | B | 0.21 | 63 | 670 |
| | | WBR | 5.4 | A | 0.33 | 40 | 5.5 | A | 0.33 | 40 | 670 |
| | | NB | 10.1 | B | 0.26 | 71 | 10.2 | B | - | - | - |
| | | NBL | - | - | - | - | 9.0 | A | 0.01 | 5 | 195 |
| | | NBT | 10.1 | B | 0.26 | 71 | 10.2 | B | 0.29 | 85 | 195 |
| | | SB | 13.0 | B | 0.46 | 86 | 13.6 | B | 0.49 | 99 | 160 |
| | | Overall | 11.7 | B | - | - | 12.4 | B | - | - | - |
| Main Street & Messina Drive | 5 | EB | 19.2 | B | 0.37 | 95 | 8.9 | A | 0.30 | 99 | 250 |
| | | WB | 18.1 | B | - | - | 7.0 | A | - | - | - |
| | | WBL | 14.8 | B | 0.01 | 6 | 5.1 | A | 0.04 | 13 | 230 |
| | | WBT | 18.2 | B | 0.33 | 91 | 7.1 | A | 0.26 | 101 | 230 |
| | | NB | 27.1 | C | 0.19 | 20 | 29.6 | C | 0.27 | 14 | - |
| | | SB | 6.8 | A | - | - | 9.5 | A | - | - | - |
| | | SBT | 34.5 | C | 0.05 | 14 | 34.1 | C | 0.13 | 32 | 270 |
| | | SBR | 5.5 | A | 0.37 | 21 | 6.0 | A | 0.31 | 43 | 50 |
| | | Overall | 16.6 | B | - | - | 9.2 | A | - | - | - |
| High Street (Rt 100) & Main Street | 6 | EB | 12.1 | B | - | - | 13.6 | B | - | - | - |
| | | EBT | 15.6 | B | 0.36 | 100 | 17.2 | B | 0.50 | 158 | 230 |
| | | EBR | 0.3 | A | 0.10 | 0 | 1.1 | A | 0.14 | 7 | 230 |
| | | WB | 15.1 | B | - | - | 20.2 | C | - | - | - |
| | | WBL | 13.0 | B | 0.03 | 13 | 13.4 | B | 0.10 | 25 | 250 |
| | | WBT | 15.2 | B | 0.31 | 88 | 20.7 | C | 0.64 | #217 | 250 |
| | | NB | 17.9 | B | - | - | 19.5 | B | - | - | - |
| | | NBL | 8.8 | A | 0.15 | 26 | 9.9 | A | 0.16 | 28 | 500 |
| | | NBT | 21.7 | C | 0.44 | 85 | 23.5 | C | 0.51 | 86 | 80 |
| | | SB | 12.5 | B | - | - | 14.0 | B | - | - | - |
| | | SBL | 11.9 | B | 0.49 | 85 | 12.9 | B | 0.47 | 88 | 190 |
| | | SBT | 14.1 | B | 0.19 | 53 | 15.9 | B | 0.23 | 70 | 190 |
| | | Overall | 14.0 | B | - | - | 16.6 | B | - | - | - |

**AD95**

Table 3: Existing 2023 Capacity Analysis Results (Cont.)

| Int. Name | Int. # | Lane Group | AM Delay (s) | LOS | V/C | 95th %tile Queue (ft) | PM Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue (Rt 142) & Saltonstall Parkway (Rt 1) | 7 | NB | 31.4 | C | - | - | 28.9 | C | - | - | - |
| | | NBL | 31.6 | C | 0.58 | 358 | 29.2 | C | 0.56 | 292 | 400 |
| | | NBT | 31.3 | C | 0.58 | 353 | 28.6 | C | 0.55 | 282 | 400 |
| | | SB | 40.0 | D | 0.10 | 18 | 46.3 | D | 0.08 | 18 | - |
| | | EB | 12.3 | B | - | - | 26.1 | C | - | - | - |
| | | EBL | 59.3 | E | 0.24 | 42 | 69.1 | E | 0.56 | 98 | 70 |
| | | EBT | 24.8 | C | 0.23 | 133 | 45.9 | D | 0.71 | 269 | - |
| | | EBR | 0.9 | A | 0.30 | 24 | 1.6 | A | 0.45 | 27 | 250 |
| | | WB | 27.0 | C | - | - | 46.2 | D | - | - | - |
| | | WBL | 62.3 | E | 0.37 | 62 | 78.5 | E | 0.70 | #140 | 140 |
| | | WBT | 24.2 | C | 0.32 | 195 | 39.7 | D | 0.52 | 219 | - |
| | | Overall | 23.5 | C | - | - | 31.5 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Main Street | 8 | EB | 11.7 | B | - | - | 16.9 | B | - | - | - |
| | | EBL | 16.6 | B | 0.10 | 33 | 18.1 | B | 0.15 | 44 | 250 |
| | | EBT | 28.2 | C | 0.32 | 83 | 34.8 | C | 0.57 | 146 | 360 |
| | | EBR | 3.3 | A | 0.29 | 37 | 3.1 | A | 0.33 | 31 | 225 |
| | | WB | 20.9 | C | - | - | 23.9 | C | - | - | - |
| | | WBL | 17.0 | B | 0.14 | 38 | 20.7 | C | 0.36 | 84 | 150 |
| | | WBT | 23.9 | C | 0.22 | 54 | 27.2 | C | 0.32 | 98 | - |
| | | NB | 14.3 | B | - | - | 23.6 | C | - | - | - |
| | | NBL | 29.7 | C | 0.41 | 87 | 35.4 | D | 0.52 | 127 | 250 |
| | | NBT | 12.3 | B | 0.50 | 223 | 21.3 | C | 0.60 | 224 | 400 |
| | | SB | 19.4 | B | - | - | 25.9 | C | - | - | - |
| | | SBL | 30.2 | C | 0.11 | 27 | 35.5 | D | 0.31 | 60 | 110 |
| | | SBT | 19.0 | B | 0.40 | 112 | 25.5 | C | 0.60 | 180 | 330 |
| | | SBR | 18.0 | B | 0.05 | 23 | 20.8 | C | 0.12 | 46 | 330 |
| | | Overall | 15.5 | B | - | - | 22.8 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Dodge Avenue | 9 | EB | 26.3 | C | 0.67 | 65 | 36.6 | D | 0.72 | 118 | 500 |
| | | WB | 24.9 | C | - | - | 27.0 | C | - | - | - |
| | | WBL | 33.2 | C | 0.05 | 10 | 27.0 | C | 0.01 | 4 | - |
| | | WBT | 0.0 | A | 0.00 | 0 | 27.0 | C | 0.01 | 4 | - |
| | | NB | 2.9 | A | 0.40 | 86 | 4.8 | A | 0.43 | 96 | 930 |
| | | SB | 12.8 | B | 0.34 | 163 | 18.8 | B | 0.58 | 313 | 210 |
| | | Overall | 9.0 | A | - | - | 14.7 | B | - | - | - |
| Coe Avenue (Rt 337) & Proto Drive | 10 | EB | 17.3 | C | 0.09 | 7 | 23.4 | C | 0.37 | 41 | - |
| | | NBL | 0.1 | A | 0.00 | 0 | 0.0 | - | 0.00 | 0 | - |
| | | Overall | 0.5 | A | - | - | 2.2 | A | - | - | - |
| Thompson Avenue & Dodge Avenue | 11 | EB | 8.6 | A | 0.21 | - | 9.7 | A | 0.28 | - | 500 |
| | | WB | 8.2 | A | 0.11 | - | 8.9 | A | 0.19 | - | 300 |
| | | NB | 8.2 | A | 0.12 | - | 8.7 | A | 0.15 | - | 535 |
| | | SB | 8.6 | A | 0.17 | - | 9.2 | A | 0.21 | - | 420 |
| | | Overall | 8.5 | A | - | - | 9.2 | A | - | - | - |
| Hemingway Avenue and Short Beach Road (Rt 142) at Coe Avenue (Rt 337) | 12 | EB | 35.3 | D | 0.28 | 30 | 35.0 | C | 0.34 | 49 | 110 |
| | | WB | 9.4 | A | - | - | 7.0 | A | - | - | - |
| | | WBL | 39.0 | D | 0.31 | 58 | 37.4 | D | 0.22 | 45 | 160 |
| | | WBT | 4.5 | A | 0.48 | 35 | 2.9 | A | 0.37 | 26 | 750 |
| | | NB | 11.0 | B | 0.29 | 138 | 18.0 | B | 0.44 | 185 | 750 |
| | | SB | 5.4 | A | - | - | 8.9 | A | - | - | - |
| | | SBL | 7.6 | A | 0.30 | 107 | 13.7 | B | 0.48 | 233 | 180 |
| | | SBT | 4.6 | A | 0.19 | 98 | 6.0 | A | 0.21 | 148 | 950 |
| | | Overall | 9.1 | A | - | - | 12.5 | B | - | - | - |

**AD96**

**Table 3: Existing 2023 Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM | | | | PM | | | | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | |
| Hemingway Avenue & Messina Drive | 13 | EB | 26.7 | D | - | - | 37.1 | E | - | - | - |
| | | EBL | 33.9 | D | 0.24 | 22 | 50.2 | F | 0.54 | 67 | 275 |
| | | EBR | 10.4 | B | 0.02 | 2 | 11.1 | B | 0.07 | 6 | 275 |
| | | NBL | 9.2 | A | 0.15 | 13 | 9.9 | A | 0.14 | 12 | 100 |
| | | Overall | 1.9 | A | - | - | 3.6 | A | - | - | - |
| Coe Avenue & Silver Sands Road | 14 | EB | 20.6 | C | 0.59 | 107 | 32.0 | C | 0.80 | #175 | - |
| | | WB | 8.6 | A | 0.12 | 24 | 11.6 | B | 0.23 | 33 | 700 |
| | | NB | 9.6 | A | 0.32 | 106 | 11.2 | B | 0.39 | 77 | - |
| | | SB | 4.6 | A | - | - | 9.1 | A | - | - | - |
| | | SBT | 8.8 | A | 0.15 | 50 | 13.1 | B | 0.48 | 125 | 610 |
| | | SBR | 2.5 | A | 0.29 | 28 | 2.8 | A | 0.29 | 27 | 610 |
| | | Overall | 9.8 | A | - | - | 15.5 | B | - | - | - |
| Silver Sands Road & South End Road | 15 | EB | 7.9 | A | 0.13 | - | 8.1 | A | 0.10 | - | 380 |
| | | WB | 7.1 | A | 0.08 | - | 7.8 | A | 0.16 | - | 570 |
| | | NB | 0.0 | A | 0.00 | - | 7.7 | A | 0.01 | - | - |
| | | SB | 7.6 | A | 0.06 | - | 8.2 | A | 0.17 | - | 450 |
| | | Overall | 7.6 | A | - | - | 8.0 | A | - | - | - |
| Kimberly Avenue & Forbes Place | 16 | EB | 10.5 | B | 0.11 | - | 11.3 | B | 0.15 | - | 235 |
| | | WB | 15.0 | B | 0.54 | - | 16.3 | C | 0.55 | - | 860 |
| | | NB | 14.5 | B | 0.51 | - | 12.4 | B | 0.34 | - | 500 |
| | | SB | 17.6 | C | 0.61 | - | 104.3 | F | 1.14 | - | 70 |
| | | Overall | 15.5 | C | - | - | 63.5 | F | - | - | - |
| Main Street & Forbes Place | 17 | EB | 12.6 | B | - | - | 14.8 | B | - | - | - |
| | | EBL | 12.9 | B | 0.10 | 44 | 14.5 | B | 0.15 | 47 | 200 |
| | | EBT | 12.6 | B | 0.22 | 123 | 14.8 | B | 0.34 | 167 | 350 |
| | | WB | 12.4 | B | - | - | 14.8 | B | - | - | - |
| | | WBT | 12.3 | B | 0.19 | 97 | 15.2 | B | 0.38 | 190 | 300 |
| | | WBR | 12.5 | B | 0.09 | 46 | 13.3 | B | 0.14 | 64 | 300 |
| | | NB | 32.5 | C | 0.46 | 84 | 30.0 | C | 0.35 | 59 | 730 |
| | | SB | 23.9 | C | - | - | 30.0 | C | - | - | - |
| | | SBT | 33.3 | C | 0.48 | 95 | 38.4 | D | 0.71 | 186 | 1250 |
| | | SBR | 3.7 | A | 0.19 | 11 | 6.5 | A | 0.23 | 31 | 150 |
| | | Overall | 17.7 | B | - | - | 20.0 | B | - | - | - |
| Frontage Road (Rt 1) & Forbes Place | 18 | EB | 10.5 | B | - | - | 13.5 | B | - | - | - |
| | | EBT | 12.8 | B | 0.42 | 156 | 16.5 | B | 0.68 | 296 | - |
| | | EBR | 4.8 | A | 0.28 | 75 | 7.4 | A | 0.54 | 184 | 200 |
| | | WB | 4.7 | A | - | - | 4.8 | A | - | - | - |
| | | WBL | 3.6 | A | 0.11 | 15 | 7.1 | A | 0.36 | 33 | 150 |
| | | WBT | 4.8 | A | 0.44 | 117 | 4.6 | A | 0.43 | 115 | - |
| | | NB | 95.6 | F | 1.07 | #233 | 39.3 | D | 0.68 | 124 | 70 |
| | | Overall | 24.8 | C | - | - | 12.8 | B | - | - | - |

\# 95th percentile volume exceeds capacity, queue may be longer.

m Volume for 95th percentile queue is metered by upstream signal

## 6.0 No-Build 2029 Analysis

The existing operations were projected to a no-build scenario in the year of 2029, when the airport expansion would be expected to have been completed. The no-build analysis does not include any additional site-generated traffic related to the airport or any other development. The results of the no-build 2029 capacity analyses are shown in **Table 4.** These results reflect the operations at the study area intersections for the year 2029. This analysis assumes that all intersections will maintain the same geometry, lane configurations, signing, and signal timing. The projected 2029 traffic volumes were calculated by applying a conservative annual growth rate of one percent to the existing 2023 traffic volumes. The calculated levels of service (LOS), volume to capacity (v/c) ratios, and 95th percentile queue lengths are provided in each of the tables. The available storage provided represents either the length of a turn-lane, the distance to an adjacent major intersection, or the distance to the gore for a freeway off-ramp, as appropriate. The queue lengths were calculated assuming an average vehicle length of 25 feet. **Appendix G** contains details of the 2029 no-build capacity analysis.

The 2029 no-build-year analysis presented in **Table 4** show that a majority of approaches and overall intersections operate at acceptable levels of service with adequate storage for queuing with the exception of the same movements and intersections as the existing conditions. In addition, the following movements and intersections degraded in level of service or the 95th percentile queue has increased in the no-build to exceed past the available storage.

- Intersection 2: High Street (Route 100) & I-95 NB On-Ramp (Exit 52)

  o The southbound approach degrades to a LOS F for both peak-hours. The through movement degrades to a LOS F for the morning peak and the 95th percentile queue in the evening increases past the available storage.

- Intersection 3: High Street (Route 100) & Kimberly Avenue

  o The southbound through movement degrades to a LOS E during the morning peak.

- Intersection 7: Hemingway Avenue (Route 142) & Saltonstall Parkway (Route 1)

  o The westbound left-turn degrades to a LOS F for the evening peak-hour with a 95th percentile queue that exceeds past the available storage.

- Intersection 13: Hemingway Avenue & Messina Drive

  o The eastbound left-turn degrades to a LOS E during the morning peak-hour.

- Intersection 18: Frontage Road (Route 1) & Forbes Place

  o The 95th percentile queue for the eastbound right-turn during evening peak hour exceeds past the available storage length.

**Table 4: 2029 No-Build Capacity Analysis Results**

| Int. Name | Int. # | Lane Group | AM | | | | PM | | | | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | |
| High Street (Rt 100) & I-95 SB Off-Ramp (Exit 52) | 1 | WB | 47.4 | D | 0.77 | 220 | 41.5 | D | 0.87 | 374 | 1000 |
| | | NB | 16.6 | B | 0.40 | m188 | 30.8 | C | 0.54 | m211 | 425 |
| | | SB | 11.6 | B | 0.61 | 377 | 23.6 | C | 0.69 | 386 | 400 |
| | | Overall | 19.9 | B | - | - | 31.8 | C | - | - | - |
| High Street (Rt 100) & I-95 NB On-Ramp (Exit 52) | 2 | EB | 26.3 | C | 0.68 | 220 | 14.0 | B | 0.35 | 123 | 400 |
| | | NB | 75.1 | E | - | - | 64.9 | E | - | - | - |
| | | NBL | 12.0 | B | 0.28 | m31 | 16.1 | B | 0.61 | m73 | 200 |
| | | NBT | 86.0 | F | 1.10 | m#293 | 83.0 | F | 1.1 | m304 | 200 |
| | | SB | 95.8 | F | - | - | 91.6 | F | - | - | - |
| | | SBL | 62.4 | E | 0.75 | #184 | 53.1 | D | 0.52 | m93 | 310 |
| | | SBT | 102.1 | F | 1.00 | #382 | 96.3 | F | 1.08 | #425 | 400 |
| | | Overall | 72.9 | E | - | - | 70.7 | E | - | - | - |
| High Street (Rt 100) & Kimberly Avenue | 3 | EB | 24.4 | C | 0.44 | 193 | 30.5 | C | 0.64 | 333 | 850 |
| | | NB | 161.3 | F | 1.25 | #578 | 290.4 | F | - | #625 | 1000 |
| | | SB | 46.0 | D | - | - | 51.1 | D | 1.56 | - | - |
| | | SBT | 73.8 | E | 0.92 | m131 | 70.2 | E | 1.04 | m#453 | 185 |
| | | SBR | 2.4 | A | 0.47 | m0 | 1.7 | A | 0.37 | m0 | 185 |
| | | Overall | 77.7 | E | - | - | 120.2 | F | - | - | - |
| High Street (Rt 100) & Messina Drive | 4 | EB | 18.6 | B | 0.15 | 34 | 18.5 | B | 0.14 | 33 | 250 |
| | | WB | 8.6 | A | - | - | 10.7 | B | - | - | - |
| | | WBT | 18.7 | B | 0.12 | 41 | 19.8 | B | 0.23 | 70 | 670 |
| | | WBR | 5.8 | A | 0.35 | 44 | 5.7 | A | 0.35 | 43 | 670 |
| | | NB | 10.9 | B | - | - | 10.2 | B | - | - | - |
| | | NBL | 8.0 | A | 0.00 | 2 | 8.5 | A | 0.01 | 5 | 195 |
| | | NBR | 10.9 | B | 0.34 | 95 | 10.2 | B | 0.3 | 90 | 195 |
| | | SB | 13.1 | B | 0.49 | 92 | 13.7 | B | 0.51 | 105 | 160 |
| | | Overall | 12.1 | B | - | - | 12.6 | B | - | - | - |
| Main Street & Messina Drive | 5 | EB | 7.2 | A | 0.24 | 67 | 9.7 | A | 0.33 | 113 | 250 |
| | | WB | 5.6 | A | - | - | 7.4 | A | - | - | - |
| | | WBL | 4.8 | A | 0.01 | 3 | 5.4 | A | 0.05 | 14 | 230 |
| | | WBT | 5.6 | A | 0.21 | 50 | 7.5 | A | 0.28 | 114 | 230 |
| | | NB | 26.2 | C | 0.18 | 20 | 29.7 | C | 0.28 | 14 | - |
| | | SB | 7.6 | A | - | - | 9.1 | A | - | - | - |
| | | SBT | 33.5 | C | 0.05 | 14 | 33.5 | C | 0.13 | 32 | 270 |
| | | SBR | 6.5 | A | 0.35 | 36 | 5.7 | A | 0.32 | 43 | 50 |
| | | Overall | 7.3 | A | - | - | 9.6 | A | - | - | - |
| High Street (Rt 100) & Main Street | 6 | EB | 13.9 | B | - | - | 14.5 | B | - | - | - |
| | | EBT | 18.0 | B | 0.45 | 119 | 18.2 | B | 0.54 | 171 | 230 |
| | | EBR | 0.4 | A | 0.12 | 0 | 1.4 | A | 0.15 | 9 | 230 |
| | | WB | 17.1 | B | - | - | 22.3 | C | - | - | - |
| | | WBL | 14.0 | B | 0.04 | 14 | 13.9 | B | 0.12 | 26 | 250 |
| | | WBT | 17.3 | B | 0.39 | 107 | 23 | C | 0.69 | #257 | 250 |
| | | NB | 20.5 | C | - | - | 19.8 | B | - | - | - |
| | | NBL | 8.7 | A | 0.15 | 28 | 9.9 | A | 0.17 | 29 | 500 |
| | | NBT | 24.5 | C | 0.56 | 111 | 23.9 | C | 0.53 | 90 | 80 |
| | | SB | 12.1 | B | - | - | 14.2 | B | - | - | - |
| | | SBL | 11.5 | B | 0.47 | 90 | 13.3 | B | 0.5 | 94 | 190 |
| | | SBT | 13.7 | B | 0.16 | 55 | 15.8 | B | 0.24 | 73 | 190 |
| | | Overall | 15.4 | B | - | - | 17.6 | B | - | - | - |

**AD99**

**Table 4: 2029 No-Build Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue (Rt 142) & Saltonstall Parkway (Rt 1) | 7 | NB | 28.7 | C | - | - | 27.4 | C | - | - | - |
| | | NBL | 28.8 | C | 0.58 | 360 | 27.7 | C | 0.57 | 311 | 400 |
| | | NBT | 28.6 | C | 0.58 | 356 | 27.1 | C | 0.56 | 302 | 400 |
| | | SB | 40.0 | D | 0.10 | 18 | 49.9 | D | 0.13 | 18 | - |
| | | EB | 13.6 | B | - | - | 26.5 | C | - | - | - |
| | | EBL | 59.6 | E | 0.25 | 43 | 69.9 | E | 0.58 | 101 | 70 |
| | | EBT | 27.9 | C | 0.26 | 150 | 46.6 | D | 0.74 | 288 | - |
| | | EBR | 1.0 | A | 0.32 | 25 | 1.6 | A | 0.47 | 28 | 250 |
| | | WB | 29.9 | C | - | - | 46.6 | D | - | - | - |
| | | WBL | 62.6 | E | 0.38 | 65 | 81.0 | F | 0.73 | #153 | 140 |
| | | WBT | 27.3 | C | 0.36 | 221 | 39.8 | D | 0.54 | 233 | - |
| | | Overall | 23.5 | C | - | - | 31.3 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Main Street | 8 | EB | 11.6 | B | - | - | 17.9 | B | - | - | - |
| | | EBL | 16.7 | B | 0.11 | 35 | 19.2 | B | 0.16 | 47 | 250 |
| | | EBT | 28.4 | C | 0.34 | 87 | 37.1 | D | 0.6 | 157 | 360 |
| | | EBR | 3.2 | A | 0.30 | 37 | 3.2 | A | 0.35 | 32 | 225 |
| | | WB | 21.1 | C | - | - | 25.7 | C | - | - | - |
| | | WBL | 17.1 | B | 0.14 | 39 | 22.7 | C | 0.41 | 91 | 150 |
| | | WBT | 24.2 | C | 0.24 | 57 | 28.7 | C | 0.34 | 105 | - |
| | | NB | 14.8 | B | - | - | 24.0 | C | - | - | - |
| | | NBL | 29.8 | C | 0.42 | 92 | 37.3 | D | 0.55 | 136 | 250 |
| | | NBT | 12.9 | B | 0.53 | 244 | 21.4 | C | 0.61 | 243 | 400 |
| | | SB | 20.1 | C | - | - | 26.2 | C | - | - | - |
| | | SBL | 30.5 | C | 0.12 | 28 | 37.1 | D | 0.33 | 64 | 110 |
| | | SBT | 19.7 | B | 0.43 | 121 | 25.6 | C | 0.61 | 192 | 330 |
| | | SBR | 18.5 | B | 0.06 | 24 | 20.6 | C | 0.13 | 48 | 330 |
| | | Overall | 15.9 | B | - | - | 23.5 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Dodge Avenue | 9 | EB | 27.3 | C | 0.68 | 71 | 36.5 | D | 0.72 | 125 | 500 |
| | | WB | 23.8 | C | - | - | 26.0 | C | - | - | - |
| | | WBL | 31.8 | C | 0.05 | 9 | 26 | C | 0.01 | 4 | - |
| | | WBT | 0.0 | A | 0.00 | 0 | 26 | C | 0.01 | 4 | - |
| | | NB | 3.3 | A | 0.43 | 96 | 6.6 | A | 0.48 | 152 | 930 |
| | | SB | 14.2 | B | 0.37 | 179 | 21.2 | C | 0.64 | 342 | 210 |
| | | Overall | 9.8 | A | - | - | 16.5 | B | - | - | - |
| Coe Avenue (Rt 337) & Proto Drive | 10 | EB | 18.4 | C | 0.10 | 8 | 25.9 | D | 0.41 | 48 | - |
| | | NBL | 0.2 | A | 0.00 | 0 | 0.0 | - | 0.0 | 0 | - |
| | | Overall | 0.5 | A | - | - | 2.4 | A | - | - | - |
| Thompson Avenue & Dodge Avenue | 11 | EB | 8.8 | A | 0.22 | - | 10 | B | 0.30 | - | 500 |
| | | WB | 8.2 | A | 0.12 | - | 9.1 | A | 0.20 | - | 300 |
| | | NB | 8.3 | A | 0.13 | - | 8.8 | A | 0.16 | - | 535 |
| | | SB | 8.8 | A | 0.18 | - | 9.4 | A | 0.22 | - | 420 |
| | | Overall | 8.6 | A | - | - | 9.4 | A | - | - | - |
| Hemingway Avenue and Short Beach Road (Rt 142) at Coe Avenue (Rt 337) | 12 | EB | 35.1 | D | 0.28 | 31 | 35.3 | D | 0.36 | 51 | 110 |
| | | WB | 9.2 | A | - | - | 6.7 | A | - | - | - |
| | | WBL | 38.6 | D | 0.31 | 60 | 37.4 | D | 0.23 | 47 | 160 |
| | | WBT | 4.3 | A | 0.49 | 34 | 2.6 | A | 0.36 | 25 | 750 |
| | | NB | 12.0 | B | 0.32 | 155 | 21.4 | C | 0.51 | 209 | 750 |
| | | SB | 6.2 | A | - | - | 10.1 | B | - | - | - |
| | | SBL | 8.8 | A | 0.33 | 125 | 15.7 | B | 0.5 | 256 | 180 |
| | | SBT | 5.2 | A | 0.20 | 118 | 6.7 | A | 0.22 | 159 | 950 |
| | | Overall | 9.7 | A | - | - | 14.2 | B | - | - | - |

**AD100**

**Table 4: 2029 No-Build Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue & Messina Drive | 13 | EB | 29.5 | D | - | - | 47.8 | E | - | - | - |
| | | EBL | 38.2 | E | 0.28 | 27 | 66.2 | F | 0.64 | 87 | 275 |
| | | EBR | 10.5 | B | 0.03 | 2 | 11.4 | B | 0.08 | 6 | 275 |
| | | NB | 1.5 | A | - | - | 1.4 | A | - | - | - |
| | | NBL | 9.4 | A | 0.16 | 14 | 10.2 | B | 0.15 | 14 | 100 |
| | | NBT | 0.0 | - | 0.24 | 0 | 0.0 | - | 0.23 | 0 | - |
| | | Overall | 2.0 | A | - | - | 4.4 | A | - | - | - |
| Coe Avenue & Silver Sands Road | 14 | EB | 23.3 | C | 0.65 | 114 | 34.2 | C | 0.82 | #191 | - |
| | | WB | 8.6 | A | 0.13 | 25 | 11.8 | B | 0.24 | 35 | 700 |
| | | NB | 10.6 | B | 0.40 | 113 | 11.7 | B | 0.42 | 82 | - |
| | | SB | 4.9 | A | - | - | 9.6 | A | - | - | - |
| | | SBT | 9.1 | A | 0.19 | 53 | 14 | B | 0.52 | 135 | 610 |
| | | SBR | 2.7 | A | 0.34 | 29 | 2.9 | A | 0.31 | 27 | 610 |
| | | Overall | 10.8 | B | - | - | 16.4 | B | - | - | - |
| Silver Sands Road & South End Road | 15 | EB | 7.9 | A | 0.14 | - | 8.2 | A | 0.10 | - | 380 |
| | | WB | 7.1 | A | 0.09 | - | 7.9 | A | 0.17 | - | 570 |
| | | NB | 0.0 | A | - | - | 7.8 | A | 0.01 | - | - |
| | | SB | 7.6 | A | 0.07 | - | 8.3 | A | 0.18 | - | 450 |
| | | Overall | 7.6 | A | - | - | 8.1 | A | - | - | - |
| Kimberly Avenue & Forbes Place | 16 | EB | 11.0 | B | 0.12 | - | 11.6 | B | 0.16 | - | 235 |
| | | WB | 17.0 | C | 0.60 | - | 17.6 | C | 0.59 | - | 860 |
| | | NB | 16.4 | C | 0.56 | - | 13.0 | B | 0.37 | - | 500 |
| | | SB | 20.7 | C | 0.68 | - | 144.3 | F | 1.25 | - | - |
| | | Overall | 17.8 | C | - | - | 85.9 | F | - | - | 70 |
| Main Street & Forbes Place | 17 | EB | 13.3 | B | - | - | 15.1 | B | - | - | - |
| | | EBL | 13.3 | B | 0.12 | 47 | 14.8 | B | 0.17 | 49 | 200 |
| | | EBT | 13.2 | B | 0.26 | 131 | 15.2 | B | 0.37 | 177 | 350 |
| | | WB | 12.9 | B | - | - | 15.1 | B | - | - | - |
| | | WBT | 12.9 | B | 0.22 | 103 | 15.6 | B | 0.41 | 200 | 300 |
| | | WBR | 12.7 | B | 0.11 | 49 | 13.4 | B | 0.15 | 66 | 300 |
| | | NB | 33.0 | C | 0.48 | 88 | 30.2 | C | 0.37 | 61 | 730 |
| | | SB | 24.1 | C | - | - | 32.1 | C | - | - | - |
| | | SBT | 33.5 | C | 0.50 | 100 | 41.0 | D | 0.74 | #222 | 1250 |
| | | SBR | 4.0 | A | 0.20 | 13 | 7.2 | A | 0.24 | 35 | 150 |
| | | Overall | 18.2 | B | - | | 20.8 | C | - | - | - |
| Frontage Road (Rt 1) & Forbes Place | 18 | EB | 10.7 | B | - | - | 14.4 | | - | - | - |
| | | EBT | 13.1 | B | 0.45 | 168 | 17.6 | B | 0.72 | 324 | - |
| | | EBR | 4.9 | A | 0.30 | 80 | 8.0 | A | 0.58 | 205 | 200 |
| | | WB | 4.9 | A | - | - | 5.3 | | - | - | - |
| | | WBL | 3.6 | A | 0.13 | 16 | 10 | A | 0.4 | 54 | 150 |
| | | WBT | 5.0 | A | 0.47 | 128 | 4.8 | A | 0.46 | 125 | - |
| | | NB | 118.9 | F | 1.14 | #254 | 41.0 | D | 0.72 | 131 | 70 |
| | | Overall | 29.6 | C | - | - | 13.7 | B | - | - | - |

# 95th percentle volume exceeds capacity, queue may be longer.

m Volume for 95th percentile queue Is metered by upstream signal

**AD101**

## 7.0 FULL-SITE BUILD 2029 ANALYSIS

The 2029 full-site build analysis models the operations throughout the study area after the Tweed New Haven Airport expansion project has been completed with a single entrance point on Proto Drive. The standard procedure to obtain site generated traffic volumes is to use the Institute of Transportation Engineers (ITE), Trip Generation Manual 11th Edition. However, the manual has limited data points for the commercial airport land-use code, such that no relevant data is able to be utilized. Alternatively, the site generated traffic volumes were obtained from estimates within the draft Environmental Assessment document developed through collaboration with Avports, the operator of the Tweed New Haven Airport. The site generated trip distribution patterns were estimated based on the expected routes for vehicles heading towards and departing from the new terminal while considering alternate GPS software routes. The results of the 2029 full-site build capacity analyses are shown in **Table 5.** This analysis assumes that all intersections will maintain the same geometry, lane configurations, signing, and signal timing. The calculated levels of service (LOS), volume to capacity (v/c) ratios, and 95th percentile queue lengths are provided in each of the tables. The available storage provided represents either the length of a turn-lane, the distance to an adjacent major intersection, or the distance to the gore for a freeway off-ramp, as appropriate. The queue lengths were calculated assuming an average vehicle length of 25 feet. **Appendix H** contains details of the full-site build 2029 capacity analysis.

The full-site build 2029 analysis presented in **Table 5** shows an overall degradation in operations throughout the study area. The movements, approaches, and intersections that previously operated poorly during the 2029 no-build conditions continue to operate poorly. The following movements or intersections have further degraded in LOS or 95th percentile queue length:

- Intersection 1: High Street (Route 100) & I-95 SB Off-Ramp (Exit 52)

  o The 95th percentile queue for the southbound approach exceeds the available storage length for the morning peak-period.

- Intersection 2: High Street (Route 100) & I-95 NB On-Ramp (Exit 52)

  o The northbound approach degrades from a LOS E in the no-build conditions to a LOS F in the full-site build conditions for both the morning and evening peak periods.

- Intersection 3: High Street (Route 100) & Kimberly Avenue

  o The overall intersection level of service degrades from a LOS E in the no-build condition to a LOS F in the full-site build condition for the morning condition. Additionally, the southbound through movement has a 95th percentile in the morning scenario that exceeds past the available storage length and extends past Intersection 2.

- Intersection 9: Hemingway Avenue (Route 142) & Dodge Avenue

  o The 95th percentile queue for the southbound approach in both the morning and evening peak-hours extend past the available storage length.

19

**AD102**

- Intersection 10: Coe Avenue (Route 337) & Proto Drive

  - The eastbound approach degrades to a LOS F for both the morning and evening peak-hours. The volume to capacity ratio indicates that the eastbound approach receives 80 percent more volume in the evening peak-hour than capacity allows. The overall intersection in the evening peak-hour operates at a LOS F with an average delay of 100.5 seconds.

  - Observationally, this intersection as existing would not be equipped for the additional site generated traffic. Major improvements would be required at this intersection to accommodate the added traffic including, but not limited to, turning radius evaluation, limiting/prohibiting street parking, installing proper signage, repaving along Proto Drive, signal warrant analysis with potential signalization and intersection timing design.

- Intersection 13: Hemingway Avenue & Messina Drive

  - Due to increased traffic on Hemingway Avenue, the eastbound approach degrades to a LOS E in the morning with the left-turn movement at a LOS F. Additionally, the eastbound approach overall degrades from a LOS E in the no-build condition to a LOS F in the full-site build condition during the evening peak-hour. Delay for the eastbound approach during evening peak increases from 47.8 sec in the no-build condition to 111.7 sec in the full build condition.

Since there were movements operating at LOS E and F during the existing and no-build conditions, a further investigation was done into the delay times to see the full extent of the full-site generated traffic on the study intersections. The following movements operate at a LOS E or F in the 2029 no-build scenario, continue to operate at an unacceptable level of service for the full-site build scenario while experiencing an increase in delay over 20 percent:

- Intersection 2: High Street (Route 100) & I-95 NB On-Ramp (Exit 52)

  - The northbound approach delay increases by 15 seconds (20 percent) between the no-build and full-site build conditions while operating at a LOS F during the morning peak-hour. The northbound delay during the evening peak-hour increases by 20.7 seconds (32 percent).

  - The delay of the overall intersection during the evening peak-hour increases by 14.1 seconds (20 percent) between the no-build and full-site build scenarios while continuing to operate at a LOS F.

- Intersection 3: High Street (Route 100) & Kimberly Avenue

  - The northbound approach delay increases by 32.9 seconds (20 percent) between the no-build and full-site build scenarios while continuing to operate at a LOS F during the morning peak-hour.

- Intersection 10: Coe Avenue (Route 337) & Proto Drive

  - The delay of the eastbound approach increases by 96.9 seconds (527 percent) during the morning peak and 381.1 seconds (1471 percent) during the evening

20

**AD103**

peak between the no-build and full-site build scenarios causing the approach to operate at a LOS F.

- o During the evening peak-hour, the overall intersection delay increases by 98.1 seconds (4088 percent) between the scenarios.

- Intersection 13: Hemingway Avenue & Messina Drive
  - o The eastbound left-turn delay increases by 23.6 seconds (62 percent) during the morning peak and 95.7 seconds (145 percent) during the evening peak between the no-build and full-site build scenarios while continuing to operate at a LOS F.

Delay comparison between the no-build and full-site build scenarios is provided in **Table 6**.

21

**AD104**

Table 5: Full-Site Build 2029 Capacity Analysis Results

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High Street (Rt 100) & I-95 SB Off-Ramp (Exit 52) | 1 | WB | 46.6 | D | 0.79 | 247 | 43.0 | D | 0.90 | 424 | 1000 |
| | | NB | 18.9 | B | 0.42 | m184 | 32.5 | C | 0.56 | m201 | 425 |
| | | SB | 13.8 | B | 0.63 | 417 | 25.9 | C | 0.72 | 386 | 400 |
| | | Overall | 22.0 | C | - | - | 33.6 | C | - | - | - |
| High Street (Rt 100) & I-95 NB On-Ramp (Exit 52) | 2 | EB | 26.3 | C | 0.68 | 220 | 14.0 | B | 0.35 | 123 | 400 |
| | | NB | 90.1 | F | - | - | 85.6 | F | - | - | - |
| | | NBL | 11.2 | B | 0.28 | m28 | 15.6 | B | 0.61 | m67 | 200 |
| | | NBT | 103.1 | F | 1.16 | m#292 | 110.0 | F | 1.17 | m#305 | 200 |
| | | SB | 94.8 | F | - | - | 102.2 | F | - | - | - |
| | | SBL | 62.8 | E | 0.75 | m#176 | 53.0 | D | 0.52 | m88 | 310 |
| | | SBT | 100.8 | F | 1.05 | #414 | 107.9 | F | 1.14 | #460 | 400 |
| | | Overall | 78.3 | E | - | - | 84.8 | F | - | - | - |
| High Street (Rt 100) & Kimberly Avenue | 3 | EB | 24.4 | C | 0.44 | 193 | 30.6 | C | 0.64 | 333 | 850 |
| | | NB | 194.2 | F | 1.33 | #628 | 337.4 | F | - | #701 | 1000 |
| | | SB | 47.0 | D | - | - | 52.1 | D | 1.67 | - | - |
| | | SBT | 73.4 | E | 0.98 | m#460 | 70.4 | E | 1.11 | m#471 | 185 |
| | | SBR | 2.5 | A | 0.48 | m0 | 1.6 | A | 0.37 | m0 | 185 |
| | | Overall | 89.4 | F | - | - | 137.6 | F | - | - | - |
| High Street (Rt 100) & Messina Drive | 4 | EB | 20.0 | B | 0.15 | 36 | 19.8 | B | 0.14 | 36 | 250 |
| | | WB | 9.2 | A | - | - | 11.5 | B | - | - | - |
| | | WBT | 20.2 | C | 0.12 | 44 | 21.3 | C | 0.23 | 75 | 670 |
| | | WBR | 6.2 | A | 0.35 | 46 | 6.1 | A | 0.35 | 45 | 670 |
| | | NB | 11.3 | B | - | - | 10.6 | B | - | - | 195 |
| | | NBL | 8.0 | A | 0.00 | 2 | 8.2 | A | 0.01 | 5 | 195 |
| | | NBR | 11.3 | B | 0.37 | 105 | 10.6 | B | 0.34 | 103 | - |
| | | SB | 13.4 | B | 0.51 | 102 | 14.0 | B | 0.54 | 116 | 160 |
| | | Overall | 12.6 | B | - | - | 13.1 | B | - | - | - |
| Main Street & Messina Drive | 5 | EB | 7.2 | A | 0.24 | 67 | 10.0 | A | 0.33 | 117 | 250 |
| | | WB | 5.6 | A | - | - | 7.4 | A | - | - | - |
| | | WBL | 4.8 | A | 0.01 | 3 | 5.4 | A | 0.05 | 14 | 230 |
| | | WBT | 5.6 | A | 0.21 | 50 | 7.6 | A | 0.28 | 114 | 230 |
| | | NB | 26.2 | C | 0.18 | 20 | 29.7 | C | 0.28 | 14 | - |
| | | SB | 7.6 | A | - | - | 9.1 | A | - | - | - |
| | | SBT | 33.5 | C | 0.05 | 14 | 33.5 | C | 0.13 | 32 | 270 |
| | | SBR | 6.5 | A | 0.35 | 36 | 5.7 | A | 0.32 | 43 | 50 |
| | | Overall | 7.3 | A | - | - | 9.8 | A | - | - | - |
| High Street (Rt 100) & Main Street | 6 | EB | 14.4 | B | - | - | 15.3 | B | - | - | - |
| | | EBT | 18.7 | B | 0.45 | 123 | 19.3 | B | 0.56 | 179 | 230 |
| | | EBR | 0.4 | A | 0.13 | 0 | 1.5 | A | 0.15 | 10 | 230 |
| | | WB | 18.0 | B | - | - | 24.6 | C | - | - | - |
| | | WBL | 14.5 | B | 0.04 | 15 | 14.7 | B | 0.12 | 28 | 250 |
| | | WBT | 18.2 | B | 0.42 | 114 | 25.4 | C | 0.72 | #279 | 250 |
| | | NB | 21.7 | C | - | - | 21.6 | B | - | - | - |
| | | NBL | 8.6 | A | 0.15 | 28 | 9.7 | A | 0.18 | 30 | 500 |
| | | NBT | 25.7 | C | 0.60 | 125 | 26.0 | C | 0.59 | 108 | 80 |
| | | SB | 12.5 | B | - | - | 14.4 | B | - | - | - |
| | | SBL | 11.8 | B | 0.50 | 93 | 13.5 | B | 0.52 | 97 | 190 |
| | | SBT | 13.9 | B | 0.21 | 69 | 15.9 | B | 0.28 | 88 | 190 |
| | | Overall | 16.1 | B | - | - | 18.8 | B | - | - | - |

**AD105**

**Table 5: Full-Site Build 2029 Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM | | | | PM | | | | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | |
| Hemingway Avenue (Rt 142) & Saltonstall Parkway (Rt 1) | 7 | NB | 24.4 | C | - | - | 32.3 | C | - | - | - |
| | | NBL | 24.5 | C | 0.61 | 445 | 32.3 | C | 0.70 | 405 | 400 |
| | | NBT | 24.4 | C | 0.61 | 443 | 32.3 | C | 0.71 | 404 | 400 |
| | | SB | 40.3 | D | 0.10 | 18 | 50.7 | D | 0.13 | 18 | - |
| | | EB | 14.5 | B | - | - | 23.5 | C | - | - | - |
| | | EBL | 59.6 | E | 0.25 | 43 | 69.9 | E | 0.58 | 101 | 70 |
| | | EBT | 36.1 | D | 0.35 | 156 | 46.0 | D | 0.73 | 288 | - |
| | | EBR | 1.3 | A | 0.44 | 27 | 2.2 | A | 0.58 | 30 | 250 |
| | | WB | 36.3 | D | - | - | 47.4 | D | - | - | - |
| | | WBL | 63.8 | E | 0.44 | 74 | 85.4 | F | 0.78 | #170 | 140 |
| | | WBT | 33.7 | C | 0.44 | 228 | 39.2 | D | 0.53 | 233 | - |
| | | Overall | 23.3 | C | - | - | 31.2 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Main Street | 8 | EB | 12.5 | B | - | - | 19.9 | B | - | - | - |
| | | EBL | 19.0 | B | 0.11 | 38 | 21.7 | C | 0.17 | 49 | 250 |
| | | EBT | 30.9 | C | 0.34 | 93 | 42.3 | D | 0.65 | 164 | 360 |
| | | EBR | 3.5 | A | 0.31 | 41 | 3.5 | A | 0.37 | 34 | 225 |
| | | WB | 23.4 | C | - | - | 29.1 | C | - | - | - |
| | | WBL | 19.4 | B | 0.15 | 43 | 26.6 | C | 0.46 | 96 | 150 |
| | | WBT | 26.4 | C | 0.24 | 60 | 31.7 | C | 0.37 | 110 | - |
| | | NB | 17.6 | B | - | - | 24.8 | C | - | - | - |
| | | NBL | 32.1 | C | 0.45 | 103 | 41.9 | D | 0.61 | 150 | 250 |
| | | NBT | 15.9 | B | 0.63 | 297 | 22.0 | C | 0.67 | 313 | 400 |
| | | SB | 21.7 | C | - | - | 27.2 | C | - | - | - |
| | | SBL | 33.5 | C | 0.12 | 29 | 40.6 | D | 0.35 | 66 | 110 |
| | | SBT | 21.5 | C | 0.58 | 178 | 26.7 | C | 0.69 | 260 | 330 |
| | | SBR | 18.0 | B | 0.05 | 24 | 19.4 | B | 0.11 | 47 | 330 |
| | | Overall | 18.3 | B | - | - | 25.1 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Dodge Avenue | 9 | EB | 30.7 | C | 0.73 | 93 | 32.8 | C | 0.73 | 135 | 500 |
| | | WB | 21.9 | C | - | - | 24.0 | C | - | - | - |
| | | WBL | 29.2 | C | 0.05 | 9 | 24 | C | 0.01 | 4 | - |
| | | WBT | 0.0 | A | 0.00 | 0 | 24 | C | 0 | 4 | - |
| | | NB | 6.2 | A | 0.55 | 146 | 17.4 | B | 0.66 | 298 | 930 |
| | | SB | 21.2 | C | 0.58 | 248 | 49.1 | D | 0.98 | #501 | 210 |
| | | Overall | 14.5 | B | - | - | 33.4 | C | - | - | - |
| Coe Avenue (Rt 337) & Proto Drive | 10 | EB | 115.3 | F | 1.05 | 270 | 407.0 | F | 1.8 | 775 | - |
| | | NBL | 0.9 | A | 0.02 | 0 | 0.8 | A | 0.0 | 0 | - |
| | | Overall | 19.0 | C | - | - | 100.5 | F | - | - | - |
| Thompson Avenue & Dodge Avenue | 11 | EB | 9.0 | A | 0.23 | - | 10.4 | B | 0.32 | - | 500 |
| | | WB | 8.5 | A | 0.16 | - | 9.6 | A | 0.25 | - | 300 |
| | | NB | 8.5 | A | 0.13 | - | 9.1 | A | 0.16 | - | 535 |
| | | SB | 9.3 | A | 0.23 | - | 10.2 | B | 0.29 | - | 420 |
| | | Overall | 8.9 | A | - | - | 9.9 | A | - | - | - |
| Hemingway Avenue and Short Beach Road (Rt 142) at Coe Avenue (Rt 337) | 12 | EB | 34.8 | C | 0.27 | 31 | 35.3 | D | 0.36 | 51 | 110 |
| | | WB | 9.3 | A | - | - | 7.4 | A | - | - | - |
| | | WBL | 39.4 | D | 0.35 | - | 38.7 | D | 0.28 | 53 | 160 |
| | | WBT | 3.7 | A | 0.47 | 66 | 2.4 | A | 0.36 | 23 | 750 |
| | | NB | 15.1 | B | 0.44 | 233 | 26.8 | C | 0.71 | #318 | 750 |
| | | SB | 9.2 | A | - | - | 12.4 | B | - | - | - |
| | | SBL | 12.1 | B | 0.37 | 138 | 17.7 | B | 0.57 | m195 | 180 |
| | | SBT | 8.4 | A | 0.29 | 191 | 10.1 | B | 0.31 | m185 | 950 |
| | | Overall | 11.9 | B | - | - | 17.7 | B | - | - | - |

**AD106**

**Table 5: Full-Site Build 2029 Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue & Messina Drive | 13 | EB | 45.9 | E | - | - | 111.7 | F | - | - | - |
| | | EBL | 61.8 | F | 0.40 | 41 | 161.9 | F | 0.96 | 142 | 275 |
| | | EBR | 11.5 | B | 0.03 | 3 | 12.5 | B | 0.09 | 7 | 275 |
| | | NB | 1.4 | - | - | - | 1.3 | A | - | - | - |
| | | NBL | 10.5 | B | 0.19 | 17 | 11.3 | B | 0.18 | 17 | 100 |
| | | NBT | - | B | 0.29 | 0 | 0.0 | - | 0.29 | 0 | - |
| | | Overall | 2.2 | A | - | - | 7.8 | A | - | - | - |
| Coe Avenue & Silver Sands Road | 14 | EB | 24.0 | C | 0.66 | 121 | 36.2 | D | 0.84 | #203 | - |
| | | WB | 8.6 | A | 0.13 | 25 | 11.7 | B | 0.24 | 35 | 700 |
| | | NB | 10.9 | B | 0.41 | 113 | 11.9 | B | 0.42 | 82 | - |
| | | SB | 4.9 | A | - | - | 9.6 | A | - | - | - |
| | | SBT | 9.3 | A | 0.19 | 53 | 14.2 | B | 0.52 | 135 | 610 |
| | | SBR | 2.8 | A | 0.36 | 29 | 2.9 | A | 0.32 | 28 | 610 |
| | | Overall | 11.1 | B | - | - | 17.1 | B | - | - | - |
| Silver Sands Road & South End Road | 15 | EB | 8.0 | A | 0.14 | - | 8.3 | A | 0.1 | - | 380 |
| | | WB | 7.2 | A | 0.10 | - | 8.0 | A | 0.19 | - | 570 |
| | | NB | 0.0 | A | - | - | 7.8 | A | 0.01 | - | - |
| | | SB | 7.8 | A | 0.08 | - | 8.5 | A | 0.19 | - | 450 |
| | | Overall | 7.7 | A | - | - | 8.2 | A | - | - | - |
| Kimberly Avenue & Forbes Place | 16 | EB | 11.0 | B | 0.12 | - | 11.7 | B | 0.17 | - | 235 |
| | | WB | 17.1 | C | 0.60 | - | 17.8 | C | 0.59 | - | 860 |
| | | NB | 16.5 | C | 0.56 | - | 13.0 | B | 0.37 | - | 500 |
| | | SB | 20.9 | C | 0.68 | - | 147.2 | F | 1.25 | - | - |
| | | Overall | 17.9 | C | - | - | 87.4 | F | - | - | 70 |
| Main Street & Forbes Place | 17 | EB | 13.3 | B | - | - | 15.1 | B | - | - | - |
| | | EBL | 13.3 | B | 0.12 | 47 | 14.8 | B | 0.17 | 49 | 200 |
| | | EBT | 13.3 | B | 0.26 | 131 | 15.2 | B | 0.37 | 177 | 350 |
| | | WB | 12.9 | B | - | - | 15.1 | B | - | - | - |
| | | WBT | 12.9 | B | 0.22 | 103 | 15.7 | B | 0.41 | 200 | 300 |
| | | WBR | 12.8 | B | 0.11 | 49 | 13.4 | B | 0.15 | 67 | 300 |
| | | NB | 33.0 | C | 0.48 | 88 | 30.2 | C | 0.37 | 61 | 730 |
| | | SB | 24.3 | C | - | - | 32.3 | C | - | - | - |
| | | SBT | 33.6 | C | 0.50 | 102 | 41.3 | D | 0.74 | #225 | 1250 |
| | | SBR | 4.0 | A | 0.20 | 13 | 7.2 | A | 0.24 | 35 | 150 |
| | | Overall | 18.2 | B | - | | 20.9 | C | - | - | - |
| Frontage Road (Rt 1) & Forbes Place | 18 | EB | 12.0 | B | - | - | 17.3 | B | - | - | - |
| | | EBT | 14.4 | B | 0.55 | 216 | 21.3 | C | 0.83 | 405 | - |
| | | EBR | 4.9 | A | 0.30 | 81 | 8.2 | A | 0.58 | 205 | 200 |
| | | WB | 5.3 | A | - | - | 6 | A | - | - | - |
| | | WBL | 3.8 | A | 0.40 | 16 | 12.3 | B | 0.41 | 64 | 150 |
| | | WBT | 5.4 | A | 0.52 | 152 | 5.3 | A | 0.53 | 155 | - |
| | | NB | 119.6 | F | 1.15 | #254 | 41.2 | D | 0.73 | 132 | 70 |
| | | Overall | 28.4 | C | - | - | 15.2 | B | - | - | - |

\# 95th percentle volume exceeds capacity, queue may be longer.

m Volume for 95th percentile queue is metered by upstream signal

**Table 6: No-Build and Full-Site Build Comparison Table**

| Int. Name | Int. # | Lane Group | AM Delay (s) No-Build | AM Delay (s) Build | AM Difference | PM Delay (s) No-Build | PM Delay (s) Build | PM Difference |
|---|---|---|---|---|---|---|---|---|
| High Street (Rt 100) & I-95 SB Off-Ramp (Exit 52) | 1 | WB | 47.4 | 46.6 | -2% | 41.5 | 43.0 | 4% |
| | | NB | 16.6 | 18.9 | 14% | 30.8 | 32.5 | 6% |
| | | SB | 11.6 | 13.8 | 19% | 23.6 | 25.9 | 10% |
| | | Overall | 19.9 | 22.0 | 11% | 31.8 | 33.6 | 6% |
| High Street (Rt 100) & I-95 NB On-Ramp (Exit 52) | 2 | EB | 26.3 | 26.3 | 0% | 14.0 | 14.0 | 0% |
| | | NB | 75.1 | 90.1 | 20% | 64.9 | 85.6 | 32% |
| | | NBL | 12.0 | 11.2 | -7% | 16.1 | 15.6 | -3% |
| | | NBT | 86.0 | 103.1 | 20% | 83.0 | 110.0 | 33% |
| | | SB | 95.8 | 94.8 | -1% | 91.6 | 102.2 | 12% |
| | | SBL | 62.4 | 62.8 | 1% | 53.1 | 53.0 | 0% |
| | | SBT | 102.1 | 100.8 | -1% | 96.3 | 107.9 | 12% |
| | | Overall | 72.9 | 78.3 | 7% | 70.7 | 84.8 | 20% |
| High Street (Rt 100) & Kimberly Avenue | 3 | EB | 24.4 | 24.4 | 0% | 30.5 | 30.6 | 0% |
| | | NB | 161.3 | 194.2 | 20% | 290.4 | 337.4 | 16% |
| | | SB | 46.0 | 47.0 | 2% | 51.1 | 52.1 | 2% |
| | | SBT | 73.8 | 73.4 | -1% | 70.2 | 70.4 | 0% |
| | | SBR | 2.4 | 2.5 | 4% | 1.7 | 1.6 | -6% |
| | | Overall | 77.7 | 89.4 | 15% | 120.2 | 137.6 | 14% |
| High Street (Rt 100) & Messina Drive | 4 | EB | 18.6 | 20.0 | 8% | 18.5 | 19.8 | 7% |
| | | WB | 8.6 | 9.2 | 7% | 10.7 | 11.5 | 7% |
| | | WBT | 18.7 | 20.2 | 8% | 19.8 | 21.3 | 8% |
| | | WBR | 5.8 | 6.2 | 7% | 5.7 | 6.1 | 7% |
| | | NB | 10.9 | 11.3 | 4% | 10.2 | 10.6 | 4% |
| | | NBL | 8.0 | 8.0 | 0% | 8.5 | 8.2 | -4% |
| | | NBR | 10.9 | 11.3 | 4% | 10.2 | 10.6 | 4% |
| | | SB | 13.1 | 13.4 | 2% | 13.7 | 14.0 | 2% |
| | | Overall | 12.1 | 12.6 | 4% | 12.6 | 13.1 | 4% |
| Main Street & Messina Drive | 5 | EB | 7.2 | 7.2 | 0% | 9.7 | 10.0 | 3% |
| | | WB | 5.6 | 5.6 | 0% | 7.4 | 7.4 | 0% |
| | | WBL | 4.8 | 4.8 | 0% | 5.4 | 5.4 | 0% |
| | | WBT | 5.6 | 5.6 | 0% | 7.5 | 7.6 | 1% |
| | | NB | 26.2 | 26.2 | 0% | 29.7 | 29.7 | 0% |
| | | SB | 7.6 | 7.6 | 0% | 9.1 | 9.1 | 0% |
| | | SBT | 33.5 | 33.5 | 0% | 33.5 | 33.5 | 0% |
| | | SBR | 6.5 | 6.5 | 0% | 5.7 | 5.7 | 0% |
| | | Overall | 7.3 | 7.3 | 0% | 9.6 | 9.8 | 2% |
| High Street (Rt 100) & Main Street | 6 | EB | 13.9 | 14.4 | 4% | 14.5 | 15.3 | 6% |
| | | EBT | 18.0 | 18.7 | 4% | 18.2 | 19.3 | 6% |
| | | EBR | 0.4 | 0.4 | 0% | 1.4 | 1.5 | 7% |
| | | WB | 17.1 | 18.0 | 5% | 22.3 | 24.6 | 10% |
| | | WBL | 14.0 | 14.5 | 4% | 13.9 | 14.7 | 6% |
| | | WBT | 17.3 | 18.2 | 5% | 23 | 25.4 | 10% |
| | | NB | 20.5 | 21.7 | 6% | 19.8 | 21.6 | 9% |
| | | NBL | 8.7 | 8.6 | -1% | 9.9 | 9.7 | -2% |
| | | NBT | 24.5 | 25.7 | 5% | 23.9 | 26.0 | 9% |
| | | SB | 12.1 | 12.5 | 3% | 14.2 | 14.4 | 1% |
| | | SBL | 11.5 | 11.8 | 3% | 13.3 | 13.5 | 2% |
| | | SBT | 13.7 | 13.9 | 1% | 15.8 | 15.9 | 1% |
| | | Overall | 15.4 | 16.1 | 5% | 17.6 | 18.8 | 7% |

**AD108**

**Table 6: No-Build and Full-Site Build Comparison Table (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) No-Build | AM Delay (s) Build | AM Difference | PM Delay (s) No-Build | PM Delay (s) Build | PM Difference |
|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue (Rt 142) & Saltonstall Parkway (Rt 1) | 7 | NB | 28.7 | 24.4 | -15% | 27.4 | 32.3 | 18% |
| | | NBL | 28.8 | 24.5 | -15% | 27.7 | 32.3 | 17% |
| | | NBT | 28.6 | 24.4 | -15% | 27.1 | 32.3 | 19% |
| | | SB | 40.0 | 40.3 | 1% | 49.9 | 50.7 | 2% |
| | | EB | 13.6 | 14.5 | 7% | 26.5 | 23.5 | -11% |
| | | EBL | 59.6 | 59.6 | 0% | 69.9 | 69.9 | 0% |
| | | EBT | 27.9 | 36.1 | 29% | 46.6 | 46.0 | -1% |
| | | EBR | 1.0 | 1.3 | 30% | 1.6 | 2.2 | 38% |
| | | WB | 29.9 | 36.3 | 21% | 46.6 | 47.4 | 2% |
| | | WBL | 62.6 | 63.8 | 2% | 81.0 | 85.4 | 5% |
| | | WBT | 27.3 | 33.7 | 23% | 39.8 | 39.2 | -2% |
| | | Overall | 23.5 | 23.3 | -1% | 31.3 | 31.2 | 0% |
| Hemingway Avenue (Rt 142) & Main Street | 8 | EB | 11.6 | 12.5 | 8% | 17.9 | 19.9 | 11% |
| | | EBL | 16.7 | 19.0 | 14% | 19.2 | 21.7 | 13% |
| | | EBT | 28.4 | 30.9 | 9% | 37.1 | 42.3 | 14% |
| | | EBR | 3.2 | 3.5 | 9% | 3.2 | 3.5 | 9% |
| | | WB | 21.1 | 23.4 | 11% | 25.7 | 29.1 | 13% |
| | | WBL | 17.1 | 19.4 | 13% | 22.7 | 26.6 | 17% |
| | | WBT | 24.2 | 26.4 | 9% | 28.7 | 31.7 | 10% |
| | | NB | 14.8 | 17.6 | 19% | 24.0 | 24.8 | 3% |
| | | NBL | 29.8 | 32.1 | 8% | 37.3 | 41.9 | 12% |
| | | NBT | 12.9 | 15.9 | 23% | 21.4 | 22.0 | 3% |
| | | SB | 20.1 | 21.7 | 8% | 26.2 | 27.2 | 4% |
| | | SBL | 30.5 | 33.5 | 10% | 37.1 | 40.6 | 9% |
| | | SBT | 19.7 | 21.5 | 9% | 25.6 | 26.7 | 4% |
| | | SBR | 18.5 | 18.0 | -3% | 20.6 | 19.4 | -6% |
| | | Overall | 15.9 | 18.3 | 15% | 23.5 | 25.1 | 7% |
| Hemingway Avenue (Rt 142) & Dodge Avenue | 9 | EB | 27.3 | 30.7 | 12% | 36.5 | 32.8 | -10% |
| | | WB | 23.8 | 21.9 | -8% | 26.0 | 24.0 | -8% |
| | | WBL | 31.8 | 29.2 | -8% | 26 | 24 | -8% |
| | | WBT | 0.0 | 0.0 | 0% | 26 | 24 | -8% |
| | | NB | 3.3 | 6.2 | 88% | 6.6 | 17.4 | 164% |
| | | SB | 14.2 | 21.2 | 49% | 21.2 | 49.1 | 132% |
| | | Overall | 9.8 | 14.5 | 48% | 16.5 | 33.4 | 102% |
| Coe Avenue (Rt 337) & Proto Drive | 10 | EB | 18.4 | 115.3 | 527% | 25.9 | 407.0 | 1471% |
| | | NBL | 0.2 | 0.9 | 350% | 0.0 | 0.8 | 7900% |
| | | Overall | 0.5 | 19.0 | 3700% | 2.4 | 100.5 | 4088% |
| Thompson Avenue & Dodge Avenue | 11 | EB | 8.8 | 9.0 | 2% | 10 | 10.4 | 4% |
| | | WB | 8.2 | 8.5 | 4% | 9.1 | 9.6 | 5% |
| | | NB | 8.3 | 8.5 | 2% | 8.8 | 9.1 | 3% |
| | | SB | 8.8 | 9.3 | 6% | 9.4 | 10.2 | 9% |
| | | Overall | 8.6 | 8.9 | 3% | 9.4 | 9.9 | 5% |
| Hemingway Avenue and Short Beach Road (Rt 142) at Coe Avenue (Rt 337) | 12 | EB | 35.1 | 34.8 | -1% | 35.3 | 35.3 | 0% |
| | | WB | 9.2 | 9.3 | 1% | 6.7 | 7.4 | 10% |
| | | WBL | 38.6 | 39.4 | 2% | 37.4 | 38.7 | 3% |
| | | WBT | 4.3 | 3.7 | -14% | 2.6 | 2.4 | -8% |
| | | NB | 12.0 | 15.1 | 26% | 21.4 | 26.8 | 25% |
| | | SB | 6.2 | 9.2 | 48% | 10.1 | 12.4 | 23% |
| | | SBL | 8.8 | 12.1 | 38% | 15.7 | 17.7 | 13% |
| | | SBT | 5.2 | 8.4 | 62% | 6.7 | 10.1 | 51% |
| | | Overall | 9.7 | 11.9 | 23% | 14.2 | 17.7 | 25% |

**AD109**

**Table 6: No-Build and Full-Site Build Comparison Table (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) No-Build | AM Delay (s) Build | AM Difference | PM Delay (s) No-Build | PM Delay (s) Build | PM Difference |
|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue & Messina Drive | 13 | EB | 29.5 | 45.9 | 56% | 47.8 | 111.7 | 134% |
| | | EBL | 38.2 | 61.8 | 62% | 66.2 | 161.9 | 145% |
| | | EBR | 10.5 | 11.5 | 10% | 11.4 | 12.5 | 10% |
| | | NB | 1.5 | 1.4 | -7% | 1.4 | 1.3 | -7% |
| | | NBL | 9.4 | 10.5 | 12% | 10.2 | 11.3 | 11% |
| | | NBT | 0.0 | - | 0% | 0.0 | 0.0 | 0% |
| | | Overall | 2.0 | 2.2 | 10% | 4.4 | 7.8 | 77% |
| Coe Avenue & Silver Sands Road | 14 | EB | 23.3 | 24.0 | 3% | 34.2 | 36.2 | 6% |
| | | WB | 8.6 | 8.6 | 0% | 11.8 | 11.7 | -1% |
| | | NB | 10.6 | 10.9 | 3% | 11.7 | 11.9 | 2% |
| | | SB | 4.9 | 4.9 | 0% | 9.6 | 9.6 | 0% |
| | | SBT | 9.1 | 9.3 | 2% | 14 | 14.2 | 1% |
| | | SBR | 2.7 | 2.8 | 4% | 2.9 | 2.9 | 0% |
| | | Overall | 10.8 | 11.1 | 3% | 16.4 | 17.1 | 4% |
| Silver Sands Road & South End Road | 15 | EB | 7.9 | 8.0 | 1% | 8.2 | 8.3 | 1% |
| | | WB | 7.1 | 7.2 | 1% | 7.9 | 8.0 | 1% |
| | | NB | 0.0 | 0.0 | 0% | 7.8 | 7.8 | 0% |
| | | SB | 7.6 | 7.8 | 3% | 8.3 | 8.5 | 2% |
| | | Overall | 7.6 | 7.7 | 1% | 8.1 | 8.2 | 1% |
| Kimberly Avenue & Forbes Place | 16 | EB | 11.0 | 11.0 | 0% | 11.6 | 11.7 | 1% |
| | | WB | 17.0 | 17.1 | 1% | 17.6 | 17.8 | 1% |
| | | NB | 16.4 | 16.5 | 1% | 13.0 | 13.0 | 0% |
| | | SB | 20.7 | 20.9 | 1% | 144.3 | 147.2 | 2% |
| | | Overall | 17.8 | 17.9 | 1% | 85.9 | 87.4 | 2% |
| Main Street & Forbes Place | 17 | EB | 13.3 | 13.3 | 0% | 15.1 | 15.1 | 0% |
| | | EBL | 13.3 | 13.3 | 0% | 14.8 | 14.8 | 0% |
| | | EBT | 13.2 | 13.3 | 1% | 15.2 | 15.2 | 0% |
| | | WB | 12.9 | 12.9 | 0% | 15.1 | 15.1 | 0% |
| | | WBT | 12.9 | 12.9 | 0% | 15.6 | 15.7 | 1% |
| | | WBR | 12.7 | 12.8 | 1% | 13.4 | 13.4 | 0% |
| | | NB | 33.0 | 33.0 | 0% | 30.2 | 30.2 | 0% |
| | | SB | 24.1 | 24.3 | 1% | 32.1 | 32.3 | 1% |
| | | SBT | 33.5 | 33.6 | 0% | 41.0 | 41.3 | 1% |
| | | SBR | 4.0 | 4.0 | 0% | 7.2 | 7.2 | 0% |
| | | Overall | 18.2 | 18.2 | 0% | 20.8 | 20.9 | 0% |
| Frontage Road (Rt 1) & Forbes Place | 18 | EB | 10.7 | 12.0 | 12% | 14.4 | 17.3 | 20% |
| | | EBT | 13.1 | 14.4 | 10% | 17.6 | 21.3 | 21% |
| | | EBR | 4.9 | 4.9 | 0% | 8.0 | 8.2 | 2% |
| | | WB | 4.9 | 5.3 | 8% | 5.3 | 6 | 13% |
| | | WBL | 3.6 | 3.8 | 6% | 10 | 12.3 | 23% |
| | | WBT | 5.0 | 5.4 | 8% | 4.8 | 5.3 | 10% |
| | | NB | 118.9 | 119.6 | 1% | 41.0 | 41.2 | 0% |
| | | Overall | 29.6 | 28.4 | -4% | 13.7 | 15.2 | 11% |

**AD110**

## 8.0 HALF-SITE BUILD 2029 ANALYSIS

The 2029 full-site build analysis projects the operations throughout the study area after the Tweed New Haven Airport expansion project has been completed with dual entrance points; one from Proto Drive and a second route through the City of New Haven. For analysis purposes, the site generated volumes used in the full-site analysis were halved for the half-site build analysis and the site generated trip distribution patterns remain the same. The results of the 2029 half-site build capacity analyses, are shown in **Table 7.** This analysis assumes that all intersections will maintain the same geometry, lane configurations, signing, and signal timing. The queue lengths were calculated assuming an average vehicle length of 25 feet. **Appendix I** contains details of the half-site build 2029 capacity analysis.

The 2029 build-year analysis presented in **Table 7** shows a slight overall improvement in operations throughout the study area from the full-site build scenario due to a reduction of site-generated traffic. The movements, approaches, and intersections that previously operated poorly during the 2029 no-build conditions continue to operate poorly. The following movements or intersections that operated poorly during the full-site build scenario have improved in LOS during the half-site build scenario:

- Intersection 1: High Street (Route 100) & I-95 SB Off-Ramp (Exit 52)

  - The 95th percentile queue for the southbound approach no longer exceeds the available storage length for the morning peak-period.

- Intersection 2: High Street (Route 100) & I-95 NB On-Ramp (Exit 52)

  - The northbound approach maintains operations at a LOS E between the no-build and half-site build scenarios during the evening peak-hour.

  - The 95th percentile queue for the southbound through movement no longer exceeds the available storage length.

  - The overall intersection during the evening peak-hour improves from a LOS F during the full-site build scenario to a LOS E during the half-site build scenario.

- Intersection 10: Coe Avenue (Route 337) & Proto Drive

  - The eastbound approach improves to a LOS D from a LOS F during the morning peak-hour between the full-site and half-site build scenario.

  - The overall intersection level of service during the evening peak-hour improves from a LOS F during the full-site build scenario to a LOS C during the half-site build scenario.

- Intersection 13: Hemingway Avenue & Messina Drive

  - The eastbound left-turn improves during the morning peak from a LOS F in the full-site build scenario to a LOS E during the half-site build scenario.

28

**Table 7: Half-Site Build 2029 Capacity Analysis Results**

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High Street (Rt 100) & I-95 SB Off-Ramp (Exit 52) | 1 | WB | 47.2 | D | 0.78 | 234 | 42.4 | D | 0.88 | 399 | 1000 |
| | | NB | 18.2 | B | 0.41 | m186 | 32.1 | C | 0.55 | m209 | 425 |
| | | SB | 12.6 | B | 0.62 | 397 | 24.6 | C | 0.7 | 386 | 400 |
| | | Overall | 20.9 | C | - | - | 32.7 | C | - | - | - |
| High Street (Rt 100) & I-95 NB On-Ramp (Exit 52) | 2 | EB | 26.3 | C | 0.68 | 220 | 14.0 | B | 0.35 | 123 | 400 |
| | | NB | 83.4 | F | - | - | 68.8 | E | - | - | - |
| | | NBL | 11.7 | B | 0.28 | m30 | 15.9 | B | 0.61 | m70 | 200 |
| | | NBT | 95.5 | F | 1.13 | m#293 | 88.2 | F | 1.11 | m#300 | 200 |
| | | SB | 95.7 | F | - | - | 92.0 | F | - | - | - |
| | | SBL | 62.6 | E | 0.75 | m#181 | 53.0 | D | 0.52 | m91 | 310 |
| | | SBT | 101.8 | F | 1.03 | #398 | 96.6 | F | 1.1 | #442 | 400 |
| | | Overall | 76.1 | E | - | - | 72.7 | E | - | - | - |
| High Street (Rt 100) & Kimberly Avenue | 3 | EB | 24.4 | C | 0.44 | 193 | 30.3 | C | 0.64 | 333 | 850 |
| | | NB | 177.6 | F | 1.29 | #604 | 313.8 | F | - | #654 | 1000 |
| | | SB | 46.7 | D | - | - | 50.7 | D | 1.61 | - | - |
| | | SBT | 73.9 | E | 0.95 | m#449 | 69.1 | E | 1.07 | m#464 | 185 |
| | | SBR | 2.4 | A | 0.47 | m0 | 1.6 | A | 0.37 | m0 | 185 |
| | | Overall | 83.5 | F | - | - | 128.4 | F | - | - | - |
| High Street (Rt 100) & Messina Drive | 4 | EB | 19.2 | B | 0.15 | 35 | 19.1 | B | 0.14 | 34 | 250 |
| | | WB | 8.9 | A | - | - | 11.1 | B | - | - | - |
| | | WBT | 19.5 | B | 0.12 | 43 | 20.5 | C | 0.23 | 72 | 670 |
| | | WBR | 6.0 | A | 0.35 | 45 | 5.9 | A | 0.35 | 44 | 670 |
| | | NB | 11.1 | B | - | - | 10.4 | B | - | - | 195 |
| | | NBL | 8.0 | A | 0.00 | 2 | 8.5 | A | 0.01 | 5 | 195 |
| | | NBR | 11.1 | B | 0.36 | 100 | 10.4 | B | 0.32 | 97 | - |
| | | SB | 13.3 | B | 0.50 | 98 | 13.8 | B | 0.52 | 109 | 160 |
| | | Overall | 12.4 | B | - | - | 12.8 | B | - | - | - |
| Main Street & Messina Drive | 5 | EB | 7.2 | A | 0.24 | 67 | 10.0 | A | 0.33 | 117 | 250 |
| | | WB | 5.6 | A | - | - | 7.4 | A | - | - | - |
| | | WBL | 4.8 | A | 0.01 | 3 | 5.4 | A | 0.05 | 14 | 230 |
| | | WBT | 5.6 | A | 0.21 | 50 | 7.6 | A | 0.28 | 114 | 230 |
| | | NB | 26.2 | C | 0.18 | 20 | 29.7 | C | 0.28 | 14 | - |
| | | SB | 7.6 | A | - | - | 9.1 | A | - | - | - |
| | | SBT | 33.5 | C | 0.05 | 14 | 33.5 | C | 0.13 | 32 | 270 |
| | | SBR | 6.5 | A | 0.35 | 36 | 5.7 | A | 0.32 | 43 | 50 |
| | | Overall | 7.3 | A | - | - | 9.7 | A | - | - | - |
| High Street (Rt 100) & Main Street | 6 | EB | 14.1 | B | - | - | 14.9 | B | - | - | - |
| | | EBT | 18.3 | B | 0.45 | 121 | 18.8 | B | 0.55 | 176 | 230 |
| | | EBR | 0.4 | A | 0.13 | 0 | 1.4 | A | 0.15 | 10 | 230 |
| | | WB | 17.6 | B | - | - | 23.4 | C | - | - | - |
| | | WBL | 14.2 | B | 0.04 | 14 | 14.3 | B | 0.12 | 27 | 250 |
| | | WBT | 17.8 | B | 0.41 | 111 | 24.2 | C | 0.71 | #268 | 250 |
| | | NB | 21.1 | C | - | - | 20.7 | C | - | - | - |
| | | NBL | 8.6 | A | 0.15 | 28 | 9.8 | A | 0.18 | 29 | 500 |
| | | NBT | 25.1 | C | 0.58 | 118 | 25.0 | C | 0.56 | 99 | 80 |
| | | SB | 12.3 | B | - | - | 14.3 | B | - | - | - |
| | | SBL | 11.7 | B | 0.49 | 91 | 13.3 | B | 0.5 | 95 | 190 |
| | | SBT | 13.9 | B | 0.18 | 62 | 15.9 | B | 0.26 | 81 | 190 |
| | | Overall | 15.8 | B | - | - | 18.2 | B | - | - | - |

**AD112**

**Table 7: Half-Site Build 2029 Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM Delay (s) | AM LOS | AM V/C | AM 95th %tile Queue (ft) | PM Delay (s) | PM LOS | PM V/C | PM 95th %tile Queue (ft) | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hemingway Avenue (Rt 142) & Saltonstall Parkway (Rt 1) | 7 | NB | 25.2 | C | - | - | 29.4 | C | - | - | - |
| | | NBL | 25.3 | C | 0.57 | 378 | 29.8 | C | 0.64 | 361 | 400 |
| | | NBT | 25.2 | C | 0.57 | 376 | 29 | C | 0.62 | 346 | 400 |
| | | SB | 40.3 | D | 0.10 | 18 | 50.7 | D | 0.13 | 18 | - |
| | | EB | 14.5 | B | - | - | 24.9 | C | - | - | - |
| | | EBL | 59.6 | E | 0.25 | 43 | 69.9 | E | 0.58 | 101 | 70 |
| | | EBT | 33.3 | C | 0.32 | 156 | 46.3 | D | 0.73 | 288 | - |
| | | EBR | 1.1 | A | 0.38 | 26 | 1.8 | A | 0.53 | 29 | 250 |
| | | WB | 36.3 | C | - | - | 47 | D | - | - | - |
| | | WBL | 63.2 | E | 0.41 | 70 | 83.0 | F | 0.75 | #162 | 140 |
| | | WBT | 31.1 | C | 0.41 | 228 | 39.5 | D | 0.54 | 233 | - |
| | | Overall | 23.2 | C | - | - | 31 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Main Street | 8 | EB | 12.0 | B | - | - | 18.7 | B | - | - | - |
| | | EBL | 17.8 | B | 0.11 | 35 | 20.5 | C | 0.16 | 49 | 250 |
| | | EBT | 29.6 | C | 0.34 | 87 | 39.2 | D | 0.61 | 164 | 360 |
| | | EBR | 3.3 | A | 0.30 | 37 | 3.4 | A | 0.35 | 33 | 225 |
| | | WB | 22.2 | C | - | - | 27.2 | C | - | - | - |
| | | WBL | 18.2 | B | 0.15 | 40 | 24.4 | C | 0.42 | 96 | 150 |
| | | WBT | 25.3 | C | 0.24 | 57 | 30.1 | C | 0.35 | 110 | - |
| | | NB | 17.3 | B | - | - | 24.6 | C | - | - | - |
| | | NBL | 30.9 | C | 0.44 | 96 | 39.1 | D | 0.57 | 147 | 250 |
| | | NBT | 15.7 | B | 0.60 | 272 | 22.0 | C | 0.66 | 276 | 400 |
| | | SB | 21.0 | C | - | - | 27.2 | C | - | - | - |
| | | SBL | 32.0 | C | 0.12 | 28 | 38.8 | D | 0.34 | 66 | 110 |
| | | SBT | 20.7 | C | 0.51 | 151 | 26.8 | C | 0.67 | 224 | 330 |
| | | SBR | 18.5 | B | 0.05 | 25 | 20 | B | 0.12 | 47 | 330 |
| | | Overall | 17.7 | B | - | - | 24.5 | C | - | - | - |
| Hemingway Avenue (Rt 142) & Dodge Avenue | 9 | EB | 29.4 | C | 0.71 | 81 | 35.2 | D | 0.73 | 131 | 500 |
| | | WB | 23.1 | C | - | - | 25.5 | C | - | - | - |
| | | WBL | 30.8 | C | 0.05 | 9 | 26 | C | 0.01 | 4 | - |
| | | WBT | 0.0 | A | 0.00 | 0 | 25 | C | 0.01 | 4 | - |
| | | NB | 3.8 | A | 0.47 | 98 | 10.3 | B | 0.57 | 225 | 930 |
| | | SB | 16.3 | B | 0.45 | 213 | 27.9 | C | 0.79 | #432 | 210 |
| | | Overall | 11.2 | B | - | - | 21 | C | - | - | - |
| Coe Avenue (Rt 337) & Proto Drive | 10 | EB | 33.8 | D | 0.55 | 76 | 110.2 | F | 1.05 | 284 | - |
| | | NBL | 0.6 | A | 0.01 | 1 | 0.4 | A | 0.0 | 1 | - |
| | | Overall | 3.7 | A | - | - | 20.4 | A | - | - | - |
| Thompson Avenue & Dodge Avenue | 11 | EB | 8.9 | A | 0.23 | - | 10.2 | B | 0.31 | - | 500 |
| | | WB | 8.3 | A | 0.14 | - | 9.3 | A | 0.23 | - | 300 |
| | | NB | 8.4 | A | 0.13 | - | 9 | A | 0.16 | - | 535 |
| | | SB | 9.0 | A | 0.21 | - | 9.8 | A | 0.26 | - | 420 |
| | | Overall | 8.7 | A | - | - | 9.7 | A | - | - | - |
| Hemingway Avenue and Short Beach Road (Rt 142) at Coe Avenue (Rt 337) | 12 | EB | 35.1 | D | 0.28 | 31 | 35.3 | D | 0.36 | 51 | 110 |
| | | WB | 9.1 | A | - | - | 6.9 | A | - | - | - |
| | | WBL | 39.1 | D | 0.33 | 63 | 37.9 | D | 0.25 | 49 | 160 |
| | | WBT | 3.9 | A | 0.48 | 33 | 2.5 | A | 0.36 | 24 | 750 |
| | | NB | 14.0 | B | 0.40 | 201 | 23.3 | C | 0.61 | 260 | 750 |
| | | SB | 7.3 | A | - | - | 11.3 | B | - | - | - |
| | | SBL | 10.5 | B | 0.35 | 135 | 17.2 | B | 0.54 | m238 | 180 |
| | | SBT | 6.2 | A | 0.25 | 152 | 8.3 | A | 0.27 | 191 | 950 |
| | | Overall | 10.7 | B | - | - | 15.7 | B | - | - | - |

**AD113**

**Table 7: Half-Site Build 2029 Capacity Analysis Results (Cont.)**

| Int. Name | Int. # | Lane Group | AM | | | | PM | | | | Available Storage (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | Delay (s) | LOS | V/C | 95th %tile Queue (ft) | |
| Hemingway Avenue & Messina Drive | 13 | EB | 35.4 | E | - | - | 69.3 | F | - | - | - |
| | | EBL | 46.8 | E | 0.33 | 32 | 98.3 | F | 0.77 | 111 | 275 |
| | | EBR | 11.0 | B | 0.03 | 2 | 11.9 | B | 0.08 | 7 | 275 |
| | | NB | 1.4 | A | - | - | 1.4 | A | - | - | - |
| | | NBL | 9.9 | A | 0.17 | 16 | 10.7 | B | 0.17 | 15 | 100 |
| | | NBT | 0.0 | - | 0.27 | 0 | 0.0 | - | 0.26 | 0 | - |
| | | Overall | 2.0 | A | - | - | 5.5 | A | - | - | - |
| Coe Avenue & Silver Sands Road | 14 | EB | 23.8 | C | 0.66 | 119 | 35.2 | D | 0.83 | #197 | - |
| | | WB | 8.6 | A | 0.13 | 25 | 11.8 | B | 0.24 | 35 | 700 |
| | | NB | 10.7 | B | 0.40 | 113 | 11.8 | B | 0.42 | 82 | - |
| | | SB | 4.9 | A | - | - | 9.6 | A | - | - | - |
| | | SBT | 9.2 | A | 0.19 | 53 | 14.1 | B | 0.52 | 135 | 610 |
| | | SBR | 2.8 | A | 0.35 | 29 | 2.9 | A | 0.31 | 28 | 610 |
| | | Overall | 11.0 | B | - | - | 16.7 | B | - | - | - |
| Silver Sands Road & South End Road | 15 | EB | 8.0 | A | 0.14 | - | 8.2 | A | 0.1 | - | 380 |
| | | WB | 7.2 | A | 0.09 | - | 7.9 | A | 0.18 | - | 570 |
| | | NB | 0.0 | A | 0.00 | - | 7.8 | A | 0.01 | - | - |
| | | SB | 7.7 | A | 0.08 | - | 8.4 | A | 0.18 | - | 450 |
| | | Overall | 7.7 | A | - | - | 8.2 | A | - | - | - |
| Kimberly Avenue & Forbes Place | 16 | EB | 11.0 | B | 0.12 | - | 11.7 | B | 0.16 | - | 235 |
| | | WB | 17.1 | C | 0.60 | - | 17.6 | C | 0.59 | - | 860 |
| | | NB | 16.5 | C | 0.56 | - | 13.0 | B | 0.37 | - | 500 |
| | | SB | 20.8 | C | 0.68 | - | 145.2 | F | 1.25 | - | - |
| | | Overall | 17.9 | C | - | - | 86.4 | F | - | - | 70 |
| Main Street & Forbes Place | 17 | EB | 13.3 | B | - | - | 15.1 | B | - | - | - |
| | | EBL | 13.3 | B | 0.12 | 47 | 14.8 | B | 0.17 | 49 | 200 |
| | | EBT | 13.3 | B | 0.26 | 131 | 15.2 | B | 0.37 | 177 | 350 |
| | | WB | 12.9 | B | - | - | 15.1 | B | - | - | - |
| | | WBT | 12.9 | B | 0.22 | 103 | 15.6 | B | 0.41 | 200 | 300 |
| | | WBR | 12.8 | B | 0.11 | 49 | 13.4 | B | 0.15 | 66 | 300 |
| | | NB | 33.0 | C | 0.48 | 88 | 30.2 | C | 0.37 | 61 | 730 |
| | | SB | 24.2 | C | - | - | 32.2 | C | - | - | - |
| | | SBT | 33.5 | C | 0.50 | 101 | 41.2 | D | 0.74 | #223 | 1250 |
| | | SBR | 4.0 | A | 0.20 | 13 | 7.2 | A | 0.24 | 35 | 150 |
| | | Overall | 18.2 | B | - | | 20.8 | C | - | - | - |
| Frontage Road (Rt 1) & Forbes Place | 18 | EB | 11.3 | B | - | - | 15.7 | B | - | - | - |
| | | EBT | 13.7 | B | 0.50 | 191 | 19.2 | B | 0.77 | 362 | - |
| | | EBR | 4.9 | A | 0.30 | 81 | 8.1 | A | 0.58 | 205 | 200 |
| | | WB | 5.1 | A | - | - | 5.8 | A | - | - | - |
| | | WBL | 3.7 | A | 0.13 | 16 | 12.4 | B | 0.41 | 64 | 150 |
| | | WBT | 5.2 | A | 0.50 | 140 | 5 | A | 0.49 | 140 | - |
| | | NB | 119.6 | F | 1.15 | #254 | 41.1 | D | 0.72 | 132 | 70 |
| | | Overall | 29.0 | C | - | - | 14.3 | B | - | - | - |

\# 95th percentile volume exceeds capacity, queue may be longer.

m Volume for 95th percentile queue is metered by upstream signal

**AD114**

## 9.0 SAFETY ANALYSIS

Historical crash data was evaluated for each of the study intersections. The latest available data was obtained from the Connecticut Crash Data Repository for the period between January 1, 2019 and December 31, 2022. Data from the year 2020 has been excluded since the onset of the Covid-19 pandemic is not representative of typical traffic operations.

A total of 432 crashes were reported at all 18 intersections throughout the three-year period. A significant number of crashes were categorized as rear-end and angle crashes accounting for 39 percent and 25 percent of total crashes respectively. Forty percent of the total crashes occurred between the hours of 10 a.m. and 4 p.m., followed by another 29 percent of crashes occurring in the evening commute hours between 4 p.m. and 7 p.m. A wide majority of crashes occurred on dry pavement during daylight conditions. The crashes were almost evenly spread across days of the week and seasons of the year. Friday was the most common day of the week for 18 percent of total crashes and the crash totals in the summer did reduce slightly as compared to the other three seasons. The crashes were also evenly distributed between the three whole years. Throughout our three years of safety analysis at the eighteen intersections, there were no fatalities reported. Slightly under a quarter of the crashes result in injury with the remainder of crashes resulting in property damage only. There were eleven total pedestrian and bicycle related collisions during the three years with all but two resulting in injury. A summary of all crashes for all intersections in the entire study area is provided in **Table 8.**

The following three intersections within the study area had higher annual average crashes as compared to the other fifteen analyzed:
- Intersection 8: Hemingway Avenue (Route 142) at Main Street (Route 100) – 54 total crashes (18 crashes/year)
- Intersection 16: Kimberly Avenue at Forbes Place – 50 total crashes (17 crashes/year)
- Intersection 2: High Street (Route 100) at Laurel Street and I-95NB On-Ramp – 45 total crashes (15 crashes/year).

These three intersections combined account for over a third of the total crashes occurring at all study area intersections.

Intersection 8 is a signalized intersection of two arterial routes where a high volume of traffic would be expected. The most common crash type at this intersection is rear-end followed by angle and sideswipe collisions. Although rear-end collisions are typically expected at signalized intersections, it could be beneficial to recalculate the clearance times of the intersection in order to avoid unexpected stopping. Besides the crash types, the other crash data does not indicate a specific pattern of common crashes. It would be expected that a high number of collisions result from driver error, which could be exacerbated with an increase in traffic volume and longer delay times.

Intersection 16 is a four-way intersection with a three-way stop and a free-flowing southbound approach. The approaches of this intersection are local roadways in close proximity to U.S. Route 1. Angle collisions account for almost 80 percent of the collisions at this intersection. The

32

signing orientation of this intersection is atypical and may interfere with driver expectations even though the stop signs on the northbound, eastbound, and westbound approaches includes signage that the southbound traffic does not stop. The high number of angle collisions indicates that this signage may not be effective in directing drivers. Additionally, the number of crashes has increased by over 100 percent between 2021 and 2022, which may illustrate a worsening issue. The northbound approach at the adjacent intersection 18 currently has 95th percentile queues that exceed the available storage length during both the morning and evening peak-hours. With queues extending past intersection 18 into intersection 16, in addition to added traffic volumes, it can aggravate drivers and cause more aggressive driving. Other improvements may be investigated at this intersection to reduce the high number of angle collisions. Installing a traffic signal has been identified by the CMF Clearing House to reduce angle collisions in urban areas by 67 percent. Signalization would require a MUTCD compliant signal warrant analysis.

Intersection 2 is a signalized intersection of a minor arterial, major collector, and an interstate on-ramp, where a high volume of traffic could be expected. Approximately two-thirds of the total crashes at this intersection are classified as rear-end collisions. This may be slightly alleviated by recalculation of clearance intervals to better match drivers' expectations. However, the 2023 existing capacity analysis indicates that this intersection operates poorly at a LOS E during both the morning and evening peak-hours with the northbound and southbound approaches along Route 100 each operating at a LOS E. During site visits, this intersection has commonly been observed as being congested with high delay times. Lengthy delay times and increased traffic congestion may lead to more aggressive driving in an attempt to pass through the intersection. This aggressive driving can cause rear-end collisions due to drivers' error.

The detailed tabular summaries of crashes for all eighteen intersections are provided in **Appendix J**.

**Table 8: Study Area Safety Analysis Results**

| Crash Type | # of Crashes |
|---|---|
| Rear-End | 167 |
| Moving/Fixed Object | 21 |
| Angle | 153 |
| Sideswipe | 63 |
| Head-On | 11 |
| Pedestrian/Bicyclist | 11 |
| Overturn | 1 |
| Other | 5 |

| Day of Week | # of Crashes |
|---|---|
| Sunday | 44 |
| Monday | 73 |
| Tuesday | 67 |
| Wednesday | 51 |
| Thursday | 64 |
| Friday | 79 |
| Saturday | 54 |

| Number of Pedestrian Collisions | | | |
|---|---|---|---|
| Year | 2019 | 2021 | 2022 |
| Total | 1 | 2 | 2 |
| Injury | 1 | 1 | 2 |
| Number of Bicycle Collisions | | | |
| Year | 2019 | 2021 | 2022 |
| Total | 2 | 3 | 1 |
| Injury | 2 | 2 | 1 |

| Time of Day | # of Crashes |
|---|---|
| 00:00-06:00 | 15 |
| 06:00-10:00 | 63 |
| 10:00-16:00 | 174 |
| 16:00-19:00 | 124 |
| 19:00-00:00 | 56 |

| Time of Year | # of Crashes |
|---|---|
| December-February | 110 |
| March-May | 110 |
| June-August | 99 |
| September-November | 113 |

| Pavement Conditions | # of Crashes |
|---|---|
| Dry | 375 |
| Wet | 45 |
| Snow | 12 |

| Crash Severity | # of Crashes |
|---|---|
| Fatal | 0 |
| Injury | 99 |
| Property Damage Only | 333 |

| Light Conditions | # of Crashes |
|---|---|
| Daylight | 328 |
| Dark-Not Lighted | 19 |
| Dark-Lighted | 75 |
| Dusk/Dawn | 10 |

| Year | # of Crashes |
|---|---|
| 2019 | 153 |
| 2021 | 139 |
| 2022 | 140 |

AD117

## 10.0  CONCLUSIONS

This report evaluated the existing and future conditions at eighteen intersections in East Haven to determine how the proposed expansion of Tweed New Haven Airport will impact the local traffic and quality of life for East Haven residents. The 2023 existing traffic conditions were evaluated to establish a baseline of operations. Currently, there are a few approaches and intersections operating poorly during both the morning and evening peak periods. The airport expansion project is projected to be completed in 2029, where additional no-build analysis was performed after projecting future volumes. Due to the increased traffic volume from ambient growth, the poorly operating locations from the 2023 conditions were slightly worsened. During both existing and no-build conditions, the main locations of concern are Intersection 2 (High Street & I-95 NB On-Ramp) and Intersection 3 (High Street & Kimberly Avenue). These two intersections currently operate overall at poor levels of service with high delays, multiple failing lane groups, and 95th percentile queues that exceed the available storage length.

The 2029 build conditions were analyzed with full-site generated traffic volumes from the airport expansion and with half of those generated volumes for the half-site generated traffic scenario to determine the impact if dual site entrances were utilized for the new airport. After the full-site traffic was distributed throughout the study area, the poorly operating conditions from the no-build scenario were worsened and additional locations, which previously operated adequately, degraded into undesirable levels of service or queue lengths. Specifically, Intersection 10 (Coe Avenue & Proto Drive) significantly degrades as this is the main intersection where all site-generated vehicles will travel through. Although the half-site generated traffic does have a slight decreased impact to the study area due to the reduced generated traffic, the results are not significantly different from those of the full-site generated traffic volumes.

The study area already experiences a high volume of traffic during the morning and evening commuting peak-hours such that there are already poorly operating locations during the 2023 existing and 2029 no-build conditions. The site generated traffic volumes for both the half-site and full-site scenarios exacerbate these current problem locations. Improvements for these locations that currently experience poor levels of service, high delays, and overly long 95th percentile queues should be investigated and remediated prior to the addition of any airport traffic.

Additionally, major improvements at Intersection 10 (Coe Avenue & Proto Drive) and along Proto Drive would be required to accommodate any generated airport traffic, in addition to the current industrial traffic. Furthermore, the airport expansion may have an impact on roadway safety and general quality of life throughout East Haven, which is one of the 25 distressed municipalities in Connecticut and prone to flooding and other natural disasters. Proper investigation and recommended improvements shall be conducted into these areas to avert potential negative impacts.

**AD118**

## Appendix B

## Flooding Documentation

**AD119**

**AD120**





005725







**Appendix C**

**Hemingway Coe Avenue Corridor Study**



Ridgway Coe Avenue Corridor Study



rt

# gway Coe Avenue Corridor Study

AD124

# TABLE OF CONTENTS

............................................................................................................... 1

............................................................................................................... 1

............................................................................................................... 1

............................................................................................................... 1

n ............................................................................................................ 1

............................................................................................................... 1

TIONS ...................................................................................................2

s .............................................................................................................. 2

............................................................................................................... 2

............................................................................................................... 3

ditions ...................................................................................................4

F PROTO DRIVE................................................................................. 6

nceptual Alternatives ..................................................................... 6

............................................................................................................... 6

............................................................................................................... 6

............................................................................................................... 7

NUE – COE AVENUE CONCEPT PLAN ............................. 8

............................................................................................................... 8

rofile .................................................................................................... 8

d Profile ............................................................................................. 8

timate ................................................................................................. 9

............................................................................................................... 10

5.1    Meeting with Review Agencies.....................................................................

5.2    Wetland and Stormwater Management ......................................................

5.3    List of Permits and Agencies........................................................................

AD 125

# 1 INTRODUCTION

...roduction on the study process and contents of this report.

...d

... Council of Governments (SCRCOG) is the designated Metropolitan ...O) for the New Haven area. The SCRCOG has undertaken the ...venue Corridor Study at the request of the Town of East Haven. CDM ...nt to assist the SCRCOG and the Town of East Haven on this project.

...as to work with the Town of East Haven to identify solutions on an ...emingway Avenue and Coe Avenue. In addition, the town is seeking ...ial re-alignment options for Proto Drive in order to better accommodate ...industrial park.

...s are:

...way and geometric conditions.

...g issues in order to elevate the intersection of Hemingway Avenue and ...es and 142) to reduce flooding and improve safety, emergency response, ...f East Haven during storm events.

...luation of the roadway grades and identify potential mitigation options ...ue and Coe Avenue corridor that alleviate flood impacts to regional ...grading impacts and maintaining safe access to existing properties ...s.

...and safety analysis on the Hemingway and Coe Avenue corridors.

...lignment options for Proto Drive based on available engineering data and ...resource mapping.

...gnitude cost estimate for roadway work.

...tems or "Next Steps" for the town to advance the design and implement

## 1.3 Study Area

The study limits for this project are Hemingway Avenue and Coe Avenue... and Proto Drive (see **Figure 1.1**). A portion of Proto Drive has been inclu... re-alignment options.

## 1.4 Meetings with Town

The following is a list of meetings conducted with the town during the st...

- Project Kick-off Meeting – May 24, 2012
- Project Meeting with Town Engineer – June 15, 2012
- Final Presentation to the Town –June 29, 2012

## 1.5 Report Contents

This report is broken into the following sections:

- **Existing Conditions** – This chapter documents the existing conditio... and Coe Avenue corridors relative to roadway conditions, traffic cond... environmental resources, and land use.

- **Realignment of Proto Drive** – This chapter studies the potential op... in order that the town can optimize future industrial development (n... expansion of existing uses) along Proto Drive. This analysis will also p... determination of potential wetland impacts based on available wetla...

- **Hemingway Avenue – Coe Avenue Concept Plan** – This chapter re... geometric conditions (plan and profile) as well as drainage and floodi... the existing roads, and provides a preliminary recommendation of a p... alleviate flooding while minimizing property impacts.

- **Next Steps** – This chapter summarizes the results of the preliminary... steps to advance this project to enable further review and discussions... use and environmental protection agencies (DEEP, U.S. Army Corps ... and to prepare engineering and design documents.

ing conditions in the project area.

*ons*

dways within the study area:

142)

Hemingway Avenue (also known as S.R. 142) is a four lane arterial roadway that is oriented in a north-south direction. It provides the principal means of access to the southern portion of the Town of East Haven and connects this shoreline area to the town center and to Interstate 95 to the north. Land uses in the area primarily consist of industrial, commercial and retail properties. The posted speed limit on Hemingway Avenue is 35 miles per hour. The travel lanes are 11 feet wide; in addition, 2 foot wide paved shoulders are generally provided on the outside of each travel lane. The intersection of Hemingway Avenue/Coe Avenue (S.R. 337)/Short Beach Road (S.R. 337) is signalized.

#### Coe Avenue (S.R. 337)

S.R. 337) is the continuation of the and maintains a north-south southerly terminus of Hemingway ith Short Beach Road. Coe Avenue is also ses in the area primarily consist of il, and residential properties. The posted is 35 miles per hour. The travel lanes are oot wide paved shoulders are generally each travel lane.



*Proto Drive looking west*

own owned road which provides access to s from Hemingway and Coe Avenues. It is ved for most of its length but becomes a dirt road at its western ed speed limit signs or pavement markings on Proto Drive. On the Drive, there is a large tidal wetland area that affects the realignment

options of Proto Drive. Traffic at the intersection of Proto Drive and Coe a stop-sign.

#### Short Beach Road (S.R. 142)

Short Beach Road (also known as S.R. 142) is a two lane roadway in the project area. This roadway is oriented in an east-west direction. It connects with Hemingway Avenue and provides principal access to the Farm River shoreline of East Haven and to the southern portion of the Town of Branford. Land uses in the area are primarily commercial and retail properties. The posted speed limit on Short Beach Road is 35 miles per hour. Lane and shoulder widths vary on Short Beach Road.

*Shor*

### 2.2 Traffic Conditions

The following details the traffic conditions at the study area intersections:

#### Existing (2012) Traffic Volumes

Manual traffic counts were conducted at the following intersections on T during the weekday A.M. peak hour (7:00-9:00 A.M.) and P.M. peak hour

- Hemingway Avenue/Coe Avenue/Short Beach Road
- Coe Avenue/Proto Drive

**Figure 2.1** shows the existing (2012) traffic volumes at the study area inte

#### Existing (2012) Level of Service Analysis

Level of Service (LOS) is a qualitative measure of driver satisfaction with influence mobility and reflect the degree of traffic congestion. These fact travel time, traffic interruption, freedom of maneuverability, safety, driv convenience, and delay.

In general, there are six levels of service describing traffic flow conditions condition of "free flow", with low volumes and high speeds. **LOS B** repre with operating speeds beginning to be restricted somewhat by traffic con

ts delay to all motorists due to congestion. **LOS F** is described as "force
y traffic volumes that exceed what the roadway can handle. This causes
ditions on the roadway; therefore, LOS F is considered an unacceptable

stimated for signalized and un-signalized intersections. The traffic
was used to determine the existing peak hour LOS at the study
**Table 2.2** highlight the LOS criteria for signalized and un-signalized
The LOS criterion for signalized and un-signalized intersections is based
measured in seconds. Control delay is defined as the amount of time a
ersection due to a stop-sign or a traffic signal.

Table 2.1
l of Service Criteria for Signalized Intersections

| vel of Service | Control Delay Per Vehicle (seconds) |
|---|---|
| A | ≤10 |
| B | >10 and ≤20 |
| C | >20 and ≤35 |
| D | >35 and ≤55 |
| E | >55 and ≤80 |
| F | > 80 |

oo Highway Capacity Manual, Transportation Research Board

Table 2.2
f Service Criteria for Un-signalized Intersections

| vel of Service | Control Delay Per Vehicle (seconds) |
|---|---|
| A | ≤10 |
| B | >10 and ≤15 |
| C | >15 and ≤25 |
| D | >25 and ≤35 |
| E | >35 and ≤50 |
| F | > 50 |

oo Highway Capacity Manual, Transportation Research Board

e study area intersections under existing conditions during the weekday
eriods using the existing traffic volumes shown in Figure 2.1. The results
d intersections are presented in **Table 2.3**Error! Reference source not

| Intersection | A.M |
|---|---|
| **Hemingway Avenue/Coe Avenue/Short Beach Road** | B |
| Coe Avenue Northbound | B |
| Hemingway Avenue Southbound | A |
| *Left* | A |
| *Through-Right* | A |
| Short Beach Road Westbound | A |
| *Left-Through* | B |
| *Right* | A |
| Plaza Drive Eastbound | B |
| **Coe Avenue/Proto Drive** | |
| Coe Avenue Northbound Left | A |
| Proto Drive Westbound | B |

As indicated above, the LOS at the study area intersections is LOS C or b
movement, approach, or as an overall intersection.

## 2.3 Safety Conditions

Accident data available through the Connecticut Department of Transpo
reviewed for the most recent three year period, i.e. between January 2006
following section summarizes the accident data for the segment of Coe A
and Short Beach Road/Hemingway Avenue and the intersection of Coe A
Avenue/Short Beach Road.

ts of the accident analysis on the Coe Avenue segment.

### Table 2.4
### Accident Analysis – Coe Avenue Segment

| | Category | Number |
|---|---|---|
| | Rear End | 3 |
| | Turning Maneuver | 5 |
| | Backing | 1 |
| | Sideswipe | 2 |
| | Fixed Object | 1 |
| | Angle | 1 |
| | **TOTAL** | **13** |
| | Dry | 11 |
| | Wet | 1 |
| | Snow/Slush | 1 |
| | **TOTAL** | **13** |
| | Injury | 5 |
| | Property Damage Only | 8 |
| | **TOTAL** | **13** |

ble, a total of 13 accidents were reported on the Coe Avenue segment
year period. Of the 13 accidents, the predominant types were collisions
rning maneuvers (approximately 38 percent) and rear-end collisions
Of the 13 accidents, five (approximately 38 percent) resulted in a
der of accidents resulted in property damage only.

**/Hemingway Avenue/Short Beach Road**

ts of the accident analysis at the Coe Avenue/Hemingway Avenue/Short

### Table 2.5
### Accident Analysis – Coe Avenue/Hemingway Avenue/Short Beac

| | Category |
|---|---|
| Accident Type | Rear End |
| | Turning Maneuver |
| | Sideswipe |
| | Fixed Object |
| | **TOTAL** |
| Road Surface | Dry |
| | Wet |
| | Ice |
| | Unknown |
| | **TOTAL** |
| Accident Severity | Injury |
| | Property Damage Only |
| | **TOTAL** |

As indicated in the above table, a total of 24 accidents were reported at t
Avenue/Short Beach Road intersection over the most recent three year p
the predominant type was rear end collisions (approximately 63 percent)
(approximately 17 percent) resulted in a personal injury, the remainder o
property damage only

## 2.4   *Environmental Conditions*

The project area is situated in the Town of East Haven near its western b
Haven in a highly developed area that is primarily comprised of industri
properties and utilities. The East Haven Industrial Park abuts the site to t
northwest is Tweed-New Haven Airport. Undeveloped areas surrounding
wetlands, tidal wetlands, coastal waters, drainage channels and other coa
area is located in the 100 year floodplain of Long Island Sound (elevation

Stormwater from the project area flows either west to Morris Creek or ea
watercourses are tidal estuaries and flow south to Long Island Sound. La
are degraded wetlands. The dominant vegetation in these estuaries is Phr
reed), an invasive weedy species of limited value to wildlife that is associ
wetland environment.

The degraded condition of the wetlands is believed to be caused by const
of tidal waters due to construction of roads, culverts, tidal gates, fill mate

naflora and Spartina patens, both indigenous tidal wetland plant
e saltwater inundation caused the Spartina grasses to die and allowed
 low salinity, to be the dominant species. According to several
e area, the degraded Phragmites-dominated wetland system is extremely
s and values and provides little value to wildlife.

ffort was obtained from available sources such as Department of Energy
on (DEEP).

d by wetlands to the west of Coe Avenue and north of Proto Drive as
eviews conducted by various members of the project team indicate that
ture" should be classified as wetlands.

hown in **Figure 2.3**. As shown in the figure, the majority of the project
 flood zone associated with Long Island Sound.

drained soils in several locations due to wetlands as shown in **Figure**

AD130

# 3    REALIGNMENT OF PROTO DRIVE

lternatives reviewed for the possible realignment of Proto Drive and the
v Town officials.

## Conceptual Alternatives

ives associated with the realignment of Proto Drive were developed for
sed on this review and discussions with Town officials, these concepts
on available GIS mapping. **Figures 3.1** through **3.4** illustrate the concept-
natives. As shown in the figures, all four alternatives required the
n of Proto Drive and Coe Avenue to the north of the vacant, town-
ted at the northwest corner of the existing intersection of Proto Drive

shows a variation in the roadway alignment between the starting point
ng point at the intersection with Coe Avenue. Since these alternatives
t, they create additional development opportunities for the town on the
wever, most of the land west of the current alignment of Proto Drive is
s, accordingly, the reconstruction of the street will result in direct
tercourses associated with Morris Creek.

## ia

iteria were selected in discussions with the town and the SCRCOG for
he conceptual alternative road alignments.

l – how can parcel dimensions be maximized?
ts – how can environmental impacts be minimized?
onjunction with information in the decision matrix detailed below, were
and refining conceptual sketches of the four potential realignments of

king process to identify the most viable alternative, a matrix was created
arious benefits and negative impacts associated with each of the four
er to **Table 3.1**. Three indicators aligned with the above-mentioned
uding:

- **Development Area Gain** – Assessed for acreage that would be "open
  on/adjacent to the site

- **Potential Impact to Wetlands** – Assessed for potential acreage that
  likely need to be mitigated

As shown in **Table 3.1,** the methodology developed to assess and rank the
factors the relative cost of constructing the various realignment options a
that each alignment option has on wetland resources. Table 3.1 tabulates
three indicators listed above (refer to Columns 1, 2 and 3) and depicts the
derive the final score (shown in the rightmost column). The final score is
reflect the expected road costs relative to the development area gained ar
impacts to wetlands relative to the area if development gained. Following
explanation of this methodology.

The cost impact is presented relative to the area of potential new develop
gained. This is determined by dividing the roadway cost (Col. 4) by the d
derive the cost per acre of development gained (Column 5). The resulting
were then converted to a "Cost Factor" (Col. 7) by comparing each alterna
the reference case is the least costly (per development acre gained) of the
(Alternative 4 in this analysis).  Therefore, Alternative 4 is established as
assigned a value of 1.0; the Cost Factors for the remaining three alternativ
dividing the respective cost per acre of development gained (Col. 5) by th
acre of development gained or the relative cost of the Reference Case (hig

The wetland impact is also presented relative to development gain. This i
the area of wetland impact (Col. 3) by the area of development gained (C
wetland impact per acre of development gain (Col. 6). The resulting ratio
then converted to a "Wetland Disruption Factor" (Col. 8) by comparing e
reference case; the reference case is the least wetland impacting (per dev
the four Alternatives (Alternative 1 in this analysis).  Therefore, Alternativ
Reference Case and assigned a value of 1.0; the Wetland Disruption facto
alternatives were determined by dividing the respective ratio of wetland i
gained (Col. 6) by the Reference Case ratio of wetland impact and develo
relative impact of the Reference Case (highlighted cell of Col. 6).

To determine the final "Score" of each alternative (rightmost column of T

is the result of ratios that compare each alternative to a Reference case ranked fourth.
, the lower the value or score represents a better performing
ernative 1 received the best score and is ranked first, Alternative 4 is

**Table 3.1**
Decision Matrix

| Column 2 Development Gain (acres) | Column 3 [1] Wetland Impact (acres) | Column 4 Potential Roadway Cost ($1M per mile) | Column 5 Roadway Cost per Acre of Development Gained | Column 6 Ac. of Wetland Impact per Ac. of Development Gained | Column 7 Cost Factor based on Column 5 | Co Wetland Facto Co |
|---|---|---|---|---|---|---|
| 1.12 | 0.63 | $109,848 | $98,079 | 0.563 | 1.69 | |
| 3.72 | 3.36 | $262,311 | $70,514 | 0.903 | 1.21 | |
| 3.35 | 2.90 | $303,030 | $90,457 | 0.866 | 1.55 | |
| 7.78 | 7.92 | $452,652 | $58,181 | 1.018 | 1.00 | |

stimated from available GIS mapping layers (wetland soils, surface waters) and field observation. Future delineation of wetlands would be required.

eveal that Alternative 1 attained the highest score even though it results
opment gain because it has the lowest potential wetland impact.
ond even though it represents the greatest potential impact to wetlands
isruption Factor) and has the highest absolute cost of road construction
the greatest gain in development area and because it has the lowest
reage of potential development that can be gained (Col. 5). .

own officials, the preferred alternative or option selected for further
study is **Alternative 4**. It should be noted that this option would not
acant, town-owned building at the northwest corner of Proto Drive and
for the town's selection is that the gain of development area creates more
ment of the properties located on the southeast offside of the potential
d will result in greater square footage of future industrial development,
n's tax base and more potential jobs.

here will be a significant impact to wetlands under this alternative and
analysis and permitting requirements with local, state and federal
be conducted. The Town also understands that more detailed studies of
and functional values of environmental resources, analysis of the
mination of road construction and environmental mitigation costs, may

design elements of the existing Hemingway Avenue/Coe Avenue
and profile was developed to alleviate flooding issues based upon
drological data and other engineering documentation and discussions

this report, Hemingway and Coe Avenues are principal arterials serving
own of East Haven as well as portions of the Town of Branford. Regional
ns; therefore, the design of arterial routes in East Haven must address
cluding highway and pedestrian safety, maintenance of vehicular access
ine, supporting adjacent economic activity that is vital to the regional
ccess to adjoining properties and businesses. In addition, and critical to
ts, these arterials provide the principal routes of evacuation in the
r coastal storm. Therefore, an important objective of this study is to
eight that the roadways can be elevated to raise the travel lanes as close
of floodwaters (i.e. the 100-year flood elevations associated with the
ound) without negatively affecting access or causing undue grading
ies.

cted on Hemingway Avenue/Coe Avenue between Short Beach Road
lowing limits - 850 feet on Coe Avenue plus 250 feet on either direction
l of 1,350 linear feet. The survey included 100 feet on side roads and
ents:

urvey baseline and control points
elevations, contours, elevations of crown line, gutter line, top of curb,
nd header elevations of driveway aprons.
tion – based on parcel data obtained from the Town.
graphic survey of edges of road, sidewalks, and other pavements, top
ot elevations, PC and PT points, bridge/culvert crossing locations, light
nd signage.
ructures, inverts, flow lines, and pipe sizes.
utilities based on field observation, field notes, and mapping provided
nies.

## 4.2 *Existing Plan and Profile*

The following are few of the key findings of the existing conditions of He
Avenue:

- **Horizontal Alignment (plan view)** – Coe Avenue has a straight sect
  portion of this roadway segment. The travel lanes are 11-12 feet wide w
  shoulders on either side. Roadway crown lies on the centerline of Coe
- **Vertical Control (profile view)** – The existing profile of Coe Avenue
  point at EL 4.12 and the highest point at EL 6.99. There are three low
  within the project area – around Station 12+00 – EL 5.85, around Stati
  around Station 23+00 – EL 4.12.
- **Property Line information** – Based on the property line information
  Assessor's maps of the Town of East Haven, the right of way on Coe A
  feet.
- **Drainage** - Drainage structures exist along Coe Avenue on both sides
  field observations, the roadway experiences ponding during major rai
  that the current drainage system cannot accommodate the run-off du
- **Utilities** – Overhead utilities (i.e. power lines) exist on the west side
  and gas lines run on the east side of the roadway.

## 4.3 *Conceptual Plan and Profile*

The conceptual plan and profile (included in the appendix) is based on th
assumptions:

- The 100-year flood elevation is at EL 10.7[1]. Due to grade impacts that v
  adjacent commercial and industrial properties along the corridor, it w
  maximum amount that Coe Avenue could be elevated at Station 23+o
  Beach Road/Plaza Drive) is 2.0 ft. This would result in an elevation of
  intersection, well below the 100-year flood elevation but a great impro
  conditions

review, these low points could be raised in elevation based on further
nnecticut Department of Transportation staff.

nceptual in nature and shows suggestions for relocation or new catch
on available data. Detailed drainage analysis was not conducted as part

e Avenue is 45 miles per hour (however, the posted speed limit will be
nt limit of 35 miles per hour).

mptions and criteria, cross-sections for the conceptual plan were
s on Coe Avenue. The design assumptions were discussed with the Town
at the meeting held on June 15, 2012. The concept plan and profile is a
d be adjusted as this project moves into preliminary design.

## *Estimate*

itude cost estimate was developed based on the concept plan. Table 4.1
e cost by design elements.

**AD134**

**Table 4.1**
**Conceptual Cost Estimate**

|  | Cost |
| --- | --- |
|  | $724,500 |
|  | $225,500 |
|  | $150,000 |
| **Traffic + Drainage)** | **$1,100,00** |
|  |  |
| btotal) | $82,500 |
| tion of Traffic (4% of subtotal) | $44,000 |
| **Items)** | **$126,500** |
|  |  |
|  | $306,625 |
|  | $122,650 |
| **g Percentages)** | **$429,275** |
| **COST (A+B+C)** | **$1,655,775** |

surface pollutants to natural systems.  This retention requirement will ne
of stormwater detention basins or holding ponds.

## 5.3   List of Permits and Agencies

A preliminary list of permits and the agency involved is provided in the a
involved are the Town of East Haven, the Connecticut Department of En
Protection (DEEP), the Office of Long Island Sound Programs (OLISP), tl
Engineers, the Connecticut Department of Transportation, and others.

es of next steps for the town to undertake such as discussions with
l mapping, and identification of permits.

## view Agencies

eetings with reviewing agencies before advancing final design of the
and the re-design of Cove Avenue. Regarding the Proto Drive
standing that the Town has initiated discussions with the U.S. Army
wn should also meet with property owners along Proto Drive i.e. Calabro
The re-design of Coe Avenue will also require discussions with the
Transportation staff.

## mwater Management

ronmental impacts that would result from the placement of fill in the
elocation of the northerly portion of Proto Drive, a wetland restoration
atially for an area of two to three times the area of wetlands that are
The restoration plan could include modifying the hydrological systems in
arough a combination of all or some of the following strategies:
channels to allow for improved tidal flows; removing Phragmites
areas to allow for the reintroduction of indigenous species and the
bitats for native wildlife; preventing of the reestablishment of
noval of fill within limited areas of wetlands to result in an increase in
a 5 year program to monitor the tidal wetland restoration efforts to
sults are being achieved and to determine if modifications to the
tain the desired results.

construction of the relocation of Proto Drive will also require hydraulic
analysis to demonstrate that the activity will not increase the 10 year and
tion over existing conditions or diminish the flood storage capacity or
oodplain. This analysis may indicate the need to excavate historic fills
ek/Tuttle Brook watersheds to compensate for loss of flood storage

of new or relocated impervious surfacing associated with the relocation
ger the need to prepare a stormwater management plan since the
urface runoff from the new pavement will be discharged into a tidal
r Quality Manual requires that the first inch of runoff from impervious
tidal waters be retained to reduce potential negative impacts of road

# Technical Appendix

Figure 1.1 – Project Area

Figure 2.1 -  Existing (2012) Traffic Volumes
Figure 2.2 – Wetland Mapping
Figure 2.3 – 100 Year Flood Zone Mapping
Figure 2.4 – Soil Classes Mapping

Figure 3.1 – Realignment of Proto Drive (Alternative 1)
Figure 3.2 – Realignment of Proto Drive (Alternative 2)
Figure 3.3 – Realignment of Proto Drive (Alternative 3)
Figure 3.4 – Realignment of Proto Drive (Alternative 4)

Conceptual Plans (Hemingway Avenue/Coe Avenue) – Sheets 1 through 21

Table 5.1 -  List of Permits and Agencies

AD136

3493
005740





Proto Dr.

Stop Sign

Coe Ave.

(61) 21
(6) 15

18 (16)
365 (560)

Coe Ave.

(35) 4
(22) 2
(28) 5

15 (31)
379 (513)
144 (357)

(12) 32
(542) 431

(6) 2
(524) 492
(34) 12

He

388 (287)
5 (24)
21 (11)

Edgemere Rd.

AD138













EXISTING SURFACE WATERS
(GIS BASED)

EXISTING WETLAND
(GIS BASED)

PROTO DRIVE

3501

005748

OTO DRIVE
3

AD144



## GENERAL NOTES:

1. Conceptual plans based on raising the road elevation at the center of the Coe Avenue/Hemingway Avenue/Short Beach Road intersection by 2 feet (EL 4.12' to EL 6.12').

2. The road elevation can be raised by at least 1 foot at the low points around stations 12+00 and 18+70 as project moves into design.

3. Conceptual plan can be adjusted in the future based on discussions with the Connecticut Department of Transportation (CTDOT) and other key stakeholders.

4. Proposed drainage is conceptual and shows suggestions for relocation or new catch basins/manholes based on available data. Detailed drainage analysis was not conducted as part of the concept plan.

5. Conceptual plan can be adjusted to address the existing or proposed location of Proto Drive.

**AD146**



BEGIN PROJECT
STA. 10+00.00

REPLACE TYPE 'C'
CATCH BASIN

REPLACE TYPE 'C'
CATCH BASIN

COE AVENUE

100' V.C.

AD147



EXISTING DRIVEWAY TO BE ADJUSTED
BASED ON POTENTIAL REALIGNMENT OF
PROTO DRIVE

REPLACE MANHOLE

REPLACE TYPE 'C'
DOUBLE CATCH BASIN

RETAIN

+38.90
75.79' LT

+68.90
76.21' LT

CONNECT TO
EXISTING 36" RCP

+44.04
26.00' LT

+88.90
26.00' LT

+18.90
26.00' LT

16

17

COE AVENUE

18

19

PC STA. 17+37.09

REPLACE TYPE 'C'
CATCH BASIN

REPLACE TYPE 'C'
DOUBLE CATCH BASIN

**AD148**

100' V.C.



DETAIL A

AD149



CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

**AD150**



CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%   2.00%   2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%   2.00%   2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%   2.00%   2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%   2.00%   2.00%

**AD151**



PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

2.00%

2.00%

2.00%

2.00%

AD152



005757



PROTO DRIVE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROTO DRIVE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

PROPERTY LINE

**AD154**





PROTO DRIVE (REALIGNED)

2.00%    2.00%    2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROTO DRIVE (REALIGNED)

2.00%    2.00%    2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%    2.00%    2.00%    2.00%

CENTERLINE OF COE AVENUE

PROPERTY LINE

PROPERTY LINE

2.00%    2.00%    2.00%    2.00%

**AD156**



**AD157**





005763







EASEMENT FOR GRADING OR
RETAINING WALL MAY BE REQUIRED.

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

SEMENT FOR GRADING OR
TAINING WALL MAY BE REQUIRED.

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

EASEMENT FOR GRADING OR
RETAINING WALL MAY BE REQUIRED.

PROPERTY LINE

CENTERLINE OF COE AVENUE

PROPERTY LINE

**AD162**



SHORT BEACH ROAD (CONN RTE 142)

CENTERLINE OF COE AVENUE

CENTERLINE OF COE AVENUE

EASEMENT FOR GRADING OR
RETAINING WALL MAY BE REQUIRED.

PROPERTY LINE

PROPERTY LINE

CENTERLINE OF COE AVENUE

EASEMENT FOR GRADING OR
RETAINING WALL MAY BE REQUIRED.

PROPERTY LINE

PROPERTY LINE

**AD163**



AD164

005769





**AD166**

## Permits Which May be Required for the Proto Drive Realignment

| Town of East Haven | CTDEEP/ OLISP | CT DOT | Federal Agency | Permit Citation | Requirement |
|---|---|---|---|---|---|
| | | | **Agency** | | |
| X | | | | East Haven Zoning Regulations http://www.townofeasthavenct.org/pdf/planzone/East-Haven-Zoning-Regulations-May2012.pdf | Since this project will result in modification of lot sizes, it will likely require a review by the Town's Zo Site Plan of Development process; approval of town-sponsored development activities will occur with |
| X | | | | Subdivision regulations of the Town of East Haven http://www.townofeasthavenct.org/pdf/planzone/subdivision-regulations-may2012.pdf | As the project will result in changes to approved subdivision maps, it is considered a re-subdivision, r |
| X | | | | Application for Demolition Permit http://www.townofeasthavenct.org/building.shtml | If the project will require demolition of existing structures. |
| X | | | | [No permit but review and potential modification to Town Plan of Conservation and Development.] | Review of Town Plan of Conservation and Development and determine whether a modification is nee industrial district and the reconstruction of the street section. |
| X | | | | Flood Damage Prevention and Control Ordinance of the Town of East Haven – provisions and standards in Section 29 of the East Haven Zoning Regulations http://www.townofeasthavenct.org/pdf/planzone/East-Haven-Zoning-Regulations-May2012.pdf | The Zoning Administrator and Town Engineer must endorse the application to the general zoning per Farm River Floodplain Overlay District requirements & any required Development Permit under the p Prevention and Control Ordinance. |
| X | | | | Per Connecticut General Statutes (CGS) Sections 22a-90 through 22a-112. http://www.ct.gov/dep/lib/dep/long_island_sound/coastal_management_manual/manual_section_5_08.pdf | An Application for Review of Coastal Site Plans is required for any plans impacting coastal boundary, delineated on the landward side by the interior contour elevation of the one hundred year frequency determined by the national Flood Insurance Act, or a one thousand foot linear setback measured fro waters, or a one thousand foot linear setback measured from the inland boundary of tidal wetlands, project area lies within the CMA jurisdictional boundaries. Coastal municipalities are required to und including, e.g. architectural floor plans and elevations, hydrology report and stormwater pollution co to the Town. |
| X | | | | Per CGS Sections 22a-36 to 22a-45(a). http://cga.ct.gov/2011/pub/chap440.htm | An application to the Inland Wetlands and Water Courses Commission may be required for this proje wetlands impacted by the road realignment. |
| | X | | | Per CGS Sections 25-68b through 25-68h. http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324172&depNav_GID=1643 | Requires preparation of site plans, sedimentation and erosion control plans, stormwater hydrograph (pretreatment basins, possible retention basins) and application form. The Permit requirements inclu impervious surfaces be collected and treated to remove a minimum of 80% of total suspended solids support of the application include, but are not limited to: floodplain management consistency worksh engineering design reports, plans and specifications describing the project and, where applicable, ho be protected. |
| | X | | | Per CGS Sections 22a-342 to 22a-349(a). http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324176&depNav_GID=1643 | Prior to placing any encroachment or obstruction riverward of a SCEL established by DEP under CGS obtained. The following are examples of regulated activities for which a SCEL permit is needed: const deposition of material; land clearing and grading; and substantial maintenance or repair of non-confo existed when the encroachment lines were adopted). DEP has designated about 270 miles of floodpla maps". These maps are on file in the Town Clerk's Office. |
| | X | | | Per CGS Sections 22a-359 through 22a-363f. http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324180&depNav_GID=1643 and http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324222&depNav_GID=1643#Longl | For projects that impact tidal wetlands, the statutes require preparation of site plans, sedimentation hydrographs, stormwater pollution control plan (pretreatment basins, possible retention basins) and requirements include that stormwater water from impervious surfaces be collected and treated to re |

A11047
3524 00510

00c5712

**3525**

| | Description | Citation / Reference |
|---|---|---|
| X | This program, administered by the Bureau of Water Protection and Land Reuse's Inland Water Resou... cause, allow or result in the withdrawal from, or the alteration, modification or diminution of, the ins... state. In general, any person proposing a diversion which was not registered with the Department an... permit. You must apply for a permit if, among other things, you propose to construct or otherwise m... which provide detention or retention of watercourse flows either by design or default; or relocate, re... culvert, ditch, drain, fill, excavate, dredge, dam, impound, dike, or enlarge waters of the state. | CT Water Diversion Policy Act per CGS Sections 22a-365 to 22a-378(a). http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324178&depNav_GID=1643 |
| X | This general permit applies to all discharges of stormwater and dewatering wastewater from construc... disturbance of *one or more* total acres of land area on a site regardless of project phasing. For constr... area (regardless of phasing) of between one and five acres, the permittee shall agree to adhere to the... regulations of the town in which the construction activity is conducted. No registration of this genera... construction activity as long as it receives town review and written approval of its erosion and sedim... Guidelines. If no review is conducted by the town, the permittee must register and comply with Secti... construction projects with a total disturbed area (regardless of phasing) of greater than five acres, re... order for the discharges to be authorized by this general permit. | Per CGS Section 22a-430(b); DEP-PERD-GP-015 http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324212&depNav_GID=1643 |
| X | Permits for the installation, revision, and removal of traffic control signals are issued to the Local Tra... East Haven it is the Police Commission. | Per CGS Section 14-299. http://www.ct.gov/dot/cwp/view.asp?A=1394&Q=259542 |
| X | Requires applicants to obtain a certification or waiver from the CTDEEP that the activity complies wit... for activities affecting the state's coastal area. | CZM Concurrence under Section 307 of the Federal CZM Act of 1972, as amended. http://www.ct.gov/dep/cwp/view.asp?A=2705&Q=441852 |
| X | The 401 Water Quality Certification program, administered by the, regulates any applicant for a fede... conduct an activity that may result in any discharge into the navigable waters, including all wetlands,... made ponds. Such persons must obtain certification from DEP that the discharge is consistent with th... Connecticut Water Quality Standards. | Section 401 of the Federal Clean Water Act (33 U.S.C. 1314) and per CGS Sections 22a-30-1 through 22a-30-17. http://www.ct.gov/dep/cwp/view.asp?a=2709&q=324168&depNav_GID=1643 |
| X | A certificate of operation is required for all developments of 100,000 square feet of floor area and/o... abut or adjoin a state highway or which substantially affect state highway traffic. A certificate is requ... expansion of an existing development which, in its entirety, equals or exceeds the aforementioned t... highway.  A new certificate is required for any development which is already certified, and is increa... parking spaces, increasing in square footage or is proposing any significant change in use from that ... retail). Developments which do not abut or adjoin a state highway, but equal or exceed the aforementioned... determine if a Certificate will be required. | **AD168** Per CGS Section 14-311. http://www.ct.gov/dot/cwp/view.asp?A=1394&Q=259538 |
| X | A permit (e.g. curb-cut permit) may be required if any change is made in the structure, layout, drain... and its appurtenances. Since Coe Avenue is a state highway, an Encroachment Permit will be require... Transportation. | Per CGS Section 13b-17, Regulations, Delegations of duties and responsibilities of commissioner, Section 13a-143a, Driveway Permits and Section 13a-247, Excavations and Obstructions. http://www.ct.gov/dot/cwp/view.asp?A=1394&Q=259544 |
| X | NEPA and CEPA requirements go into effect when airports, buildings, military complexes, highways, p... state sponsored activities with the potential for impacts are proposed. Environmental assessments (E... Statements (EIS's), which are assessments of the likelihood of impacts from alternative courses of act... state agencies and are the most visible NEPA/CEPA requirements. NEPA/CEPA requires agencies to d... parties and the general public. The central element in the environmental review process is a rigorous... "no action" alternative. | Full NEPA review, including environmental assessments (EA's) or environmental impact statements (EIS's), may be required if federal agencies' funding is used or if federal agencies must make any permitting decisions. Similarly, CEPA review, EA's or EIS's may also be required if state funds are used for any portion of the project, depending on the threshold requirements of each state agency. http://www.epa.gov/region1/nepa/ |
| X | Review of these laws and the related requirements may be required if the habitat of any of the listed... the impacted location. | Endangered Species Act, Migratory Bird Treaty Act, or Wild Bird Conservation Act http://www.fws.gov/permits/legacyfs.pdf |
| X | "Waters of the United States" are navigable waters, tributaries to navigable waters, wetlands adjacen... wetlands that have a demonstrated interstate commerce connection.  Review is conducted with... Water Quality Permit).  Additional review by U.S. Fish and Wildlife, U.S. Environmental Protection Ag... conducted based on potential impacts of the wetlands or wildlife habitat. Since the relocation of Pro... (or dredged) materials within the jurisdictional limits of the USACOE (i.e. waterward of the high tide l... required. The National Oceanic and Atmospheric Administration (NOAA) may also be involved for rev... | The Corps of Engineers regulates work and structures that are located in, under or over navigable waters of the United States under Section 10 of the Rivers and Harbors Act of 1899; the discharge of dredged or fill material into waters of the United States under Section 404 of the Clean Water Act; and the transportation of dredged material for the purpose of disposal in the ocean (regulated by the Corps under Section 103 of the Marine Protection, Research and Sanctuaries Act). http://www.nae.usace.army.mil/Regulatory/ |
| X | May need review of new street lights by the FAA regarding airfield lighting safety in the vicinity of the... | |

...minary assessment; actual permitting requirements may vary and will require documentation of existing coastal and environmental resources, preliminary engineering and additional research.

# NANCY DUTTA, PH.D., PE, PTOE

**TITLE**
Traffic Engineer

**EDUCATION**
Doctor of Philosophy, Civil Engineering, University of Charlotteville, 2019

Master of Science, Civil Engineering, University of Massachusetts, 2011

**YEARS OF EXPERIENCE:**
6

**YEARS WITH VN:**
1

**PROFESSIONAL REGISTRATIONS**
- P.E., VA #040263817
- PTOE, 2022

**PROFESSIONAL AFFILIATIONS**
- Institute of Transportation Engineer
- LeadershipITE Alumni (Class of 2020)

Nancy Dutta has over five years of experience in the transportation engineering. She has worked in both private and public sector and in multitude of projects involving traffic safety, data analysis, intelligent transportation systems, traffic operations and site development. She is a registered professional engineer in Virginia and an active member of Institute of Transportation Engineers (ITE). Nancy is experienced in the use of computer applications including Synchro, Highway Capacity Software (HCS), VISTRO, VISIO and R.

**EXPERIENCE**

**SCRCOG Congestion Management Report.** This is a congestion management report update for SCRCOG that identifies the region's most congested roadways and help the COG take appropriate actions. As part of this project, Nancy coordinated the travel time data collection effort, included the new congestion performance measure adopted by CTDOT in the report and updated the report and summary tables. (09/2022 – Present)

**Toelles Rd Safety Study.** This project includes evaluation of the existing condition and past crash history at Toelles Road and Hartford Turnpike intersection and propose safety improvements that could range from low-cost alternatives to more elaborate geometric and new traffic signal alternatives. Nancy is responsible for obtaining the crash data for this intersection and its approaches, preparing summary tables and crash diagram, and identifying crash patterns. She developed several alternatives and evaluated their effectiveness using crash modification factors, cost, and constructability. (11/2022 - Present)

**Route 15 Interchange 59 Improvements.** The project involves the widening of Route 15 to incorporate acceleration and deceleration lanes for all ramps at interchange 59 and the addition of a new loop ramp to access Route 15 northbound from Route 69 southbound in New Haven and Woodbridge. Nancy performed the safety analysis and identified crash patterns and high crash locations within the study area, developed collision diagrams to graphically depict on-ramp and off-ramp crashes. She also proposed improvements based on the crash patterns and evaluated them using the crash reduction factors related to the improvements. (07/2022 – Present)

**Route 161 corridor study.** This project includes assessment of existing and forecasted conditions of Route 161 in Town of East Lyme and develop a comprehensive plan to guide future transportation improvements along the corridor. Nancy was involved in the safety analysis part of the project and analyzed crash data and identified potential safety issues along 3.7 miles of Route 161 corridor. (04/2022 – 06/2022)

**I-95 Planning and Environmental Linkages (PEL) Study.** This project includes crash analysis for over 50 intersections and key segments along I-95 in Stamford. The task includes summarizing five years of crash data and developing crash diagrams for each location and identifying the prominent crash types and level of injury. Nancy Dutta is responsible for gathering and analyzing crash data, developing crash diagrams, prepare safety analysis report and coordination with VN team members internally to ensure efficient workflow. (2021-Present)

**Bridge Replacement, Bridge No. 01872, Route 1 over Greenwich Creek, Greenwich, CT.** This project included the replacement of existing Bridge No. 01872 which carries U.S. Route 1 over Greenwich Creek in Greenwich, CT. VN Engineers was responsible for the design of Temporary and Permanent Traffic Signalization Plans for the intersection of US Route 1 at Hillside Road. Nancy was involved in calculating clearance intervals and preparing the quantity estimates and special provisions for all the temporary and permanent traffic signalization items. (5/2018-Present).

VN ENGINEERS, INC.

**Gorove Slade Associates, Alexandria, VA.** Transportation Engineer. Performed traffic and transportation impact studies for Arlington County, City of Alexandria and DDOT projects. Prepared parking management plan (PMP) and transportation management plan (TMP) documents. Performed multimodal transportation studies. Conducted transportation demand management and capacity analysis. (10/2019 – 11/2020)

**T3 Design Corporation, Fairfax, VA.** Transportation Engineer II. Performed intersection improvement studies for VDOT/SHA. Conducted safety assessment and detour analysis for VDOT. Performed numerous Signal timing optimization and warrant analysis. Prepared tech memo and detailed report to present the project findings. (6/2019 – 10/2019)

**Virginia Transportation Research Council (VTRC)/ University of Virginia, Charlotteville, VA.** Graduate Research Assistant. Performed data analysis and evaluation of the Diagonal Down Yellow Arrow Lane Use Control Signal. This project was a MUTCD experimentation to determine the usefulness of a new type of lane control signal. Evaluated the effect of the I-66 Active Traffic Management System on safety and operations. Conducted research on how to improve the current safety analysis methodology included in Highway Safety Manual to better address traffic conditions and dynamic countermeasures. (8/2015 – 5/2019)

**Binghamton Metropolitan Transportation Study, Binghamton, NY.** Traffic Engineer. Conducted traffic operations studies and developed alternative solutions for Village of Endicott under the jurisdiction of Broome County. Performed traffic signal warrant studies for all state-owned traffic signal in Binghamton. Performed safety audits on streets under local jurisdiction and developed sustainable countermeasures for city of Binghamton and village of Endicott. (8/2012 – 03/2014)

VN ENGINEERS, INC.

# ROBERT S. GOMEZ, P.E.

## PROJECT TITLE
Project Manager / Traffic

## EDUCATION
Bachelor of Science Civil Engineering, Florida International University; Miami, Florida 1994

## YEARS OF EXPERIENCE:
37

## YEARS WITH VN:
14

## PROFESSIONAL REGISTRATIONS
- Professional Engineer
  1999 FL #53847
  2004 GA #29873
  2004 CT #23842
  2007 NY #85134-11999
  2009 MA #48289
  2010 RI #9378
  2015 PA #082911
  2020 VA #062120

## PROFESSIONAL AFFILIATIONS
- Past President of American Society of Highway Engineers
- Past President of Connecticut Society of Civil Engineers

Mr. Gomez has 37 years of experience in transportation engineering. He is proficient in design standards, procedures, practices, and guidelines. He brings years of experience in a wide variety of roadway and CADD software including MicroStation, OpenRoads and InRoads. As a project manager, he takes a hands-on approach to project management and is involved in all phases of rail and roadway design.

## EXPERIENCE

**Task Order Regional Transportation Safety Studies, Various Locations.** Project Manager for a study that will assist the CTDOT in developing a Regional Transportation Safety Plans for various Municipal Planning Organizations. The Regional Safety Study serves as a road map and strategy to save lives. The study is data-driven, multimodal and multidisciplinary, and it will identify collaborative partners. The project includes the collection of crash and traffic volume and analyzing using arcGIS tools to prepare crash maps and identify high crash intersections and corridors. The data is then used to make countermeasure recommendations based on FHWA list of proven countermeasures. The studies involve the following tasks: Task 1: Data Collection, Task 2: Document Review, Task 3: Stakeholder Meetings, Task 4: Data Analysis, Task 5: Countermeasure Selection, Task 6: Prioritize/Initiate Projects, and Task 7: Report Preparation.

**U.S. Route 1 Operational Lanes, Orange, CT.** Project Manager for the development of the new storm drainage design to accommodate and provide stormwater quality for the additional impervious surface associated with the roadway widening. Oversaw the development of Synchro models and traffic analysis for the development of the new signal designs and optimization of the signal timings at the intersections of Boston Post Road (Route 1) with Peck Lane, Orange Center Road, and Lambert Road. Oversaw the preparation of a traffic study and Traffic Signal and Signing and Pavement Marking Plans.

**Rehabilitation of the Approach Spans for Arrigoni Bridge No. 00524, Middletown and Portland, CT.** Project Manager. Provided QA/QC for the production of Signing and Pavement Marking, Maintenance and Protection of Traffic, Illumination, Incident Management System, and Highway plans for the approach spans to the Arrigoni Bridge.

**Waterbury Downtown Traffic Signal Upgrade, Waterbury, CT.** Project Manager. Oversaw the performance of traffic signal analysis, modeling, and design of 10 signalized intersections in Downtown Waterbury as part of the Congestion Mitigation and Air Quality (CMAQ) program. Project included revised traffic signal timing and phasing and implementation of wireless interconnect coordination and leading pedestrian intervals to optimize traffic operations and reduce congestion. Participated in public outreach for the project to solicit input from the public on known issues and identify concerns within the project area.

**Bicycle-Pedestrian Safety Corridors Study Greenwich, Stamford, Norwalk and Westport, CT.** Project Manager. VN Engineers identified bike and pedestrian safety deficiencies on corridors identified by SWRPA, and designed street improvements that calm traffic, improve pedestrian and bike connectivity, and comfort, while enhancing the urban environment. Project included design of innovative bike infrastructure such as bike boxes, sharrows, and buffered bike lanes, and enhancing the pedestrian realm with widened and texturized sidewalks and crosswalks, pedestrian refuge islands, and curb extensions.

**Traffic Control Signal Replacement Project on State Roads in District 4.** Project Manager for the preparation of signal plans and signal analysis for signal replacements for the intersection of Route 4 at Huckleberry Hill Road in Farmington, CT and at Route 6 at Route 17 at Town Hall Library Drive in Woodbury, CT. The project included installation of new signal support structures, 360-degree video detection and accessible pedestrian signals with concurrent signal phasing.

**Bridge No. 00388- Route 17 Northbound over Route 17 Southbound Ramp 007, Glastonbury, CT.** Project Manager. Provided QA/QC for the performed traffic analysis to address changes to the interchange geometry and the design of new signal plans at the intersections of New London Turnpike with Oak Street/Williams Street East and the Route 17 southbound on/off-ramps.

VN ENGINEERS, INC.

**Transportation Plan for Lake Avenue and West Street, Danbury, CT.** Project Manager. This study addressed and documented the numerous roadway safety concerns throughout the area. Some road safety concerns documented included traffic flow and safety operations, an existing narrow and low clearance railroad structure, and periodic flooding. Options were evaluated and roadway capacity upgrades were recommended. This project also included the creation of a mapped driveway management and pedestrian access plan. Coordination with HART was important to consider transit service and operation in the corridor and typical details and guidelines for enhancement and beautification along the corridor were developed. A list of improvements and project cost estimates were developed and presented to the public.

**Charter Oak Bridge, Hartford/East Hartford, CT, SPN. 63-703.** Project Manager. The proposed improvements included widening I-91 northbound to extend the four-lane travel section from Interchange 27 to Interchange 29 to relieve congestion, address significant safety concerns, and provide an efficient I-91 to I-84 connection. It was also proposed to remove the existing ramp at I-91 northbound Interchange 29 and provide a major diverge south of the I-91 bridge over route 15 to address the existing adverse vertical grade and limited capacity of the existing ramp. Responsibilities on this project included providing QA/QC for the traffic analysis utilizing Highway Capacity software, the design of maintenance & protection of traffic staging and detour plans and the design of signing and markings.

**Preliminary, Semi-Final, and Final Design for Bridge Nos. 03160A-D. 03301, and 03303 – I-84 EB and WB over Amtrak and Local Roads (Aetna Viaduct), Hartford, CT.** Project Manager. Provided QA/QC for the design of maintenance and protection of traffic plans, detour plans, signing and pavement marking plans, traffic standard and guide sheets, special provisions, quantities, and cost estimates.

**CT*fastrak*.** Project Manager for a 2.5-mile section of a new BRT contained within the Amtrak rail corridor in Hartford, CT. The project entails design of a new two-lane BRT facility including drainage design, permit coordination, public involvement, signalization, lighting design, four new bridges, and multiple retaining walls. Project included the development of the signing and marking plans for the project.

**I-95 US-1 Exit 14 &15 Improvement Project, Norwalk, CT.** Project Manager for the preliminary and final traffic engineering design and public outreach services for the reconstruction of I-95 Interchange 14, Norwalk, CT. Responsible for overseeing capacity analyses utilizing Synchro and HCS software programs. Design of four traffic signals including required revisions to an existing traffic signal interconnect. Design of highway illumination for the I-95 mainline and associated ramps. Preparation of pavement marking and ground mounted regulatory, warning, and guidance signing design for all state and town roadways within the project limits, estimated quantities, and preparation of special provisions. Oversaw the development of the project website and ongoing site maintenance.

**Design of the I-84 Interchange 5, 6, and 11 Improvements, Danbury and Newtown, CT.** Project Manager for operational analysis and capacity analysis for six signalized intersections and three unsignalized intersections using Synchro and Highway Capacity software. Accident data was collected and summarized in collision diagrams. A warrant analysis was prepared for four intersections. A PE report was prepared outlining improvements addressing safety and operations to I-84 and the route 34 and route 25 intersection including acceleration lanes, deceleration lanes, taper lengths, and the need for turning lanes. Design of three traffic signals and traffic signal improvements for four signalized intersections including quantities and special provisions.

**Reconstruction on I-95/I-91/Rte-34 Interchange State Project Nos. 92-619 & 92-531/622, New Haven, CT.** Project Manager. Responsible for oversight and QA/QC of the operational and capacity analysis of nine signalized intersections for this project using highway geometric design criteria including capacity, intersection sight distance, design vehicle, lane arrangements, lane widths, and volumes etc. Design drawings for all intersections were prepared by developing a fiber-optic interconnected traffic signal system controlled by the City of New Haven's system. Developed plans, special provisions, and details for the installation of the signals and interconnect. Developed signing for the maintenance of traffic plans, ground mounted and overhead guide signing to facilitate twelve construction stages; developed approximately thirty overhead temporary and permanent signing for the freeway corridor, ramps, and local streets that supported cross-sections, and quantities, special provisions, and proposal estimate; and prepared ground mounted regulatory, warning, and guidance signing and overhead guide side designs for approximately fifteen locations. Designed permanent highway illumination, preparing ten 1:500 scale design plans and prepared temporary illumination design for each of the twelve construction stages.

**Route 305 Corridor Study, Bloomfield and Windsor, CT**. Project Manager. The Route 305 study corridor is approximately 2.5-miles and extends from Interstate 91 – Interchange 37, in the Town of Windsor, westerly to Route 187 in the Town of Bloomfield. The study evaluated options of extending Route 305 in Bloomfield westerly to Route 189 (a distance of approximately 2 miles). Tasks included the preliminary traffic engineering analysis of twelve intersections, the preparation of traffic simulations for presentation at public hearings, and accident analysis of intersections within the study corridor.

VN ENGINEERS, INC.

# SYDNEY BROOKS LALUNA, P.E.

**PROJECT TITLE**
Traffic Engineer

**EDUCATION**
Bachelor of Science, Civil Engineering, Worcester Polytechnic Institute, Worcester, MA, 2018

**YEARS OF EXPERIENCE:**
5

**YEARS WITH VN:**
5

**PROFESSIONAL REGISTRATIONS:**
- Professional Engineer 2022 CT #0036324

**PROFESSIONAL AFFILIATIONS**
- Chi Epsilon Honor Society President (2017-2018)
- Rho Lambda Leadership Society
- American Society of Civil Engineers
- Phi Sigma Sigma Sorority

Mrs. Brooks LaLuna is a highly skilled and experienced professional engineer. Her technical proficiency includes a variety of software such as Microsoft Office, Bentley Connect Systems, AutoCAD, Synchro, Highway Capacity Software, HydroCAD, Civil 3D, Revit, Matlab, RISA 2D, Primavera, iMovie, Photoshop, Echo360, Logger Pro, Maple, and social media. Additionally, she has hands-on experience with various equipment including miter saws, planners, coping saws, mechanical fretsaws, G- and C-clamps, car jacks, and hydraulic car lifts. She is professional, meticulous, and a respected team member, maintaining excellent client relations throughout her career.

## EXPERIENCE

**Traffic Assessment for Proposed Fast-Food Restaurant with Drive-Thu**. Evaluated the traffic impact of a proposed fast-food restaurant development in Waterbury, CT. Performed traffic capacity analysis and crash analysis for the Route 69 corridor including five signalized intersections. Determined site-generated traffic and distribution patterns per the Institute of Transportation Engineers (ITE) Trip Generation Manual. Summarized results within a traffic report.

**Rehabilitation of Bridge No. 00162, Interstate 95 over Metro-North Railroad, West Haven, CT**. Assisted in the preparation of a traffic study along State Route 122 (First Avenue) to assess current traffic operations and identify possible signal-focused improvements at the study area intersections to improve progression along First Avenue.

**Old Dominion Freight Lines, North Haven, CT.** A Comprehensive Traffic Impact Assessment report for a proposed Old Dominion Truck Terminal Facility. The study included a thorough analysis of five intersections in proximity to the proposed facility site. Existing and future traffic conditions, as well as crash history, were examined to the standards relative to the local approval and OSTA review processes. Responsibilities included: Primary author of the report, performed the crash analysis, traffic counts, calculated future traffic volumes and determined site generated trips, developed the Synchro traffic model, performed the capacity analysis, and compiled OSTA submission documents.

**Hartford Line, CT Rail – Windsor Locks and North Haven Stations.** Developed two new signal plans in Windsor Locks involving the New Haven-Hartford-Springfield railroad grade crossing. Additionally, prepared illumination plans for the North Haven station lots.

**New Haven Rt. 34 Downtown Crossing.** Developed two preliminary signal plans to be used in the Base Technical Concept for the design-build contract.

**Waterbury Downtown Traffic Signal Upgrade.** Developed 10 new coordinated signal plans in downtown Waterbury. Calculated quantities and cost estimate. Assisted in traffic modeling and coordination improvements and calculated clearance intervals. Attended progress meetings at the Department of Transportation. Reviewed the Traffic Technical Memorandum.

**New Britain Signal Design.** Developed signal plan and mast arm detail sheet for an intersection in New Britain, CT. Attended utility coordination meeting and a site visit.

**Rehabilitation of the Approach Spans for the Arrigoni Bridge No. 00524**. Designed maintenance & protection of traffic plans and signing & pavement marking plans for the traffic set. Calculate the quantities and cost estimate for the traffic set and the incident management system set. Contributed to the research and writing for the protective fence study. Performed sight distance analysis for crosswalks and summarized results within a safety memo. Attended DOT meetings.

**U.S. Route 1 (Orange, CT) Operational Lanes**. Developed traffic signal plans for two intersections along U.S. Route 1. Analyzed the traffic operations at two intersections and summarized results in a traffic report.

VN ENGINEERS, INC.

**I-95 New Haven Harbor Crossing Corridor Improvement Program**. Evaluated the pre- and post-construction operational conditions of a 7-mile corridor along Interstate 95. Analyzed the post-construction conditions using Highway Capacity Software (HCS). The post-construction conditions were compared to pre-construction conditions from the previous traffic reports. Performed and compared the pre- and post-construction crash analyses to quantify the safety improvements. Compiled the results and comparisons into a traffic study report.

**Route 7 - Route 15 Interchange, Norwalk/Wilton, CT.** Performed accident analysis and prepared diagrams summarizing the crash experience along different segments within the study limits as part of preparation for the Environmental Assessment (EA) Documentation. Updated synchro models for existing, build year, and design year conditions. Optimized phasing and timing at one redesigned and five new signalized intersections. Oversaw the preparation of signal plans.

**Centerline Rumble Strips – Local Road Screening and Outreach, Statewide, CT.** Performed and reviewed safety analysis for 430 project corridor segments and identified target crashes that could be reduced from Centerline Rumble Strips (CLRS) implementation.

**Reconstruction of I-95, Exits 7-9, Stamford, CT.** Performed safety analysis for 50 intersections in the downtown Stamford area and 8 segments along I-95. Reviewed safety analysis report, diagrams, and maps. Deliverables to be utilized in the Planning and Environmental Linkages (PEL) study.

**District 4 Traffic Control Signal Replacement on State Roads**. Developed traffic signal plans for two intersections in District 4. Analyzed the traffic operations at two intersections and summarized results in an Intersection Design Statement. Performed utility coordination for traffic signal installation.

**JCI Phase II MET Interlocking 30% Design**. Designed maintenance & protection of traffic plans. Researched current traffic conditions and develop reference documents for MPT locations. Created initial civil sheets and sheet sets. Aided in the progression of the rail drainage design.

**Rehabilitation of Williamsburg Bridge**. Developed scope for collecting the necessary traffic count data. Perform accident analysis of the study area. Performed traffic capacity analysis through Synchro and HCS. Contributed to traffic study report. Coordinated with prime company and the traffic count sub. Evaluated traffic capacity for work zone conditions. Reviewed shop drawings for Design Services During Construction (DSDC).

**LKB 111th Avenue (Queens, NY) Traffic Study**. Performed accident analysis of the study area. Coordinated with the prime company and the traffic count sub. Uploaded the data to the Traffic Information Management System (TIMS) database.

**Van Wyck Expressway Design Build**. Developed temporary and permanent traffic signal plans and a Basis of Design Report for the 5-stage construction of Atlantic Ave./94th Ave. Bridge (BIN 1055699) over the Van Wyck Expressway to allow for widening.

**Astoria Blvd Eastbound Bridge over 278I (BQE West Leg) BIN 2-23081-0 NYCDOT.** Coordinated data collection. Developed Synchro traffic models for various conditions. Produced traffic capacity and accident analysis reports. Processed speed data. Provided non-technical support for the compilation of the Design Approval Document.

**Washington Avenue Safety Improvements – Brooklyn NY Traffic Study.** Developed traffic study model for various conditions. Contributed to traffic study report. Performed field observations. Reviewed crash analysis. Coordinated with traffic count subconsultant.

**John F. Kennedy International Airport Federal Circle Improvements, Queens, NY**. Progressed signal plans from 25% preliminary stage with the addition of timing plan, standard details, and removal plans. Developed Synchro model to determine the coordination and optimization of five signalized intersections. Coordinated with the Port Authority of New York and New Jersey (PANYNJ) on the electrical supply to the traffic signal cabinets.

**John F. Kennedy International Airport Westbound Connector, Queens, NY**. Designed a signal plan layout with the development of wiring plan, dimensioning plan, and removal plans.

VN ENGINEERS, INC.