ORAL ARGUMENT NOT YET SCHEDULED

Nos. 24-1028 (lead), 24-1029 (consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SAVE THE SOUND, INC., et al.,
*Petitioners*,

v.

FEDERAL AVIATION ADMINISTRATION, et al.,
*Respondents*,

and

TWEED-NEW HAVEN AIRPORT AUTHORITY, et al.,
Intervenor-Respondents.

On Petition for Review of an Order of the Federal Aviation Administration

**[PAGE-PROOF] BRIEF FOR FEDERAL RESPONDENTS**

Of Counsel:

EVAN BAYLOR
*Attorney*
FEDERAL AVIATION ADMIN.
Office of the Chief Counsel

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT J. LUNDMAN
REBECCA JAFFE
KEVIN W. McARDLE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Tele: (202) 305-0219
kevin.mcardle@usdoj.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.     Parties and Amici**

All parties, intervenors, and amici are listed in the Brief for Petitioners, except that Chris Rocheleau, Acting Administrator of the Federal Aviation Administration, is automatically substituted as Federal Respondent for his predecessor in office, Michael Whitaker.

**B.     Rulings Under Review**

References to the Order of the Federal Aviation Administration under view appear in the Brief for Petitioners.

**C.     Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

<u>/s/ *Kevin W. McArdle*</u>
KEVIN W. McARDLE

Counsel for Federal Respondents

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ............................................................................................i

TABLE OF AUTHORITIES ...........................................................v

GLOSSARY...................................................................................ix

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION..................................................3

STATEMENT OF THE ISSUES.......................................................3

PERTINENT STATUTES AND REGULATIONS .............................4

STATEMENT OF THE CASE...........................................................4

    A.    Statutory and regulatory background ........................................4

        1.    The National Environmental Policy Act....................................4

        2.    The Airport Improvement Act ...................................................6

        3.    Airport layout plan approval procedures ..................................6

    B.    Factual background ....................................................................8

        1.    Tweed New Haven Airport.........................................................8

        2.    The Project ...............................................................................10

        3.    Potential future taxiway reconfiguration ................................13

        4.    Project NEPA review and FAA order.......................................16

        5.    Procedural history ...................................................................19

SUMMARY OF ARGUMENT ........................................................20

STANDARD OF REVIEW ................................................................23

ARGUMENT ................................................................................24

I.   FAA did not segment NEPA review of the Project and the
     potential future taxiway reconfiguration. ....................................24

     A.   The taxiway reconfiguration was not the subject of any
          pending federal proposal that could have been
          segmented. ................................................................24

     B.   The taxiway reconfiguration is independently useful and
          will not overlap temporally with the Project. ....................27

     C.   The runway extension does not automatically require a
          full-length parallel taxiway. ...........................................30

II.  FAA's cumulative-impact analysis complied with NEPA. .............32

     A.   The taxiway reconfiguration was beyond the scope of a
          proper cumulative-impact analysis ..................................33

     B.   FAA properly accounted for Avelo's operations in
          assessing the existing baseline conditions at Tweed. ..........37

III. FAA reasonably concluded that the Project will reduce the
     number of flights needed to meet forecasted demand. ...................42

     A.   FAA explained its methodology. ....................................42

     B.   The runway extension will not induce additional growth. ....46

IV.  FAA took a hard look at potential impacts on wetlands, flood
     risk, and stormwater runoff. ...................................................50

     A.   FAA took a hard look at wetland impacts. ........................50

     B.   FAA took a hard look at floodplain impacts. ....................58

     C.   FAA took a hard look at potential pollution form runoff. ....59

V.      Vacatur is not warranted...................................................................62

CONCLUSION ..........................................................................................63

CERTIFICATE OF COMPLIANCE.........................................................65

ADDENDUM .............................................................................................66

# TABLE OF AUTHORITIES

**Cases**

*Airport Neighbors Alliance, Inc. v. United States*,
90 F.3d 426 (10th Cir. 1996) ................................................................29

*Allied-Signal v. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ..............................................................63

*American Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) ................................................... 55, 56, 57

*Barnes v. U.S. Department of Transportation*,
655 F.3d 1124 (9th Cir. 2011) ................................................. 45, 48, 49

*Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021) ...............................................................63

*Building & Construction Trades Department, AFL-CIO v. Brock*,
838 F.2d 1258 (D.C. Cir. 1988) ............................................................44

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................... 58, 61

*City of Boston Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018) ................................................... 4, 26, 33

*City of North Miami v. FAA*,
47 F.4th 1257 (11th Cir. 2022) .............................................................40

*City of Olmstead Falls v. FAA*,
292 F.3d 261 (D.C. Cir. 2002) ..................................... 49, 50, 59, 60

*City of Oxford v. FAA*,
428 F.3d 1346 (11th Cir. 2005) ............................................................36

*City of Port Isabel v. FERC*,
111 F.4th 1198 (D.C. Cir. 2024) ..................................... 27, 29, 32

*Coalition on Sensible Transportation, Inc. v. Dole,*
  826 F.2d 60 (D.C. Cir. 1987) ...................................................................... 28, 29

*Communities Against Runway Expansion, Inc. v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ...................................................... 3, 6, 23

*Conservation Law Foundation v. FERC,*
  216 F.3d 41 (D.C. Cir. 2000) ...................................................................... 40

*Custer County Action Ass'n v. Garvey,*
  256 F.3d 1024 (10th Cir. 2001) ...................................................... 40, 41, 42

*Delaware Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014) .................................................... 24, 25

*El Puente v. U.S. Army Corps of Engineers,*
  100 F.4th 236 (D.C. Cir. 2024) .................................................................. 39

*Izaak Walton League v. Marsh,*
  655 F.2d 346 (D.C. Cir. 1981) .................................................................. 45

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) .................................................................................. 25

*Lowman v. FAA,*
  83 F.4th 1345 (11th Cir. 2023) .................................................... 27, 41

*Marin Audubon Society v. FAA,*
  121 F.4th 902 (D.C. Cir. 2024) ............................................ 5, 37, 38, 39, 40

*Midwest Ozone Grp. v. EPA,*
  61 F.4th 187 (D.C. Cir. 2023) .................................................................. 23

*Minisink Residents for Envtl. Pres. and Safety v. FERC,*
  762 F.3d 97 (D.C. Cir. 2014) ...................................................... 26, 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .................................................................................. 23

*Myersville Citizens for a Rural Community, Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2018) ................................................................4

*National Parks & Conservation Ass'n v. U.S. Dep't of Transp.*,
222 F.3d 677 (9th Cir. 2000) ................................................................49

*National Wildlife Federation v. FERC*,
912 F.2d 1471 (D.C. Cir. 1990) ................................................... 25, 26

*Nevada v. Department of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ....................................................... 46, 47

*Northern Plains Resources Council v. Surface Transportation Board*,
668 F.3d 1067 (9th Cir. 2011) ..................................................... 34, 35

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .............................................................. 58, 59, 62

*Sierra Club v. FERC*,
38 F.4th 220, (D.C. Cir. 2022) .............................................. 57, 61, 62

*Sierra Club v. U.S. Army Corps of Engineers*,
803 F.3d 31 (D.C. Cir. 2015) ..............................................................25

*St. John's United Church of Christ v. FAA*,
550 F.3d 1168 (D.C. Cir. 2008) ..........................................................48

*Theodore Roosevelt Conservation Partnership v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ............................................................36

*Town of Stratford v. FAA*,
285 F.3d 84 (D.C. Cir. 2002) ................................................................8

*Trenton Threatened Skies, Inc v. FAA*,
90 F.4th 122 (3d Cir. 2024) ........................................................ 41, 44

*Village of Bensenville v. FAA*,
457 F.3d 52 (D.C. Cir. 2006) ....................................................... 24, 59

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ....................................................................46

*Wyoming Outdoor Council v. U.S. Army Corps of Engineers*,
    351 F. Supp. 2d 1232 (D. Wyo. 2005) ..........................................................57

**Statutes**

5 U.S.C. § 706 ....................................................................... 23, 45, 62

42 U.S.C. § 4332 ..................................................................... 4, 24

42 U.S.C. § 4336 ..........................................................................5

49 U.S.C. § 46110 ................................................................... 3, 41

49 U.S.C. § 47107 ........................................................................6

**Regulations**

14 C.F.R. § 119.49 ......................................................................41

33 C.F.R. § 332.2 .......................................................................54

40 C.F.R. § 1508.1 ......................................................................24

40 C.F.R. § 1501.5 ........................................................................5

40 C.F.R. § 1502.23 .....................................................................45

40 C.F.R. § 1502.9 ......................................................................62

40 C.F.R. § 1508.1 ................................................................ 38, 50

# GLOSSARY

APA        Administrative Procedure Act

CEQ       Council on Environmental Quality

EIS        Environmental Impact Statement

EPA       Environmental Protection Agency

FAA       Federal Aviation Administration

NEPA     National Environmental Policy Act

# INTRODUCTION

Tweed New Haven Airport in southern Connecticut has two deficiencies that hinder efficient operations. The airport's only active runway is too short, resulting in weight limits that reduce the number of passengers each flight can carry. Tweed's sole passenger terminal (a converted aircraft hangar built in 1930) is also outdated and cramped, creating poor conditions for passengers.

To address those deficiencies, the Tweed-New Haven Airport Authority has proposed to extend the runway and to build a new terminal (the Project). As a prerequisite for seeking federal funding, the Authority requested that the Federal Aviation Administration (FAA) unconditionally approve the corresponding elements of Tweed's airport layout plan. Because such approval requires review under the National Environmental Policy Act (NEPA), the Authority submitted a draft environmental assessment in support of its request. FAA solicited and considered public comments on the draft, finalized the analysis, and concluded that the Project would have no significant environmental impacts. FAA then unconditionally approved the related components of Tweed's airport layout plan.

Petitioners oppose the Project and challenge FAA's finding of no significant impact. They contend that FAA improperly separated or "segmented" NEPA review of the Project and potential taxiway improvements that are also shown on Tweed's airport layout plan. Petitioners further argue that FAA failed to analyze

1

the cumulative impact of the Project and the taxiway improvements, and failed to account for the operations of Avelo Airlines, Tweed's sole commercial air carrier, in its cumulative-impact analysis. Petitioners also take issue with FAA's conclusion that the Project will reduce the number of flights required to meet forecasted demand. And they disagree with FAA's finding that the Project will have no significant impact on wetlands, floodplains, and stormwater runoff.

As demonstrated below, Petitioners' arguments all lack merit. FAA did not segment NEPA review of the Project and the taxiway improvements because the taxiway improvements were not the subject of a federal proposal requiring NEPA review; the Project and the taxiway improvements have independent utility and will not overlap temporally; and the Project does not require the taxiway improvements to comply with FAA standards or for operational safety. The taxiway improvements also were beyond the scope of a proper cumulative-impact analysis for the Project, and FAA properly accounted for Avelo's operations in assessing the existing baseline conditions at Tweed. FAA also reasonably concluded that the Project would reduce the number of flights needed to meet forecasted passenger demand. Finally, FAA took the hard look NEPA requires and reasonably determined that the Project will have no significant impact on wetlands, floodplain functions, and pollution from stormwater runoff.

The petitions for review should be denied.

**STATEMENT OF JURISDICTION**

In addition to FAA's finding of no significant impact, the challenged FAA order contains funding-eligibility determinations made under Parts A and B of Subtitle VII of the Airport and Airway Improvement Act (Airport Improvement Act), 49 U.S.C. §§ 47101 et seq.  *See* [8936].  The Court thus has jurisdiction over the petition for review pursuant to 49 U.S.C. § 46110(a).  *See Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 683-84 (D.C. Cir. 2004).

**STATEMENT OF THE ISSUES**

1. Whether FAA improperly segmented NEPA review of the Project and the taxiway reconfiguration that is also shown on Tweed's airport layout plan.

2. Whether FAA, in its cumulative-impact analysis:  (A) reasonably concluded that the taxiway reconfiguration was beyond the scope of the analysis because the effects of the Project and the taxiway reconfiguration will not overlap in time, and because the environmental impacts of the taxiway reconfiguration are not reasonably foreseeable; and (B) properly accounted for Avelo's ongoing operations in assessing the existing baseline conditions at Tweed.

3. Whether FAA reasonably concluded that the Project will reduce the number of flights required to meet forecasted passenger demand.

4. Whether FAA reasonably concluded that the Project will have no significant impact on wetlands, floodplain functions, and runoff-related pollution.

5.     Whether, if the Court finds that FAA did not adequately explain any of its conclusions, the Court should remand the challenged FAA order without vacatur to allow the agency to provide a more fulsome explanation.

**PERTINENT STATUTES AND REGULATIONS**

All pertinent statutes and regulations not included in the Addendum to Petitioners' Opening Brief are set forth in the attached Addendum.

**STATEMENT OF THE CASE**

**A.     Statutory and regulatory background**

**1.     The National Environmental Policy Act**

"NEPA establishes an environmental review process under which federal agencies identify the reasonable alternatives to a contemplated action and look hard at the environmental effects of their decisions." *City of Boston Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (cleaned up). "An agency's NEPA obligations are essentially procedural," and NEPA "does not require any particular substantive result." *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2018) (cleaned up).

NEPA directs federal agencies to prepare a detailed "environmental impact statement" (EIS) for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Agencies may first prepare an environmental assessment to determine whether an action will have significant

impacts.  *See* 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.5(a)-(b).[1]  An

environmental assessment is a "concise public document," *id*. § 1508.1(h), that

must "[b]riefly provide sufficient evidence and analysis for determining whether to

prepare an [EIS] or a finding of no significant impact," *id*. § 1501.5(c)(1).

FAA has adopted agency-wide policies and procedures for complying with

NEPA, *see* Order 1050.1F, *Environmental Impacts:  Policies and Procedures* (July

16, 2015), [9383], and supplemental NEPA instructions specifically for proposed

federal actions to support airport development projects, *see* Order 5050.4B, *NEPA*

*Implementing Instructions for Airport Actions* (Apr. 26, 2006), [9150]; *see also*

[9168, 9172-73, 9400]; 71 Fed. Reg. 29,014 (May 18, 2006).

---

[1] The cited NEPA regulations were promulgated by the Council on Environmental Quality (CEQ).  In response to Executive Order 14,154, § 5(a), 90 Fed. Reg. 8,353, 8,355 (Jan. 20, 2025), CEQ recently issued an interim final rule to rescind its NEPA regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025).  The rescission states that "agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed."  *Id*. at 10,614.  This brief therefore cites to the 2023 version of CEQ's NEPA regulations that were in effect when FAA issued the challenged order.  Other recent developments have unsettled the status of CEQ's NEPA regulations.  In *Marin Audubon Society v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024), this Court stated that CEQ lacked authority to promulgate legally binding NEPA regulations.  The District of North Dakota also recently issued an order vacating CEQ's 2024 NEPA regulations.  *See Iowa v. CEQ*, ECF No. 145, No. 1:24-cv-89 (D.N.D. Feb. 3, 2025).  Those developments do not impact this case, however, because FAA completed its NEPA analysis before they occurred, and because FAA fully complied with the statutory requirements.

### 2. The Airport Improvement Act

The Airport Improvement Act authorizes FAA "to provide federal funding for airport improvement projects and establishes detailed requirements that must be satisfied in order for a project to be eligible for such funding." *Communities Against Runway Expansion*, 355 F.3d at 681 (citing 49 U.S.C. §§ 47104-47107). Airports that seek funding under the Act must "maintain a current FAA-approved airport layout plan." *Id*. (citing 49 U.S.C. § 47107(a)(16)). The airport layout plan is a graphic representation of existing airport facilities and recommended development for long-term planning purposes. [10783, 12515]. The airport sponsor may not alter any aspect of the airport or its facilities that is within the scope of FAA's approval authority unless the alteration "complies with the portions of the plan approved by" FAA. 49 U.S.C. § 47107(a)(16)(C)(ii).

### 3. Airport layout plan approval procedures

Under FAA guidelines, approval of an airport layout plan may occur in stages. *See* FAA Order 5050.4B, ¶ 202.c, [9186-87]. The agency's initial, "conditional" approval signifies that the recommended features "are safe and efficient for airport operations" but that FAA "has not yet completed its review of the environmental impacts the features on the [plan] would cause … because the features are not yet needed and are not ripe for decision." *Id*. ¶ 202.c(1)(a)-(b). FAA "has *not* authorized the airport sponsor … to begin building the facilities

shown" on the conditionally approved plan.  *Id.* ¶ 202.c(1)(c).  Instead, the airport

sponsor "may start building those facilities *only after* [FAA] completes its

environmental analysis of those facilities and … issues an unconditional approval"

of the related plan components.  *Id.*

The airport sponsor's request for unconditional approval triggers the

procedural requirements of NEPA.  *See id.* ¶ 202.c(2)-(3).  Because the airport

layout plan typically depicts both short-term and long-term recommended

improvements, FAA need not unconditionally approve or analyze the entirety of

the plan at once.  FAA instead may "environmentally analyze and unconditionally

approve the near-term and intermediate term development shown on [the plan] that

is ripe for decision," but "defer its environmental review of the long-term

development that is not yet ripe for decision."  *Id.* ¶ 202.c(3).

Airport sponsors are expected "to begin all of the unconditionally approved

development within 3 years of the date [FAA] completes its environmental review

for that development."  *Id.* ¶ 202.c(3)(a).  If the sponsor later elects to pursue

longer-term improvements shown on the plan, the sponsor must first request

FAA's unconditional approval of the related plan components.  *Id.* ¶ 202.c(3)(b).

Upon receiving such a request, FAA must "complete the proper NEPA document"

and, if appropriate, "unconditionally approve the [layout-plan] segments depicting

the development that is now ripe for decision."  *Id.*

### B. Factual background

#### 1. Tweed New Haven Airport

Tweed is a regional airport in southern Connecticut. [1455]. It occupies 437 acres in the City of New Haven and the Town of East Haven in a densely populated residential area adjacent to the Long Island Sound. [1455, 1561, 12300-01]. Tweed is owned by the City of New Haven and managed and operated by the Tweed-New Haven Airport Authority (Authority) in partnership with Avports, a private airport management company. [1455].

Tweed has one active runway (Runway 2-20), a system of taxiways, a terminal building located on the west side of the airport, and related facilities. [12305].[2] Tweed is served by one commercial airline, Avelo Airlines, which began service in November 2021 after American Airlines left the market. [1459-60]. A 2021 satellite image of the airport is reproduced on the following page. *See* [12305]. The key components for purposes of this dispute are Runway 2-20; Taxiway (TWY) A and Taxiway B on the east side of the runway; taxiways C and D on the west side of the runway, which enter the runway at acute angles; and the west ramp (highlighted in purple) which is adjacent to the existing west terminal.

---

[2] Runways are identified by their compass headings. The designation "2-20" means that northbound traffic follows a compass heading of 20 degrees northeast and southbound traffic follows a heading of 200 degrees southwest. *See Town of Stratford v. FAA*, 285 F.3d 84, 86 n.2 (D.C. Cir. 2002).



Figure 2-3: Overview of Airside Facilities

Two conditions at Tweed hinder efficient operations. First, the length of Runway 2-20 (5,600 feet) is inadequate, resulting in weight limits on a variety of aircraft that reduce the number of passengers each flight can carry. [1471, 1751]. For example, Avelo serves Tweed with a combination of Boeing 737-700 aircraft and the larger 737-800 aircraft, which is preferred by Avelo and the industry generally. *See* [1471]. The 737-800 can seat up to 189 passengers. *Id*. But weight limits on the 737-800 resulting from the inadequate runway length limit Avelo to 162 passengers per flight, a 14 percent reduction in capacity. *Id*. The end result is reduced operating efficiency and the need for more flights to serve the same volume of passengers. [1471, 1476, 1490, 1495, 1751].

Second, Tweed's passenger terminal—originally constructed as an aircraft hangar in 1930—is outdated, undersized, and poorly designed. *See* [1471-75, 1499, 12288, 12490, 12494]. Passengers experience poor conditions including long queues for ticketing, security, and baggage claim. Because FAA anticipates that passenger demand and enplanements (departing passengers) will increase, those poor conditions are expected to worsen over time. [1474-77, 1499, 8919].

### 2.      The Project

To address the above deficiencies, the Authority has proposed the *Runway 2-20 Extension and Terminal Expansion Project* (Project). [1463-64, 1468-69, 8917]. The Project has two main components. [1463-64]. The first involves

extending Runway 2-20 by 639 feet at the southern (Runway 2) end and by 336 feet at the northern (Runway 20) end, resulting in a runway length of 6,575 feet. [1463-64]. The extended length is designed to safely accommodate aircraft with 150-200 seats without the current weight restrictions. The extended runway will remain within the existing airport boundary and avoid impacts to tidal wetlands near the southern (Runway 2) end. [1464, 1471, 1476, 1494-95, 1498, 8919].

The second major component of the Project involves constructing a new passenger terminal on the east side of the airport, along with a new aircraft apron, taxilane/taxiway connections, a vehicle parking area, and an access road. [1464, 1502, 8914-15]. The new terminal will dramatically improve conditions for passengers. [1472-77, 1500-01, 8919]. In addition, because aircraft using the current west terminal must cross the runway before takeoff or after landing, the new terminal on the east side of the airport will improve operating efficiency and safety by eliminating runway crossings. [1481, 1499, 1501, 12495, 12501-02].

The image on the following page depicts the planned Project improvements (shaded in green, blue, and dark gray). *See* [1467]. The Project is expected to be completed by the end of 2026. [1468, 8917].

Figure 1-3: Proposed Action



### 3. Potential future taxiway reconfiguration

FAA conditionally approved Tweed's revised airport layout plan in 2021, after the Authority updated its master plan for the airport. [1459, 12537]. In addition to the Project components, the layout plan depicts various other improvements that the Authority hopes to implement over the 20-year planning period. One such improvement is the reconfiguration of taxiways A and B to comply with FAA runway-taxiway separation standards and to extend to the ends of the extended runway, creating a single full-length parallel taxiway. [12489, 12491]. The Authority also hopes to build a new partial parallel taxiway on the west side of the runway to address problematic taxiway geometry, including the acute-angled (as opposed to right-angled) intersections between the runway and taxiways C and D. *Id.*; *see also* [10903, 11132, 12446-49]. Those recommended improvements are depicted in purple and orange in the image on the following page, with each color corresponding to the phase of the 20-year planning period during which the Authority hopes to implement the improvements (orange – Phase II/years 6-10; purple – Phase III/years 11-20). *See* [12523].



012523

**Figure 8-1: Project Phasing Plan**



**LEGEND**

PHASE I BUILDING
PHASE I PAVEMENT
PHASE II BUILDING
PHASE II PAVEMENT
PHASE III BUILDING
PHASE III PAVEMENT
POTENTIAL EXPANSION AREA
TO BE REMOVED
FUTURE EASEMENT/
LAND ACQUISITION (ON-GOING)
EXISTING AIRPORT PROPERTY
AIRPORT EASEMENT

SCALE
0    400    800    1600
FEET

N

336' DISPLACED THRESHOLD

EXPAND ARFF BUILDING

EXPAND FUEL FARM

EXPAND MAINTENANCE/ SRE BUILDING

PROPOSED TERMINAL 50,000 SQ. FT.

PROPOSED PARKING 440,000 SQ. FT.

BRIDGE OVER WETLANDS

BLAST WALL

RUN-UP PAD

PROPOSED APRON 11,945 SQ. YD.

235' DISPLACED THRESHOLD

699' RUNWAY EXTENSION

365' X 200' EMAS

MALSR BEYOND 20-YEAR PLANNING PERIOD

AIRPORT EASEMENT/ FUTURE LAND ACQUISITION

RUNWAY 2-20 - 6,635' X 150'

LOCALIZER

WEST RAMP

EAST RAMP

TWY D
TWY F
TWY A
TWY C
TWY G
TWY B
TWY E

CHARTER OAK AVE
DODGE AVE
GERRISH AVE
DODGE AVE
THOMPSON AVE
BURR ST
TOWNSEND AVE
DEAN ST
TOWNSEND AVE
LIGHTHOUSE RD
SILVER SANDS RD
SOUTH END RD
URIAH ST
PROTO 09

tweed NEW HVN
Southern Connecticut's Airport

McFarland Johnson

K:\Tweed New Haven\1-18534.00 HVN MPU 2019\Drawings\Figures\Figure8\PHASING.dwg

14

As noted above, the taxiway A and B improvements would address the existing nonstandard runway-taxiway separation. Advisory Circular 150/5300 contains FAA's standards for airport design, [10749], including runway-taxiway separation standards, [10875, 11069-81]. For Tweed, the applicable standard calls for a 400-foot offset between the runway and a parallel taxiway. [10875, 11077, 11081]. Portions of taxiways A and B do not meet that standard. [12446].

When Taxiway B was extended to the current Runway 2 end in 2002, FAA modified the standard to allow for a 275-foot offset. [5084-85]. Advisory Circular 150/5300 explains that site-specific conditions "may make it impractical to meet all FAA design standards" and that modifications may be appropriate if they "result in an acceptable level of safety and efficiency." [10800]; *see also* [10796]. For the 2002 Taxiway B extension, FAA determined that a modification of the separation standard was appropriate because it would maintain safe conditions while avoiding substantial impacts to wetlands near the Runway 2 end. [5084-85].

A segment of Taxiway A was recently modified to achieve a 400-foot offset from Runway 2-20 as part of a prior project. *See* [1641, 5615]. (That is the segment in the image on the preceding page adjacent to the east ramp that is not highlighted in either green, orange, or purple.) The remainder of Taxiway A (from Taxiway F to the Runway 20 end) is separated from the runway by 275 feet. [12446, 12523]. The Authority hopes to modify taxiways A and B in the future to

15

meet the 400-foot separation standard.  [12446, 12477, 12489].  The Authority also hopes to connect and extend each taxiway to the corresponding end of the extended runway.  [12523].  The Authority explained that the resulting full-length parallel taxiway would provide "improved flexibility from an operational standpoint by allowing aircraft to maintain clear of the runway environment and exist at optimal points to minimize runway occupancy time."  [12489].

As the above image indicates, the Authority hopes to build the segment connecting taxiways A and B during Phase II of its long-term plan (years 6-10). The remaining taxiway improvements—including the extension of taxiways A and B—are recommended for Phase III (years 11-20).  [12523].  However, extending Taxiway A would require the acquisition of nonairport property, which the Authority has made clear "would only be considered on a willing seller basis." [12489, 12491, 12507, 12515].  And the depicted Taxiway B extension would have a "High" impact on adjacent wetlands and Morris Creek.  [12489, 12491].

### 4.     Project NEPA review and FAA order

As a prerequisite for seeking federal funding for the Project, the Authority requested FAA's unconditional approval of the related components of Tweed's revised airport layout plan.  [1465].  Because such unconditional approval requires NEPA review, *id*., the Authority submitted a draft environmental assessment in support of its request, [8913].  FAA solicited and responded to public comments on

the draft, [1466, 1712-90, 8927-29]; coordinated with interested state and federal agencies, *id*.; and finalized and adopted the environmental assessment, [1444, 1751, 8913-14, 8933].  FAA then issued an order finding that the Project would have no significant impact requiring the preparation of an EIS.  [8912-36].  FAA also unconditionally approved the related components of Tweed's airport layout plan and made other funding-eligibility determinations required under the Airport Improvement Act that are not at issue in this case.  [8935-36].

FAA concluded the Project would have minimal environmental impacts. *See* [8919-27].  Although the new terminal and related facilities will affect 9.28 acres of wetlands on airport property, the impacts would not be significant because of the low value of the affected areas and because of the compensatory mitigation required under state and federal permits that the Authority must secure before starting construction.  [8922-24, 8931-32].  In addition, although the Project requires the placement of fill (soil and rock) in the floodplain, which can reduce the capacity of the affected area to hold floodwaters, the Authority must make offsetting cuts (excavations) elsewhere on airport property.  [8921-22, 8932].  And although the Project will increase the amount of impervious surfaces (pavement) on airport property, the risk of pollution from stormwater runoff will be minimized by the stormwater management plan required under state law, which must be

designed to maintain to the maximum extent achievable pre-development hydrology and pollutant loads.  [1740, 1786]; *see also* [8922-23, 8929, 8931-32].

FAA also concluded that the Project's minimal impacts would not combine with other projects to cause a significant cumulative impact.  *See* [1640-44].  FAA explained that the taxiway improvements shown on the airport layout plan were beyond the scope of its cumulative-impact analysis because the Project will be completed in 2026, [1640], whereas the taxiway improvements are not "expected to be considered for implementation within the next five (5) years," [1642].

In response to comments, FAA further explained that the Project and the taxiway reconfiguration are not "connected" within the meaning of NEPA because each has independent utility.  [1782, 1801, 1841, 2076].  The runway extension does not require a corresponding extension of taxiways A and B, FAA explained, because aircraft can continue to taxi on the runway as they do under existing conditions.  *Id*.  Although Taxiway B currently extends to the existing Runway 2 end, larger aircraft landing via Runway 20 turn around at the Runway 2 end and taxi along the runway to an alternate exit instead of making the turn onto the narrow Taxiway B entrance.  Flights departing from Runway 2 also taxi on the runway to the Runway 2 end and turn around.  The runway extensions will include turnaround pavement to facilitate that process, [1467], which the Authority's master plan update specifically contemplated, [12483, 12537, 12804-05].  FAA

explained that if the Authority elected to pursue the taxiway improvements in the future, "they would be subject to a separate NEPA action" at that time. [1642].

FAA also accounted for Avelo's ongoing and anticipated operations in its discussion of the baseline conditions at Tweed. *See* [1470]. FAA determined that, in comparison to the baseline no-action scenario, the Project is likely to reduce the number of flights needed to meet forecasted passenger demand through 2031. [1470-71, 1495, 1726, 1751]. That is because the runway extension will allow for the increased use of larger Boeing 737-800 aircraft with reduced weight limits, meaning that each flight can carry more passengers. *Id*. As a result, "overall net emissions for most pollutants are predicted to decrease" in comparison the no-action alternative. [1726]. Noise levels would increase in certain limited areas due to the more frequent use of larger aircraft, but the impacts would be adequately mitigated by ongoing airport sound mitigation programs. [8924-26, 8930-31].

### 5. Procedural history

In February 2024, Petitioners Save the Sound, Inc., and the Town of East Haven timely filed separate petitions for review of FAA's December 2023 order for the Project. Each petition challenges FAA's finding of no significant under NEPA; the petitions do not challenge the agency's determinations under the Airport Improvement Act. The petitions were consolidated and the Authority and Avports intervened as respondents. After FAA filed the administrative record,

19

Petitioners filed a consolidated opening brief arguing that FAA violated NEPA by: (1) segmenting review of the Project and the taxiway reconfiguration shown on the airport layout plan; (2) failing to account for the taxiway reconfiguration and Avelo's operations in its cumulative-impact analysis; (3) arbitrarily concluding that the Project would reduce the number of flights required to meet projected demand; and (4) unreasonably concluding that the Project would have no significant impact on wetlands, floodplain functions, and pollution from stormwater runoff. As demonstrated below, all of Petitioners' arguments lack merit.

## SUMMARY OF ARGUMENT

1. FAA did not segment NEPA review of the Project and the taxiway reconfiguration shown on the airport layout plan because the latter is not the subject of any federal proposal requiring NEPA review. The two actions also are not connected within the meaning of NEPA because each has independent utility: the Project will remedy the deficiencies at Tweed that hinder efficient operations, and the taxiway reconfiguration would address the existing nonstandard taxiway geometry. The two actions also will not overlap temporally: the Project will be completed by 2026, whereas the Authority does not anticipate pursuing the taxiway improvements for at least the next five years. And the runway extension does not require a full-length parallel taxiway to meet FAA standards or for operational safety. Under FAA's Advisory Circular 150/5300, the need for a full-

20

length parallel taxiway is tied to the flight procedures and visibility minimums set by FAA as a matter of aircraft operations, not by the extension of a runway.

2.     FAA's cumulative-impact analysis complied with NEPA.  FAA reasonably concluded that the taxiway reconfiguration was beyond the scope of its analysis because the Project and the taxiway improvements will not overlap in time, and because the potential impacts of any future taxiway improvements are not reasonably foreseeable.  FAA also accounted for Avelo's ongoing operations in assessing the existing baseline conditions at Tweed and the likely future conditions under the no-action alternative.  FAA then evaluated the Project's incremental impact on baseline operational emissions and airport noise levels, as well as the aggregate emissions and noise levels under both the no-action and proposed-action alternatives.  Nothing more was required.

3.     FAA reasonably concluded that the Project is likely to reduce the number of flights needed to meet forecasted passenger demand through 2031. FAA determined that Avelo's forecasted flight schedules were the best indicator of the likely underlying demand with or without the Project.  Using average daily departures derived from those schedules, FAA estimated the likely enplanements (departing passengers) through 2031.  FAA then reasonably concluded that the predicted enplanements could be accommodated by fewer flights with the Project because the extended runway will allow for increased use of higher-capacity

21

Boeing 737-800 aircraft, meaning that each flight can carry more passengers. Petitioners' complaint that the record lacks sufficient detail regarding the enplanement calculations is unfounded and amounts to improper flyspecking. And Petitioners' assertion that the runway extension will induce growth is based on outdated information and at odds with both the administrative record and the case law. FAA's forecast of the likely passenger demand through 2031 is reasonable, within the agency's area of special expertise, and entitled to deference.

4. FAA took the required hard look at potential impacts on wetlands, floodplain functions, and stormwater runoff, and reasonably concluded that any impacts will be minimal. The Project will affect 9.28 acres of wetlands on airport property that serve minimal wetland functions. FAA reasonably determined that those impacts would be offset by the compensatory mitigation required under state and federal permits that the Authority must secure before starting construction. The placement of fill in the floodplain must be offset by cuts elsewhere on airport property. And the Authority must secure state approval of a stormwater management plan that must maintain, to the maximum extent achievable, pre-development hydrology and pollutant loads. Although Petitioners complain about the lack of a complete mitigation plan, NEPA requires only that an agency discuss mitigation in sufficient detail to ensure that environmental consequences have been fairly evaluated. FAA's detailed analysis easily satisfies that standard.

5.      The petition for review should be denied.  But if the Court determines that FAA did not adequately explain any of its conclusions, the Court should remand without vacatur to allow FAA to provide a more fulsome explanation.

**STANDARD OF REVIEW**

FAA's order is reviewed under the deferential standard contained in the Administrative Procedure Act (APA), which authorizes a reviewing court to set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

In the NEPA context, the Court's role under the APA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Communities Against Runway Expansion*, 355 F.3d at 685.  Agency "determinations based upon highly complex and technical matters are entitled to great deference," *Midwest Ozone Group v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023) (cleaned up), and the

burden to show that FAA's order is arbitrary or capricious falls on Petitioners, *Village of Bensenville v. FAA*, 457 F.3d 52, 70-71 (D.C. Cir. 2006).  As demonstrated below, Petitioners have not met their burden here.

## ARGUMENT

**I.    FAA did not segment NEPA review of the Project and the potential future taxiway reconfiguration.**

Petitioners argue that FAA improperly segmented NEPA review of the Project and the taxiway reconfiguration shown on Tweed's airport layout plan.  *See* Opening Br. 19-27.  That argument fails because the taxiway reconfiguration is not the subject of any pending federal proposal requiring NEPA review; each project has independent utility; the two projects will not overlap temporally; and the runway extension does not automatically require a full-length parallel taxiway to meet FAA runway design standards or to maintain operational safety.

**A.    The taxiway reconfiguration was not the subject of any pending federal proposal that could have been segmented.**

NEPA requirements are triggered by "proposals for … major *Federal* actions."  42 U.S.C. § 4332(2)(C) (emphasis added); *see* 40 C.F.R. § 1508.1(x) (defining a federal "proposal" subject to NEPA).  "An agency impermissibly 'segments' NEPA review when it divides connected … *federal actions* into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v.*

*FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (emphasis added); *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 49-50 (D.C. Cir. 2015). Proposals for "actions that will have cumulative or synergistic environmental impact upon a region … pending concurrently before an agency … must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); *see, e.g., Delaware Riverkeeper*, 753 F.3d at 1308, 1314 (agency improperly segmented NEPA review of four related projects where all four were either under construction or concurrently "pending before the [agency] for environmental review and approval"). But where (as here) the allegedly connected action is not the subject of any pending federal proposal requiring NEPA review, segmentation concerns do not arise. *See National Wildlife Federation v. FERC*, 912 F.2d 1471, 1477-78 (D.C. Cir. 1990).

*National Wildlife Federation* is instructive. There, the applicant sought FERC's approval of two proposals relating to the first and second phases of a hydroelectric project, but the applicant later withdrew its proposal for Phase II. The petitioners asserted that the EIS for Phase I was deficient because it did not analyze the impacts of Phase II as a connected or cumulative action. *Id*. at 1474, 1476-79. The Court disagreed, holding that an EIS "need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue." *Id*. at 1478. Because FERC "did not have before it a proposal for a license as to Phase

II" and "in no way approved Phase II," FERC was not required to consider the environmental impacts of Phase II as a connected action. *Id*. at 1478-79.

Here as well, FAA did not have before it any proposal to construct the taxiway improvements shown on Tweed's airport layout plan and FAA in no way authorized those improvements. FAA's *conditional* approval of the plan signified only that the depicted features "are safe and efficient for airport operations"; it did "*not* authorize[] the airport sponsor … to begin building the facilities shown." FAA Order 5050.4B, ¶ 202.c(1), [9186]. The Authority cannot build the taxiway improvements until it secures FAA's unconditional approval of the related plan components, and any request for such approval would trigger NEPA review. *Id*. ¶ 202.c(1)-(2). Because the Authority did not submit such a request and indicated that it did not intend to do so within at least the next five years, *see* [1642, 12523], there was no connected federal action relating to the taxiway improvements that FAA could have segmented from its review of the Project.

On that basis alone, Petitioners' segmentation claim fails. *See National Wildlife Fed'n*, 912 F.2d at 1477-78; *see also Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 113 n.11 (D.C. Cir. 2014) (projects not connected where proponent of later-in-time project "had not yet applied" for federal approval); *City of Boston Delegation*, 897 F.3d at 252 (proposals not connected where they were "not under simultaneous consideration by the

26

agency"); *Lowman v. FAA*, 83 F.4th 1345, 1361 (11th Cir. 2023) (FAA did not segment NEPA review of successive airport improvement projects where "Phase I was approved in 2016 and Phase II was not even proposed until 2020 when the construction of Phase I was well underway").

**B.      The taxiway reconfiguration is independently useful and will not overlap temporally with the Project.**

Petitioners' segmentation claim fails for a second reason:  the Project and the taxiway reconfiguration are not connected within the meaning of NEPA because each has independent utility and the two will not overlap temporally.

Actions are "connected" under NEPA, and should be discussed in the same environmental assessment or EIS, if they:  "(a) May automatically trigger other actions requiring [environmental assessments] or EISs[;] (b) Cannot or will not occur unless other actions occur at the same time or earlier[;] and (c) Are independent parts of a large action but depend on the larger action for justification. FAA Order at 5050.4B, ¶ 905.c(1), [9276].  However, two actions are not connected when each has "substantial independent utility" and the two will not "overlap temporally."  *City of Port Isabel v. FERC*, 111 F.4th 1198, 1211 (D.C. Cir. 2024) (cleaned up).  Both of those factors confirm that the Project and the taxiway reconfiguration are not connected within the meaning of NEPA.

First, each project would be independently useful.  The Project will allow for more efficient aircraft operations and improved passenger service, regardless of

whether the taxiway reconfiguration is implemented. [1494-95, 1501]. And the taxiway reconfiguration would address the nonstandard separation between the runway and portions of taxiways A and B—a condition that has existed for years and has nothing to do with the runway extension. [12446, 12477, 12489]. The new partial parallel taxiway on the west side of Runway 2-20 would also correct preexisting problematic taxiway geometry, including the acute-angled intersections between the runway and taxiways C and D. [10903, 12446-49, 12477, 12793]. Those preexisting issues also have nothing to do with the runway extension, and correcting them would be independently useful.

True, the extension of the northern end of Taxiway A and the southern end of Taxiway B shown on the airport layout plan would not be useful if the runway were not extended. And the new taxiway on the west side of the runway could be shortened by 336 feet. *See* [12489, 12523]. But the test for connectedness is whether "one project will serve a significant purpose even if a second related project is not built," *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987), not whether every aspect of the first project would remain exactly the same. Here, except for the extensions of taxiways A and B and a portion of the new west-side taxiway, the remainder of the depicted taxiway improvements would be independently useful regardless of whether the runway is extended. The taxiway reconfiguration thus would still serve significant purposes and, as a result,

it is not connected to the Project. *See id.*; *see also Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 431 & n.5 (10th Cir. 1996) (NEPA review of runway upgrade did not need to encompass other airport improvements discussed in 20-year master plan, even though those improvements "might be linked" to the runway upgrade, because the runway upgrade had independent utility).

The two projects also are not connected because they will not "overlap temporally." *City of Port Isabel*, 111 F.4th at 1211. "This factor generally asks whether the projects are either under construction or pending before the [agency] for environmental review and approval at the same time." *Id*. at 1213 (cleaned up). As discussed, there was no proposal relating to the taxiway improvements pending before FAA when it reviewed the Project. And contrary to Petitioners' assertions (Opening Br. 17, 26), the taxiway improvements—assuming the Authority elects to pursue them at all—will not be under construction at the same time as the Project. The Project will be completed in 2026, [8917], and the Authority does not expect to pursue the taxiway improvements for at least the next five years, [1642, 12523]. Indeed, the master plan update indicates that the Authority does not plan to pursue the extension of taxiways A and B that is the focus of this dispute (Opening Br. 16, 23) until at least Phase III (years 11-20) of its long-term plan. *See* [12523].

For those reasons as well, the Project and the taxiway reconfiguration shown on the airport layout plan are not connected with the meaning of NEPA.

### C. The runway extension does not automatically require a full-length parallel taxiway.

Petitioners argue that the Project and the taxiway reconfiguration are connected because the runway extension automatically requires a full-length parallel taxiway to comply with FAA design standards and to maintain airport safety. *See* Opening Br. 4, 15, 21-27, 29-31, 33. Both contentions are wrong.

The runway design standards in FAA Advisory Circular 150/5300 do not require a full-length parallel taxiway whenever a runway is extended. *See* [10805-10878, 11077] (applicable runway design standards). And the Authority did not state otherwise in its 2021 master plan update. *Contra* Opening Br. 15-16, 21. The Authority instead stated that it hoped to construct a full-length parallel taxiway to provide "improved flexibility from an operational standpoint." [12489].

Nor is a full-length parallel taxiway automatically required for operational safety. Petitioners cite FAA's 2002 decision approving the prior extension of Taxiway B, which noted that the lack of a full-length parallel taxiway increased the risk of a runway incursion because aircraft had to use the runway for taxiing. [5087].[3] But as Advisory Circular 150/5300 indicates, whether incursion risks require a full-length parallel taxiway is determined by the flight procedures and

---

[3] The incursion risk is increased under existing conditions because aircraft using the west terminal must cross the runway before takeoff and after landing. [1481, 1499, 12495]. The Project will address that deficiency and increase operational safety by providing a new terminal on the *east* side of the airport. [1501, 12502].

30

visibility minimums set by FAA as a matter of aircraft operations, not by the length or extension of the runway. *See* [10896, 11153-57].

Visibility minimums generally represent the minimum distance a pilot must see down the runway to safely land or take off. *See* [1723, 10780, 10781]. All else being equal, a *low* visibility minimum can *increase* the risk of a collision between an approaching aircraft and an object on the runway because the pilot has less time to discontinue the approach after observing the object. *See* [1723]. As the required visibility minimum increases, the risk of a collision decreases because the pilot would have more time to discontinue the approach if necessary. A parallel taxiway protects the runway under low visibility conditions by eliminating the use of the runway for taxiing. [10896]. FAA Advisory Circular 150/5300 therefore links the requirement for a full-length parallel taxiway to the instrumented flight procedures and visibility minimums put in place to govern aircraft operations: Taxiway Standard 4.6.1 directs airport sponsors to "[p]rovide a full-length parallel taxiway, or equivalent taxi path … for [instrument flight procedures] with visibility minimums below one mile (1.6 km)." [10896, 11157].

"Aircraft follow approach and departure procedures that are developed and published by FAA and are specific to each airport and a given runway. The approach procedures include visibility minimums established by FAA using a variety of factors." [1723, 10813]. FAA thus will need to reassess the required

visibility minimums for Runway 2-20 after the runway is extended in light of Standard 4.6.1 and other factors, including whether the Authority can provide an equivalent taxi path, [10896], or put additional operational controls in place to ensure aircraft safety if the desired visibility minimum for either runway end is below one mile, *see* [10770, 10800-01, 11107].

For purposes of Petitioners' NEPA claim, however, the salient point is that the runway extension does <u>not</u> automatically require a full-length parallel taxiway to comply with FAA design standards or to maintain operational safety. For that reason as well, the Project and the taxiway reconfiguration are not connected actions within the meaning of NEPA. Petitioners' segmentation claim lacks merit.

## II. FAA's cumulative-impact analysis complied with NEPA.

FAA's NEPA instructions require consideration of cumulative impacts in an environmental assessment or EIS. *See* FAA Order 5050.4B, ¶ 1007.i, [9298]. Cumulative impacts are the environmental effects "resulting from the incremental effects of the proposed action when added to the effects of past, other present, and reasonably foreseeable future actions." *Id*. FAA concluded that the Project would not cause or contribute to significant cumulative impacts. [1640-48]. Petitioners challenge that conclusion on two grounds. First, they argue that if the taxiway reconfiguration shown on the airport layout plan is not a connected action, then it is at least a reasonably foreseeable future action that FAA should have analyzed for

potential cumulative impacts.  Opening Br. 29-34.  Second, Petitioners argue that FAA failed to consider the impacts of Avelo's commencement of service at Tweed and its ongoing operations.  *See id*. at 35-37.  Both arguments fail.

### A. The taxiway reconfiguration was beyond the scope of a proper cumulative-impact analysis.

FAA concluded that the taxiway reconfiguration was beyond the scope of a proper cumulative-impact analysis for the Project because the taxiway improvements were not expected to be considered for implementation within the next five years.  [1642].  That conclusion was reasonable, consistent with this Court's precedent, and in accord with FAA's NEPA guidelines.

Two projects cannot combine to produce a significant cumulative impact if their effects will not "overlap in time," meaning that "the short-term impacts from constructing the former would abate before construction commenced on the latter." *City of Boston*, 897 F.3d at 253; *see also Minisink Residents*, 762 F.3d at 113 (two projects were unlikely to combine to cause a significant cumulative impact where the first project under review "was expected to have minimal impacts" and the construction timeline for the second project would be "quite distinct").  FAA's cumulative-impact analysis thus properly focused on the period "during which [the Project] is expected to affect a resource, ecosystem, or human community," [1640], which FAA conservatively set at five years despite the Project's minimal impacts, [1640-42], and its expected completion in 2026, [1468].

When FAA conducted its analysis, the Authority indicated that it did not expect to pursue the taxiway reconfiguration for at least five years. *See* [1642]. Moreover, the reconfiguration of Taxiway B—the component that Petitioners claim will have significant environmental impacts (Opening Br. 16, 24, 30, 34)—is not scheduled for possible implementation until Phase III (years 11-20) of the Authority's long-term plan. [12523]. FAA thus reasonably concluded that the effects of the Project and the taxiway reconfiguration will not overlap in a manner that could cause a significant cumulative impact.

Petitioners criticize FAA's use of a five-year analysis period, citing *Northern Plains Resources Council v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011). Opening Br. 32-33. But *Northern Plains* is inapposite. The agency there used a five-year lookahead for its cumulative-impact analysis based on its assumption that the railroad project under review would be completed during that time. *Id*. at 1078. But the court held that the agency's assumption was unreasonable in light of the project's long history of delays. *Id*. Because there was "little reason to presume that the railroad would be construed in five years," the agency had arbitrarily concluded that railroad construction would not overlap with other reasonably foreseeable projects in the area. *Id*. at 1078, 1079.

Here, nothing in the record contradicts FAA's statement that the Project will be constructed by 2026. [8917]. And *Northern Plains* otherwise confirms the

point that two projects will not produce a significant cumulative impact where (as here) "there would be no overlap" between them. 668 F.3d at 1079-80.

FAA's treatment of the taxiway reconfiguration also accords with its own NEPA instructions, which provide that a cumulative-impact analysis should consider "reasonably foreseeable actions" in the project area. FAA Order 5050.4B, ¶ 706.h, [9251]. A project may qualify as reasonably foreseeable when it "is included on an unconditionally approved" layout plan; the project proponent has "committed to complete the proposed action" or "developed preliminary design plan for an action in an Airport Capital Improvement Plan"; and the action "would occur within the same time frames" as the project under review. *Id.* ¶ 9.q, [9179]. The taxiway reconfiguration did not meet any of those criteria when FAA conducted its NEPA review of the Project.

Nor was it reasonably certain that the Authority would construct the taxiway improvements as shown on the airport layout plan. *Contra* Opening Br. 30, 33-34. The Taxiway A extension is contingent on the Authority's ability to acquire non-airport property, which is speculative; the Authority would only consider acquiring such property "on a willing seller basis." [12489, 12507, 12515]. And the depicted Taxiway B reconfiguration may be modified to avoid wetland impacts—just as the prior Taxiway B extension and the runway extension at issue here were so modified. [1463-64, 1494, 1737, 5084-86]. Indeed, the Connecticut

35

Department of Energy and Environmental Protection identified the area directly adjacent to (and potentially overlapping with) the depicted Taxiway B reconfiguration (the area known as the Pig Farm Road site) as one of its two preferred wetland mitigation sites for the Project, creating further uncertainty as to whether the Taxiway B reconfiguration ultimately would be constructed as shown on the plan.  *See* [8855, 8902-03, 8908-10, 12407].

As the record here shows, "projects in their infancy have uncertain futures." *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010).  "Master planning through environmental planning through design and permitting is a lengthy and dynamic process that often requires revision and updates based on changing conditions."  [1762].  Because changing conditions can significantly alter the NEPA analysis, FAA guidelines urge airport sponsors "to begin all of the unconditionally approved development within 3 years of the date [FAA] completes its environmental review for that development."  FAA Order 5050.4B, ¶ 202.c(3)(a), [9187].  Therefore, until the Authority at least submits a concrete proposal to build specific taxiway improvements and requests unconditional approval of the related layout-plan components, the potential environmental impacts do not qualify as reasonably foreseeable under NEPA and FAA's implementing instructions.  [9179]; *see also City of Oxford v. FAA*, 428 F.3d 1346, 1354-56 (11th Cir. 2005) (new terminal described in layout-plan

narrative as "key component" of airport development not reasonably foreseeable absent a concrete proposal and request for unconditional layout-plan approval).

FAA thus reasonably concluded that the taxiway reconfiguration was beyond the scope of a proper cumulative-impact analysis for the Project.

**B.     FAA properly accounted for Avelo's operations in assessing the existing baseline conditions at Tweed.**

Petitioners next contend that Avelo's arrival at Tweed "is a pivotal past action that must be included in the cumulative impacts analysis" and that FAA "did not identify any impacts associated with this action."  Opening Br. 35-36.  That argument lacks merit because FAA fully accounted for the impacts of Avelo's operations in assessing the existing baseline conditions at Tweed.

"When conducting an environmental analysis of a proposed action under NEPA, an agency compares the action's projected environmental effects to the existing condition of the environment.  Through that comparison, the agency can ascertain the magnitude of the proposed action's environmental impacts." *Marin Audubon*, 121 F.4th at 915-16.  Here, FAA properly began its analysis by evaluating the existing conditions at Tweed in 2022, the year preceding its NEPA review of the Project, because those conditions accurately represented the existing "airline fleet mix, schedule, destinations and enplanements"—including Avelo's ongoing operations and enplanements.  [1721-22, 1750].

FAA explained that in 2022, Avelo's first full year of service at Tweed, total enplanements increased from 29,372 in 2021 to 351,506.  [1470].  FAA then disclosed the impacts of the associated aircraft operations.  For example, FAA provided the total airport noise levels in 2022, *see* [8045], and total operational emissions for six pollutants, [8070].  All of those figures reflected the impacts of Avelo's ongoing operations.  *See* [8009, 8016, 8023-26, 8061, 8069].

FAA then predicted noise levels and emissions in 2026 and 2031 under both the proposed-action alternative (assuming Project implementation) and the no-action alternative (continuation of airport operations without the Project).  [8046-55, 8070].  FAA properly disclosed the likely incremental changes with the proposed action and the aggregate noise and emissions levels under both the proposed-action and no-action alternatives.  *Id*.; *see also* 40 C.F.R. § 1508.1(g)(3).

As the analysis shows, total operational emissions are expected to decrease with the Project for all but one pollutant.  [8070]; *see also* [1746-47].  That is because the runway extension would allow for increased use of larger Boeing 737-800 aircraft with no or reduced weight limits.  The larger 737-800 aircraft thus will be able to carry more passengers and more efficiently meet projected demand, which would reduce total air carrier operations in comparison to the no-action alternative.  [1578, 1726, 8069].  Noise levels would increase in certain limited areas due to the more frequent use of larger aircraft.  But the airport has already

mitigated noise impacts for most of the affected housing units, and sound mitigation would also be available to the remaining qualifying units. [1724-25, 8050-60, 8924-26, 8930-31].

In the cumulative-impact section of the environmental assessment, FAA properly incorporated its prior analyses and reasonably concluded that the Project would not contribute to significant cumulative air quality or noise impacts. [1640]; *see also* [1724-26, 1746-47]; *El Puente v. U.S. Army Corps of Engineers*, 100 F.4th 236, 250-51 (D.C. Cir. 2024) (cumulative-impact analysis sufficed where agency "extensively detailed the existing conditions … elsewhere in the [EA], and then— in the cumulative-impacts section—summarized its conclusion" that the project posed little risk of significant cumulative impacts).

Petitioners do not identify any aspect of Avelo's operations that FAA allegedly failed to consider. And the facts here are not comparable to those in *Marin Audubon*. *Contra* Opening Br. 36. That case involved a challenge to two agencies' new plan to govern tourist flights over four national parks. In their NEPA analysis, the agencies treated existing aircraft operations under a statutory grant of interim operating authority as the baseline and concluded that the new plan's incremental impact would be minimal. *Id*. at 916. The Court held that the agencies' approach directly contravened the relevant statute, which mandated "that

39

the provisional grant of interim operating authority should not function as the baseline for environmental analysis." *Id*. at 917.

This case does not involve a comparable statutory scheme. Consequently, FAA reasonably treated the existing level of aircraft operations as the baseline for purposes of its analysis. *See Conservation Law Foundation v. FERC*, 216 F.3d 41, 44-48 (D.C. Cir. 2000) (affirming FERC's decision to treat existing conditions at dam under current operating license as the baseline); *see also Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (the "current level of activity" is the appropriate "benchmark" for purposes of NEPA review); *City of N. Miami v. FAA*, 47 F.4th 1257, 1265, 1269-70 (11th Cir. 2022) (rejecting argument that FAA needed to consider flight levels from 2006—instead of existing flight levels—in evaluating environmental impacts of 2020 action).

Indeed, using airport conditions before 2022 as the comparison point would have been arbitrary because the resulting analysis would not have captured the specific impacts from the Project, which is what FAA was required to evaluate. And because airport operations in 2022 indisputably would continue (and increase) even without the Project, *see* [1470, 1722, 1750], FAA's baseline was not "artificially high," *Marin Audubon*, 121 F.4th at 916. In further contrast to *Marin Audubon*, FAA here "'fully examined' the environmental effects of its proposed action and the alternative options." *Id*. at 917 (citation omitted); *supra* pp. 37-39.

Finally, Avelo's commencement of service at Tweed in 2021 required an FAA amendment of operating specifications, which was the subject of a separate NEPA review at that time. [1723, 1750, 1822].[4] Although Petitioners assert that the full extent of Avelo's operations was "omitted from previous analyses," Opening Br. 36, that issue is not properly before the Court. The only order specified in the petitions for review, as required by Federal Rule of Appellate Procedure 15(a)(2)(C), is the December 2023 order for the Project. And the time for challenging FAA's prior amendment of operating specifications has long since expired. *See* 49 U.S.C. § 46110(a) (petitions challenging FAA orders "must be filed not later than 60 days after the order is issued."). Petitioners thus cannot use FAA's cumulative-impact analysis for the Project as a vehicle for attempting to challenge the sufficiency of the prior NEPA analysis. *See Lowman*, 83 F.4th at 1360; *Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 134 & n.14 (3d Cir. 2024); *Custer County*, 256 F.3d at 1040.

FAA's cumulative-impact analysis complied with NEPA.

---

[4] Operating specifications are certificates that FAA issues to airlines outlining their operational requirements and authorizing them to use certain routes, airports, and areas of operations. 14 C.F.R. § 119.49.

**III. FAA reasonably concluded that the Project will reduce the number of flights needed to meet forecasted demand.**

Petitioners next challenge FAA's conclusion that the Project will reduce the number of aircraft operations needed to meet passenger demand in 2026 and 2031, which FAA expressed in terms of the number of predicted enplanements (departing passengers). Opening Br. 37-51. Petitioners argue that FAA did not adequately explain the basis for its conclusion or account for the runway extension's alleged growth-inducing effects. *Id.* Both arguments fail.

**A. FAA explained its methodology.**

As FAA explained, the enplanement estimates for 2026 and 2031 represent foreseeable passenger demand with or without the Project. *See* [1470, 8024-25]. FAA determined that the best indicator of the likely underlying demand was the "expected level of service to be provided by the airport's sole carrier, Avelo," as documented in Avelo's forecasted flight schedules. [8024-25]. That conclusion was reasonably based on several factors: Avelo was "the only airline currently offering commercial services at [Tweed]," [1459]; there were "no firm proposals from other carriers" to begin service, *id.*; and Avelo had shown its ability to prove the market: as noted above, in 2022, Avelo's first full year of service at Tweed, enplanements increased from 29,372 in 2021 to 351,606, validating Avelo's market forecasts. *See* [1470, 8024].

Although enplanement estimates reflect a variety of factors, enplanements are most directly tied to departing flights. *See* [1470, 1474, 1760, 1762]. Using Avelo's forecasted daily departures, along with the likely aircraft mix and load factors (percentage of seats occupied), FAA estimated that annual enplanements would continue to increase from 351,506 in 2022 to more than 1.2 million by 2031. [1470, 1474]; *see also* [1751, 1760, 8016, 8024-28].[5] FAA provided a specific, simplified explanation of its methodology: taking the 22 average daily departures in 2031 derived from Avelo's flight schedules, and assuming each departure is a 189-seat Boeing 737-800 operating at 85 percent capacity, yields approximately 1.2 million enplanements for 2031. [1474]; *see also* [1760, 1762].[6]

To be sure, Avelo's forecasted schedules assumed an extended runway. [8025]. But the enplanement estimates derived from those schedules were the best indicator of likely underlying demand through 2031 with or without the Project. *See* [8024]. FAA also concluded that such demand would be met without the Project—albeit inefficiently and with a poor level of passenger service—either by Avelo or by a mix of Avelo and another airline. [1746-47, 1757, 1760]. That

---

[5] FAA thus did not "assume that enplanements would be constant," as Petitioners erroneously assert. Opening Br. 40, 41, 43.

[6] That is a simplified explanation in part because the aircraft mix likely would include some 737-700s in addition to 737-800s. *See* [8027-28]. The 22 average daily departures in 2031 represent half of the 44.8 average daily operations derived from Avelo's forecasted flight schedules. *See* [8024, 8026]; *see also* [1762].

conclusion was also reasonable because the predicted level of aircraft operations in 2031 (43,702 operations), [1470, 8026], would be well below Tweed's estimated potential annual service volume (134,658 operations), which is the maximum annual operations that the existing airfield could accommodate, [12431, 12433-34]. The existing terminal also is not constraining growth and could accommodate the predicted 1.2 million enplanements (albeit with poor service).  *See* [1722, 1752, 1757, 1763]; *see also Trenton Threatened Skies*, 90 F.4th at 137 ("FAA reasonably concluded that the new terminal itself would not increase air traffic…").

The central difference between the proposed-action and no-action alternatives, FAA explained, is that the aircraft mix used to accommodate the projected enplanements would change under the proposed action:  the runway extension would allow for increased use of higher-capacity Boeing 737-800 aircraft, whereas the no-action alternative would require a higher percentage of lower capacity 737-700 aircraft.  The end result is that the Project would reduce the number of flights required to accommodate the predicted enplanements compared to the no-action alternative.  [1470-71, 8024-25].

The Court should defer to FAA's reasoned analysis.  "When called upon to review technical determinations on matters to which the agency lays claim to special expertise, the courts are at their most deferential." *Bldg. & Const. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988).  And forecasting

air traffic falls squarely within FAA's special expertise: "FAA's expertise in forecasting air transportation demand is an area where courts accord significant deference." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011).

Petitioners nevertheless complain that the FAA did not provide the mathematical computations showing how it arrived at the "actual numbers" of predicted enplanements. Opening Br. 41. That criticism is misplaced because the detailed information that FAA *did* provide was more than "sufficient to enable those who did not have a part in [the environmental assessment's] compilation to understand and consider meaningfully the factors involved," which is all that NEPA requires. *Izaak Walton League v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981). An agency need only "identify any methodologies used" in the NEPA analyses and "may place discussion of methodology in an appendix." 40 C.F.R. § 1502.23. That is what FAA properly did here by explaining its methodology both in the environmental assessment, *e.g.*, [1474], and in Appendix I, [8023-31].

Nor could Petitioners show that they were prejudiced by the lack of additional detail. *See* 5 U.S.C. § 706 (reviewing court must take "due account … of the rule of prejudicial error"). What matters for purposes of NEPA is not the mathematical calculations themselves, but rather FAA's determination that: (1) Avelo's forecasted flight schedules were the best indicator of underlying demand, which would be the same with or without the Project; and (2) such

demand would be met under the no-action alternative, but with a different mix of aircraft requiring additional flights.  Both key points are thoroughly explained and documented in the record.  Petitioners' complaints about the lack of additional mathematical detail thus are "of the flyspecking variety" and should be rejected. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013); *see also Nevada v. Department of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) ("It is well settled that the court will not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor.").

## B.  The runway extension will not induce additional growth.

Petitioners next contend that FAA erred in using Avelo's expected level of service to predict underlying demand with or without the runway extension.  *See* Opening Br. 41-51.  Citing the forecasting in the 2021 master plan update and statements made by Allegiant Airline in 2020, Petitioners argue that the runway extension will induce other carriers to begin serving Tweed, resulting in increased operations and environmental impacts that would not otherwise occur, and which FAA's analysis does not capture.  *Id*.  That argument is also flawed.

The master plan forecasting did predict higher enplanements in an "unconstrained" scenario versus a "constrained" scenario (no major airport changes).  [12361-62].  But as FAA explained, the master plan forecasting, which was based on 2018 data, [12356], was outdated in 2023 when FAA conducted its

NEPA review of the Project, [8023]. That is because the master plan preceded Avelo's arrival at Tweed in 2021. *Id.* "Avelo, in its current form as an airline did not exist when the Master Plan forecasts were approved." [1762]. Therefore, FAA reasonably concluded that any comparison of the master plan forecasts to the post-Avelo market would be "invalid." [1974, 8023].

Petitioners' reliance on Allegiant's expression of interest in serving Tweed if the runway were extended (Opening Br. 44) is misplaced for the same reason: Allegiant made that statement in "February 2020," before Avelo began using Tweed as a base. [1459]. As FAA explained, when the environmental assessment for the Project was finalized in December 2023, "there were no firm proposals" from Allegiant or any other carriers to begin serving Tweed. [1459, 1760].

Regardless, FAA recognized that forecasted demand through 2031 could be met solely by Avelo *or* by Avelo and another airline. *See* [1746-47, 1757, 1760]. But contrary to Petitioners' mistaken assumption, the overall number of flights would not increase if another airline entered the market. Because Avelo's expected level of service is the best indicator of the likely underlying demand, the entry of another carrier would simply displace a portion of Avelo's forecasted operations. In other words, the predicted demand could be accommodated "entirely by Avelo or could include a mix of other airlines with Avelo." [1746-47, 1760]. "However, the market demand for service will be unaffected by fleet

changes." [1751]. Again, the agency's predictive judgment falls squarely within its area of special expertise and is entitled to deference. "[W]hen the FAA's determination involves, as here, forecasts of capacity and demand at an airport, even more deference is due." *St. John's United Church of Christ v. FAA*, 550 F.3d 1168, 1172 (D.C. Cir. 2008).

Nor is the "goal" of the Project to induce new demand or passenger growth. *Contra* Opening Br. 41, 50. The goal is to better accommodate existing and reasonably foreseeable passenger volumes. [1468, 1760-61]. "Specifically, the Project would address *operational* constraints through the runway extension and replacement of existing terminal with a new East Terminal." [8917] (emphasis added). There was no need for a "ground capacity expansion project." Opening Br. 47-48. As the master plan update explains, "planning for capacity-increasing measures should take place" when "airport operational levels reach 60 percent" of potential annual service volume. [12431]. Tweed's predicted operations through 2031 under either the proposed-action or no-action alternative do not approach 60 percent of the airport's potential annual service volume. *See* [1470, 12434].

Petitioners cite *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011), in support of their theory that a runway extension necessarily induces growth. Opening Br. 46-51. But the split decision in *Barnes* is inapposite. That case involved a *new* runway, which the majority made clear "has a unique

potential to spur demand." *Id*. at 1138.  And the airport was operating near (and

forecasted to exceed) its potential annual service volume when the new runway

was planned, *id*. at 1128-29, which made clear that the project was designed to

expand the airport's capacity, *id*. at 1134-36.  As noted, Tweed was not operating

anywhere near its potential annual service volume when FAA conducted its NEPA

review of the Project.  [1470, 12434].  And in a prior case involving a runway

*extension*, the Ninth Circuit agreed with FAA that the project might not affect the

number of flights "or that flight increases may occur regardless of the runway

extension," *National Parks & Conservation Ass'n v. U.S. Dep't of Transp*.,

222 F.3d 677, 681 (9th Cir. 2000), just as FAA predicted here, [1748, 1752].

Similarly, in a case involving the relocation of an existing runway and a

2,250-foot extension of a second parallel runway, this Court upheld FAA's

judgment that the existing airfield could accommodate projected demand even

without the proposed improvements (albeit less efficiently) and that the

improvements would "not induce demand."  *City of Olmstead Falls v. FAA*, 292

F.3d 261, 272 (D.C. Cir. 2002).  As in this case, FAA explained that the projected

demand was "independent of the proposed improvements at the Airport."  *Id*.

In other words, for a runway *extension*, "it is not necessarily true that if you

build it, they will come," *National Parks*, 222 F.3d at 681, especially when FAA

predicts (as it did here) that "if you don't build it, they will come anyway,"

*Olmsted Falls*, 292 F.3d at 272.  Petitioners obviously disagree with FAA's

conclusions.  But the agency's judgment that foreseeable passenger demand

through 2031 would be the same with or without the Project is reasonable, within

the agency's area of expertise, and entitled to "significant deference."  *Id.*

Finally, FAA also reasonably explained that the Project is unlikely to spur

development of air cargo operations at Tweed because no air cargo facilities exist,

no plans to construct such facilities exist, and the Project is designed to better

accommodate commercial passenger service, not to facilitate hypothetical and

speculative future air cargo operations.  [1722, 1747].[7]

## IV.   FAA took a hard look at potential impacts on wetlands, flood risk, and stormwater runoff.

Petitioners next argue that FAA did not adequately analyze the Project's

impacts on wetlands, flood risk, and stormwater pollution.  Opening Br. 57-66.

But the record demonstrates that FAA took the hard look NEPA requires.

### A.    FAA took a hard look at wetland impacts.

FAA carefully analyzed the Project's impacts on wetlands, determined that

the affected wetlands are low quality, accounted for compensatory mitigation that

---

[7] Contrary to Petitioners' assertions (Opening Br. 42-43, 48-50), FAA also
thoroughly responded to EPA's comments, [1750-56], and nothing in the statute or
regulations required EPA to formally participate in the NEPA process as a
cooperating agency in addition to submitting comments, *see* 40 C.F.R. § 1508.1(a).

will be required during future state and federal permitting, and reasonably concluded that the Project's impacts on wetlands will not be significant. [1631].

The Project will be constructed mostly on previously disturbed areas within the airport boundary, and the selected alternative was designed to avoid wetland impacts to the extent practicable. [1463, 1478, 1581, 1630, 8840-41]. The runway extension was reduced by 60 feet to avoid tidal wetlands, and it will not affect any wetlands (tidal or nontidal). [1464, 1471, 1625, 8848]. The selected alternative for the new east terminal was also designed to avoid impacting relatively undisturbed wetlands around the perimeter of the airfield. [1500-01, 8848-52].

Although construction of new terminal and related facilities will impact 9.28 acres of wetlands on airport property, [1626], the affected areas are primarily low-quality, shallow depressions that were previously filled in the 1930s, [1500-01, 1625-26]. "Therefore, the natural function, value, and quality is low for the disturbed wetlands subject to project impacts." [1626].

FAA relied on a thorough field investigation to verify the nature and functionality of the affected wetlands. [1562, 1730, 7846-7929]. The field investigation showed that the 9.28 acres of wetlands impacted by the east terminal development (in areas identified as W04, W05, W06A, and W06B) are inland, nontidal wetlands; two are manmade drainage features. [1626, 1628, 7853-59]. The principal function of all four areas is sediment/toxicant retention; one area

(W05) also serves minimal production export functions (i.e., the production of nutrients for living organisms). [1626, 1743-44]. The areas do not serve significant flood storage or other wetland functions. [1743-44, 1771, 1786]; *contra* Opening Br. 52-53, 63-66. And even for sediment/toxicant retention, their value is low. [1730, 1743-44, 1754]. FAA therefore concluded that the loss of wetland functions caused by the Project would not be significant. *See* [8923-24].[8]

The Connecticut Department of Energy and Environmental Protection and the U.S. Army Corps of Engineers informed FAA that the affected wetlands fell within their regulatory jurisdiction. [1565]. The Connecticut Department of Energy and Environmental Protection thus indicated that the Authority would need to secure a state wetland permit and water quality certification before commencing construction, and the Corps indicated that the Authority would need to secure a permit under Section 404 of the Clean Water Act. [1717]. FAA explained that those separate permitting processes (which are not before the Court in this case) would occur *after* FAA completed its NEPA review of the Project in support of its unconditional approval of the related airport layout plan components. [1730]. However, as part of its NEPA analysis, FAA thoroughly evaluated the mitigation that likely would be required during those future permitting processes.

---

[8] The site conditions also make it very unlikely that additional tidal wetlands would form naturally in the Project area. [1770]; *contra* Opening Br. 63.

As FAA explained, "[c]ompensatory wetland mitigation to offset lost wetland functions and values is an important consideration" during state and federal permitting. [8854]. And after extensive interagency coordination, FAA reasonably determined that the Project's minimal impacts could be offset by the required compensatory mitigation. *See* [1630, 1646, 1716, 1730-31, 8854-8910].

FAA (in coordination with the state) identified ten non-airport wetland areas that could serve as required mitigation sites (i.e., sites to be acquired and preserved to offset the Project's impacts on wetlands) during future state permitting. [8854-55, 8860-69, 8901-10]; *contra* Opening Br. 65. All ten sites are within two miles of the airport and within the same watershed. The list includes two tidal wetland sites identified by the Connecticut Department of Energy and Environmental Protection, including the Pig Farm Road site directly adjacent to (and potentially overlapping with) the potential Taxiway B reconfiguration shown on the airport layout plan. [8855, 8902-03, 8908-10, 12407]. Those two sites are preferred by the state and will "be subject to detailed engineering analysis during the design and permitting phase" of the Project. [8855]. However, the identification of ten potential mitigation sites will provide "substantial flexibility" in meeting state compensatory mitigation requirements. [8855].

FAA next explained taht the Corps' objective when issuing permits under Section 404 of the Clean Water Act is to achieve "no net loss" of wetlands

according to their ecological functions and values. [1630, 1646]; *Clean Water Act § 404(b)(1) Guidelines*, 55 Fed. Reg. 9210, 9211 (Mar. 12, 1990). "Appropriate and practicable compensatory mitigation is required for unavoidable adverse impacts." 55 Fed. Reg. at 9212; *see also* 33 C.F.R. § 332.2; [8841]. When the impacted wetlands are in the service area of an approved in-lieu fee program, the permittee may meet compensatory mitigation requirements by purchasing credits from the program sponsor. *Id*. § 332.3(b)(3); [8854]. The sponsor uses the funds to create sites to compensate for lost aquatic resource functions. The use of in-lieu fee programs for compensatory mitigation is often preferred because such programs can "help reduce risk and uncertainty" and "typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation." 33 C.F.R. § 332.3(b)(2).

The Corps informed FAA that its preference for required federal compensatory mitigation for the Project would be the purchase of credits from Connecticut's approved in-lieu fee program. [1631, 8855, 8902]. In its NEPA analysis, FAA therefore disclosed the cost of securing such credits, [1631], and explained that the process "is straightforward and readily available," [8855]. The actual required payment would be calculated during the federal permitting process, after state mitigation requirements are satisfied and based on the acreage and type of wetlands impacted. [1631, 1730-31, 8855, 8902].

After considering the low value and limited functions of the affected wetlands, providing detailed responses to all public comments relating to wetland impacts (*see* [1730-31, 1737, 1743-44, 1754-55, 1769-76, 1785-86]), and coordinating extensively with the state and federal permitting agencies, FAA reasonably concluded that the Project's impacts on wetlands "can be appropriately mitigated to ensure 'no-net-loss,'" [1630], and thus would not be significant, [1631]. FAA's decision makes clear that "[a]ll required regulatory permits shall be obtained prior to construction," and that any specific measure discussed in the environmental assessment that is "intended to avoid or minimize environmental effects, is considered a mitigation commitment by the Airport Authority." [8932].

FAA's careful analysis bears no resemblance to the "breezy," "unreasoned" assessment at issue in *American Rivers v. FERC*, 895 F.3d 32, 50 (D.C. Cir. 2018). *Contra* Opening Br. 55-56. There, FERC concluded that relicensing seven hydroelectric facilities along an Alabama river would not significantly impact aquatic species, despite "extensive" evidence that "dissolved oxygen levels in the Project area frequently plummeted below the lowest tolerable level, threatening 'acute mortality'" for many species and violating "water quality license conditions" and "water-quality standards codified in Alabama law." 895 F.3d at 53-54. The Court held that FERC's no-significance finding failed to account for the "known violations of minimum dissolved oxygen levels," and improperly

relied on a vague license requirement calling for the installation of "oxygen diffuser aeration systems" with no "information about what aeration system will be implemented, or when, or how it will perform." *Id*.

The record here is completely different. Tweed has no history of water quality violations, *see* [1569], and there is no evidence that the Project will have impacts even remotely comparable to killing "1.3 million fish per year" and "11% of a fish population," as was the case in *American Rivers*. 895 F.3d at 50. The Project will impact only 9.28 acres of low-value wetlands on airport property, with minimal resulting adverse effects on wetland functions and values. [8923-24].

Nor did FAA rely on "some sort of" speculative mitigation scheme in concluding that those minimal impacts could be offset. 895 F.3d at 54. FAA relied on well-established requirements for compensatory mitigation under state and federal law, which will involve the acquisition of one or more identified mitigation sites "in addition to payment into the Connecticut In-Lieu Fee Program," [1771], which is "straightforward" process, [8855]. And as explained above, the mitigation discussed in the analysis is considered "a mitigation commitment by the Airport Authority." [8932]. The Authority must also "monitor the implementation and effectiveness of such measures," and if it determines during final design or Project implementation "that any measure needs

modification or elimination," the Authority must coordinate with FAA before implementing the change.  *Id*.

Petitioners' reliance on *Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232 (D. Wyo. 2005), is similarly misplaced.  There, the Corps assumed that a permit authorizing the destruction of 574 acres of wetlands would have a significant impact but that the impact would be offset by a requirement that wetlands be replaced at a 1:1 ratio.  *Id*. at 1249.  Unlike in this case, the Corps in *Wyoming Outdoor Council* did not conduct a field investigation to determine the functions and values of the affected wetlands, relying instead "on acreage as an indicator of adverse effect."  *Id*. at 1249.  In further contrast to the situation here, where ten specific mitigation sites have been identified that could be used to offset impacts to 9.28 acres of low value wetlands, there was no evidence in *Wyoming Outdoor Council* that offsetting the loss of 574 acres of wetlands in the area was "even possible."  *Id*. at 1252.  Nor was there any evidence supporting the Corps' "generalization that a 1:1 replacement ration will be 90% effective."  *Id*.

More fundamentally, contrary to Petitioners' apparent belief, "NEPA does not mandate that [an agency] formulate a specific mitigation plan, only that it discuss mitigation 'in sufficient detail to ensure that environmental consequences have been fairly evaluated.'"  *Sierra Club v. FERC*, 38 F.4th 220, 233, (D.C. Cir. 2022) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352

(1989)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) (NEPA requires "only a 'reasonably complete discussion of possible mitigation measures'") (quoting *Robertson*, 490 U.S. at 352). FAA's detailed discussion of compensatory mitigation to be implemented during future state and federal permitting—along with the safeguards in place to ensure that such mitigation is implemented and effective, [8932]—easily satisfies that standard.

**B.      FAA took a hard look at floodplain impacts.**

FAA also reasonably concluded that the Project would have a minimal impact on local floodplain functions. *See* [1635-36, 8921-22].

The airport and surroundings fall within a special flood hazard area. [8921]. To minimize floodplain impacts, the new terminal will be constructed on columns to allow floodwater to pass beneath. [1465, 1500]. This design also reduces the amount of fill (rock or soil) required for terminal construction and minimizes the impedance of floodwaters flowing across the site. [1633]. And, as noted, the affected wetlands do not provide significant flood storage or flow-alteration functions. [1771, 1786]; *see also* [1743-44].

Despite the benefits of the Project design, elevating the runway and constructing the new aircraft-parking apron and related facilities in the new east terminal area will require placement of 61,300 cubic yards of fill in the floodplain. But FAA reasonably determined that floodplain values will be maintained by

offsetting cuts (excavations) in other areas within the airport boundary. [1635-36, 1647, 1728, 8922]. Local ordinances require no net loss of flood storage volume, so any placement of fill in the floodplain must be offset by a corresponding cut elsewhere. *Id*. In other words, if the Authority adds fill in some areas for the Project, it must excavate in other areas to ensure that the airport retains the same ability to store floodwater. *Id*.

FAA specifically identified the candidate areas for offsetting cuts on airport property, which contain 90,000 cubic yards of fill available for floodplain mitigation. [1636, 1638]. Those sites are obviously not "remote," Opening Br. 57, given that they are within the airport boundary. And although Petitioners speculate that they may not be sufficiently comparable to the areas filled, *id*. at 57-59, local laws require certification by a registered professional engineer (with supporting analyses) that floodplain encroachments will not result in any increase in flood levels, [1635, 8922, 8932]. Insofar as Petitioners cite their own expert to challenge FAA's floodplain analysis (Opening Br. 57-58), FAA "is entitled to rely upon its" own analysis "and to credit the views of its own experts … over [Petitioners'] contrary views," *City of Olmsted Falls,* 292 F.3d at 272.

### C. FAA took a hard look at potential pollution form runoff.

Finally, FAA reasonably concluded that Project-related stormwater runoff will not adversely impact adjacent wetlands and waterways. [1776, 8922-24].

Tweed currently operates under a stormwater discharge permit issued by the Connecticut Department of Energy and Environmental Protection. [1569]. Stormwater runoff from existing impervious surfaces (pavement) may enter adjacent Morris Creek, which is regularly tested for contaminants. *Id*. Test results consistently fall within acceptable ranges under the permit. *Id*.

The Project will result in a net increase of 941,922 square feet of impervious surfaces within the airport boundary, which will increase stormwater runoff and the potential for contaminants to enter adjacent waterways. [1630]. However, the Authority must prepare a Stormwater Pollution Prevention Plan and secure a new discharge permit from the Connecticut Department of Energy and Environmental Protection before commencing construction, thus minimizing the risk of significant adverse impacts. [1583, 1630, 1717, 1776, 8929].

Under state guidelines, the required stormwater management plan must maintain, to the maximum extent achievable, pre-development hydrology and pollutant loads. [1740, 1786]. The plan is expected to involve onsite stormwater infiltration as was as detention and treatment systems that will allow for the controlled release of stormwater. [1754, 8923]. Infiltration strategies have been successfully employed on previous projects at Tweed, [1785], and the Project design in this case likewise will allow for some stormwater infiltration and filtering, [1630]. Detention and treatment systems must be provided for any

stormwater that cannot be infiltrated.  [1630, 8923].  The stormwater management plan will be developed during the state permitting process.  [1630, 1717, 1740-41, 1754, 1771].  However, because runoff that cannot be infiltrated will be collected and treated before release, no adverse impacts on local adjacent wetlands and waterways from runoff pollution are anticipated.  [1776].

Petitioners complain that the environmental assessment lacks specifics about the required stormwater management plan and systems.  *See* Opening Br. 60-62.  But as noted, "NEPA does not mandate that [an agency] formulate a specific mitigation plan."  *Sierra Club*, 38 F.4th at 233.  And requiring a high level of specificity here would violate NEPA's "rule of reason," *Citizens Against Burlington*, 938 F.2d at 200-01, because FAA was not reviewing an application for a stormwater discharge permit, [1771].  The required stormwater management plan will be developed during the state permitting process, which occurs *after* FAA completes its NEPA review in support of its proposed airport layout plan approval.  [1730, 1754, 1771].  Because implementation of the Project ultimately depends on "state and local governmental bodies that have jurisdiction over" stormwater mitigation, "it would be incongruous to conclude that [FAA] has no power to act until the local agencies have reached a final conclusion on what mitigating measures they consider necessary."  *Robertson*, 490 U.S. at 352-53.

In sum, Tweed has successfully operated under a state stormwater permit with no evidence of adverse impacts, [1569]; stormwater infiltration strategies have been successfully employed on past projects at Tweed, [1785]; the required stormwater management plan must maintain pre-development hydrology and pollutant loads, [1740, 1786]; development and implementation of the plan is "considered a mitigation commitment by the Airport Authority," [8932]; and the Authority must "monitor the implementation and effectiveness" of the plan, *id*. FAA's discussion of stormwater management requirements thus provides "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Sierra Club*, 38 F.4th at 233 (cleaned up). "As with all projects subject to NEPA, should any conditions change or impacts be discovered that require further NEPA analysis, the FAA will require that a supplemental analysis, review, and decision be conducted." [8932]; *see* 40 C.F.R. § 1502.9(d)(ii).

## V.     Vacatur is not warranted.

The Court should deny the petition for review for the reasons set forth above. However, if the Court concludes that FAA erred in conducting any aspect of its NEPA analysis and that the error prejudiced Petitioners, *see* 5 U.S.C. § 706, the Court should remand to the agency for corrective action without vacatur.

In deciding whether to vacate, courts consider "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose

62

correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal v. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (cleaned up). Courts should remand without vacatur when it is "reasonably likely that on remand the [agency] can redress its failure of explanation … while reaching the same result." *Vecinos parael Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021). That would be the case here if the Court credits any of Petitioners' arguments.

Those arguments largely boil down to the allegation that FAA did not adequately explain the basis for its conclusions, and the arguments have no merit as shown above. But if the Court concludes otherwise, FAA can easily provide a more robust explanation through an appropriate administrative process. Vacatur in these circumstances would be unwarranted.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

/s/ *Kevin W. McArdle*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

Of Counsel:

EVAN BAYLOR
*Attorney*
FEDERAL AVIATION ADMIN.
Office of the Chief Counsel

ROBERT J. LUNDMAN
REBECCA JAFFE
KEVIN W. McARDLE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Tele: (202) 305-0219
kevin.mcardle@usdoj.gov

March 14, 2025
DJ No. 90-13-1-17560

# CERTIFICATE OF COMPLIANCE

1.	This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 13,694 words.

2.	This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Kevin W. McArdle*
KEVIN W. McARDLE

Counsel for Federal Respondents

# ADDENDUM

**Airport and Airway Improvement Act**

49 U.S.C. § 46110(a) ........................................................................ 1a

49 U.S.C. § 47107(a)(16) ................................................................. 1a

**National Environmental Policy Act Regulations**

40 C.F.R. § 1501.5(a)-(c) (2023) ..................................................... 3a

40 C.F.R. § 1502.9(d) (2023) ........................................................... 3a

40 C.F.R. § 1502.23 (2023) .............................................................. 4a

40 C.F.R. § 1508.1(g), (h), (x) (2023) ............................................. 5a

**Airport and Airway Improvement Act**

**49 U.S.C. § 46110 - Judicial review**

(a) Filing and venue.  Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part, part B, or subsection (l) or (r) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

\* \* \* \*

**49 U.S.C. § 47107 - Project grant application approval conditioned on assurances about airport operations**

**(a) General written assurances**.  The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that—
\* \* \* \*
(16) the airport owner or operator will maintain a current layout plan of the airport that meets the following requirements:

(A) the plan will be in a form the Secretary prescribes;

(B) subject to subsection (x), the Secretary will review and approve or disapprove the plan and any revision or modification of the plan before the plan, revision, or modification takes effect;

(C) the owner or operator will not make or allow any alteration in the airport or any of its facilities unless the alteration--

(i) is outside the scope of the Secretary's review and approval authority as set forth in subsection (x); or

(ii) complies with the portions of the plan approved by the Secretary; and

(D) when an alteration in the airport or its facility is made that is within the scope of the Secretary's review and approval authority as set forth in subparagraph (B), and does not conform with the portions of the plan approved by the Secretary, and the Secretary decides that the alteration adversely affects the safety, utility, or efficiency of aircraft operations, or of any property on or off the airport that is owned, leased, or financed by the Government, then the owner or operator will, if requested by the Secretary—

(i) eliminate the adverse effect in a way the Secretary approves; or

(ii) bear all cost of relocating the property or its replacement to a site acceptable to the Secretary and of restoring the property or its replacement to the level of safety, utility, efficiency, and cost of operation that existed before the alteration was made, except in the case of a relocation or replacement of an existing airport facility that meets the conditions of section 47110(d);

\* \* \* \*

**National Environmental Policy Act Regulations**

**40 C.F.R. § 1501.5 (2023) – Environmental assessments**

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

\* \* \* \*

**40 C.F.R. § 1502.9 (2023) – Draft, final, and supplemental statements**

\* \* \* \*

(d) Supplemental environmental impact statements. Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

## 40 C.F.R. § 1502.23 (2023) – Methodology and scientific accuracy.

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement.  Agencies may place discussion of methodology in an appendix. Agencies are not required to undertake new scientific and technical research to inform their analyses. Nothing in this section is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research.

## 40 C.F.R. § 1508.1 (2023) – Definitions

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.
* * * *

(g) *Effects or impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

(h) *Environmental assessment* means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.
* * * *
(x) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.