**ORAL ARGUMENT NOT YET SCHEDULED**

Docket Nos. 24-1028 and 24-1029 (Consolidated)

_____

# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TOWN OF EAST HAVEN, CT and SAVE THE SOUND, INC., *Petitioners*,

---v.---

FEDERAL AVIATION ADMINISTRATION, et al., *Respondents*, and

TWEED NEW HAVEN AIRPORT AUTHORITY and AVPORTS, LLC,
*Intervenors.*

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL AVIATION ADMINISTRATION

_____

### FINAL JOINT REPLY BRIEF FOR PETITIONERS
_____

| | |
|---|---|
| JAMES T. SHEARIN, Esq. | ROGER REYNOLDS, Esq. |
| DANA M. HRELIC, Esq. | JESSICA ROBERTS, Esq. |
| Pullman & Comley LLC | DARA ILLOWSKY, Esq. |
| 90 State House Square | Save the Sound |
| Hartford, CT 06103 | 127 Church Street, 2d Floor |
| Tel: 860-424-4382 | New Haven, CT 06510 |
| jtshearin@pullcom.com | Tel: 203-787-0646 |
| dhrelic@pullcom.com | rreynolds@savethesound.org |
| | jroberts@savethesound.org |
| *Counsel For Petitioner Town of East Haven* | dillowsky@savethesound.org |
| | *Counsel For Petitioner Save the Sound, Inc* |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES .......................................................................... iii

GLOSSARY OF ABBREVIATIONS ..............................................................v

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ...................................................................................................1

I.     FAA Improperly Segmented NEPA Review of the Proposed Action by Omitting Review of the Taxiway Reconfiguration. .........1

    A.     The Taxiway Reconfiguration is an Actual Proposal That Was Segmented From the FEA. ........................................................2

    B.     The Taxiway Reconfiguration is not Temporally Separate. ...............................................................................5

    C.     The Taxiway Reconfiguration Has No Independent Utility. ................................................................................6

    D.     Whether the Runway Extension Automatically Requires a Full-Length Parallel Taxiway, the Taxiway Reconfiguration is Necessarily Connected to it. ..........................9

II.     FAA Unlawfully Failed to Consider Cumulative Impacts from the Reasonably Foreseeable Taxiway Reconfiguration and the Past Entry of Avelo. .............................................11

    A.     Temporal Overlap is Not Required for Cumulative Impacts Analyses. .................................................................12

    B.     The Impacts from the Proposed Action and Taxiway Reconfiguration Would Overlap Temporally and Compound Localized Flooding and Stormwater Pollution. ................................................................14

    C.     The Taxiway Reconfiguration and its Associated Impacts are Reasonably Certain. ..............................................15

    D.     FAA Unlawfully Failed to Consider Impacts from a Past Action. ................................................................16

III.     The Enplanement Forecasting Utilized in the FEA is Deficient and Should Not Be Accorded Deference. ........................18

    A.     FAA Does Not Meaningfully Distinguish *Barnes* ....................19

    B.     FAA Fails to Adequately Justify its Decision to Use Different Enplanement Forecasting Methodology in the FEA Than in the MPU. ..........................................21

     C.     FAA Failed to Consider Reasonably Foreseeable Scenarios. ................................................................22

**IV.** **FAA Failed to Meaningfully Analyze and Mitigate Localized Flooding, Stormwater Pollution, and Wetlands Impacts.** ...........................................................24

     A.     FAA Does Not Dispute that FAA's Analysis is Incomplete. .........................................................24

     B.     FAA Relied on Speculative and Unsupported Mitigation Measures. ......................................................26

          i.     Localized Flooding ...........................................26

          ii.     Wetlands .............................................................27

          iii.     Stormwater Pollution ......................................29

**V.** **Remand Without Vacatur is Not Warranted.** ...............30

**CONCLUSION**................................................................................32

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS** ..................33

**CERTIFICATE OF SERVICE** .......................................................34

# TABLE OF AUTHORITIES[*]

**Cases**

*Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209 (D.C. Cir. 1983) ...............24

*Am. Bankers Ass'n. v. Nat'l Credit Union Admin.*, 934 F.3d 649 (D.C. Cir. 2019)30

*Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020)................29

*Am. Rivers v. FERC*, 895 F.3d 32 (D.C. Cir. 2018) ................................... 27, 28, 29

*\*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011)................... 18, 19

*Cboe Futures Exchange, LLC v. SEC*, 77 F.4th 971 (D.C. Cir. 2023)....................29

*City of Boston Delegation v. FERC*, 897 F.3d 241 (D.C. Cir. 2018) .................4, 13

*City of Olmsted Falls v. F.A.A.*, 292 F.3d 261 (D.C. Cir. 2002) ...................... 18, 20

*City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) ...............................5

*Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60 (D.C. Cir. 1987) ..........7, 8

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) ....................12

*Earthreports, Inc. v. FERC*, 828 F.3d 949 (D.C. Cir. 2016) .................................26

*El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236 (D.C. Cir. 2024)..............17

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) .......................16

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)..................................................................4

*Lowman v. FAA*, 83 F.4th 1345 (11th Cir. 2023) .......................................................4

*Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024) .............................11

*Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97 (D.C. Cir. 2014) ..........................................................................................................................4

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677 (9th Cir. 2000) ................................................................................................................ 19, 20

*Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471 (D.C. Cir. 1990) ...................... 2, 3, 4

*O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225 (5th Cir. 2007) ............ 12, 27

*Public Gas Ass'n v. U.S. Dep't of Energy,* 22 F.4th 1018 (D.C. Cir. 2022) ...........31

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............... 25, 28

*Seven Cty. Infrastructure Coal. v. Eagle Cty.*, No. 23-975 (U.S. May 29, 2025). 11, 18, 30

*\*Sierra Club v. FERC,* 38 F.4th 220 (D.C. Cir. 2022) ...........................................28

*Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189 (D.C. Cir. 2017) .....................24

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973)..........................................................24

*TNHAA v. Tong*, 930 F.3d 65 (2d Cir. 2019)...........................................................22

*\*TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ........................... 11, 13, 16, 17

*Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.Supp.2d 1232 (D. Wyo. Jan. 7, 2005)................................................................................. 26, 27, 29

**Statutes**

42 U.S.C. § 4332 ....................................................................................................12

42 U.S.C. § 4332(2)(C)..................................................................................... 24, 25

**Regulations**

40 C.F.R. § 1501.9(e)(1) .......................................................................................10

\* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ACIP | Airport Capital Improvement Plan |
| ALP | Airport Layout Plan |
| AR_1 | Administrative Record at page 1 |
| HVN | Tweed New Haven Airport |
| DEA | Draft Environmental Assessment |
| DEEP | Connecticut Department of Energy & Environmental Protection |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FAA | Federal Aviation Administration |
| FEA | Final Environmental Assessment |
| FEMA | Federal Emergency Management Agency |
| FONSI | Finding of No Significant Impact |
| MPU | Master Plan Update |
| NEPA | National Environmental Protection Act |
| ROD | Record of Decision |
| TNHAA | Tweed New Haven Airport Authority |

## SUMMARY OF ARGUMENT

In finding that the Proposed Action will not significantly impact the environment, FAA relies on a facially flawed analysis that (1) impermissibly segments NEPA review of the Proposed Action; (2) fails to consider direct, indirect, and cumulative impacts; and (3) relies on unsupported methodology and mitigation measures. FAA's brief[1] fails to justify separating the Taxiway Reconfiguration from the Proposed Action or its failure to analyze direct, indirect, or cumulative impacts. In seeking deference for enplanement forecasting, FAA fails to distinguish *Barnes*, and in seeking deference for its proposed mitigation, FAA continues relying on vague, unsubstantiated future mitigation measures. These inadequacies and failures cannot serve as the foundation for deference to FAA. Accordingly, the FEA and FONSI/ROD must be vacated, and the matter remanded with direction to complete a full and adequate EIS.

## ARGUMENT

### I.  FAA Improperly Segmented NEPA Review of the Proposed Action by Omitting Review of the Taxiway Reconfiguration.

FAA's segmentation argument turns a blind eye to reality. Rather than acknowledging the Taxiway Reconfiguration as a critical piece of the puzzle in

---

[1] Intervenors, Avports and TNHAA, make nearly identical arguments as Respondents. Accordingly, Petitioners generally respond to Respondents' specific arguments, except where noted. References in this reply brief to "FAA" include both Federal Respondents.

TNHAA's proposed expansion, FAA begins by misleadingly describing it as a "potential future" action. FAA Br. 24. This implies that the Taxiway Reconfiguration is optional, speculative, and might not even occur, notwithstanding the MPU and ALP plainly depicting a full-length parallel taxiway 400 feet from the extended runway. FAA doubles down by arguing the Taxiway Reconfiguration is completely disconnected from the runway it is designed to support. FAA's final argument hinges on the view that a full-length parallel taxiway is not required under the law, but rather the taxiway's length depends on "visibility minimums." However, by conceding that it must "reassess" the length of the taxiway once the runway is extended, FAA makes clear that these two pieces of the airport expansion are connected.

### A. The Taxiway Reconfiguration is an Actual Proposal That Was Segmented From the FEA.

FAA contends that the Taxiway Reconfiguration is not a "pending federal proposal that could have been segmented." FAA Br. 25 (citing *Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1477-78 (D.C. Cir. 1990)). But this ignores the facts. The MPU described, in definitive and concrete terms, extending the runway, constructing a new terminal, and reconfiguring the taxiways, as well as land acquisition, noise mitigation, and other necessary parts of this large, comprehensive plan. A914-15. Part of this comprehensive plan has already been accomplished by reconfiguring a portion of the taxiway to meet the 400-foot runway-taxiway separation standard.

Together, these pieces of the airport's expansion facilitate the overall goal of TNHAA, which is to ensure that HVN operates safely, functionally, and efficiently—and in compliance with FAA standards required for critical federal funding eligibility. A1111-12, A1137.

Contrary to FAA's labeling, the Taxiway Reconfiguration is not described as a "*potential* future" project in either the MPU or FEA. Rather, the Taxiway Reconfiguration is deeply embedded within the expansion project, serving the critical function of bringing the current runway and taxiway into FAA compliance. A1111. It is the *only* correction to the current nonstandard runway-taxiway separation; without it, HVN will have nonstandard, noncompliant runway-taxiway separation continuing in perpetuity. Moreover, the Taxiway Reconfiguration includes construction of a full-length parallel taxiway, which will "provide[] improved flexibility from an operational standpoint by allowing aircraft to maintain clear of the runway environment and exit at optimal points to minimize runway occupancy time." *Id.* The Taxiway Reconfiguration not being part of the currently pending federal proposal *is precisely the point*. Without the Taxiway Reconfiguration, FAA approved a Proposed Action that is not compliant with current FAA Standards and that contains no FAA modification to standards approval—a key component for federal funding and a requirement in the Airport Improvement Handbook. A885.

FAA's reliance on *Nat'l Wildlife Fed'n* is misplaced. Petitioners in *Nat'l Wildlife Fed'n* argued that the EIS for Phase I of a hydroelectric project was deficient because it did not analyze the impacts of Phase II as a connected or cumulative action. 912 F.2d at 1474. Prior to the EIS, however, and in response to concerns raised during various hearings, the applicant had specifically withdrawn its request for approval of Phase II. *Id.* As such, the Court concluded that the EIS "need not delve into the possible effects of a hypothetical project." *Id.* at 1477 (citing *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)).

Here, the Taxiway Reconfiguration plans have never been withdrawn, abandoned, postponed, or questioned by any of the parties. It is not "a hypothetical project" that need not be considered.[2] As the Taxiway Reconfiguration is undeniably an "actual proposal" in the MPU, upon which the FEA is based; AR_26, 30; FAA had as much information as it had about the runway extension and terminal construction projects.[3] FAA even concedes in its brief that approval of the Taxiway Reconfiguration would necessarily "trigger NEPA review." FAA Br. 26.

---

[2] Intervenor TNHAA describes Phase III of the Taxiway Reconfiguration as "entirely speculative," but neither cites to the record in support of this representation nor explains how the Taxiway Reconfiguration could be "entirely speculative" in the face of its concrete description in the MPU. TNHAA Br. 12.

[3] The other cases upon which FAA relies are equally unavailing. *See Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 113 & n.11 (D.C. Cir. 2014) (at time of proposal, no details of the second project were known, the EA discussed the second project, and it found no significant cumulative impacts); *City*

Despite being both an interdependent part of the airport expansion plan and intricately connected to the runway extension as a basic safety component, the Taxiway Reconfiguration was omitted from the FEA. The question for the Court is not whether TNHAA's failure to submit this actual proposal means there was "no connected federal action relating to the taxiway improvements that FAA could have segmented from its review of the Project." FAA Br. 26. The question is whether TNHAA's failure to submit this actual proposal and FAA's subsequent approval of the FEA despite this fatal failure created improper segmentation. Petitioners contend it did; therefore, FAA's approval of the FEA violated NEPA.

### B. The Taxiway Reconfiguration is not Temporally Separate.

FAA argues that the Taxiway Reconfiguration is temporally separate from the Proposed Action, citing *City of Port Isabel v. FERC*, 111 F.4th 1198, 1211 (D.C. Cir. 2024), for the notion that connected actions must "overlap temporally." FAA Br. 27. However, in *City of Port Isabel*, this Court emphasized the importance of looking at "the whole story" when considering temporal connectedness. 111 F.4th at 1213. The "whole story" here is that the MPU and ALP recommended *both* the runway extension *and* the Taxiway Reconfiguration and provided detailed plans for

---

*of Boston Delegation v. FERC*, 897 F.3d 241, 253 (D.C. Cir. 2018) (of three proposals, one was severely curtailed in operation and one was withdrawn, demonstrating proposals not connected); *Lowman v. FAA*, 83 F.4th 1345, 1361 (11th Cir. 2023) (Phase II project not part of a pending proposed action but rather an all-new proposal, reflecting separation from Phase I project).

the design and construction of both projects. In fact, the Taxiway Reconfiguration is set to occur in every single phase of the project set forth in the MPU—including the first phase, during the next five years. The design and construction of the full-length parallel Taxiway A in the terminal area is set to begin in Phase I (2022-2026), which also includes the runway extensions at issue in the FEA. A914. The Taxiway Reconfiguration, including the design and construction of full-length parallel Taxiway A, is set to continue in Phase II, and further taxiway improvements are to occur in Phase III and Phase IV. A914-15. It is simply inaccurate to say that TNHAA "does not expect to pursue the taxiway improvements for at least the next five years." FAA Br. 29.

In sum, the Taxiway Reconfiguration is a concrete, connected action to be undertaken by the same project sponsor and approved by the same regulator. It was undoubtedly omitted from the Proposed Action because doing so would have presented challenges for NEPA review, including the almost certain requirement to prepare an EIS, the need to disclose significant environmental consequences, and the limits of mitigating those consequences. Omitting it from the Proposed Action constitutes improper segmentation.

**C. The Taxiway Reconfiguration Has No Independent Utility.**

FAA's attempt to assign independent utility to the Taxiway Reconfiguration falls short. As FAA readily concedes; *see* FAA Br. 28; unless and until the Taxiway

6

Reconfiguration occurs, Runway 02-20—extended or not—will continue to be noncompliant with FAA standards, principally the required runway-taxiway separation. This does not make the Taxiway Reconfiguration independently useful, as FAA would have it; *see id.*; but rather a component of the runway expansion project itself. The Taxiway Reconfiguration is needed because it is the *only* proposal to address this noncompliance.

This begs the question Petitioners raised in their opening brief: if the runway extension proceeds but the Taxiway Reconfiguration fails to pass muster under NEPA review at some later point (as TNHAA and FAA would have it), what then? TNHAA will have spent incredible amounts of time and resources on a project that will never be safe or complete, and at an airport that could be rendered ineligible for federal funding—efforts that cannot be saved without undoing the planned work or undertaking some other unspecified herculean effort. This underscores both the interconnectedness of these actions and the importance of the Taxiway Reconfiguration to the Proposed Action.

Instead of considering the Taxiway Reconfiguration in its entirety as a comprehensive project serving the runway expansion, as proposed and conditionally approved by FAA in the ALP and MPU, FAA divides the project into pieces and cherry picks which parts are independently useful. FAA Br. 27-29. According to FAA, this gives the entire Taxiway Reconfiguration independent utility "regardless

of whether the runway is extended." FAA Br. 28. FAA relies upon this Court's decision in *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60 (D.C. Cir. 1987), to support its independent utility theory. However, the Court in *Dole* was considering separate highway and interchange projects that would independently improve traffic conditions, regardless of whether and which of the projects moved forward. *Id.* at 68-70. FAA's approach here is not only arbitrary and capricious but also nonsensical. Unlike highway and interchange projects, each of which has an independent "significant purpose"; *id.* at 69; a taxiway has no independent purpose, or reason to exist, apart from the runway it serves. The Taxiway Reconfiguration exists to make the runway safe and compliant with FAA standards.

If the runway expansion does not occur, it would make no sense to extend the taxiway beyond the ends of the runway. FAA's modification of the standard from 2002 to allow for a 275-foot offset between Taxiway B and the current Runway 2 end simply would be unaffected and the Taxiway Reconfiguration would be unneeded. *See* FAA Br. 15. But if the runway extension proceeds and the northern and southern ends of Runway 02-20 move, the conditions of that modification will change. There are no plans in the Proposed Action to seek a new or amended modification of the 400-foot runway to taxiway separation standard. Thus, the runway extension requires the Taxiway Reconfiguration to maintain compliance with FAA standards. Unlike the projects in *Dole*, the Taxiway Reconfiguration has

8

no independent utility and serves no significant purpose if the runway extension is not built.

FAA's conditional approval of the ALP and MPU as one interconnected, comprehensive plan underscores this point. FAA acknowledges this conditional approval but states that TNHAA may nevertheless take a piecemeal approach to seeking unconditional approval of deconstructed pieces of the same plan. FAA Br. 26. It is disingenuous for FAA to suggest that, because TNHAA intentionally (and likely strategically) deconstructed this singular plan and chose a disjointed approach to seeking said approval from FAA, the comprehensive plan loses its substantive connections.

**D. Whether the Runway Extension Automatically Requires a Full-Length Parallel Taxiway, the Taxiway Reconfiguration is Necessarily Connected to it.**

Petitioners maintain that the runway extension automatically requires the Taxiway Reconfiguration to comply with FAA design standards and to maintain airport safety. However, even if the Court finds that this is not true, it nevertheless remains that the Taxiway Reconfiguration is connected to the runway extension. FAA concedes that the Taxiway Reconfiguration will bring HVN into compliance with the FAA runway-to-taxiway 400-foot separation standard. FAA Br. 28. As noted, this point alone demonstrates the interconnectedness of these projects. While FAA now takes the position that the necessity of a full-length parallel taxiway turns

on "visibility minimums," FAA admits that it will have to "reassess the required 'visibility minimums' … after the runway is extended." FAA Br. 31-32. There is no reason why, however, FAA cannot do this now. Having not done so, FAA cannot meaningfully state that the taxiway will not be a necessary component of the runway extension. FAA does not dispute this fact. There is thus an indisputable connection between the runway expansion and the Taxiway Reconfiguration.

Moreover, to be considered a "connected action" under applicable regulations, the Taxiway Reconfiguration need only meet one of the three definitions contained therein, which define "connected actions" as closely related actions that:

(a) Automatically trigger other actions;

(b) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(c) Are interdependent parts of a larger action and depend on the larger action for their justification.

A771; *see also* 40 C.F.R. § 1501.9(e)(1). Thus, whether the runway extension automatically triggers the need for a full-length parallel taxiway, the Taxiway Reconfiguration satisfies the remaining prongs. The runway expansion will require FAA to "reassess visibility minimums" and decide whether a full-length parallel taxiway is necessary or whether the issue can be addressed alternatively. This demonstrates that the Taxiway Reconfiguration is necessarily connected to the

10

runway extension and should not have been left out of the Proposed Action, an omission constituting improper segmentation that requires setting aside the FEA and FONSI/ROD.[4]

## II. FAA Unlawfully Failed to Consider Cumulative Impacts from the Reasonably Foreseeable Taxiway Reconfiguration and the Past Entry of Avelo.

Even if the Court finds that the Taxiway Reconfiguration was not segmented from the Proposed Action, it most certainly is reasonably foreseeable. This Court has required agencies conducting an EA to analyze the cumulative impacts of an underlying agency action. *TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006).[5] By listing the Taxiway Reconfiguration as a "future project" in its cumulative impacts analysis, FAA has acknowledged that the Taxiway Reconfiguration is reasonably foreseeable. A251. Notwithstanding this acknowledgment, FAA argues that the Taxiway Reconfiguration is beyond the scope of this analysis because it does not

---

[4] The Supreme Court's recent decision in *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, No. 23-975 (U.S. May 29, 2025) does not warrant a different result than that urged by Petitioners. The Supreme Court noted that "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand," as opposed to separate projects that may be built in the future by another entity or in another location. *Seven Cty.*, slip op. at 16 (internal citations omitted).

[5] *TOMAC* is grounded in NEPA's implementing regulations. *Id.* at 864. While this Court in *Marin* stated that CEQ lacked authority to promulgate legally binding regulations; *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024); FAA agrees that this decision does "not impact this case … because FAA completed its NEPA analysis before" *Marin* was decided. FAA Br. 5.

"overlap in time" with the Proposed Action and its impacts are not reasonably certain. FAA Br. 33-37. For the reasons provided below, both arguments fail.

## A. Temporal Overlap is Not Required for Cumulative Impacts Analyses.

FAA contends that two projects cannot combine to produce a significant cumulative impact unless they overlap temporally. FAA Br. 33-35. This mischaracterizes the standard for cumulative impacts review, conflating the requirements for a cumulative impacts analysis with the standard for demonstrating segmentation. While related, cumulative impacts and segmentation are distinct. *Compare Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) (one factor in considering whether segmentation has occurred is "temporal nexus between the projects") *with O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007) ("temporal nexus" or overlap is not a factor in conducting a cumulative impacts analysis); *see also* A767-68. The sole threshold for considering a future project in a cumulative impact analysis is whether it is "reasonably foreseeable." *See* 42 U.S.C. § 4332.

A project can be "reasonably foreseeable" without overlapping temporally with the Proposed Action. The case relied upon by FAA, *City of Boston Delegation v. FERC*, 897 F.3d 241, illustrates this point. There, this Court held that two projects (the "AIM Project" and "Atlantic Bridge Project") were not segmented, in part because there was no temporal overlap between them. *Id.* at 252. However, the Court

12

held that a cumulative impacts analysis, encompassing both projects, was still required because "[a]t the time of the [defendant's] consideration of the AIM Project, the impacts of the Atlantic Bridge Project were reasonably foreseeable." *Id.* at 253. As stated above, this Court requires that agencies analyze the cumulative impacts of reasonably foreseeable past and future actions. *TOMAC*, 433 F.3d at 864. Past and future actions, by definition, are temporally distinct from the present, Proposed Action; this fact alone does not excuse FAA from analyzing them in a cumulative impacts analysis.

FAA suggests that *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, No. 23-975 (U.S. May 29, 2025), eliminates its obligation to consider reasonably foreseeable future actions through a cumulative impacts analysis. *See* FAA Suppl. Letter. However, the future actions at issue in *Seven County* were geographically separate from the proposed action and not subject to the agency's regulatory authority or control. *Seven Cty.*, slip op. at 15-22. In contrast, FAA has authority and control over the Proposed Action and other actions at issue here, which all impact the same area. Moreover, FAA Order 5050.4B provides that an EA's cumulative impacts analysis should consider past, present, or reasonably foreseeable future actions, and that "analysists must determine if those actions and the airport action would cause significant cumulative impacts." A768.

**B. The Impacts from the Proposed Action and Taxiway Reconfiguration Would Overlap Temporally and Compound Localized Flooding and Stormwater Pollution.**

To the extent that the projects' *impacts* must overlap temporally, the record clearly shows that the Proposed Action's impacts *would* overlap with, and be compounded by, the Taxiway Reconfiguration's impacts. For instance, the Proposed Action would impact 9.28 acres of onsite wetlands and add 61,300 cubic yards ("CY") of fill and 21.6 acres of impervious surface. A235, A631, A667. The Taxiway Reconfiguration will involve bridging or paving over a portion of Morris Creek and adding over 6.8 acres of impervious surface. A303, A658, A665, A1020-27, A1131. Both the Proposed Action and the Taxiway Reconfiguration will impact wetlands, exacerbate localized flooding, and increase stormwater pollution. A617-34, A668, A1096, A1111, AR_3461, AR_5889-91, . These impacts will likely extend indefinitely into the future after the projects' construction.[6] A234-40. While FAA has gestured towards potential mitigation measures, FAA did not contend or put forth any evidence that the Proposed Action's impacts will be *fully eliminated or abated* within five years. *Id.* If anything, the record shows that they will very likely get worse in the coming decades with climate change. A179, A525-26.

---

[6] As explained below, FAA has not provided sufficient information to assess whether, and to what extent, the Proposed Action's impacts will be mitigated.

The record indicates that the impacts will compound upon each other and have a far greater cumulative impact than either one project would have in isolation. By way of example, the addition of 27.9 acres (combined total of the Proposed Action and Taxiway Reconfiguration) would have a greater impact than the addition of just 21.6 acres (the Proposed Action) or 6.8 acres (the Taxiway Reconfiguration). In this manner, the impacts from the Proposed Action and Taxiway Reconfiguration are cumulative. Thus, the Taxiway Reconfiguration is clearly within the scope of a proper cumulative impacts review.

**C. The Taxiway Reconfiguration and its Associated Impacts are Reasonably Certain.**

As FAA contends, it is not "reasonably certain that [TNHAA] would construct" the Taxiway Reconfiguration, highlighting that the Taxiway Reconfiguration is not *automatically* required to comply with FAA Standards. FAA Br. 30-37. However, as previously described, this Taxiway Reconfiguration is the *only* option provided in the MPU for complying with the pertinent FAA Standards and HVN's Facility Requirements. A1111-12. Moreover, by mapping out and planning the Taxiway Reconfiguration in the MPU, HVN has expressed clear intent to comply with FAA Standards by constructing the Taxiway Reconfiguration. *See, e.g.*, A1111-12, A1131, A1137, A1142-44 (showing the specific location, specifications, and timetable for the Taxiway Reconfiguration's completion).

15

Based on these plans, the precise parameters of the Taxiway Reconfiguration are already known, which means the impacts of the Taxiway Reconfiguration are also reasonably certain. The MPU has stated that this project will involve paving or bridging over a part of Morris Creek, paving wetlands, and adding over 6.8 acres of impervious surface to HVN. *See* A1131. HVN has already considered these impacts in the MPU; A1111; and no one disputes that these impacts are significant. *See* FAA Br. 16. There is no reason why FAA could not have considered those impacts in the FEA, and the failure to do so violated NEPA, rendering the FONSI/ROD arbitrary and capricious.

### D. FAA Unlawfully Failed to Consider Impacts from a Past Action.

As part of its cumulative impacts analysis, NEPA requires FAA to take a "hard look" at past actions that have impacted the study area and to identify the impacts from these past actions and the "overall impact that can be expected if the individual impacts are allowed to accumulate." *TOMAC,* 433 F.3d at 864. This analysis involves "more than just catalog[ing]" relevant past projects. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006). Additionally, the analysis cannot merely state that ambient conditions, as described elsewhere in the EA, reflect the impacts of past actions. *See id.* at 973.

The introduction of Avelo Airlines is a past action that resulted in a dramatic increase in enplanements (from 29,372 in 2021 to 351,506 in 2022). *See* A68, A982.

16

As EPA noted in its DEA comments: "Identification and acknowledgment of these impacts is an important part of understanding the environmental condition of the project area." A498-99. In the FEA, Avelo's introduction was listed as a relevant past action, but the cumulative impacts section did not identify any associated impacts. A249-50. Nor did the FEA analyze the cumulative impacts of Avelo's introduction in conjunction with the Proposed Action. *Id.* This is not the hard look that NEPA requires.

In its brief, FAA contends that it "fully accounted for the impacts of Avelo's operations in assessing the existing baseline conditions" at Tweed in 2022 (a year after the entry of Avelo). FAA Br. 37. FAA contends it did so by comparing (in other sections of the FEA) the 2022 baseline conditions to the Proposed Action's expected impacts. *Id.* FAA's comparison misses a key component of a proper cumulative impacts analysis. As the Court has previously stated, a cumulative impacts analysis must identify the specific impacts from past actions. *TOMAC*, 433 F.3d at 864. And doing so should require comparing the conditions *before* that action to the conditions after it. FAA failed to take this step, comparing instead the conditions after the past action to those expected after the Proposed Action.

FAA cites *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236 (D.C. Cir. 2024), to support its assertion that a discussion of existing conditions is sufficient for an analysis of past actions. FAA Br. 39. However, no past actions were identified

17

in *El Puente*. *See* Appellant Brief at 19, *El Puente*, 100 F.4th 236 (No. 23-5189). Here, FAA clearly identified Avelo's introduction as a past action but did not analyze its impacts. A250. This is not a sufficient cumulative impacts analysis, and fatally infects the entirety of FAA's conclusion.

**III.    The Enplanement Forecasting Utilized in the FEA is Deficient and Should Not Be Accorded Deference.**

In response to Petitioners' enplanements challenges, FAA and Avports urge this Court to defer to FAA's supposed expertise in enplanement forecasting. FAA Br. 44-45, Avports Br. 15-16. Such deference is unwarranted because (1) FAA's methodology, by failing to consider the growth-inducing nature of the runway extension, is facially deficient, and (2) FAA did not adequately explain the reasons for using this methodology despite requests from other agencies and experts. Deference is not without limits—NEPA requires agencies to adequately describe the basis of their decisions and respond to legitimate comments. *See City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 269 (D.C. Cir. 2002) (under NEPA, courts must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious"); *Seven Cty.*, slip op. at 9 ("Under th[e arbitrary-and-capricious standard], a court asks … whether the agency action was reasonable and reasonably explained."). FAA relied on facially deficient and inadequately explained enplanement forecasts, and conclusions drawn using those forecasts are arbitrary and capricious.

18

**A. FAA Does Not Meaningfully Distinguish *Barnes*.**

The holding in *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011), is directly on point, and FAA has failed to meaningfully distinguish it. In *Barnes*, the Ninth Circuit rejected an EA after finding that FAA had failed to consider the demand-inducing impacts of adding a new runway to an airport. *Id.* at 1137-39. The Court concluded that the addition of a new runway was "a major ground capacity expansion project," and that "a new runway has the unique potential to spur demand, which sets it apart from other airport improvements, like changing flight patterns, improving a terminal, or adding a taxiway…." *Id.* at 1138. Because a "major ground capacity expansion project" was at issue, FAA was required, but failed to, "analyze the impacts of the increased demand attributable to the additional runway." *Id.* at 1139.

FAA argues that *Barnes* should be limited only to instances where a new runway is added and should not apply to the extension of an existing runway. FAA Br. 48-49. This interprets *Barnes* too literally and ignores the reasoning underlying its decision. The fact that the Proposed Action extends an existing runway as opposed to adding a new runway is not the dispositive point. What matters is that the extension of an existing runway is a major expansion of ground capacity, which creates the potential (and expectation) to "spur demand." *Barnes*, 655 F.3d at 1139. "[E]ven if the stated purpose of the project is to increase safety and efficiency, the

agencies must analyze the impacts of the increased demand attributable to the additional runway as growth-inducing effects….” *Id.* This is what FAA missed in *Barnes*, and what FAA missed here by failing to undertake a serious analysis of the capacity increase.

The citation to *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677 (9th Cir. 2000), provides no support for FAA's position because the EIS in *Nat'l Parks & Conservation Ass'n* had the requisite analysis to support its conclusions. Specifically, the EIS determined "that the project may not affect arrivals at all, or that flight increases may occur regardless of the runway extension." *Id.* at 681. Critically, the EIS's analysis contained an independent study finding "that tourism and airline executives expected 'no or little lasting long-term growth-inducing impact' from the runway extension," as well as a study examining a nearby airport with a runway the same length as the proposed extension. *Id.* No such independent, analytical studies can be found in the FEA. Instead, FAA's conclusion relies solely on a single airline's expected flight schedule. A389, A418. There is no analysis as to whether the flight schedules might change due to capacity increases and no study about whether other airlines would be expected to enter in the event of an expansion. FAA's conclusion here is nothing more than an unsupported, bare assertion by one airline with a vested interest in the airport's expansion.

FAA's reliance on *City of Olmsted Falls*, 292 F.3d 261, is likewise misplaced. That case involved the *relocation* of an existing runway rather than the *expansion* of additional ground capacity. *Id.* at 265. There, this Court deferred to FAA's conclusion that improvements at an airport would not induce demand, since "the improvements [we]re to *move an existing* runway, not the addition of a runway." *Id.* at 272 (emphasis added). Where that case involved the relocation of an existing runway, this case involves the expansion of additional ground capacity by expanding the existing runway to create new runway lengths. While deference to the agencies may be warranted when they exercise their expertise, deference is not warranted when, as here, the agency's supposed expertise was not exercised at all. *See id.* at 269.

**B. FAA Fails to Adequately Justify its Decision to Use Different Enplanement Forecasting Methodology in the FEA Than in the MPU.**

In the MPU, six scenarios were considered in forecasting enplanements: three constrained and three unconstrained. A983-84. Each constrained scenario assumed that no major changes would be made to the airport. A983. For each growth scenario, *i.e.*, low, medium, and high growth, the unconstrained case forecasted greater enplanements than the constrained case, a difference which grew as time passed. A984. FAA acknowledges that the MPU concluded as much. FAA Br. 46 ("The

master plan forecasting did predict higher enplanements in an 'unconstrained' versus a 'constrained' scenario.'").

To explain the failure to consider the impact on demand of the extended runway (*i.e.*, unconstrained versus constrained scenario), FAA contends that the forecasts contained in the MPU were based on 2018 data, which were outdated when FAA began its NEPA review. *Id.* at 46-47. This miscomprehends Petitioners' claim, which is not that FAA should have utilized the *data* from the MPU's analysis, but that FAA should have utilized the *methodology* from the MPU's analysis, inputting updated data reflecting the present circumstances. FAA failed to do so, and its empty analysis—and rejection of increased enplanements—falls flat.

### C. FAA Failed to Consider Reasonably Foreseeable Scenarios.

Rather than conduct the required analysis, FAA erroneously relied exclusively on Avelo's forecasted daily departures, which were derived from a letter of intent submitted to Avports. A389, A418. The purpose of forecasting is not to determine one airline's actual plans, which depends on many things aside from runway size, but to predict how *all* airlines respond to an increase in ground capacity. If Avelo chose, for whatever reason, not to increase flights in the face of additional capacity, other airlines are likely to move in to take advantage of that additional capacity. This does not necessarily mean, as FAA presumes, that the other airlines "would simply displace a portion of Avelo's forecasted operations." FAA Br. 47. Rather, it is

reasonable to expect that, if other airlines increase their operations at HVN, then the total number of flights and enplanements will also increase.

Previous litigation involving this runway extension supports this point. In *TNHAA v. Tong*, the Second Circuit concluded that:

> Lengthening the runway would allow for the safe use of larger aircraft, allow flights with no seating restrictions, allow more passengers on each airplane, and allow service to more destinations. It would also allow [HVN] to attract more carriers and expand the availability of safe air service for its customers.

930 F.3d 65, 69 (2d Cir. 2019). The Court's prediction from *Tong* has already come to fruition: In December 2024, another airline announced service to ten new locations from HVN.[7] The FEA itself noted that "airlines have expressed interest in serving HVN; however, the existing 5,600-foot runway length has prevented them from doing so." A68; *see also* A552, A555, A890, (noting that HVN cannot

---

[7] Breeze Airlines announced the addition of ten routes out of New Haven, with some routes beginning immediately and some beginning in February 2025. *See* NBC CONNECTICUT, *What to know about the 10 new Breeze Airways routes from New Haven*, NBC CONNECTICUT, https://www.nbcconnecticut.com/news/local/what-to-know-about-the-10-new-breeze-airways-routes-from-new-haven/3451520/ (Dec. 10, 2024 at 1:42 ET); *see also* Bob Connors, *Breeze Airways begins six new routes from Tweed New Haven Airport*, NBC CONNECTICUT, https://www.nbcconnecticut.com/news/local/breeze-airways-begins-six-new-routes-from-tweed-new-haven-airport/3493375/ (Feb. 6, 2025 at 2:37 ET).

Similarly citing to an online news article, Avports noted that, in February 2025, Breeze had reduced some of its routes to Florida. Avports Br. 21 n.5. Avports conveniently omitted the fact that, simultaneous to its decision to stop some service to Florida, Breeze was beginning service to other locations as articulated by their December 2024 plans.

presently adequately serve the needs of the flying population). Yet FAA continues to erroneously maintain its counter-factual assertion that the Proposed Action could not and will not induce more demand.

By limiting the forecasted departures solely to those intended by Avelo, FAA contradicts itself, ignoring its own claims that the runway extension would incentivize additional airlines to offer service at HVN. FAA's failure to adequately consider other reasonably foreseeable scenarios taints the enplanement forecasting, and reliance on these inadequate forecasts renders FAA's decision arbitrary and capricious.

## IV.     FAA Failed to Meaningfully Analyze and Mitigate Localized Flooding, Stormwater Pollution, and Wetlands Impacts.

Instead of conducting a full and meaningful analysis of water resources, FAA largely deferred this analysis to a later date. However, NEPA requires FAA to fairly evaluate the environmental impact of the Proposed Action *now*, in its EA. *See* 42 U.S.C. § 4332(2)(C). FAA's failure to do so renders the FEA arbitrary and capricious.

### A. FAA Does Not Dispute that FAA's Analysis is Incomplete.

Agencies must analyze the direct and indirect impacts of a proposed action in consideration of public comments on the draft EA. A772; *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 193 (D.C. Cir. 2017); *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983). When commenters, and

particularly "responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project ... these comments may not simply be ignored. There must be a good faith, reasoned analysis in response." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973).

FAA received myriad expert and agency comments concerning both direct and indirect impacts of the Proposed Action on water resources, yet failed to provide a sufficient, reasoned analysis in response. Despite receiving expert comments on how the Proposed Action would indirectly pollute tidal wetlands, FAA failed to analyze or even mention the indirect impacts on wetlands in the FEA. A617-18, A665. FAA also failed to conduct an analysis of "floodplain compensation volume versus floodplain displacement volume … on an incremental elevation range," despite DEEP expressing a clear need and request for this analysis. A508. And FAA failed to analyze the soil conditions on site, despite experts noting that this analysis is necessary to determine the extent to which stormwater mitigation measures are even possible. A665-67. This renders FAA's analysis incomplete.

As purported justification, FAA contends that the impacted wetlands are "low value," and a fuller analysis will be provided later. FAA Br. 50-62. This is neither appropriate nor proper. The purpose of conducting a NEPA analysis is to determine and analyze the impacts *now*. 42 U.S.C. § 4332(2)(C). Furthermore, the claim that

the wetlands are relatively "low value," does not excuse FAA from conducting a full analysis or responding to credible and relevant agency and expert comments.

### B. FAA Relied on Speculative and Unsupported Mitigation Measures.

FAA also failed to support the efficacy of its proposed mitigation measures, largely deferring its analysis of efficacy to a later date. *See* A234-41. While an EA need not contain a formal mitigation plan, it must, at the very least, discuss mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). Even where mitigation measures or standards for them are mandated by law, FAA still needs to provide support that these measures will be successful. *See Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.Supp.2d 1232, 1251-52 (D. Wyo. Jan. 7, 2005). FAA's failure to do so[8] renders the FEA arbitrary and capricious.

#### i. *Localized Flooding*

To mitigate impacts on flooding, FAA proposes using up to 90,000 CY of cut (the amount "available within airport property"); A244-45; despite comments from DEEP that "given the high groundwater table and low-lying airport property," this

---

[8] While TNHAA highlights that FAA may rely on other regulatory agencies; *see* TNHAA Br. 16-19; FAA cannot abdicate its responsibility to those agencies without "independently evaluating" the relevant impacts and efficacy of mitigation. *See Earthreports, Inc. v. FERC*, 828 F.3d 949, 957, 959 (D.C. Cir. 2016).

cut "may not provide sufficient water holding capacity." A508. FAA responded that "a more detailed analysis would not be performed until the design and permitting phases." A743. FAA cites local ordinances "requir[ing] no net loss of flood storage volume" as evidence that it will mitigate the loss of flood storage volume. FAA Br. 59. However, FAA does not show *how* up to 90,000 CY of cut would comply with this ordinance or what FAA plans to do if it does not. *See id.*

As the agency did in *Wyoming Outdoor Council*, FAA simply relies on the "the conclusory nature of the mitigation measures themselves, which mandate that [impacts be mitigated]." *See Wyoming Outdoor Council*, 351 F.Supp.2d at 1252. It is improper for agencies to rely solely on promises that they will, someday, somehow, comply with the law, particularly in the face of evidence that the proposal for doing so will not be effective. *See id.*; *see also O'Reilly*, 477 F.3d at 234 (holding that "[b]ecause the feasibility of the mitigation measures is not self-evident," the "cursory detail" provided in the EA as to "what those measures are and how they serve to reduce those impacts to a less-than-significant level" was insufficient). FAA cannot simply kick the can down the road to avoid doing the required analysis now.

### ii. Wetlands

To mitigate the impacts on wetlands, FAA proposes using some combination of permittee-responsible mitigation and participation in the In-Lieu Fee Program. A239-40. However, FAA did not specifically identify which strategies would be

used and where; instead, FAA repeated its refrain that these details would be dealt with later. A239-40, A729. But as experts pointed out, without these details, there is "no way to assess ... whether mitigation would be adequate or not." A538. Where the law requires "no net loss" of wetlands, FAA must demonstrate how it will comply with that requirement and cannot rely merely on the requirement itself as assurance that it will comply. *See Wyoming Outdoor Council*, 351 F.Supp.2d at 1252; *see also Am. Rivers v. FERC*, 895 F.3d 32, 54-55 (D.C. Cir. 2018).

In *Am. Rivers*, this Court found that FERC impermissibly "hang[ed] its hat" on a requirement to mitigate impacts without providing specifics (*e.g.*, what exactly mitigation will consist of and whether it will be effective). *Id.* at 53-55. Similarly, FAA now hangs its hat on the requirements for mitigation without specifying what mitigation strategies it will in fact use, where they will occur, and whether they will achieve "no net loss." *See* A234-41. While FAA attempts to distinguish *Am. Rivers* by suggesting that the impacts there were more severe; FAA Br. 55-56; the severity of impacts has no bearing on whether the agency must fairly evaluate them. *See Robertson*, 490 U.S. at 352.

In support of their argument that more details are not necessary for a fair evaluation, FAA and TNHAA cite *Sierra Club v. FERC,* 38 F.4th 220 (D.C. Cir. 2022). However, in *Sierra Club*, FERC described a specific course of action to mitigate erosion and runoff, indicated where exactly the mitigation measures would

be installed, provided empirical data supporting their effectiveness, and put forward a proposal for monitoring their efficacy. *Id.* at 232-33. Considering the details in FERC's analysis, the Court held that FERC need not provide a more detailed mitigation plan. *Id.* Here, by contrast, FAA does not even indicate which specific mitigation strategies it will use. *See* A234-40. This is not sufficient detail "to ensure that environmental consequences have been fairly evaluated." *See Robertson*, 490 U.S. at 352.

### iii. Stormwater Pollution

Finally, FAA's proposal to mitigate stormwater pollution suffers the same flaw. While FAA states that "stormwater controls" (*e.g.*, detention, infiltration, treatment) would be used to mitigate pollution, it failed to demonstrate which *specific* controls would be used (or even feasible), repeating its refrain that these details would be dealt with during the permitting process. A727-29, A747. For assurance that these stormwater controls would be effective, FAA cites the permitting requirements, again without showing how it will comply with those requirements. *See id.* This is simply not the hard look that NEPA requires, and it renders FAA's decision arbitrary and capricious. *See Am. Rivers*, 895 F.3d at 54-55; *Wyoming Outdoor Council*, 351 F.Supp.2d at 1252.

## V. Remand Without Vacatur is Not Warranted.

FAA argues that, should the Court agree with Petitioners, the Court should undertake the extraordinary remedy of remanding the matter to the agency for corrective action without vacatur. FAA Br. 62. The Court should decline this meritless request.

As an initial matter, "vacatur is the normal remedy." *Cboe Futures Exchange, LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023) (internal quotation marks omitted). "Remand without vacatur is the exception rather than the rule." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 512 (D.C. Cir. 2020).

The test is well settled.[9] In considering whether to undertake the unusual course of remand without vacatur, courts must "balance (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Am. Bankers Ass'n. v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (internal quotation marks omitted).

FAA's request for remand without vacatur should be denied because FAA has not demonstrated that (1) the deficiencies in its FEA were so insignificant that it will

---

[9] The *Seven County* decision does not change this analysis. While the Court identifies "[t]he bedrock principle of judicial review in NEPA cases" as deference, it does not alter the test for whether and where the extraordinary step of remanding without vacatur is appropriate. *Seven Cty.*, slip op. at 15.

be able to justify them on remand; or (2) the ordinary remedy of vacatur would be so disruptive as to justify departing from this normal course. In fact, FAA's brief contains no analysis of the *Am. Bankers* standard at all. FAA asserts only that Petitioners' arguments "largely boil down to the allegation that FAA did not adequately explain the basis for its conclusions ... [thus] FAA can easily provide a more robust explanation through an appropriate administrative process." FAA Br. 63. While Petitioners appreciate FAA's implicit acknowledgement that the FEA lacked an adequate explanation of its reasoning, Petitioners submit that the fundamental deficiencies cannot be cured by a simple rewrite. Even if FAA has demonstrated—which it has not—that the deficiencies in the FEA could be addressed by a remand, FAA has not demonstrated that disruptive consequences will flow from a vacatur. Thus, FAA's bare-bones request for remand without vacatur should be denied.

If the Court is nevertheless inclined to grant FAA's request for remand without vacatur, it should not remand without restriction. While this Court has acknowledged there may be "pragmatic benefits of remand without vacatur" in certain circumstances, which FAA has not shown exist here, an "open-ended remand without vacatur ... can create a new problem: The agency may have little or no incentive to fix the deficient rule." *Public Gas Ass'n v. U.S. Dep't of Energy,* 22 F.4th 1018, 1030 (D.C. Cir. 2022). In *Am. Public Gas Ass'n*, this Court remanded a

rule to the agency for reevaluation and required appropriate remedial action within 90 days, explaining that, if the agency failed to do so, the final rule would be vacated. *Id.* at 1031. Accordingly, if the Court is inclined to agree with FAA's argument, it should remand with an order mandating that FAA take the appropriate remedial action within a specified time frame, or else FAA's actions will be vacated.

## **CONCLUSION**

For these reasons, and for those discussed in Petitioners' opening brief, the FEA and FONSI/ROD should be vacated, and the matter remanded to FAA with direction to perform a full and adequate EIS.

Dated: July 23, 2025

Respectfully submitted,

*/s/ James T. Shearin*
   JAMES T. SHEARIN, Esq.
   DANA M. HRELIC, Esq.
   Pullman & Comley LLC
   90 State House Square
   Hartford, CT 06103-3702
   Tel: 860-424-4382
   jtshearin@pullcom.com
   dhrelic@pullcom.com

*Counsel for Petitioner Town of East Haven*

*/s/ Roger Reynolds*
ROGER REYNOLDS, Esq.
JESSICA ROBERTS, Esq.
DARA ILLOWSKY, Esq.
Save the Sound
127 Church Street, 2d Floor
New Haven, CT 06510
Tel 203-787-0646
rreynolds@savethesound.org
jroberts@savethesound.org
dillowsky@savethesound.org

*Counsel for Petitioner Save the Sound, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS</u>

This reply brief complies with the word limit of Fed. R. App. P. 35(a)(7)(B) and this Court's Order dated August 1, 2024, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains **7,466** words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman font, size 14.

Dated: July 23, 2025                              */s/ Dana M. Hrelic*

## <u>CERTIFICATE OF SERVICE</u>

I, Dana M. Hrelic, hereby certify that on this 23rd day of July, 2025, I electronically filed the Petitioners' Joint Brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system and that a true and correct copy of the foregoing Joint Brief was served by the appellate CM/ECF system on all participants in this matter pursuant to Circuit Rule 25.


Dated: July 23, 2025                    */s/ Dana M. Hrelic*