ORAL ARGUMENT NOT YET SCHEDULED

Nos. 24-1028 (lead), 24-1029 (consolidated)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SAVE THE SOUND, INC., et. al.,
*Petitioners*,

v.

FEDERAL AVIATION ADMINISTRATION, et. al.,
*Respondents*,

and

AVPORTS LLC and TWEED NEW HAVEN AIRPORT AUTHORITY,
*Intervenors*.

**FINAL BRIEF OF INTERVENOR AVPORTS LLC
IN SUPPORT OF RESPONDENTS**

KENNETH P. QUINN (Lead Counsel)
DAVID F. KNAPP
ALEXANDER E. MATTHEWS
CLYDE & CO US LLP
1775 Pennsylvania Ave, NW
Washington, DC 20006
(202) 468-1056
Ken.Quinn@clydeco.us
David.Knapp@clydeco.us
Alexander.Matthews@clydeco.us

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Intervenor Avports LLC ("Avports") respectfully submits this Certificate as to the Parties, Rulings, and Related Cases.

## A. Parties

All parties, intervenors, and amici are listed in the Brief of Petitioners and Brief for the Federal Respondents.

## B. Rulings Under Review

All references to the Order of the Federal Aviation Administration appear in the Joint Brief of Petitioners and the Brief for Federal Respondents.

## C. Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

# CERTIFICATE OF NECESSITY OF SEPARATE INTERVENOR BRIEF

Pursuant to Circuit Rule 28(d)(4), I hereby certify that separate Intervenor briefs are necessary in this case for all the reasons stated by the Intervenors in the July 1, 2024, Joint Proposed Briefing Format and Schedule filed by the parties.

/s/ *Kenneth P. Quinn*
KENNETH P. QUINN

*Counsel for Intervenor*
*Avports LLC*

**CORPORATE DISCLOSURE STATEMENT**

Avports LLC is controlled and majority owned by West Street Infrastructure Partners III ("WSIP III"), an infrastructure investment fund managed by Goldman Sachs Asset & Wealth Management.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF AUTHORITIES .................................................................................v

GLOSSARY OF ABBREVIATIONS ................................................................. vii

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................1

JURISDICTIONAL STATEMENT ....................................................................3

STATEMENT OF THE ISSUES...........................................................................3

PERTINENT STATUTES AND REGULATIONS.................................................3

STATEMENT OF THE CASE...............................................................................3

   A. Background and Operations at HVN......................................................3

   B. HVN's Current Facilities and the Need for Modernization ..........................4

   C. The Project ................................................................................5

   D. FAA Found No Significant Impact for the Project ..........................7

ARGUMENT .......................................................................................................8

   I. STANDARD OF REVIEW ................................................................8

   II. FAA DID NOT IMPROPERLY SEGMENT NEPA REVIEW OF THE PROJECT AND THE ASPIRATIONAL TAXIWAY RECONFIGURATION ...................................................................................................8

      A. The Taxiway Reconfiguration Is Not a Pending Proposal For a Major Federal Action That Could Have Been Segmented From NEPA Review of the Project.................................................................................9

      B. The Project Does Not Automatically Require Completion of the Taxiway Reconfiguration and Will Comply with FAA Airport Design Standards ..11

      C. The Project and Taxiway Reconfiguration Have Independent Utility and Will Not Overlap Temporally ...................................................14

   III. FAA REASONABLY CONCLUDED THAT THE PROJECT WILL REDUCE ENPLANEMENTS AND NOT INDUCE GROWTH..................15

      A. FAA's Forecasting Decisions Are Well-Supported and Due Deference....16

      B. Petitioners' Arguments to the Contrary Are Meritless ..............................19

   IV. VACATUR IS UNWARRANTED.................................................22

CONCLUSION....................................................................................................24

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993)................................................................22

*Barnes v. U.S. Dep't of Transp.,*
655 F.3d 1124 (9th Cir. 2011) ...............................................................20

*BRRAM, Inc. v. Fed. Aviation Admin.,*
721 F. App'x 173 (3d Cir. 2018) ............................................................18

*City of Bridgeton v. FAA,*
212 F.3d 448 (8th Cir. 2000) .................................................................22

*City of Los Angeles v. F.A.A.,*
138 F.3d 806 (9th Cir. 1998) ...........................................................15, 18

*City of Olmsted Falls, OH v. F.A.A.,*
292 F.3d 261 (D.C. Cir. 2002)......................................................15, 16, 20

*City of Port Isabel v. FERC,*
111 F.4th 1198 (D.C. Cir. 2024)........................................................14, 15

*Cnty. of Rockland, N.Y. v. F.A.A.,*
335 F. App'x 52 (D.C. Cir. 2009).............................................................19

*Coalition on Sensible Transp., Inc. v. Dole,*
826 F.2d 60 (D.C. Cir. 1987)..................................................................15

*Delaware Riverkeeper Network v. FERC,*
753 F.3d 1304 (D.C. Cir. 2014)............................................................9, 11

*Marin Audubon Society v. FAA,*
121 F.4th 902 (D.C. Cir. 2024)................................................................12

*Marin Audubon Society v. FAA,*
129 F.4th 869 (D.C. Cir. 2025)................................................................22

*Minisink Residents for Envtl. Pres. and Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014) ........................................................................11

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*,
222 F.3d 677 (9th Cir. 2000) ..............................................................18, 19, 21

*National Wildlife Federation v. FERC*,
912 F.2d 1471 (D.C. Cir. 1990) .................................................................... 9

*St. John's United Church of Christ v. F.A.A.*,
550 F.3d 1168 (D.C. Cir. 2008) ....................................................................16

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*,
685 F.3d 288 (3d Cir. 2012) ..........................................................................17

*Trenton Threatened Skies, Inc v. Fed. Aviation Admin.*,
90 F.4th 122 (3d Cir. 2024) ...........................................................................19

*Vill. of Bensenville v. Fed. Aviation Admin.*,
457 F.3d 52 (D.C. Cir. 2006) .........................................................................22

**Statutes and Other Authorities**

FAA Order 5050.4B ..............................................................................7, 10

90 Fed. Reg. 10,610 (Feb. 25, 2025) ...............................................................12

HVN, Tweed New Haven Airport, Destinations, available at:
https://flytweed.com/destinations/ ...............................................................4

Lutge, Katherine, (2025, February 6) *Breeze Airways to end flights
from Tweed New Haven to a Florida destination*, N.H. Register:
available at: https://www.ctinsider.com/business/article/ct-breeze-
airways-ends-flights-new-haven-florida-20146013.php. ................................21

Zaretsky, M., (2024, December 10), *Breeze Airways begins flights
from Tweed New Haven on Tuesday, joining Avelo*, N.H. Register:
available at: https://www.nhregister.com/news/article/breeze-
begins-flying-tweed-new-haven-regional-19969868.php. .................................4

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ALP | Airport Layout Plan |
| Authority | Tweed-New Haven Airport Authority |
| Avports | Avports LLC |
| EA | Environmental Assessment |
| FAA | Federal Aviation Administration |
| HVN | Tweed-New Haven Airport |
| MPU | Master Plan Update |
| NEPA | National Environmental Protection Act |

# INTRODUCTION AND SUMMARY OF ARGUMENT

This case is a challenge to the terminal and runway expansion at Tweed New Haven Airport ("HVN")—located, in what Petitioners concede, is "one of the most underserved air travel markets in the country." Petitioners Br. ("Pet. Br.") at 4. HVN was constructed in 1929 and needs modernization. The sole passenger terminal (a converted aircraft hangar) is outdated and undersized, causing cramped conditions and long queues for passengers. The only active runway is also too short, resulting in the use of smaller aircraft and a reduction in the number of passengers each flight can carry.

Recognizing the need to modernize HVN, the Federal Aviation Administration ("FAA"), following public meetings, review of over 900 comments, and based upon an administrative record here spanning over 14,000 pages, issued a Finding of No Significant Impact ("FONSI") and Record of Decision ("ROD") approving an extension of the existing runway and the construction of a new passenger terminal (the "Project"). The extended runway will allow for the use of larger aircraft carrying more passengers in and out of HVN and will be built within the existing airport boundaries, avoiding impacts to the surrounding environment and tidal wetlands. The new terminal will improve conditions for passengers and enhance aviation safety by minimizing the risk of runway incursions. Other improvements, including taxiway improvements, increased parking, and a new

1

aircraft access road are part of the Project.  These renovations are overdue.  When completed, the Project will go a long way towards making HVN the airport it was always meant to become: a modern, comfortable, medium-sized airport with efficient commercial service.

Petitioners do not contest these findings (nor could they) and instead offer tired and familiar arguments under the National Environmental Policy Act ("NEPA") against the FAA's ROD.  Respondent FAA's brief in support of the FONSI more than adequately responded to each of these arguments.  As Intervenor, Avports focuses on just two of those arguments: segmentation and forecasting.  Petitioners contend that FAA segmented the review of the Project under NEPA.  Not so.  The FAA did not segment the Project since the potential future taxiway reconfiguration is not a pending proposal for federal action requiring NEPA review, and both the extended runway and taxiway reconfiguration have independent utility.  Petitioners' challenge to FAA's forecasting decisions fares no better.  Using their agency expertise and actual data, which this Court and others have long held are entitled to particularized deference, FAA reasonably concluded that the Project would not induce growth in enplanements (departing passengers).

The FAA's FONSI is the product of a detailed record and a host of findings.  While Petitioners may disagree with these findings, they come nowhere close to meeting their burden under NEPA.  Without question, the FAA has taken the

requisite "hard look."  FAA correctly determined that "no significant environmental impacts" would exist from the Project.

This Court should deny the Petition for Review.

## JURISDICTIONAL STATEMENT

Avports adopts the jurisdictional statement filed by the FAA and Petitioners.

## STATEMENT OF THE ISSUES

Avports adopts FAA's Statement of the Issues.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Joint Brief of Petitioners and the Brief for Federal Respondents.

## STATEMENT OF THE CASE

### A. Background and Operations at HVN

Constructed nearly 100 years ago, HVN is a public airport in New Haven, Connecticut that "plays a vital role" in airline passenger travel in southern Connecticut—"one of the most underserved air travel markets in the country."  A64; Pet. Br. at 4.  Over 2.2 million people reside within 30 miles of HVN.  A68.  A "thriving bioscience, technology, and innovation hub" exists in HVN's catchment area and the surrounding neighborhoods of New Haven.  *Id.*  HVN offers businesses and leisure travelers convenient access to major urban areas while maintaining the "multitude of advantages" of a regional airport.  A64.

HVN is owned by the City of New Haven and occupies 437 acres in New Haven and nearby East Haven in a populated area alongside Long Island Sound. A64, 170. The Tweed New Haven Airport Authority ("Authority") is the sponsor of HVN, but it has delegated the responsibility for operation and management of HVN to Avports. A64; *see also* Avports Motion to Intervene at 2-5. Avports provides airport services at HVN seven days a week, twenty-four hours a day. *See id.*; Declaration of Jorge Roberts at ¶ 4, Avports Motion to Intervene. HVN is home to two commercial airlines, Avelo Airlines and new entrant Breeze Airways. A68-69; HVN, Tweed New Haven Airport, Destinations, available at: https://flytweed.com/destinations/. Avelo began service in HVN in November 2021 after American Airlines left the market. A68. Breeze began service to HVN in December 2024.[1]

## B. HVN's Current Facilities and the Need for Modernization

HVN has one active runway, Runway 2-20, and a terminal building (the "West Terminal") that was constructed as an aircraft hangar in 1930. A64, 927. The current length of Runway 2-20 (5,600 feet long) places weight limits (reductions in passengers, fuel, and baggage) on larger aircraft and a reduction in the number of

---

[1]Zaretsky, M., (2024, December 10), Breeze Airways begins flights from Tweed New Haven on Tuesday, joining Avelo, *New Haven Register*: https://www.nhregister.com/news/article/breeze-begins-flying-tweed-new-haven-regional-19969868.php.

passengers those aircraft can carry.  A80, 709.  Avelo serves HVN with a mix of Boeing 737-700 aircraft (which seat 149 passengers) and Boeing 737-800 aircraft (which seat 189 passengers).  A80, 85, 99-100, 104, 709.  Because of the existing runway length and weight limits, Avelo's 189-seat 737-800 is limited to 162 passengers per flight.  *Id.*  This is a *14 percent* reduction in capacity.  Avelo and other carriers must fly more flights to serve the same volume of passengers.  *Id.*

The existing West Terminal at HVN is outdated and undersized.  A80-81.  It was converted from an aircraft hangar and was never intended to be a passenger terminal.  A81.  The West Terminal is cramped and the layout from check-in to the gate is confusing and inefficient.  *Id.*  Passengers enter a modular building to check-in, then carry luggage back outside, before re-entering the terminal to drop off luggage for security and proceed to the gate.  A80-81.  At its current location, the West Terminal cannot be expanded due to flood risk and space limitations.  A80-82. The West Terminal is a source of "chronic and severe passenger terminal area congestion."  *Id.*

**C. The Project**

The Project provides new infrastructure and support to meet HVN's commercial and general aviation needs.  A25-26.  The Project has two major goals: a runway extension and construction of a new terminal building.  A25-26, 72-73. Runway 2-20 will be extended by 639 feet at the Runway 2 end (southern end) and

336 feet at the Runway 20 end (northern end), resulting in an overall runway length of 6,575 feet. A72-73. This extended runway can safely accommodate larger aircraft (*i.e.*, Avelo's 189-seat capacity 737-800) without the current weight restrictions. A80. Despite Petitioners' insistence that the extended runway will "significantly" and "negatively" impact the environment, Pet. Br. at 7, 24, 34, the extended runway is designed to *prevent* such harm. A79-80, 103-104. While a "longer runway is justified," the runway extension contemplated by the Project is within the existing airport boundaries and "minimize[s] environmental impacts" to tidal wetlands surrounding HVN. A27-28, 72-73, 80, 85, 103-104, 261-62.

The same is true of the construction of the new terminal building on the east side of HVN ("East Terminal"). The East Terminal will replace the aging and constrained West Terminal and improve passenger conditions. A27, A81-86. Development of the West Terminal was considered and rejected because of the "severe constrain[ts]" imposed by Runway 2-20, residential land use and Tuttle Brook, and the adjacent tidal wetlands on the west side. A90, 108, 1123-24. The East Terminal also offers a significant safety enhancement—minimizing runway incursions. Aircraft taking off or landing at Runway 2-20 need to cross active runways. A90. The East Terminal will improve efficiency and safety by eliminating these crossings. A90, 108, 110, 1123-1124.

Apart from the Project, Avports and the Authority have examined and hope to implement other improvements over the next 20 years. *See* HVN Airport Layout Plan ("ALP"). Ideally, taxiways A and B could be extended to the ends of the extended runway to create a single full-length parallel taxiway (among other improvements, the "Taxiway Reconfiguration"). A1111-1113. Yet, extending these taxiways would impact tidal wetlands and Morris Creek and require the acquisition of adjacent private property. A1111-1113, 1129-1137.[2] The resulting full-length taxiway would "improve[] flexibility" and operations by allowing aircraft at HVN to "maintain clear of the runway environment" and "minimize runway occupancy time." A1111. The Taxiway Reconfiguration has not received "unconditional" approval from the FAA and therefore does not require NEPA review. *See* FAA Order 5050.4B, ¶ 202.c(1)(a)-(b); A762.

**D. FAA Found No Significant Impact for the Project**

Pursuant to NEPA, the FAA conducted an environmental assessment ("EA") and determined that the Project would not impose a significant environmental impact requiring an EIS. A20-44, 64, 670-748. As to segmentation, the FAA determined that the Taxiway Reconfiguration is not a pending proposal for major federal action

---

[2] Petitioners ironically criticize FAA for not incorporating the potential full-length taxiway "[in] compliance with FAA Standards" in its environmental assessment. Pet. Br. at 4, 15-16. But Petitioners would be first in line to object if the Taxiway Reconfiguration was included with the Project because it would pose far more environmental issues with impacts to tidal wetlands.

and so could not have been segmented from the Project. A762. The FAA also responded to comments and determined that the Project and the Taxiway Reconfiguration were not connected within the meaning of NEPA because each had independent utility. A740, 749, 751, 754. As to enplanements, FAA applied its agency expertise and found that the Project was likely to reduce the number of flights needed to meet forecasted enplanements (passenger demand) through 2031. A79-80, 104, 684. FAA emphasized the importance of the runway extension in allowing larger Boeing 737-800 aircraft to operate without weight limits or reductions in passengers. *Id.* After considering the environmental impacts between the Project and the no-action alternative, the FAA reasonably concluded that there would be "no significant environmental impacts" and the runway extension and new terminal "would not jeopardize the safe and efficient operations" at HVN. A35.

## ARGUMENT

### I. STANDARD OF REVIEW

Pursuant to Circuit Rule 28(i), Avports adopts by reference and incorporates here the Standard of Review as set forth in FAA's brief.

### II. FAA DID NOT IMPROPERLY SEGMENT NEPA REVIEW OF THE PROJECT AND THE ASPIRATIONAL TAXIWAY RECONFIGURATION

Petitioners argue that the Taxiway Reconfiguration is "an interdependent element" of the Project and that FAA improperly segmented NEPA review of the

8

Project and the Taxiway Reconfiguration. *See* Pet. Br. 19-27. Petitioners' arguments lack merit because the Taxiway Reconfiguration has not received unconditional approval from the FAA and is not a pending proposal for federal action requiring NEPA review. Further, the Project and Taxiway Reconfiguration are not connected actions within the meaning of NEPA because the Project will comply with FAA airport design standards and does not automatically require completion of the Taxiway Reconfiguration. Finally, the Project and Taxiway Reconfiguration have independent utility and will not overlap temporally. At bottom, Petitioners' arguments ignore the record and rest on a fundamental misunderstanding of airport planning and airline economics.

### A. The Taxiway Reconfiguration Is Not a Pending Proposal For a Major Federal Action That Could Have Been Segmented From NEPA Review of the Project

Under FAA NEPA guidance, NEPA review is required when an applicant seeks "FAA's approval of a major Federal action." *See* A756-57. As Petitioners correctly noted (Pet. Br. at 19), it is well-settled that "[a]n agency impermissibly 'segments' NEPA review when it divides connected…*federal actions* into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (emphasis added). Improper segmentation under NEPA does not occur when a purported connected action is not the subject of a pending

9

proposal for a major federal action requiring NEPA review.  *See National Wildlife Federation v. FERC*, 912 F.2d 1471, 1477-78 (D.C. Cir. 1990).

The FAA had neither reviewed nor approved any proposal for a major federal action to construct the Taxiway Reconfiguration.  The FAA has only granted an initial, "conditional" approval of the ALP that signifies that the recommended future facilities, including the Taxiway Reconfiguration, "are safe and efficient for airport operations" but the FAA "has not yet completed its review of the environmental impacts the features on the ALP would cause … because the features are not yet needed and are not ripe for decision." *See* FAA Order 5050.4B, ¶ 202.c(1)(a)-(b) A762.  As sponsor, the Authority may begin building the facilities shown on its ALP "*only after* [FAA] completes its environmental analysis of those facilities and … issues an unconditional approval of the ALP depicting those facilities."  *Id.*

Petitioners repeatedly cite to HVN's 2021 Master Plan Update ("MPU"), but the MPU is not the proposed federal action under review.  As noted in FAA NEPA guidance, during the airport master planning process, "Airport sponsors and their planners consider various ways of solving an airport's problems *before FAA begins its formal NEPA process*."  A764 (emphasis added).  The operative facts here are that the Authority has not requested unconditional approval of the [non-Project components of the] ALP, nor have they indicated an intention to do so within at least the next five years.  *See* A251, 1145.  The uncertain and extended temporal

10

connection between the Project and Taxiway Reconfiguration is very distinguishable from *Del. Riverkeeper Network.* There, improper segmentation of four related projects were either under construction or concurrently "pending before the [agency] for environmental review and approval." *Del. Riverkeeper Network*, 753 F.3d at at 1314.

Here, no "self-evident interrelatedness of the projects [and] temporal overlap" exists. *Id.* Without a pending request for federal action, Petitioners' arguments that the Taxiway Reconfiguration is "an interdependent element" of the Project (Pet. Br. at 21) and that FAA "improperly segmented NEPA review" (Pet. Br. at 20) lack all merit. *See* FAA Br. at 24-27; *National Wildlife*, 912 F.2d at 1477-78; *see also Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 113 n.11 (D.C. Cir. 2014) (no improper segmentation when the applicant "had not yet applied" for federal approval of a subsequent project and construction was not underway on either project).

## B. The Project Does Not Automatically Require Completion of the Taxiway Reconfiguration and Will Comply with FAA Airport Design Standards

Petitioners argue that FAA improperly segmented the Project and Taxiway Reconfiguration because the runway extension would automatically trigger the need for a full-length parallel taxiway to "comply" with FAA airport design standards and to maintain safety. *See* Pet. Br. at 4, 15, 21-27, 29-31, 33. FAA would not approve

a project that is noncompliant or poses a risk to safety—Petitioners' assertions again show a misunderstanding of the FAA airport design and approval processes.

FAA standards and recommendations for airport design are contained in FAA Advisory Circular 150/5300-13B (A778-883, "Design Standards") and do not support Petitioners' arguments that the runway extension requires construction of a full-length parallel taxiway. The operative and "advisory" FAA Design Standards recommend that airport sponsors "[p]rovide a full-length parallel taxiway, or equivalent taxi path … for [instrument flight procedures] with visibility minimums below one mile (1.6 km)." A860, 882. As noted in their brief, (FAA Br. at 31-32), FAA will need to assess the required visibility minimums for the extended runway and consider other factors. The applicable Design Standards do not require construction of a full-length parallel taxiway when a runway is extended. The Project and the Taxiway Reconfiguration are not connected actions under NEPA.[3]

Petitioners misunderstand FAA's Design Standards and rely on sweeping assertions unsupported by the record. Petitioners acknowledge that the Design

---

[3] Petitioners rely on Council on Environmental Quality ("CEQ") regulations to support their "connected actions" argument. Pet. Br. at 19, 20, 46. In *Marin Audubon Society v. FAA*, 121 F.4th 902, 908 (D.C. Cir. 2024), this Court held that CEQ regulations are *ultra vires*. Likewise, CEQ recently issued an interim final rule to rescind its NEPA regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025). Nevertheless, as the FAA correctly observed, these developments have no impact here since FAA completed its NEPA analysis of the Project *before* they occurred, and in any event, FAA's analysis fully complied with NEPA. *See* FAA Br. at 5.

Standards are only mandatory for projects funded under the Airport Improvement Program (AIP). Pet. Br. at 15. Yet, Petitioners fail to explain that compliance with the Design Standards is only mandatory once a sponsor accepts AIP funding for a project, which has not occurred for either the Project or the Taxiway Reconfiguration.

In addition, the FAA has authority to issue a modification to standards given that the FAA's Design Standards acknowledge "site-specific conditions may make it impractical to meet all FAA design standards at an airport." A784. Absent AIP funding, the Design Standards "[do] not constitute a regulation, [are] not mandatory, and [are] not legally binding in [their] own right." A778.

Petitioners assert that "the FAA approved a Proposed Action that is not compliant with current FAA Standards and contains no FAA modification to standards approval…" Pet. Br. at 23. Both of Petitioners' claims have no basis in the record. As FAA noted in response to public comments, "[t]he proposed runway extension would comply with FAA design standards and is functional as presented in the EA. The referenced taxiway extension is not required for aircraft to utilize the full length of the runway. As the commenter describes, aircraft can back taxi and turn around, as is done under existing conditions." A740.

Petitioners cite to an excerpt from the AIP Handbook (Pet. Br. at 23), which demonstrates the reason no FAA modification to standards exists—any modification

to standards, if needed, would only be pursued and approved in connection with an application for and acceptance of AIP funding. What Petitioners convey as an urgent state of non-compliance is, in fact, a misunderstanding of the Design Standards and AIP funding processes. As the runway extension will comply with FAA Design Standards and does not require completion of the Taxiway Reconfiguration, the Project and Taxiway Reconfiguration are not connected actions under NEPA.

## C. The Project and Taxiway Reconfiguration Have Independent Utility and Will Not Overlap Temporally

Petitioners' segmentation claim further relies on an assertion that the Project and Taxiway Reconfiguration do not have independent utility and are connected under NEPA and FAA guidance (*See* A766)—the record indicates otherwise. Two actions are not connected when they have "substantial independent utility" and will not "overlap temporally." *City of Port Isabel v. FERC*, 111 F.4th 1198, 1211 (D.C. Cir. 2024) (cleaned up). The Project and Taxiway Reconfiguration are not connected actions under NEPA.

The independent utility of the Project is discussed at length in the record, including improved passenger service and safer and more efficient operations, among other benefits. *See, e.g.*, A90, 108, 110, 1117, 1123-1124. The Taxiway Reconfiguration would address preexisting, nonstandard runway-taxiway separation and taxiway geometries. A861, 1068-1071, 1099, 1158. The utility in fixing these longstanding taxiway issues is independent of the runway extension. While the

14

extension of Taxiways A and B contemplated in the ALP would not be useful if the runway is not extended, the test for whether two projects have independent utility is whether "one project will serve a significant purpose even if a second related project is not built." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987).

As discussed, the Authority has not yet proposed a federal action to construct the Taxiway Reconfiguration, so it is not "under construction or pending before the [agency] for environmental review and approval at the same time" as the Project and will not "overlap temporally." *City of Port Isabel*, 111 F.4th at 1213, 1211. Under the MPU, the Authority does not plan to pursue the extension of Taxiways A and B for 11-20 years under its long-term plan.

With independent utility and no temporal overlap, the Project and Taxiway Reconfiguration are not connected within the meaning of NEPA. For the reasons discussed above, Petitioners' segmentation claim is unsupported by the record.

## III. FAA REASONABLY CONCLUDED THAT THE PROJECT WILL REDUCE ENPLANEMENTS AND NOT INDUCE GROWTH

The FAA's "expertise in forecasting air transportation demand and airfield capacity are areas where courts accord significant deference." *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 272 (D.C. Cir. 2002). Where FAA is forecasting capacity and "predicting demand at an airport, the agency's conclusion is due 'more deference.'" *City of Los Angeles v. F.A.A.*, 138 F.3d 806, 807, n. 2 (9th Cir. 1998).

And for good reason. The FAA is "charged" with the responsibility of "determining demand and capacity issues for the *National Airspace System*." *City of Olmsted Falls*, 292 F.3d at 272 (emphasis added). The agency has experts with decades of experience and expertise to carry out this mission. *See*, *e.g.*, Federal Aviation Administration, *FY 2024-2044 FAA Aerospace Forecast*, available at: faa-aerospace-forecast-fy-2024-2044. That is why FAA's forecasting and enplanement decisions are entitled to "even more deference" than courts give to the "highly deferential arbitrary and capricious standard." *St. John's United Church of Christ v. F.A.A.*, 550 F.3d 1168, 1172 (D.C. Cir. 2008).

Applying their expertise, FAA reasonably concluded that the Project will reduce the number of flights needed to meet forecasted passenger demand (enplanements) at HVN. That conclusion is supported by the record and should be upheld by this Court.

## A. FAA's Forecasting Decisions Are Well-Supported and Due Deference

To forecast the Project, FAA relied on the best indicator of passenger demand at HVN—the "expected level of service to be provided by the airport's sole carrier, Avelo." A389-390. From there, FAA used Avelo's flight schedules to arrive at enplanement estimates for 2026 and 2031. A79, 83, 718, 720. Those estimates found that the Project would reduce the number of flights needed to meet forecasted passenger demand through 2031. A79-80, 104.

The reason why is simple. Using average daily departures from Avelo's schedules, FAA found that enplanements could be accommodated by larger Boeing 737-800 aircraft, meaning that each flight could carry more passengers (189 passengers as opposed to 162 passengers under the existing weight limits). A79-80, 104, 684. The FAA's "upgauging" assumptions for this Project were both reasonable and adequately disclosed. A79-80, 104, 684; *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 298 (3d Cir. 2012) (FAA's upgauging assumptions regarding passenger demand at Philadelphia International Airport were reasonable and adequately disclosed under NEPA).

Petitioners complain that FAA provided "no support…for the forecasted enplanements." Pet. Br. at 40. But FAA's methodology makes perfect sense. Start with 2022, Avelo's first year of service at HVN, where enplanements increased from 29,372 to 351,606. A79, 389. Using Avelo's forecasted daily departures, combined with likely aircraft mix and load factors (percentage of passengers to available seats), FAA forecasted that the annual enplanements at HVN would continue to increase from 351,606 in 2022 to approximately *1.2 million* in 2031. A79-80, 83.

The 1.2 million enplanement figure is well-founded. Based on Avelo's flight schedules at HVN, FAA forecasted enplanements and scheduled departures to grow from an average of 12 daily departures to 22 daily departures. A79. Take 22 average daily departures in 2031, and assume each departure is a 189-seat Boeing 737-800

aircraft operating at "approximately 85 percent" capacity, and that will produce approximately 1.2 million enplanements for 2031.[4] A83, 718-720.

While FAA's forecasts assumed an extended runway, A390, FAA reasonably concluded that forecasted demand for HVN would be met with or without the Project either by Avelo or by a mix of Avelo and another airline. FAA Br. at 43-45; A704-705, 715, 718. FAA found that the existing runway and terminal could accommodate the predicted 1.2 million enplanements (albeit with very poor service). A680, 710, 715, 721. This conclusion is based on FAA's expertise and "accumulated experience nationwide" about what effects demand. *City of Los Angeles*, 138 F.3d 806, 807. That experience teaches a simple truth: "[I]f you don't build it, they will come anyway." *Id.* at 807.

FAA's forecasting decisions are supported by the record and entitled to deference. Forecasting passenger demand is an inexact science. *City of Los Angeles*, 138 F.3d at 807 n. 2 ("predicting demand for the airport in 15 years is a [] prognostication"); *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222

---

[4] Petitioners fault FAA for its purported failure to rely on "reliable data and resources" in its forecasting. Pet. Br. at 41-42. But it is difficult to imagine a more "reliable" predictor of future passenger demand and airfield capacity at HVN than data from Avelo, the sole airline who "has proven" the "underlying market" at HVN. A389-390; *see also BRRAM, Inc. v. Fed. Aviation Admin.*, 721 F. App'x 173, 176 (3d Cir. 2018) (forecasting of air traffic and noise impacts based on "all foreseeable air traffic by Allegiant and other airlines operating" at Trenton-Mercer Airport).

F.3d 677, 680 (9th Cir. 2000) ("airport demand projections are little more than guesses[.]").  Still, when making such decisions, FAA is entitled to a presumption of regularity based on their agency expertise.  This presumption "ensures that [courts] give proper deference and respect to the official actions" of the agency. *Trenton Threatened Skies, Inc v. Fed. Aviation Admin.*, 90 F.4th 122, 131 (3d Cir. 2024).

FAA exercised that expertise here and reasonably concluded that foreseeable passenger demand through 2031 would be the same with or without the Project. Petitioners may disagree with FAA's conclusions.  But FAA's decisions are entitled to "substantial deference" and pointing to "statements … that show nothing more than the possibility of another reasonable view" is "not enough to discharge their burden to show the FAA was arbitrary."  *Cnty. of Rockland, N.Y. v. F.A.A.*, 335 F. App'x 52, 54 (D.C. Cir. 2009).

## B.  Petitioners' Arguments to the Contrary Are Meritless

Petitioners make a series of arguments challenging FAA's forecasting and enplanement decisions.  All lack merit.

First, Petitioners cite out-of-context statements about the alleged "growth-inducing effects" of the Project.  Pet. Br. at 41-51 (citing 2021 MPU and statements of interest from Allegiant in 2020).  As they see it, "extending a runway, like the

addition of a runway, is a 'ground capacity expansion project.'" *Id.* at 48 (citations omitted). That is wrong.

The MPU *preceded* Avelo's arrival in 2021 and was based on outdated forecasting data from 2018. A388, 720, 978. As such, FAA reasonably concluded that the MPU forecasts were "invalid." A742, 388. The statements of interest from Allegiant in 2020 were just that—non-binding statements. Pet. Br. at 44-45. As FAA explained, when the EA for the Project was finalized in 2023, there were "no firm proposals" from Allegiant or any other carriers to service HVN. A68, 718.

In support of its theory, Petitioners rely on *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011). But *Barnes* is inapposite. That case was a challenge to an FAA order concerning the construction of a *new runway* at Hillsboro Airport in Portland, Oregon. *Id.* at 1126-28. The Ninth Circuit held that a new runway—unlike the proposed extension of an *existing runway* at HVN—has the "unique potential to spur demand." *Id.* at 1138. An existing runway and a new runway are not similarly situated and have different effects on demand.

This Court's decision in *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261 (D.C. Cir. 2002), shows why. There, the FAA approved a runway improvement project at Cleveland Hopkins International Airport. *Id.* at 265-67. This Court made clear that, as here, the improvements were to an "*existing* runway, not the addition of a runway, and thus in the FAA's judgment they will not induce demand." *Id.* at

272. The Court also affirmed FAA's judgment that the airport and existing runway "can accommodate the predicted demand" even without the proposed improvements. *Id.*; *see also Nat'l Parks & Conservation*, 222 F.3d at 680 (affirming FAA's conclusion that passenger demand will increase "even if the new runway is not extended").

Second, Petitioners claim that "if additional airlines are attracted to HVN, enplanements will necessarily increase." Pet. Br. at 44-48. This misunderstands basic airline economics. As the FAA found, the Project will *reduce* the number of flights needed to meet passenger demand at HVN through 2031. A79-80, 104. That is because the runway extension at HVN will allow for increased use of Avelo's Boeing 737-800 aircraft (which seats up to 189 passengers) rather than the Boeing 737-700 aircraft. *Id.*

In other words, less flights to serve the same volume of passengers. Also, more airlines servicing HVN does not mean enplanements will "necessarily increase." In fact, Breeze just canceled its route from HVN to Sarasota and reduced service for its routes from HVN to Fort Myers and Palm Beach.[5]

---

[5] Katherine Lutge, *Breeze Airways to end flights from Tweed New Haven to a Florida destination*, N.H. Register, February 6, 2025, available at: https://www.ctinsider.com/business/article/ct-breeze-airways-ends-flights-new-haven-florida-20146013.php.

In short, FAA more than satisfied their burden under NEPA. The FONSI is supported by tens of thousands of pages of "findings, analysis, and correspondence with interested parties and government agencies." *City of Bridgeton v. FAA*, 212 F.3d 448, 459 (8th Cir. 2000). And Petitioners' "litany of arbitrary and capricious challenges" is "thoroughly rebutted by the FAA." *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 72 (D.C. Cir. 2006).

## IV.  VACATUR IS UNWARRANTED

As explained above, and as set forth in FAA and the Authority's briefs, the Court should deny the Petition. Nevertheless, if the Court decides to grant any part of the Petition, the Court should remand without vacatur. Vacatur is a remedy with "harsh consequences." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 129 F.4th 869, 871 (D.C. Cir. 2025). In deciding whether to vacate, courts consider the "seriousness of the order's deficiencies…and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

As FAA clarified, the agency can address any error here through the administration process. FAA Br. at 62-63. But vacatur and remand here would have harsh consequences, including the unwinding of the Project and the imposition of significant financial costs to all parties, including Avports. Avports bears most of the financial burden of the development and operation of HVN. *See* Avports Motion

22

to Intervene at 10-11.  The Projects at issue, namely the completion of the Runway 02-20 expansion and the construction of the new East Terminal, are the "responsibility of Avports to execute and complete."  *See* Avports Motion to Intervene at 8-9; Declaration of Jorge Roberts at ¶ 4.  Unwinding these Projects would be costly to Avports and disruptive for HVN, the region, and the traveling public.

As explained by the Authority, vacatur would also require the Authority to stop the permitting and design process and await the outcome of the remand.  Authority Br. at 25-26.  The Authority has prepared its Connecticut Department of Energy and Environmental Protection ("CTDEEP") Inland Wetland Permit application and expects to file the application by April 25. Delaying this process, along with the needed improvements at HVN, would jeopardize these substantial financial and regulatory investments as well as the benefits to the traveling public.  As such, vacatur in these circumstances would be unwarranted.

**CONCLUSION**

For the foregoing reasons, the Petition for Review should be dismissed.

Date: July 23, 2025

Respectfully submitted,

CLYDE & CO US LLP

/s/ Kenneth P. Quinn

*Counsel for Intervenor*
*Avports LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in this Court's August 1, 2024 Order because, excluding words allowed to be excluded under Federal Rules of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), this brief contains 5,222 words, and this brief and Tweed-New Haven Airport Authority's brief do not exceed 10,500 words in the aggregate.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman font, size 14.

/s/ Kenneth P. Quinn
Kenneth P. Quinn

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2025, a copy of the foregoing document was filed with the Clerk of the Court by using the CM/ECF Court system, which will send notification of such filing to all counsel of record.

/s/ Kenneth P. Quinn
Kenneth P. Quinn
